```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                          - - -
      SHIRE DEVELOPMENT INC., SHIRE       :    CIVIL ACTION
 4    PHARMACEUTICAL DEVELOPMENT, INC.,   :
      COSMO TECHNOLOGIES LIMITED, and     :
 5    GIULIANI INTERNATIONAL LIMITED,     :
                                          :
 6              Plaintiffs,               :
      v                                   :
 7                                        :
      CADILA HEALTHCARE LIMITED (d/b/a    :
 8    ZYDUS CADIL) and ZYDUS             :
      PHARMACEUTICALS (USA) INC.,         :
 9                                        :    NO. 10-581-KAJ
                Defendants.        - - -
10
                           Wilmington, Delaware
11                         Monday, March 28, 2016
                           Bench Trial - Volume A
12
                           - - -
13
      BEFORE:       HONORABLE KENT A. JORDAN, U.S.C.C.J.
14
       APPEARANCES:               - - -
15
                    RICHARDS, LAYTON & FINGER, P.A.
16                  BY:  FREDERICK L. COTTRELL, III, ESQ.,
                         KELLY E. FARNAN, ESQ., and
17                       JASON J. RAWNSLEY, ESQ.

18                     -and-

19                  FROMMER LAWRENCE & HAUG, LLP
                    BY:  EDGAR H. HAUG, ESQ.,
20                       ANGUS CHEN, ESQ.,
                         JASON A. LIEF, ESQ.,
21                       DAVID A. ZWALLY, ESQ.
                         ANDREW WASSON, and
22                       ELIZABETH MURPHY, ESQ.
                         (New York, New York)
23
                           Counsel on behalf of Plaintiffs
24

25    Valerie Gunning               Brian P. Gaffigan
      Official Court Reporter       Official Court Reporter
```

1    APPEARANCES:   (Continued)

2

3                    PHILLIPS, GOLDMAN, McLAUGHLIN & HALL, P.A.
                     BY:   JOHN C. PHILLIPS, JR., ESQ., and
                           DAVID A. BILSON, ESQ.

4

5                          -and-

6                    LOCKE LORD, LLP
                     BY:  MICHAEL J. GAERTNER, ESQ.,
                           KEITH D. PARR, P.C.,

7                          JAMES T. PETERKA, ESQ.,
                           DAVID B. ABRAMOWITZ, ESQ.,

8                          ANDY J. MILLER, ESQ.,
                           WASIM K. BLEIBEL, ESQ., and

9                          TIMOTHY F. PETERSON, ESQ.
                           (Chicago, Illinois)

10

11                         -and-

12                   LOCKE LORD, LLP
                     BY:  ANDREA L. WAYDA, ESQ.
                           (New York, New York)

13

14                              Counsel on behalf of Defendants

15

16

17

18

19

20

21

22                              - oOo -

23                          P R O C E E D I N G S

24                   (REPORTER'S NOTE:  The following bench trial

25    proceedings were held in open court, beginning at 9:02 a.m.)

1                THE COURT:  Good morning.  Please be seated.

2                (The attorneys respond, "Good morning, Your

3  Honor.")

4                THE COURT:  This is the time set for trial in

5  this matter, Shire versus Cadila Healthcare.  And we have no

6  jury in the box, a bench trial, so we can dispense with some

7  formalities.  Why don't we go ahead, though, and start with

8  introductions.  Shire.

9                MS. FARNAN:  Good morning, Your Honor.  Kelly

10  Farnan from Richards Layton & Finger on behalf of Shire.  I

11  have with me my co-counsel from Frommer Lawrence & Haug.  Ed

12  Haug.

13                MR. HAUG:  Good morning, Your Honor.

14                THE COURT:  Good morning.

15                MS. FARNAN:  Jason Lief.

16                MR. LIEF:  Good morning.

17                THE COURT:  Good morning.

18                MS. FARNAN:  Angus Chen.

19                MR. CHEN:  Good morning, Your Honor.

20                MS. FARNAN:  And Liz Murphy.

21                MS. MURPHY:  Good morning, Your Honor.

22                MS. FARNAN:  And also Jason Rawnsley, you might

23  see him throughout the week.

24                MR. RAWNSLEY:  Good morning, Your Honor.

25                THE COURT:  Good morning.

1            MS. FARNAN:  And I think Mr. Haug will handle

2    the opening and may introduce some other folks.

3            THE COURT:  And your presence indicates that the

4    issue we discussed at the pretrial conference has been

5    resolved to the satisfaction of everyone; am I right?

6            MR. PHILLIPS:  It has, Your Honor.

7            THE COURT:  All right.  Thank you, Mr. Philips.

8    Thank you, Ms. Farnan.

9            MS. FARNAN:  Thank you, Your Honor.

10           MR. PHILLIPS:  Your Honor, Jack Phillips on

11   behalf of the defendants.  With me in the court is Mike

12   Gaertner.

13           MR. GAERTNER:  Good morning, Your Honor.

14           MR. PHILLIPS:  James Peterka.

15           MR. PETERKA:  Good morning, Your Honor.

16           MR. PHILLIPS:  Andy Miller.

17           MR. MILLER:  Good morning, Your Honor.

18           And Andrea Wayda from Locke Lord.

19           MS. WAYDA:  Good morning, Your Honor.

20           THE COURT:  All right.  Good morning.

21           Thank you, Mr. Phillips.

22           All right.  Without further ado, why don't we

23   begin with openings.

24           MR. GAERTNER:  Your Honor, may I address an

25   issue, just one housekeeping matter that deals with the

1    order of witnesses?

2            THE COURT:  All right, Mr. Gaertner.

3            MR. GAERTNER:  Your Honor, this issue came up

4    briefly during the pretrial conference, and I want to make

5    sure we have your guidance on it because we had a little bit

6    of dispute with Shire leading up to the trial.

7            There are a number of what we would call testing

8    declarants, that is, some labs and individuals that did

9    testing, didn't render any opinions.  They did the test,

10   passed the test off to an expert who is going to render an

11   opinion on this.

12           We thought that we were keeping open the option

13   not to call those as live witnesses, the declarants, because

14   of the time constraints and, in fact, included on our

15   exhibit list their declarations so our testifying experts

16   could rely on those declarations when they testify.  And we

17   ran -- got a little bit crosswise with the plaintiffs as we

18   headed off to the trial date, and it seems to me, and maybe

19   Mr. Haug can clarify for me, but it seems to me they're

20   going to object to our experts relying on the declarations

21   because the declarants are not present to sponsor those

22   declarations even though there is no objections to them.

23           I just want to make sure that in your view, Your

24   Honor, if there is no objection to the declaration, our

25   experts can rely on the testing declarants' work.

1              THE COURT:  I will hear from Mr. Haug.

2              MR. HAUG:  Thank you, Your Honor.  The issue

3    really is we did not reach agreement on not having experts

4    testify about their testing.  The reason it came up at all,

5    the thought was maybe that was a way to save time, but it's

6    not a lot of time in opening in these, but we didn't reach

7    agreement.  And so if they want to put in testing evidence,

8    and put it in the record, I think they have to have an

9    appropriate sponsoring witness.

10             THE COURT:  Yes.

11             MR. HAUG:  That's all.

12             THE COURT:  Okay.  Well, Mr. Gaertner, I'll give

13   you the last word.

14             MR. GAERTNER:  They didn't object to the

15   declarations that are on the exhibit list.

16             THE COURT:  Well, I'll not sure why you think

17   their failure to object to the declarations means they're

18   waiving their objection under the Federal Rules of Evidence.

19   They may say, fine, put the declaration in, but I am not

20   certain that that means we have agreed to stipulate that the

21   declaration will substitute for the witness.  You either

22   agree or you don't agree, right?  And if you don't agree,

23   then we're bound by the Rules of Evidence.  I can't -- yes,

24   that's where I stand.

25             MR. GAERTNER:  And that's fine.  We're prepared

1  to present them.  We just wanted to make sure we did the

2  right thing.  Thank you, Your Honor.

3          THE COURT:  Okay.  Mr. Haug.

4          MR. HAUG:  May it please the Court, this is a

5  one patent case, Your Honor.  And I'd like to, just very

6  briefly, the first slide is just Shire.  Shire is a

7  biopharmaceutical company that is in a lot of different

8  areas and, in particular -- if we can have the next slide,

9  Kyle.

10         They market a product called Lialda.  Lialda was

11  approved in 2007 with a NDA.  Lialda, the active ingredient

12  in Lialda is mesalamine.  It is a delayed release tablet

13  which is currently indicated for the induction of remission

14  in adults with active, mild, to moderate ulcerative colitis,

15  a very difficult disease, and for the maintenance of

16  remission of ulcerative colitis.

17         So that is what it has been approved for.  It's

18  been on the market since 2007.

19         In 2015, I believe the sales just went over

20  $1 billion.

21         THE COURT:  Hold on one second, Mr. Haug.

22         First, with the demonstratives like this, is

23  everyone comfortable with having me have a copy of those?

24         MR. HAUG:  Actually, I am not comfortable having

25  forgotten to give them to you.

1           THE COURT:  Okay.

2           MR. HAUG:  If I may approach, Your Honor.

3           THE COURT:  Yes, you certainly may.

4           And just so we're clear, I think people

5   understand this.

6           (Binders passed forward.)

7           THE COURT:  Thanks very much.

8           We are timed.  Everyone knows that.  When you

9   are on your feet, the clock is running against you.  If

10  there is an objection, and we have to absorb a lot of time,

11  I'll figure out how to split that time or charge it all to

12  one side or the other.  All right?  I will try to be fair to

13  everybody on that.

14          Okay.  Go ahead.

15          MR. HAUG:  Next slide, Kyle.

16          So the defendants in this case, Zydus, one of

17  them is Cadila Healthcare, Limited, which is based in

18  Ahmedabad, if I pronounced that correctly, which is India,

19  and they have a U.S. subsidiary, Zydus Pharmaceuticals, USA,

20  and that subsidiary is the one that filed the ANDA in this

21  case.

22          Go to the next slide.

23          Cadila Pharmaceuticals, or I should say Cadila

24  Healthcare, Limited is the manufacturer of the product and

25  what we see here in slide PDX-1.4 is the label, the label

 1    that is in their ANDA, showing that it is manufactured by

 2    Cadila Healthcare, Limited in Moraiya, spelled

 3    M-o-r-a-i-y-a, which is in India.  They filed this ANDA in

 4    2009.

 5            If I can have the next slide, Kyle, please.

 6    Thank you.

 7            I am not going to go through all these things on

 8    this slide, but this is just the timeline for the case.  And

 9    if we go all the way to the left, so that is the original

10    ANDA submission was in December of 2009.

11            And if we go along on the bottom of the

12    timeline, go all the way to October 22, 2013, about four

13    years later, that is when Zydus filed a resubmission, if you

14    will, of its ANDA with the FDA, and then this case was

15    reopened thereafter, and here we are.

16            To this point in time, there has not been an

17    approval to my knowledge.

18            The patent, one patent case, as Your Honor is

19    very well aware, it's the '720 patent, as we have referred

20    to it, filed in June of 1999.

21            At a very high level, this invention, the

22    invention is really about how you control release of

23    mesalamine, that is the active ingredient.  Mesalamine has

24    been around a very long time, but it is a very soluble, very

25    fast releasing drug.  If you just took mesalazine and

1    ingested it, it would go in your system.  The disease we're

2    trying to treat, ulcerative colitis, is mainly in the large

3    intestine.  So the goal here is to get the active ingredient

4    so that it can be locally acting in the large colon.  So it

5    takes hours to get there.

6           So the challenge is how do you control the

7    release of mesalamine so it doesn't release long before it

8    gets to the point in the body where it does what it is

9    supposed to do.

10          In addition to that challenge, the inventors

11   also were faced with the dosage form itself.  You need a lot

12   of active, 1,200 milligrams, and the claims, we'll see the

13   claims in a second, they require at least 80 percent of the

14   total weight of the tablet is mesalamine.  That is an

15   unusual percent active.

16          So the challenges are how do you get a tablet

17   with a lot of active ingredient in it and how do you control

18   that release?

19          And the invention they came up with is a two

20   matrix system.  More about that in a bit.

21          Can we have the next slide, please.

22          THE COURT:  I don't want to be --

23          MR. HAUG:  Certainly.

24          THE COURT:  I am just curious because we have

25   the court reporter taking this all down.  What is the name

1    of the active ingredient here.  Mesalamine?

2              MR. HAUG:  Mesalamine, which is synonymous with

3    mesalazine.  It's the same thing.  It is just spelled

4    differently and it has a chemical name, too.  But it's the

5    same thing.

6              So the title of this patent, mesalazine is

7    mesalamine.  We will I think largely always be referring to

8    it as mesalamine, with an M.

9              THE COURT:  Okay.

10             MR. HAUG:  That is the same thing.

11             THE COURT:  Okay.

12             MR. HAUG:  This slide, 17.7, is the claim

13   construction from the Court.  The claim construction that --

14   well, I should say the claim terms, and I am going to go

15   through those in a second.

16             But "inner lipophilic matrix,"

17             "Outer hydrophilic matrix,"

18             "Melting points," and also,

19             "Wherein the active ingredient is dispersed both

20   in the lipophilic matrix and the hydrophilic matrix" I think

21   are the main terms.

22             There is also I think a dispute about

23   "consisting of" and the extent of that language and its

24   impact on the infringement proofs here.

25             Next slide, please.

1            The parties did agree to a few claim terms

2    before the claim construction.

3            That was "matrix," "a macroscopically homogenous

4    structure in all its volume."

5            And then the two words which you will hear a lot

6    in this case, "lipophilic," which was agreed to mean "a poor

7    affinity towards aqueous fluids," not no affinity but poor

8    affinity.

9            And "hydrophilic" was agreed to mean "has an

10   affinity for water."

11           So the claim, we have one claim, one independent

12   claim, claim 1.

13           Claim 1 I have highlighted in yellow here some

14   of the undisputed facts, right?

15           "Oral pharmaceutical compositions," as I have

16   indicated here, that is not a dispute in this case.

17           Zydus has an oral pharmaceutical composition.

18           Similarly, Zydus has an active ingredient which

19   is 5-amino-salicylic acid.  That's the chemical name for

20   mesalamine.  They have that.  There is no dispute, obviously.

21           And then if we go all the way down to the lower

22   element C in the claim, "wherein the active ingredient is

23   present in an amount of 80 to 95 percent by weight of the

24   total composition," that also is not in dispute because that

25   is what the Zydus formulation contains.

1          So what are the disputes?  The disputes I've

2     indicated here in red, one, claim element 1A, inner

3     lipophilic matrix.  Does Zydus have an inner lipophilic

4     matrix consistent with the claim construction in this

5     case?

6          Another point in dispute is the melting point.

7     Is the inner lipophilic matrix, or I should say the

8     excipient, which is in the inner lipophilic matrix or is the

9     inner lipophilic matrix, which in this case is magnesium

10    stearate, does magnesium stearate have a melting point below

11    90?  That is a disputed fact and, clearly, an issue in the

12    case.

13         While I'm looking at that right now, I should

14    also point out, Your Honor, that the claim here is literal

15    infringement of claim 1.  However, with respect to this

16    claim element, should the Court find there is no literal

17    infringement, there also is an assertion of infringement

18    under the doctrine of equivalents.

19         The doctrine of equivalents allegation is that

20    is the magnesium stearate that Zydus uses is equivalent in

21    function, way and result to another ingredient, which in

22    this case we say would be stearic acid, which clearly falls

23    within the scope of the 1A group consisting of, and stearic

24    acid is also used in the patent examples.

25         And so the claim that we're making is that if we

```
 1    need to get to the doctrine of equivalents that the

 2    magnesium stearate, should the Court find that the melting

 3    point is above 90, it operates in the same way, functions

 4    the same way to ultimately give the same result.  So that's

 5    the doctrine of equivalents case that is also going to be

 6    presented.

 7              Then we have another disputed claim element,

 8    which is 1B, the outer hydrophilic matrix, and much like the

 9    dispute with 1A, the question simply is -- not simply, but

10    the question is, does Zydus' formulation have an outer

11    hydrophilic matrix as called for in claim 1B?  And in this

12    case, we believe the outer hydrophilic matrix consists of

13    two excipients.  One is sodium starch glycolate, SSG, and

14    the other is sodium carboxy methyl cellulose, which is CMC.

15    And so we'll be using those, I think, abbreviations, if you

16    will, CMC and SSG.  That's what they mean.

17              But, in any event, we assert, we believe the

18    evidence will show that the outer hydrophilic matrix in the

19    Zydus product consists of those two excipients at least, and

20    at the inner lipophilic matrix consists of magnesium

21    stearate.

22              THE COURT:  Give me those two excipients again

23    with SSG --

24              MR. HAUG:  SSG, sodium starch glycolate, and the

25    other is sodium carboxy methyl cellulose, CMC.
```

1              So we believe we will establish infringement

2       here of the Zydus product by a preponderance of the evidence

3       in a number of ways.

4              First, by looking at the Zydus manufacturing

5       process itself, how do they actually make their formulation?

6       And we believe the evidence will show that by looking at

7       their formulation manufacturing process that is set forth in

8       their ANDA together with the experts who analyze it and

9       opine on it, we believe that will be very compelling

10      evidence that the matrices are being formed as covered by

11      this patent.

12             In addition to that, we have internal

13      development documents from Zydus as well as some analyses

14      that Zydus itself made about their product during the

15      development that we also think are relevant to the issue of

16      infringement.

17             And we have Zydus testimony.  Now, the Zydus

18      testimony, there is -- Your Honor will hear one of the

19      witnesses by deposition.  He's the head of pharmaceutical

20      development, if you will, from Zydus.  He's resident in

21      India.  He was deposed.  We believe he was a 30(b)(6)

22      witness.  I think there may be an issue that we'll have to

23      address if Zydus raises it, but we believe it was a 30(b)(6)

24      deposition taken of Mr. Kulkarni, and he made a number of

25      admissions on behalf of Zydus that we believe as a factual

1    matter are highly relevant to the question of infringement.

2              And then, lastly, we have Shire expert testing

3    and analysis, which I'm going to very briefly touch on.

4              Now, back to Zydus development.

5              Kyle, if I could have PTX-299.8.  Can we blow

6    that up?  A little more.

7              This is an exhibit which is not objected to,

8    PTX-299.8.  This is a slide that was sent by the head of

9    development for Zydus to an in-house patent attorney, or at

10   least someone they believe was a patent attorney.  And Your

11   Honor may remember, we had quite an issue about privilege on

12   some documents.  This is one of the documents that was

13   deemed not to be privileged.

14             So as it says, formulation strategy to

15   circumvent OB, that means Orange Book Patent No. U.S.

16   6,773,720.  And they have three ways, if you will, to

17   circumvent, as the title of this slide says, the patent.

18   And this will be discussed a bit by Mr. Kulkarni in his

19   deposition, and the first point is the active ingredient

20   should be present in an amount of 70 to 75 percent by weight

21   of total composition.

22             Your Honor may recall, I just had claim 1 up

23   there, and the claim limitation says it has to have at least

24   80 percent.  So this was considered to be a way around the

25   80 percent limitation.  In the end, Zydus' formulation has

1    over 80 percent.  So they did not pursue that.

2             Number two, the inner matrix is hydrophobic in

3    nature instead of being lipophilic.

4             Now, hydrophobic means repels water, and the

5    testimony is going to show that the Zydus people believed

6    that if they had something which was hydrophobic, that would

7    not be lipophilic.  As it turns out, as a scientific matter,

8    magnesium stearate, which is what they used, is lipophilic.

9    They believed it was hydrophobic, but for purposes of this

10   patent and the claim construction we have with this patent,

11   if you have something which is hydrophobic, it's still

12   lipophilic.  And so they went with option two.

13            And, number three, they have the release of core

14   tablet is controlled by polymer coating instead of by matrix

15   formulation.  So, in other words, the thought there being

16   they would have a core of active material and they would

17   coat it with a polymer.  That was a different way to

18   formulate this product as opposed to using a matrix

19   formulation.  In the event, Zydus went with a matrix

20   formulation.

21            So the next slide, 1.13.  So here are some of

22   the we believe to be admissions.  Certainly, it's the

23   testimony of Mr. Kulkarni in his 30(b)(6) deposition.  For

24   example, magnesium stearate is hydrophobic.

25   Roll-compaction, that was part of the Zydus process of

1   manufacture, is a dry granulation method.  Zydus' dry

2   granulation stage creates granules.

3          The granules from Zydus' dry granulation stage

4   contain mesalamine, the active magnesium stearate, which we

5   believe is the lipophilic excipient, and colloidal silicon

6   dioxide and other excipients.

7          It goes on.  There are no hydrophilic excipients

8   in Zydus' dry granulation manufacturing.

9          Carboxy methylcellulose is hydrophilic.  Carboxy

10  methylcellulose is the sodium carboxy methylcellulose I was

11  just referring to.

12         And then right below that, sodium starch

13  glycolate is hydrophilic.  That's the second of the

14  hydrophilic excipients I was referring to in the outer

15  hydrophilic matrix.

16         And then lastly, Zydus' product exhibits

17  swelling upon contact with aqueous fluids, and this swelling

18  is attributable to its hydrophilic excipients.  So I point

19  this out because these are statements made by Mr. Kulkarni,

20  which will be presented to the Court later today.

21         So the last piece of evidence or the last

22  tranche of evidence, if you will, that we believe shows

23  infringement -- if I could have the next slide, Kyle, thank

24  you.  Next one.  I'm on 1.11, 1.11.  There we go.

25         Testing by Shire's experts.  Your Honor is going

1    to hear from a number of experts.  While the number may be

2    large of experts, many of them will be short.  And so we

3    intend to be as focused and crisp as we possibly can be, and

4    a number of these are testing people.

5              The first one, Vivian Gray, will talk about

6    dissolution testing and imaging of the Zydus product.

7              Dr. Hoag is going to talk about what's called

8    the drop penetration test, which simply shows the

9    penetration of water into different formulations to show

10   whether the inner lipophilic matrix, whether water

11   penetrates at the same rate as in the outer.

12             And then we have Dr. Hanton, who has a series of

13   tests that were conducted largely going to determine the

14   melting point and also the, whether or not the magnesium

15   stearate used by Zydus is what we call in a hydrated state

16   or an anhydrous state.  More of that during the trial.

17             And then, lastly, Dr. Davies, he conducted Raman

18   spectroscopy and also did some optical microscopy.  Dr.

19   Davies is the expert that trial testimony will be presented

20   by deposition, and I thank the Court again for allowing us

21   to present his testimony in that way.

22             So those are the tests that have been conducted

23   by Shire's experts and that will be introduced into this

24   case.

25             1.15.  This is just an optical microscope from

1    Dr. Davies, which Your Honor will see.  And what you see in

2    that circle, if you will -- it's not really a circle --

3    that's supposed to be a G.  The testimony is that that

4    is a G.  All Dr. Davies was doing, he was asked to pick out

5    a granule in this optical microscope of the cross-section

6    of Zydus' tablet, so that's what he did.  So there's a

7    granule.

8              And then the next slide, 1.16, this is a Raman

9    map, as it's called, which shows the presence of mesalamine.

10   The different coloring, whether it's yellow, orange, red,

11   that goes to the intensity of the amount of mesalamine that

12   is present in the different cross-sectional areas, and the

13   testimony will further explain that.

14             Now, if I can go to 1.14.  I already mentioned

15   the one part of this case is doctrine of equivalents.

16   Again, essentially, what we're asserting is that this is

17   claim element 1A, and it's an inner lipophilic matrix

18   consisting of, and what's highlighted is, hydrogenated fatty

19   acid, salts.

20             Magnesium stearate is a hydrogenated fatty acid,

21   salt.  It's a salt.  Okay.  Again, if Your Honor finds that

22   the melting point is not below 90, which we assert that it

23   is, but if Your Honor finds that it's not, stearic acid is

24   also a hydrogenated fatty acid.  Magnesium stearate, as I

25   said, is the salt of stearic acid.  It's very close, very

```
 1    chemically similar.  And magnesium stearate and stearic acid

 2    are both lipophilic.  And stearic acid has a melting point

 3    well below 90.  So that is the essence of our doctrine of

 4    equivalents case.

 5              Just a very short couple of words, if you will,

 6    on the validity Zydus of the case.

 7              All I've shown here is to my understanding,

 8    Zydus is claiming that the patent is invalid for one of two

 9    reasons, or maybe two reasons.

10              One is they assert invalidity under 103,

11    obviousness.  Under reference, which is U.S. Patent No. 5,

12    593,690, called Akiyama, A-k-i-y-a-m-a.  That Akiyama

13    reference was considered during the prosecution of

14    this patent.  It is not directed to mesalamine, but, in

15    any event, they point to this reference as a primary

16    reference to my understanding showing that the '720 patent

17    is obvious in combination with one or more of the 17 other

18    references.

19              Now, these 17 references are what are contained

20    in the pretrial order in this case.  I doubt they will go

21    with 17 references, but I will let Mr. Gaertner speak to

22    that.

23              And then the other ground of invalidity is under

24    112, asserting that the patent does not satisfy the

25    requirements of 35 U.S.C. 112.
```

```
 1                        And with that, Your Honor, I would just close
 2       this opening, saying that we intend to offer five live
 3       witnesses today.  And time permitting, two witnesses, maybe
 4       three by deposition.
 5                        THE COURT:  All right.
 6                        MR. HAUG:  Thank you.
 7                        THE COURT:  Thank you, Mr. Haug.
 8                        Mr. Gaertner, your opening.
 9                        MR. GAERTNER:  Good morning, Your Honor.  Mike
10       Gaertner.  And may I approach?
11                        THE COURT:  Yes.  Please.
12                        (Binders passed forward.)
13                        MR. GAERTNER:  The '720 patent has a very
14       specific composition that has a very specific limitation:
15       "excipient structure of properties and dispersion of the
16       active ingredient."
17                        Can we go to slide 3, please.
18                        On slide 3, Mr. Haug has taken to the evidence
19       that he thinks he is going to show in this case.  And on
20       behalf of the defendants, I'd like to walk you through the
21       issues we think are critical and what we believe the
22       evidence will show.
23                        Now, the plaintiffs have the burden of proving
24       that:
25                        The Zydus ANDA product has an inner lipophilic
```

1    matrix that has the required excipients.  They're very

2    narrowly defined.

3              A required structure, which we really didn't

4    hear a lot of discussion about in the opening for plaintiffs.

5    And,

6              Exhibiting the required properties.

7              Now, the plaintiffs also have the burden of

8    showing that the Zydus ANDA product has mesalamine in the

9    inner matrix and the outer matrix.

10             We believe the evidence will show that the

11   plaintiffs will be unable to meet their burden on any of the

12   elements and any one of these will be dispositive in this

13   case.

14             At the end of this as well, Judge, we'll talk a

15   little bit about the invalidity case as well.

16             Could you go to the next slide, please.

17             Now, the required excipients really break down

18   to two aspects.  Mr. Haug has mentioned one of them, and

19   that is "melting point."  That is an issue in dispute.

20             Mr. Haug pointed out some of the experts that

21   the plaintiffs will be presenting.  The defendants will be

22   presenting several experts themselves.  Dr. Thomas

23   O'Halloran from Northwestern University did an open

24   capillary melting point test that is required by the USP.

25   He will present the evidence on that.

1              We will be presenting Professor Mark Sacchetti

2      from the University of Wisconsin.  He performed two tests:

3      a DSC test and a hot stage microscopy.  And, actually, that

4      is a still image from the hot stage.  That will be a movie

5      test.  It is a melting point test where it films the

6      temperature as the crystals enter the microscope, and we

7      believe that evidence will be very compelling ultimately of

8      the outcome of the melting point limitation.

9              THE COURT:  What does DSC stand for?

10             MR. GAERTNER:  Differential scanning

11     calorimetry.

12             Add the defendants will be presenting

13     Dr. Hollingsworth from Kansas state who is an expert in

14     solid state chemistry to opine on the melting point as well.

15             That is one aspect of the required excipients

16     that the plaintiffs would have to show is in the inner

17     lipophilic matrix.

18             Now, the second aspect of the required

19     excipients -- and we can go to the second point, the next

20     slide, excuse me -- is the "consisting of" limitation.

21             And I think Mr. Haug touched on it in his

22     opening statement but didn't discuss it that much.  And this

23     is where I would like to talk a little bit about how this

24     product comes together.

25             And you heard Mr. Haug talk about magnesium

```
1    stearate.  And magnesium stearate is the alleged lipophilic

2    forming agent in this case.  Magnesium stearate is a

3    lubricant.

4              THE COURT:  Let me stop you for a second.  You

5    said it is the "alleged."

6              MR. GAERTNER:  I am sorry.

7              THE COURT:  You said it is the "alleged."

8              MR. GAERTNER:  Yes.

9              THE COURT:  It is the alleged lipophilic matrix,

10   is that what you said?

11             MR. GAERTNER:  The lipophilic forming matrix,

12   yes.  You heard Mr. Haug talk a lot about magnesium stearate

13   in his opening.  He says the lipophilic matrix is formed by

14   the magnesium stearate.

15             I want to get to the slide Mr. Haug talked about,

16   but also I'd like to talk about just generally what is going

17   on with the product, not to go into detail but to put some

18   context on it.  And that is, for lack of a scientific word,

19   mesalamine, the active ingredient, it is sort of fluffy, and

20   to make it work in the Zydus formulation, Zydus decided to

21   roll or compact the mesalamine.  Now, roll or compaction, sort

22   of as the name suggests, is rollers.  You pour the active

23   ingredient in and the roller compacts, smushes, it compacts

24   the active ingredient.

25             Well, you are going to hear testimony from
```

1  another Cadila formulator, a gentlemen named Kieran Hoffer.

2  It will be by deposition, and he was the formulator who

3  decided to put the magnesium stearate in the roller

4  compaction.  And he is going to testify he did it because

5  the magnesium -- I am sorry -- the mesalamine was sticking

6  to the roller compaction as it was going through.  So he

7  added lubricant to make sure it came through smoothly.

8            THE COURT:  So the reason you say this is the

9  alleged excipient is because the position that Zydus was

10  taking here is that magnesium stearate is not an excipient

11  in the drug.  It was a lubricant for the machinery.

12            MR. GAERTNER:  Yes.  It is a lubricant and does

13  not form a matrix.  That's right, Your Honor.

14            THE COURT:  Okay.

15            MR. GAERTNER:  You know, Mr. Haug put up a

16  slide, I think it was slide 15.  In all events, he talked

17  about the various options, you might recall that, that one

18  of Zydus formulators was looking at a time.  And I think he

19  said he went with option 2 which is hydrophobic matrix.

20            The evidence is going to show that that is a

21  very early stage development document and that that, none of

22  those, that option was not pursued.  A different option was

23  pursued to actually avoid putting those sorts of elements

24  into the inner volume of the Zydus product.

25            But I bring that us up as an aside because

1   really my point is a little bit different.  That is, in this

2   roller compaction, I just mentioned you have magnesium

3   stearate that it helps with the lubrication.  Mesalamine

4   comes through.

5          On the slide is the bill of materials which is

6   the actual ingredients that go in that step.  The second

7   element there, colloidal silicon dioxide, that is

8   hydrophilic.  So to the extent the plaintiffs are going to

9   endeavor to prove that those granules, which is a word that

10  Mr. Haug mentioned in his opening, if that is their theory,

11  that they're going to prove that granules form a matrix,

12  well, there is colloidal silicon dioxide which is a

13  hydrophilic component which is in these matrixes, too.

14         What does that do?  Consisting of, it is limited

15  only to the Markush group limitation.  That means that it

16  excludes only substances un related to the claims or

17  impurities, and we will show the evidence that it is neither

18  unrelated nor impure.

19         Let's go to the next slide.

20         I'd like to talk next about the other

21  requirement of the '720 patent.  We haven't had a discussion

22  of that, and that is the structure.

23         There must be a matrix, and the claim limitation

24  matrix, and this is agreed construction as Mr. Haug pointed

25  out, it means "a macroscopically homogenous structure in all

1    its volume."

2              Now, they used the images from the prosecution

3    history for what the patent, they submitted to the Patent

4    Office to describe a matrix structure.  And what we're going

5    to see as the evidence proceeds is that the plaintiffs will

6    not be able to show a matrix structure in the Zydus ANDA

7    product, consisting of magnesium stearate.

8              If we could go to the next slide.

9              THE COURT:  Will they be able to show a matrix

10   structure consisting of any other chemical compound?  You

11   just said they wouldn't show it, a matrix --

12             MR. GAERTNER:  That takes me back --

13             THE COURT:  -- structure.

14             MR. GAERTNER:  -- to the preceding point.

15   Judge, if their theory is that the granules come out of the

16   compaction step, and that is the matrix or some part of that

17   is the matrix.  If that is the matrix, and I am not sure

18   what the structure of that is, when we get to that in a

19   second, because there is another element of the structure

20   that is important to your question.  But if that is matrix,

21   that is why I brought you back to the colloidal silicon

22   dioxide because there will be a hydrophilic component in

23   that as well.

24             But to further answer your question, I think the

25   next slide is helpful.  If you could go to slide 6.

1              Two aspects to the structure.  One is matrix.

2     The other is -- I am sorry, I think it's slide 7.  I think I

3     misspoke.  Slide 7.  Thank you.

4              And the other aspect is dispersed.

5              This is plaintiffs' claim construction.  They

6     have, plaintiffs advocated this claim in the structure and

7     the Court awarded to it.

8              So the construction of "dispersed" is

9     "sufficiently mixed to incorporate one substance into

10    another."

11             And so, Judge, if you put those two terms

12    together, "matrix" and "dispersed," at the end of the day,

13    we believe that plaintiffs are required to prove that the

14    mesalamine is sufficiently mixed to incorporate it into a

15    macroscopically homogenous structure in all of its volume

16    and consisting of magnesium stearate.

17             That is what the plaintiffs will have to prove

18    here, and we believe they will be unable to meet that burden.

19             If we can go to the next slide, please.

20             The next slide implicates the properties of the

21    matrix.  And we've had a lot of discussion about that in the

22    prior claim construction hearing.  And one of the things

23    that struck me when Mr. Haug was up here is he talked a lot

24    about the excipient that was in the alleged matrix but not

25    the properties of the matrix.  And remember, Judge, that is

1    actually what the Federal Circuit shot down in the Shire V

2    Watson case.  That is, the matrix is defined by the presence

3    of excipients.  The entire matrix has to have a certain

4    character.

5           Now, there was some testing done, and Mr. Haug

6    touched on that testing.  Two I think tests are particularly

7    important here that you will have to take a look at:

8           One is the so-called drop penetration test that

9    Dr. Hoag did in an effort to show lipophilicity.  That

10   wasn't done on the Zydus ANDA product, that was done on

11   some other powder compacts that Dr. Hoag created in his

12   laboratory.

13          I mean the Federal Circuit has been clear that

14   to prove infringement, you need to do testing on the ANDA

15   product.  That testing was not done.

16          The second aspect of the testing I think you are

17   going to hear about was some dissolution testing that was

18   done by Vivian Gray and reviewed by Dr. Little.  Dr. Little

19   is going to circle some images on that and do various

20   things, and you will hear what his testimony is.  But I do

21   think the testimony will not be, that the plaintiffs can

22   show that there is any particular element in what they claim

23   to be the alleged matrix.

24          Let's go to the next slide, please.

25          And the final limitation I am going to talk

1    about this morning before we move on is "dispersed in both."

2    We talked about what "dispersed" means, "sufficiently mixed

3    to incorporate one and another."

4              Plaintiffs will also have to show that

5    mesalamine is incorporated both in the inner lipophilic

6    matrix as well as dispersed in the outer hydrophilic matrix.

7              Zydus only adds mesalamine in one step of its

8    manufacturing process.  It doesn't add it in two.  And we

9    believe the evidence will show that there is no second

10   addition and no separate dispersion, excuse me, of the

11   mesalamine in the alleged outer hydrophilic matrix as well.

12             Mr. Haug put on the screen a granule, I think it

13   was of Dr. Davies.  That, I have the number down.  That is

14   PDX-1.15.  Dr. Davies did circle that page which he purports

15   to say was a granule but you will hear his de bene esse

16   deposition later either today or tomorrow and the testimony

17   will be that Dr. Davies is not opining that is a matrix.

18   Dr. Davis isn't opining he knows is in there.  He will say

19   he believes it is mesalamine in there, but he won't be able

20   to say whether there is magnesium stearate, colloidal

21   silicon dioxide, SSG, or the other various hydrophilic

22   components that are in that alleged granule.

23             As a result of that, we believe the testimony,

24   the expert testimony -- they're going to have a lot of it.

25   There is no doubt they're going to have a lot of it.  But we

1    believe that experts are going to ask you to see things that

2    nobody else can see ultimately in an effort to try to cobble

3    together that case.

4            Now, I'd like to touch briefly on Doctrine of

5    Equivalents which is my next slide.

6            I will be quick because I'd like to wrap it up

7    and get on to the evidence.

8            Magnesium stearate is a lubricant.  It is not

9    chemically similar to stearic acid which is a known matrix

10   forming agent and it does not form a matrix.  It does not do

11   the same function in the same way and have the same result.

12   We believe the evidence will be very clear on that, and that

13   their Doctrine of Equivalents argument will not prevail.

14           Finally, on invalidity.  Next slide.

15           One thing that was not touched on the opening

16   that we think it is a powerful invalidity defense is our

17   indefinite defense.

18           We believe the evidence will show that under the

19   plaintiffs' theory, and we believe they're going to advance

20   the theory that you can have both hydrophilic and lipophilic

21   elements to a matrix.  Under that theory, the patent is

22   indefinite because it provides no parameter for a person of

23   ordinary skill in the art to determine what is hydrophilic

24   or lipophilic.

25           The second thing is the obviousness defense,

Stautberg - direct

1    that is the one thing Mr. Haug talked about.  I want to make

2    a correction here.  We're not claiming that we need 17

3    combinations to prove our obviousness defense.  In fact,

4    in the pretrial order, we say it is clear -- I forget the

5    paragraph but it is in there and we're saying we're relying

6    on four references.

7              There is a lot of references in there for the

8    background of the knowledge of person of ordinary skill but,

9    no, we're not relying on them.  We're going to show there

10   are four references.  You put them together.  If you put

11   those four references together that the patented invention

12   is obvious.

13             Thank you, Your Honor.

14             THE COURT:  Okay.  Thanks, Mr. Gaertner.

15             Mr. Haug, your first witness.

16             MR. HAUG:  Shire will call Andrew J. Stautberg.

17             ... ANDREW J. STAUTBERG, having been first duly

18   sworn, was examined and testified as follows ...

19             THE COURT:  You may be seated.

20             You may proceed.

21             MR. HAUG:  Thank you.

22                       DIRECT EXAMINATION

23   BY MR. HAUG:

24   Q.    What is your occupation and title, Mr. Stautberg?

25   A.    I am a Vice President at Shire Pharmaceuticals, and

Stautberg - direct

1   my title is Product Strategy Team Leader.

2   Q.      How long have you been with Shire?

3   A.      I've been with Shire for just under six years.

4   Q.      And prior to Shire, did you work somewhere else?

5   A.      I worked for AstraZeneca for a little over 16 years.

6   Q.      And how long have you worked in the pharmaceutical

7   industry?

8   A.      So adding those two together, I've been in the

9   pharmaceutical industry about 22 years.

10  Q.      And what are your responsibilities as Vice President

11  and Product Strategy Team Leader for Shire?

12  A.      I lead a team composed of representatives from

13  different functions that have responsibility for the

14  management of Lialda.

15          Some of those functions are, for example,

16  clinical, regulatory, supply chain, as well as marketing and

17  sales.  And I also have direct responsibility for the U.S.

18  marketing team.

19  Q.      What are the responsibilities of the marketing team?

20  A.      The marketing team has responsibility for defining

21  marketing strategies, for defining the key messages that are

22  to be used in advertising and promotion, for understanding

23  the competitive environment that our product competes in.

24  Those are some of the key responsibilities that they have.

25  Q.      What does it mean to understand the competitive

Stautberg - direct

1   environment for a product?

2   A.    Some components of understanding the competitive

3   environment would include understanding the product and

4   understanding the products that our product, that Lialda

5   competes with.  So, for example, what the active ingredients

6   are, what the indications are, the dose regimens, the

7   strengths, the form, the pharmaceutical form.

8            Also, part of understanding the competitive

9   environment would be understanding the disease, how it is

10  treated, how it impacts patients as well as understanding

11  how the product is performing and how it is performing

12  versus expectations, how it is performing versus competition

13  in terms of volume and sales, and market share.

14  Q.    I'd like to ask you a few questions, background

15  questions about Shire itself.  What is the basic business of

16  Shire?

17  A.    Shire is a biopharmaceutical company.  It is focused

18  on rare diseases and certain specialty conditions with high

19  unmet medical need.  Shire invests in research and

20  development to bring new treatments to market.  It also end

21  licenses technologies that were discovered outside of the

22  company and works to develop treatments that can be brought

23  to market to treat diseases that have high-end met needs.

24  And then it also is involved in marketing and selling those

25  products.

Stautberg - direct

1    Q.      And what are some of the therapeutic areas treated by

2    the medicines that Shire brings to market?

3    A.      Gastroenterology is one.  Shire also has treated in

4    hereditary angioedema, in lysosomal storage disorders, in

5    endocrinology, and in neuroscience.

6    Q.      Under what therapeutic area does Lialda fall?

7    A.      In gastroenterology.

8    Q.      What is Lialda?

9    A.      Lialda is an oral tablet that contains 1.2 grams of

10   mesalamine, or mesalamine, or 5-amino-salicylic acid, or

11   5-ASA.

12   Q.      And what is Lialda's FDA approval for?

13   A.      Lialda is indicated for the induction of remission in

14   adults with active mild to moderate ulcerative colitis, and

15   it is also indicated for the maintenance of remission of

16   ulcerative colitis.

17   Q.      Can you just briefly explain what ulcerative colitis

18   is?

19   A.      Sure.  Ulcerative colitis is a form of inflammatory

20   bowel disease.  It is a disease that impacts the lining of

21   the large intestine, so the colon and the rectum, and it's

22   characterized by inflammation and ulceration of that colonic

23   and rectal tissue.

24              THE COURT:  Can I interrupt just a moment here?

25              THE WITNESS:  Sure.

Stautberg - direct

1        THE COURT:  Just to note one procedural thing.

2   The parties are clear on the sequestration responsibility

3   and you've got that handled.  Right?

4        MR. HAUG:  I believe -- yes.  I believe

5   Mr. Stautberg is the only live fact witness.

6        THE COURT:  Okay.  Just making sure.

7        MR. HAUG:  Thanks.

8        THE COURT:  We're squared away.  All right.  Go

9   ahead.

10  BY MR. HAUG:

11  Q.     So you were -- what areas of the large intestine are

12  affected by ulcerative colitis?

13  A.     Ulcerative colitis always involves the rectum and

14  involves the end of the colon, and depending on the patient,

15  the disease can involve a larger extent of the colon

16  extending in some patients all the way up the colon to the

17  large intestine, or to the end of the small intestine.

18  Q.     And what are the symptoms of ulcerative colitis based

19  on your experience?

20  A.     So I'm not a physician.  I am offering my perspective

21  as someone who has worked in the field for five years now on

22  this particular product.  But the cardinal symptoms of

23  ulcerative colitis are rectal bleeding.  That's from the

24  ulcerations in the colon.  Diarrhea, so the combination of

25  the two is bloody diarrhea.  Also frequency.  So high

Stautberg - direct

1    frequency of the need to have bowel movements.  So sometimes

2    patients need to use the restroom six to eight times per day

3    as well as abdominal pain and cramping.

4                    So this is, it's a pretty nasty disease,

5    and when patients are having a flare of this disease, they

6    are often not able to go to work.  They are homebound.  They

7    need to be near bathroom facilities, et cetera.

8    Q.    And what do you believe causes ulcerative colitis?

9    A.    So it's not definitively known exactly what causes

10   ulcerative colitis.  It is an autoimmune disease, so it's in

11   the same category as rheumatoid arthritis and psoriasis in

12   that it is the body's immune system not working properly and

13   the body attacking itself to cause this inflammation and

14   ulcerations.

15   Q.    All right.  Are you aware of any cure for ulcerative

16   colitis?

17   A.    There is no medical therapy that can cure ulcerative

18   colitis.  Surgery is a cure.  You can resect the diseased

19   portions of the colon, but it's not a very good cure because

20   it can leave patients with an ostomy, with an ostomy bag,

21   and it can be -- impacts of surgery are so great that it's

22   only used in the most severe cases.

23   Q.    So how is ulcerative colitis treated in your cases?

24   A.    In my experience, so mesalamines are the typical

25   first line of treatment for mild to moderate cases of

Stautberg - direct

1    ulcerative colitis, as well biologics for other

2    immunosuppressive therapies are used for patients who don't

3    respond to mesalamines, or who have more severe disease at

4    their first presentation.  And another common treatment for

5    ulcerative colitis is steroids.  Those are commonly used,

6    but they are used short-term in order to get symptoms under

7    control.  They are not a good long-term option because of

8    longer, of side effects of long-term use.

9    Q.    And what is mesalamine?

10   A.    Mesalamine is a -- it's the active ingredient in

11   Lialda, and it is a locally acting drug that serves to

12   reduce inflammation in the tissue that it comes into contact

13   with.

14   Q.    And based on your experience, how does mesalamine

15   work to treat the symptoms of ulcerative colitis?

16   A.    It works to treat the symptoms by reducing the

17   inflammation in the diseased tissue that it comes into

18   contact with, thereby allowing the body to heal itself.  And

19   by healing the ulcerations and reducing the inflammation,

20   that takes care of the symptoms as well.

21   Q.    How is mesalamine administered?

22   A.    Mesalamine can be administered either orally or

23   rectally.

24   Q.    And what do you mean by oral or rectal

25   administration?

Stautberg - direct

1    A.     So orally means ingested, so a tablet would be an

2    example of an oral administration.  Rectal administration

3    would be in the form of a suppository or an enema, and that

4    would involve administering the product to a patient and

5    then having them lie prone for a period of hours so that the

6    product -- so the mesalamine can come into contact with the

7    diseased tissue, and it's not a very convenient option.

8    Q.     How is Lialda administered?

9    A.     Lialda is administered orally, so what that means is,

10   it's administered orally.  It needs to make its way through

11   the, through the small intestine.  It's coated in order to

12   do so and not release while the product is in the small

13   intestine.  And once it reaches the large intestine, then

14   the product delivers mesalamine throughout the, the large

15   intestine.

16   Q.     Do you know when Lialda was approved by the FDA?

17   A.     Lialda was approved in 2007.

18   Q.     And what was the indication at that time?  Do you

19   know?

20   A.     The indication at launch in 2007 was for the

21   induction of remission in adults with active mild to

22   moderate ulcerative colitis.

23   Q.     Was Lialda approved for any other indications?

24   A.     It was approved in 2011 for the maintenance of

25   remission of ulcerative colitis.

Stautberg - direct

1    Q.    At the time of Lialda's approval in 2007, were there

2    any other oral mesalamine products on the market?

3    A.    There were.

4    Q.    And do you know what they were?

5    A.    In 2007, the products on the market were Asacol and

6    Pentasa, which were both mesalamine products, and Dipentum

7    and Balsalazide, which we considered to be mesalamine

8    products, but they are pro drugs of mesalamine, which means

9    that the molecules in those products are converted in the

10   large intestine into mesalamine.

11   Q.    Does Lialda differ from any of those products in

12   terms of its administration?

13   A.    Lialda in 2007 was the first mesalamine product that

14   was indicated for once daily dosing.

15   Q.    And how many competitor products are there now in the

16   oral dosage form, if you know?

17   A.    So there are seven currently, eight if you consider a

18   little longer period of time, and I will explain my answer.

19   So Asacol, Pentasa, Dipentum and Colazal were the four that

20   were available in 2007.  Since that time, there has been a

21   launch of four additional products.  Asacol HD, Apriso,

22   Giazo, and Delzicol.  And in 2013, Asacol, which was one of

23   the products that was available back in 2007, was -- was

24   withdrawn from the market, or, more accurately, the

25   manufacturer stopped manufacturing that product and making

Stautberg - direct

1    it available.

2    Q.    And who do you consider to be Lialda's primary market

3    competitor today?

4    A.    Our primary market competitors are Asacol HD,

5    Delzicol and Apriso.

6    Q.    And do you know what the dosing regimens are for

7    those competitive products you just mentioned?

8    A.    For Asacol HD and for Delzicol, those products are

9    indicated to be dosed three times a day for the induction of

10   remission.  For Apriso, Apriso is indicated to be dosed once

11   daily, but it only has an indication for the maintenance of

12   remission of ulcerative colitis.  It does not have an

13   indication for acute treatment of ulcerative colitis.

14   Q.    Do any of the competitive products have FDA approval

15   for an indication for once a day administration?

16   A.    Apriso would be the only one.  And, again, that is

17   only indicated for the maintenance of remission.  So for

18   patients who have already been put into remission on another

19   therapy.

20   Q.    Approximately how long had Asacol been on the market

21   in 2007 when Lialda launched its product?  Do you know?

22   A.    Asacol was launched in 1992, so 2007, that would make

23   it 15 years that Asacol had been on the market when Lialda

24   was launched.

25   Q.    And when Lialda came to market, who was the market

Stautberg - direct

1    leader?

2    A.    Asacol was.

3    Q.    And what was their market share, if you know?

4    A.    Asacol's market share at the time of the introduction

5    of Lialda was about 60 percent.

6    Q.    And how would you describe Lialda's performance since

7    it launched in 2007?

8    A.    Ever since Lialda has launched, it has had

9    tremendous, tremendously successful performance.  Lialda has

10   grown to be the number two product in Shire.  It has seen

11   consistent growth in market share in volume and in sales.

12   Q.    What is your basis for that testimony?

13   A.    It's my job to manage the product and manage the

14   expectations internally and to measure the performance or

15   lead the team that measures the performance externally.

16   Q.    And have you noticed any trends in the market

17   regarding Lialda's performance or uptake?

18   A.    So as I mentioned, it has grown consistently.  One

19   remarkable thing is that it has continued to grow

20   consistently over a very, very long period of time, and an

21   unusually long period of time in the pharmaceutical

22   industry.

23                   We're in our ninth year now since launch

24   and the product continues to grow very rapidly.  It is the

25   number one most prescribed mesalamine, and I think in 2010,

Stautberg - direct

1   I'm sorry, 2010 -- in 2015, it was still growing ten percent

2   in terms of volume growth, and that is in a completely flat

3   market.  So the market is not growing at all and our product

4   grew ten percent in the eighth year on the market.

5   Q.     Based on your experience, has Lialda been profitable

6   for Shire?

7   A.     Lialda has been profitable since the year after

8   launch and consistently so throughout its life.

9   Q.     Do you know what Lialda's current market share is?

10  A.     The market share from January of 2016 was

11  37.3 percent.

12  Q.     And how does Lialda's current market share of

13  37.3 percent compare to your other competitors?

14  A.     That market share number is approaching the

15  combination of the next three competitors' market shares

16  combined.

17  Q.     And do you know what Lialda's gross sales were in

18  2015?

19            THE COURT:  Let me ask a question, if I might,

20  if that's all right with you folks.

21            MR. HAUG:  Yes.

22            THE COURT:  When you say 37.3 percent of the

23  market, how are you defining the market?  Are you defining

24  that as the market for Lialda's drugs?

25            THE WITNESS:  So the market are those drugs that

Stautberg - direct

1    I outlined before --

2                THE COURT:  The four drugs plus Lialda?

3                THE WITNESS:  Yes.  It's the mesalamine

4    drugs plus Colazal, plus Dipentum.  Both of those are pro

5    drugs.

6                THE COURT:  All right.  Thank you.

7                MR. HAUG:  Thank you.

8    BY MR. HAUG:

9    Q.    What is a pro drug, very briefly?

10   A.    A pro drug is -- and, again, I'm not an expert in

11   this field, but my understanding of a pro drug, it's a

12   chemical and active ingredient, or chemical that is ingested

13   into the body in one form and then catalyzed into the active

14   ingredient that actually treats the condition while inside

15   the body.  And Dipentum and Colazal do that in the large

16   intestine.

17   Q.    And I was starting to ask you the question.  What

18   were Lialda's gross sales in 2015, if you know?

19   A.    In 2015, for the first time, Lialda had gross sales

20   in excess of $1 billion.  And that was after reaching $870

21   million in 2014.

22   Q.    Do you recall what the sales were in 2013?

23   A.    In 2013, the sales were, I think, $660 million.

24                MR. HAUG:  No further questions.

25                THE COURT:  Cross-examination.

Stautberg - cross

1          MR. MURPHY:  Good afternoon, Your Honor.

2                  CROSS-EXAMINATION

3    BY MR. MILLER:

4    Q.    Good morning, Mr. Stautberg.  Nice to see you again.

5    A.    Nice to see you again.

6          THE COURT:  Can you identify yourself for the

7    record?

8          MR. MILLER:  Andy Miller from Locke Lord.

9          THE COURT:  All right.  Thank you.

10   BY MR. MILLER:

11   Q.    Just a few questions, Mr. Stautberg.  You mentioned a

12   competitive environment of Lialda's and you said that when,

13   correct me if I'm wrong, when Lialda all came on the market,

14   Asacol was on the market a year?

15   A.    That's correct.

16   Q.    That is Asacol 400 milligrams; is that correct?

17   A.    That's correct.

18   Q.    And Asacol 400 milligrams, that was discontinued from

19   the market; is that correct?

20   A.    The manufacturer of Asacol 400 withdrew, or

21   technically, they stopped manufacturing and making available

22   that product in 2013.

23   Q.    And as a result of that discontinuation, Lialda did

24   gain some market share; is that correct?

25   A.    Lialda gained market share in 2013.  It's difficult

Stautberg - cross

1    to draw the direct tie, if you want to say it's because of

2    the withdrawal of Asacol 400 from the market.  The way I

3    would characterize it is, there were a lot of patients who,

4    when that product was discontinued, needed to be treated

5    with other therapies.

6                    A lot of doctors prescribed habitually in

7    this category, and that forced doctors to think about what

8    they were doing.  When they thought about what they were

9    doing, then they chose Lialda more than they had in a

10   situation where Asacol was an option.  And our market share

11   grew as a result of that.

12   Q.    And you're not here offering any opinion on the

13   compositions of the '720 patent; is that correct?

14   A.    That is correct.

15                  MR. MILLER:  No further questions, Your Honor.

16                  THE COURT:  All right.  Any redirect?

17                  MR. HAUG:  No, Your Honor.

18                  THE COURT:  All right.  Thanks very much, sir.

19   You may step down.

20                  THE WITNESS:  Okay.  Thank you.

21                  (Witness excused.)

22                  THE COURT:  Your next witness?

23                  MR. HAUG:  Our next witness will be Vivian Gray,

24   and my partner, Elizabeth Murphy, will conduct the examination.

25                  THE COURT:  All right.  Thank you.

Gray - direct

1                   ... VIVIAN ALBERTINA GRAY, having been duly

2      sworn as a witness, was examined and testified as follows...

3                   MS. MURPHY:  Your Honor, may I approach the

4      bench?

5                   THE COURT:  You may.

6                   (Ms. Murphy handed binders to the Court.)

7                   MS. MURPHY:  May I approach the witness?

8                   THE COURT:  You may freely approach.  Thank you.

9                   (Ms. Murphy handed a binder to the witness.)

10                  MS. MURPHY:  Your Honor, Elizabeth Murphy,

11     Frommer, Lawrence & Haug.

12                  THE COURT:  Thank you.  You may proceed, Ms.

13     Murphy.

14                         DIRECT EXAMINATION

15     BY MS. MURPHY:

16     Q.     Good morning, Ms. Gray.

17     A.     Good morning.

18     Q.     Can you please briefly describe for the Court your

19     educational and professional background?

20     A.     Yes.  I received my Bachelor of Science degree with a

21     major in chemistry from Mary Washington College at the

22     University of Virginia.

23     Q.     And your professional experience after that?

24     A.     Yes.  My professional experience in the area of

25     dissolution started when I started working for the USP,

Gray - direct

1   United States Pharmacopeia.  I worked there for 23 years in

2   various positions.

3                  My first position for the first eight years

4   was as a bench chemist doing dissolution testing.  And the

5   second eight years was method of, supervising method

6   development for dissolution testing.  And then the third

7   eight years was as a liaison, which my job was to interact

8   with the expert committees on dissolution and FDA and

9   pharmaceutical industry.

10  Q.    And do you currently serve on any professional

11  committees?

12  A.    Oh, I didn't finish.  I'm sorry.

13  Q.    All right.

14  A.    I went -- from USP, I went to DuPont Merck and headed

15  up their analytical dissolution group in their R&D

16  department.  And after that, in 2001, I began my consulting

17  business for dissolution.  The business was called V. A.

18  Gray Consulting.  And also I became managing director of

19  "Dissolution Technology," which is a peer-reviewed journal

20  on dissolution.  And I have, I have nearly 40 years of

21  experience in dissolution testing.

22  Q.    And do you serve on any professional committees?

23  A.    Yes, I do.  I serve on quite a few committees.

24  Mainly, the USP committee.  USP.  Mainly, one of the biggest

25  and best committees is the USP Expert Committee on

Gray - direct

1     pharmaceutical dosage forms.  That is the committee at USP

2     that approves standards for dissolution testing, and that is

3     an elected position.

4     Q.     And in what capacity do you serve on the expert

5     committee?

6     A.     On the expert committees, we make decisions about

7     general chapters and monographs and dissolution.  We either

8     revise general chapters or create general chapters.  One of

9     my roles on that committee, I was the author, co-author of

10    two general chapters regarding dissolution, 1092 method

11    development and validation, and then 1094, dissolution,

12    special considerations for capsules.

13    Q.     And who relies on these USP monographs and chapters

14    you've just described?

15    A.     The pharmaceutical industry, FDA, also other

16    countries that cite the USP and their laws.

17    Q.     And have you previously testified as an expert at

18    trial?

19    A.     Yes, I have.  Salix v Novell.

20    Q.     And did the Court accept you as an expert in that

21    case?

22    A.     Yes, they accepted me as an expert in dissolution

23    testing.

24              THE COURT:  Let me ask a question, if I might,

25    Ms. Murphy.

Gray - direct

1            You referenced USP a few times and gave me the

2    name of it, United States Pharmacopeia I think you said.

3            THE WITNESS:  Yes.

4            THE COURT:  Can you tell me what that is?

5            THE WITNESS:  Exactly.  It is the United States

6    Pharmacopeia.  It is a nonprofit standard setting

7    organization for the pharmaceutical industry.  Its product

8    is a large book called the USP.  And this organization,

9    first off, produces the USP.  The USP have these standards

10   that either are in monograph form or in general chapter

11   form.  And the standards are what the FDA uses to enforce

12   the standard.  In other words, the USP makes the standards

13   and the FDA enforces these standards.

14           THE COURT:  Thank you very much.  Thank you.

15           MS. MURPHY:  If we could please pull up PTX-543.

16   BY MS. MURPHY:

17   Q.    And if you could turn to PTX-543 in your binder, Ms.

18   Gray.

19   A.    Actually in my binder, it's 544.  That's okay.

20   Q.    I believe we put PTX-543 up on the screen.  Do you

21   see that?

22   A.    That's my CV.

23   Q.    Okay.  And is it accurate and up-to-date?

24   A.    Yes, it is.  I do have a couple of articles I just

25   published which aren't in that CV.

Gray - direct

1              MS. MURPHY:  Plaintiffs would offer PTX-543 into

2      evidence.

3              MR. MILLER:  No objection, Your Honor.

4              THE COURT:  It's admitted without objection.

5              (PTX-543 is admitted into evidence.)

6              MS. MURPHY:  And plaintiffs would also offer

7      Ms. Gray as an expert in dissolution testing.

8              MR. MILLER:  No objection, Your Honor.

9              THE COURT:  All right.

10     BY MS. MURPHY:

11     Q.     Ms. Gray, can you please provide a brief description

12     of what you have been asked to do for purposes of this

13     litigation?

14     A.     Yes.  I have been asked to design and carry out

15     experiments, dissolution testing on the Zydus -- three

16     tablets of the Zydus product which include generating

17     mesalamine dissolution data and also capturing digital

18     images of the dissolution.

19     Q.     And can you please describe for the Court briefly the

20     experimental setup of your experiment?

21     A.     Yes, I can.  I have a schematic up there.

22             This is the USP Apparatus II dissolution

23     paddles.  You can see paddles there in the equipment.

24             This equipment has been, was equipment I used

25     that was calibrated by, calibrated according to GMP

Gray - direct

1    standards.  This equipment, you can see there are eight

2    vessels in the equipment.  However, we only used three

3    vessels, one for each.

4                    THE COURT:  What is a GMP?

5                    THE WITNESS:  Good manufacturing practice.

6                    THE COURT:  Thank you.

7    BY MS. MURPHY:

8    Q.    And it looks like there is liquid in three of those

9    vessels.

10   A.    Yes.

11   Q.    Is that what you were referring to?

12   A.    Yes.  It turns out that, let me just describe what is

13   going on with those vessels.

14                   There is a tablet in each vessel.  There is the

15   paddle that provides gentle agitation.  Then you have the

16   media, which I will describe later, three different media.

17   And the bath is, the dissolution tester, that water bath

18   there is set at 37 degrees centigrade body temperature.

19                   What you don't see there are three cameras, a

20   camera for each vessel.  And that camera was mounted on a

21   tripod and took images of the three different vessels at

22   certain time intervals.

23                   Also, there were lights around the setup to

24   facilitate clearer imaging.

25   Q.    Did you consider any materials to design your

Gray - direct

1    dissolution experiment?

2    A.    Yes, I did.  I considered the validation report from

3    the Zydus ANDA.

4    Q.    If we could please turn to PTX-544.  It's in your

5    binder.

6    A.    Okay.

7    Q.    And, Ms. Gray, do you recognize this document?

8    A.    Yes, it is.  This is the method development report

9    for the Zydus product.  I relied on this report for my own

10   experimental design.

11   Q.    And why did you rely on this report for your

12   experimental design?

13   A.    Well, this was filed -- this was Zydus's, part of

14   Zydus's ANDA which was filed with the FDA, which assured me

15   of the fact that this was an accurate method that would

16   produce accurate results.

17   Q.    And if you could please turn to page 3 of this

18   document which is marked PTX-544.3 at the bottom.

19   A.    Okay.

20   Q.    Do you see where it says "test methodology?"

21   A.    Yes.  Here is where there are three media used in the

22   testing I described.

23           The first media is .1 normal hydrochloric acid.

24           The next media is 6.4 pH phosphate buffer.

25           And the third media is 7.2 pH phosphate buffer.

Gray - direct

1    Q.    Ms. Gray, when you say "phosphate buffer," what is

2    phosphate buffer?

3    A.    It's a dissolution media that is used very often in

4    dissolution, because you see the pH there is 7.2, 6.4, and

5    the acid is acid which is the pH of the stomach.  And the

6    intestinal tract shows the pH of 6.4 and 7.2.  So it is a

7    typical dissolution media, related to the body.

8                THE COURT:  Is there some difference between

9    phosphate and phosphate buffer?

10               THE WITNESS:  It should be phosphate buffer.

11               THE COURT:  All right.  Thank you.

12   BY MS. MURPHY:

13   Q.    And did you use these three media in your experiment?

14   A.    Yes, I did.

15               MS. MURPHY:  If we could please turn back to the

16   schematic at PDX-3.2.  I am sorry.  3.1.

17   BY MS. MURPHY:

18   Q.    Ms. Gray, how are the dissolution measurements taken

19   in your experiment?

20   A.    Well, with each of these three vessels, a sample was

21   taken from each at the specified time points.  The sample

22   was taken.  It was a 10 mil aliquot.  It was filtered and

23   collected in a test-tube and then analyzed by UV

24   spectrophotometry, generating absorbance values which was

25   used to generate the percent dissolved.

Gray - direct

1   Q.      For each vessel, how much dissolution measurements

2   were taken during your experiment?

3   A.      32 points.

4   Q.      How do you know that?

5   A.      Well, I have prepared a table that gives all these.

6   Q.      Okay.  And we have up on the screen, PDX-3.2.  Do you

7   see that?

8   A.      Yes.

9   Q.      Is that the table you prepared?

10  A.      Yes, it is.

11  Q.      Looking on the left-hand column, under dissolution

12  media, what is shown under that column?

13  A.      First off, this table is the dissolution data for

14  tablet 1.  And under the dissolution media, there is the

15  acids, acid media, .1 normal HCl, and the phosphate buffer,

16  pH 6.4, and the pH 7.2 phosphate buffer.

17  Q.      And how many dissolution measurements were taken

18  during the acid stage of your experiment?

19  A.      There were two taken every 60 minutes with a total

20  of -- the total time in acid was two hours.

21  Q.      How many measurements were taken on the pH 6.4

22  phosphate buffer stage?

23  A.      There were two taken.  They were taken every

24  30 minutes for a total of one hour.

25  Q.      And how many measurements were taken during the pH

Gray - direct

1   7.2 phosphate buffer stage?

2   A.     This, the samples were taken every 15 minutes for the

3   first six hours and every 30 minutes for the last two hours.

4   This was a total of eight hours.  And there were 28 time

5   points for the 7.2 phosphate buffer stage, totalling in all

6   the 32.

7              MS. MURPHY:  If we could turn to the next slide,

8   please.

9   BY MS. MURPHY:

10  Q.     PDX-3.3.  Do you have that?

11  A.     Yes.

12  Q.     And what is shown here?

13  A.     This says the very same information you saw with

14  tablet 1 except for the percent dissolved is unique to

15  tablet 2.

16  Q.     And tablet 2 would be in vessel 2?

17  A.     Yes.

18             MS. MURPHY:  And if we could have the next

19  slide, please.

20  BY MS. MURPHY:

21  Q.     What is shown here?

22  A.     This is the dissolution data on tablet 3.  This, all

23  this description of the experiment is identical to tablet 2

24  and 1 except the dissolution of the percent dissolution

25  dissolved is unique to tablet 3.

Gray - direct

1   Q.      And tablet 3 is the vessel 3; is that right?

2   A.      Yes.

3           THE COURT:  Can you tell me how you get more

4   than 100 percent dissolution?

5           THE WITNESS:  This is not unusual to see that in

6   dissolution.  It's simply can be that the measurement is

7   showing that it was manufactured to slightly above 100

8   percent.  It's, we see this all the time.  And, in other

9   words, it is very rare that you would actually see 100.00

10  all with the labeled claim.

11          THE COURT:  So what it is reflecting is that the

12  amount of what?

13          THE WITNESS:  The active ingredient.

14          THE COURT:  The active ingredient is above the

15  amount that was supposed going to be in it.

16          THE WITNESS:  Slightly, yes.  But it's typical

17  variation, typical balance of data for 100 percent dissolved.

18          THE COURT:  All right.  Thank you.

19          MS. MURPHY:  If we could please turn to

20  PTX-547-R.

21  BY MS. MURPHY:

22  Q.      Ms. Gray, do you recognize this document?

23  A.      Yes.  This is the Boston Analytical report of the

24  dissolution data that was generated in my experiment.

25  Q.      And who is Boston Analytical?

Gray - direct

1   A.      It's a contract lab that I supervise doing this

2   dissolution testing.  I had previous experience with this

3   lab from several projects.

4   Q.      Okay.  And if you could please turn to the page

5   number 5 which is marked PTX-547-R-4.5.

6   A.      (Witness complies.)

7   Q.      Are you there?

8   A.      Yes.

9   Q.      Do you see table 6 on that page?

10  A.      Yes, I do.  This is the report of the dissolution

11  results for the three vessels, going over to the next two

12  pages all the way to the end of the experiment, to

13  480 minutes.

14  Q.      Where do you see the end of the experiment on these

15  pages.

16  A.      It's on PTX-547-R.7.

17  Q.      And the average percent dissolved in this column, do

18  you see on the right-hand side, there was average percent

19  dissolved?

20  A.      Yes.

21  Q.      What is that?

22  A.      That is -- well, first off, vessels 1, 2, and 3 were,

23  the percent dissolved were calculated for that particular

24  time point and the average in vessel 1 is the average of the

25  three.  No, that's just the median of the calculation.

Gray - direct

1   Q.      For each time point?

2   A.      Yes.

3   Q.      Okay.  And did you check the data that we have been

4   looking at in table 6 for accuracy?

5   A.      Yes, I did.

6   Q.      How did you do that?

7   A.      I referred to, first off, there is a sample

8   calculation on R 9, R.9.  And then I used the raw data in,

9   that is shown in R.  Let's see.  I am not sure of this, it

10  has a page number.  But if you, right after R., it must be

11  R.11, 12, 13, 14.  Let's see.  Go to the very end there.  To

12  page, page R.19.  No, R.20.  And I used this raw data to

13  calculate the percent dissolved.

14  Q.      And can you turn to the next page, PTX-547-R.21?

15  A.      Yes, I have it.

16  Q.      And what is shown there?

17  A.      This is the notebook of where the analysts wrote down

18  their observations and experimental information.

19  Q.      Okay.

20  A.      This, by the way, this notebook page was witnessed by

21  their supervisor at the bottom.

22              MS. MURPHY:  I would offer PTX-547-R into

23  evidence.

24              MR. MILLER:  No objection.

25              THE COURT:  All right.  Exhibit 547-R, which I

Gray - direct

1    take it is the entirety of that exhibit, is admitted without

2    objection.

3              (PTX-547-R is admitted into evidence.)

4    BY MS. MURPHY:

5    Q.    And if you could please turn to the tab marked

6    PTX-900.1053 in your binder?

7    A.    Yes.  Oops.  Yes.  Okay.

8    Q.    And just looking at that page, PTX-900.1053, what is

9    that?  Rather, do you recognize this document?

10   A.    Yes, I do.

11   Q.    What is shown there?

12   A.    This is the mean value of the percent dissolved.

13   This is a graphical representation of a mean value of the

14   percent dissolved.  The dissolution data.

15              MS. MURPHY:  And plaintiffs would offer

16   PTX-900.1053 into evidence.

17              MR. MILLER:  No objection, Your Honor.

18              THE COURT:  It is admitted without objection.

19              (PTX-900.1053 is admitted into evidence.)

20   BY MS. MURPHY:

21   Q.    Ms. Gray, we just talked about the dissolution data

22   during your experiment.  I'd like to turn to the images that

23   you took of the tablets in dissolution.  If we can please

24   put up the schematic we were looking at before, PDX-3.1.

25              Could you please explain how the images were

Gray - direct

1    captured during your experiment?

2    A.    Yes.  As you recall, there are three vessels with the

3    three tablets.  Each had a camera.  The camera was put on a

4    tripod and operated by remote control.  And so there were

5    images taken for every, many times, all at set time

6    intervals; and also the images contained a date stamp,

7    date and timestamp, and also a number, an image number.

8    Q.    Okay.  And what were the time intervals?

9    A.    I have a table that I prepared that I can tell you

10   that.

11   Q.    Could you turn to PDX-3.5?

12   A.    (Witness complies.)

13   Q.    Is this the table you prepared?

14   A.    Yes.  And this is a table of the information about

15   the photos for tablet 1 and vessel 1.

16   Q.    Okay.  And how many time intervals did you take

17   pictures for in the acid stage?

18   A.    Four.  The approximate times for these photographs

19   were:  within one minute, five minutes, 60 minutes and

20   120 minutes.

21   Q.    And what were the intervals for the pH 6.4 phosphate

22   buffer stage?

23   A.    This was also within one minute, five minutes,

24   30 minutes, and 60 minutes.

25   Q.    And same question for the pH 7.2 phosphate buffer

Gray - direct

1    stage?

2    A.      It was within one minute, then every three minutes

3    for the first two hours, and then every ten minutes for

4    remaining six hours.

5    Q.      And then, Ms. Gray, what was the total length of your

6    experiment in terms of hours?

7    A.      It was 11 hours, and I supervised the experiment, the

8    capture of the pictures, and also the dissolution for that

9    entire time.

10   Q.      And looking at the next column, titled d1v1, do you

11   see that?

12   A.      Yes.

13   Q.      What is that?

14   A.      The d1v1 is the designation for vessel 1.

15   Q.      Okay.  Why are there several values reported for each

16   of these time points?

17   A.      Under d1v1, it goes from 0.10 to 0.13, and that is

18   how many images, the number of the images that were taken

19   during that time, during that one minute.

20   Q.      Okay.  And if we could go onto the next column time.

21   Do you see that?

22   A.      Yes.

23   Q.      What does that refer to?

24   A.      That refers to the hour, minutes and seconds

25   corresponding to the image number in the previous column.

Gray - direct

1    Q.      And the d1v1 column and the time column, I think you

2    mentioned earlier that there were image and time stamps on

3    each of the photos taken.  Do those refer to those image and

4    time stamps?

5    A.      Yes.  This d1v1 is designated for all the images in

6    vessel 1 and the designation of d1v2 is for all the images

7    taken in vessel 2, and d1v3 is for all the images taken in

8    vessel 3.  And the time stamp includes the time, the hours,

9    minutes and seconds.

10   Q.      And the last column on the far right entitled PTX, do

11   you see that?

12   A.      Yes.

13   Q.      What does that refer to?

14   A.      That refers to the number that was given to each

15   recorded, that was recorded for each image.

16   Q.      And if you could please turn to PTX-900.18 in your

17   binder.  Are you there?

18   A.      Yes.

19   Q.      Do you recognize this image?

20   A.      Yes.  It's the very first image taken in vessel 1 of

21   the whole experiment, in acid stage.

22   Q.      I see on the bottom right-hand corner, there's an

23   insignia, D11-0010.  Is that the image stamp you were

24   talking about before?

25   A.      Yes.

Gray - direct

1    Q.     Below that, there's a date and a time stamp?  Do you

2    see that?

3    A.     Yes.

4    Q.     Is that the date and time stamp on the table?

5    A.     Yes.

6    Q.     This is the first image of the acid stage.  Can you

7    identify by PTX number the last image taken in the acid

8    stage of your experiment?

9    A.     Let's see.  That's chart -- you want the last image

10   for the acid stage?

11   Q.     The last image for the acid stage for vessel 1?

12   A.     Okay.  900.37, and leaping over to 900.37.  Yes.  And

13   I have that.

14   Q.     So what is the range of images by PTX number for all

15   of the images taken during the acid stage for vessel 1 in

16   your experiment?

17   A.     It goes from PTX-900.18 to PTX-900.37.

18   Q.     Okay.  And if you could turn to the next page,

19   PTX-900.38.

20   A.     Mm-hmm.

21   Q.     Do you recognize this image?

22   A.     Yes.  This is the very first image within, taken

23   within one minute of the 6.4 phosphate buffer stage.

24   Q.     And which vessel is this for?

25   A.     This is for vessel 1.

Gray - direct

1    Q.      All right.  And, again, could I ask you to identify

2    the last image taken during the pH 6.4 phosphate buffer

3    stage?

4    A.      That is 900.66.  I have it.

5    Q.      And, Ms. Gray, what is the PTX number range for all

6    of the images of the Zydus tablet taken from vessel 1 during

7    pH 6.4 phosphate buffer stage in your experiment?

8    A.      900.38 to 900.66.

9    Q.      Okay.  And if we could go to the next image, which is

10   marked PTX-900.67.

11   A.      Yes.

12   Q.      And --

13   A.      This is the first image taken within one minute of

14   vessel 1 in the 7.2 phosphate buffer stage.

15   Q.      All right.  And, again, could you identify for me by

16   PTX number the range of images taken during the pH 7.2

17   phosphate buffer stage?

18   A.      900.67 to 900.362.

19   Q.      All right.  And --

20   A.      Do you see that?  Do you see that?

21   Q.      Can we pull up PTX-900.362?

22   A.      Yes.

23   Q.      All right.

24   A.      And that's the last image of vessel 1.

25           MS. MURPHY:  Plaintiffs would move into evidence

Gray - direct

1   PTX-900.18 to PTX-900.362.

2           MR. MILLER:  No objection, Your Honor.

3           THE COURT:  It's admitted without objection.

4   (PTX-900.18 to PTX-900.362 were admitted into evidence.)

5   BY MS. MURPHY:

6   Q.    Okay.  And if we can please go to slide 6.  What is

7   shown here?

8   A.    This is the slide prepared for the photos for tablet

9   2 and vessel 2.  This contains at least for the first two

10  columns the same information that you saw in the previous

11  table, but it contains the image numbers, the time and the

12  PTX numbers for vessel 2, or tablet 2.

13  Q.    All right.  And if we go to PTX-900.402.

14  A.    Yes.

15  Q.    All right.

16  A.    And this is, this is the first image taken within one

17  minute of vessel 2 in the acid stage.

18  Q.    And can you identify the range of images by

19  PTX-number?

20  A.    It begins with 900.402 and ends with 900.419.

21  Q.    And what is the stage of your experiment that those

22  images correspond to for vessel 2?

23  A.    That would be acid stage.

24  Q.    Okay.  And if we can go to PTX-900.420.

25  A.    Yes.

Gray - direct

1   Q.      What is shown here?

2   A.      This is, this is the, for vessel 2, it is the first

3   image taken within one minute of pH 6.4 phosphate buffer

4   stage.

5   Q.      And what is the PTX number range for all of the

6   images taken during the pH 6.4 phosphate buffer stage for

7   vessel 2?

8   A.      900.420 to 900.441.

9   Q.      Okay.  And if we could turn to PTX-900.442.

10  A.      Okay.  Excuse me.  Okay.

11  Q.      And --

12  A.      This is, this is the first image taken for vessel 2

13  within one minute in the 7.2 phosphate buffer state.

14  Q.      And what is the range of images by PTX number for pH

15  7.2 phosphate buffer state for vessel 2?

16  A.      It goes from 900.442 to 900.722.

17  Q.      Okay.  And if we could turn to the next and last

18  slide, which is PDX 3.7.

19          Ms. Gray, what is shown here?

20  A.      This is a table, Table 3 -- this is the table for

21  tablet 3 and vessel 3, describes the photos taken during the

22  run.  The dissolution media and photo time points are the

23  same, but the D1, D3 and the time and the PTX numbers are

24  unique to tablet 3.

25  Q.      And, Ms. Gray, could you please read the range of PTX

Gray - direct

1    numbers for all photos taken during the acid stage?

2    A.    900.736 to 900.756.

3    Q.    And this is for vessel 3; is that right?

4    A.    Vessel 3, yes.

5    Q.    Okay.  And, Ms. Gray, for vessel 3, could you please

6    read the range of PTX numbers for images taken during pH 6.4

7    phosphate buffer stage of your experiment?

8    A.    Yes.  900.757 to 900.775.

9    Q.    And could you also please read the PTX number range

10   for all of the images taken in vessel 3 for the pH 7.2

11   phosphate buffer stage?

12   A.    900.776 to 900.1052.

13                MS. MURPHY:  And plaintiffs would offer into

14   evidence PTX-900.736 to 900.1052.

15                MR. MILLER:  No objection, Your Honor.

16                MS. MURPHY:  And if we could go back one slide,

17   please.

18                THE COURT:  It's admitted.

19                MS. MURPHY:  My apologies.  I'm sorry Your

20   Honor.

21   (Exhibit admitted into evidence.)

22   BY MS. MURPHY:

23   Q.    We were looking at the data before.  This is for

24   vessel 2; is that right?

25   A.    Okay.

Gray - cross

1    Q.    Okay.  And plaintiffs would additionally offer into

2    evidence PTX-900.402 to PTX-900.722.

3                   MR. MILLER:  No objection, Your Honor.

4                   THE COURT:  Admitted without objection.

5                   (Exhibit admitted into evidence.)

6    BY MS. MURPHY:

7    Q.    Ms. Gray, we've just gone through the details of your

8    experiment that you performed for this case, including the

9    measurements, the dissolution measurements that you took and

10   the images that were taken of the three vessels.

11                  Do you have an opinion as to whether the data

12   and images that we've gone through were an accurate

13   representation of the Zydus product?

14   A.    Yes.  The data we have just gone through is an

15   accurate are representation of the dissolution of the Zydus

16   product.

17                  MS. MURPHY:  Thank you, Ms. Gray.  No further

18   questions.

19                  THE COURT:  Cross-examination.

20                  MR. MILLER:  Thank you, Your Honor.  Andy Miller

21   again for defendants.

22                        CROSS-EXAMINATION

23   BY MR. MILLER:

24   Q.    Ms. Gray, you don't have any opinions in this case on

25   infringement; is that right?

                              Gray - cross

1    A.      No, I do not.

2    Q.      And the only ingredient as it were that you analyzed

3    in the Zydus product is mesalamine; is that correct?

4    A.      Yes.

5                   MR. MILLER:  No further questions, Your Honor.

6                   THE COURT:  All right.  Thank you.

7                   Any redirect?

8                   MS. MURPHY:  No, Your Honor.

9                   THE COURT:  All right.  Thank you, ma'am.  You

10   may step down.

11                  (Witness excused.)

12                  THE COURT:  Hold on just a moment.

13                  Ms. Farnan?

14                  MS. FARNAN:  Your Honor, I wanted to let you

15   know that the next witness is going to be a video deposition

16   that is going to take an hour, so I didn't know if Your

17   Honor wanted to take a break at this point.

18                  THE COURT:  Not really.

19                  MS. FARNAN:  All right.  We're happy to proceed

20   then.

21                  THE COURT:  Let's fire it up and go.

22                  MS. FARNAN:  Shire is now calling defendant's

23   30(b)(6) witness, Mr. Kulkarni, by video deposition.

24                  Among other things, he was designated as a

25   30(b)(6) witness on the composition, formulation and

Gray - cross

1    development of the Zydus ANDA.  Product and I will get some

2    binders to hand up for Your Honor.

3              THE COURT:  All right.  Hold on just a moment.

4              Mr. Gaertner?

5              MR. GAERTNER:  Yes, Your Honor.  This is the

6    issue that I think Mr. Haug graciously flagged at the

7    beginning, that is the dispute over whether or not this is a

8    30(b)(6) deposition.  I will tell you why that is.

9              THE COURT:  Okay.

10             MR. GAERTNER:  In advance of this deposition, as

11   it often happens in a 30(b)(6), you try to negotiate.  You

12   file objections on the topic and you negotiate the scope of

13   them and you reach an agreement.  Then you let it go.

14             What happened here was the plaintiffs noticed

15   this witness both as a 30(b)(1) and a 30(b)(6) deposition

16   witness.  We objected to the 30(b)(6) topics.  We endeavored

17   to reach an agreement on those 30(b)(6) topics.

18             We did not reach an agreement on those 30(b)(6)

19   topics, so at the time at the time the deposition went

20   forward, we still objected to those.  And we made objections

21   on the record during the deposition.  However, we did not

22   refuse to let the witness answer because we know we're not

23   allowed to do that, plus he was a 30(b)(1) witness.

24             But we do object to having him characterized as

25   a 30(b)(6) witness on these various topics, because we had

Gray - cross

1     an objection standing.  We made it clear we were not

2     presenting him on that basis.

3               THE COURT:  Did you agree on him being a

4     30(b)(6) witness on any topic?

5               MR. GAERTNER:  Not to this topic, no.

6               THE COURT:  No.  When you say "this topic,"

7     there's nothing that this man is going to say that you

8     agree he is a valid 30(b)(6) witness that could bind

9     Zydus?

10              MR. GAERTNER:  We went back and looked at the

11    transcript last evening when this when this issue came to a

12    head.  We went back.

13              I noticed we objected during the time at the

14    deposition to each of the topics that the plaintiffs tried

15    to characterize as 30(b)(6) topics because we had objections

16    pending and we hadn't reached a resolution of this.

17              THE COURT:  Right.  So the answer to my question

18    is yes?

19              MR. GAERTNER:  Yes, it is.

20              THE COURT:  There's nothing that this man says

21    that you agree could bind the defendant --

22              MR. GAERTNER:  That's correct.

23              THE COURT:  -- as a 30(b)(6) witness.  All

24    right.  All right.  I got your position.

25              Ms. Farnan, are you going to speak to this?

                          Gray - cross

1            MS. FARNAN:  Yes, Your Honor.  I'm speaking to

2    this because I was involved in the meet and confers we had

3    on this last evening.

4            The issue here is just whether or not it's

5    testimony that is binding on the company.  And he was

6    offered as a 30(b)(6) witness.  He appeared as a 30(b)(6)

7    witness.  And they are correct, that there were some

8    objections to the topic, but it was not a complete

9    objection.

10           So, for example, in -- and on page 20 of his

11   deposition transcript, the objection was --

12           THE COURT:  Hold on just a moment.  If you are

13   going to be referring to that, why don't you hand up the

14   transcript.

15           MS. FARNAN:  Your Honor, may I approach?

16           THE COURT:  Please.

17           (Ms. Farnan handed binders to the Court.)

18           THE COURT:  Thank you.  Okay.  You started to

19   refer to --

20           MS. FARNAN:  So if you look, Your Honor, in

21   the front of the binder -- and I just want to note, we did

22   have this dispute last night and we asked them to -- Your

23   Honor will see when we go through the designations that

24   there is no specific objection to scope as to the specific

25   questions that we are seeking to admit into evidence, so

Gray - cross

 1  there's only this general objection at the beginning of the

 2  deposition.

 3           And last night we asked them to identify, which

 4  of these portions of testimony do you say are outside the

 5  scope, and they wouldn't identify it.  So I think that's one

 6  area.  We can put that aside and I can show Your Honor where

 7  they, in fact, agreed.  He was presented on some of these

 8  important topics subject to their objection.

 9           So we'll look at page 20 of his transcript.  And

10  what's going on here is that Shire is reading into the

11  record the topic and asking if he's prepared to testify on

12  them.

13           And on line 5 on page 20, it says, so he's being

14  presented on topic one as limited by a response and

15  objection.

16           So, of course, there were objections that were

17  served, but they did agree to, for example, produce him on

18  topic one.

19           Another topic that we think is important here,

20  but they have not identified it, would be topic six.  And

21  if you look at page 25 of the transcript, line 7 to 11, he

22  says, again, object to the extent that Mr. Lief is implying

23  that the witness is presented on full scope of topic six

24  as it was worded as he is not being presented on that full

25  scope.

Gray - cross

1             So it was clear at the deposition, and it

2       was clear from their objection that he was a 30(b)(6)

3       witness, but that they were attempting to limit it.  But

4       there's no specific objection to any of the questions then

5       later.

6             And I think what they are trying to do is say,

7       we don't want this testimony binding on the company.  But

8       not only is he a 30(b)(6) witness, but under 801(c)(2), as

9       an officer, managing agent, who dealt with formulation in

10      the course of his business, these are binding admissions on

11      the company in any event.

12            So it's not really clear to us how they're going

13      to walk away from the binding nature of this, nor have they

14      identified it.  But he was clearly offered as a 30(b)(6)

15      witness.  They had some objections.  Their primary objection

16      was that we would be talking about the current ANDA

17      formulation, which we did.  We have not heard anything to

18      say that this testimony applies to anything other than the

19      current Zydus product.

20            And so we think we are well within the scope of

21      the 30(b)(6) on which they offered this witness, and it's

22      our view that all of this testimony is therefore binding on

23      the company.

24            THE COURT:  Okay.  Thank you.

25            Mr. Gaertner, your response?

Gray - cross

1           MR. GAERTNER:  At the beginning of the

2    deposition, the examination started out with reviewing each

3    of the deposition topics.  I rendered objections to each of

4    those topics, but I certainly --

5           THE COURT:  Let me stop and ask you this.

6           MR. GAERTNER:  Yes.

7           THE COURT:  They sent you a 30(b)(6) notice and

8    you offered this gentleman.  Is that Mr. Kulkarni?  Is that

9    the man you put forward to be the representative?  Even if

10   you thought we're going to negotiate the scope, he is the

11   guy you put forward.  Is that correct?

12          MR. GAERTNER:  That's correct, Your Honor.

13          THE COURT:  All right.  So how is it that we get

14   into the courtroom on the day of trial and you are prepared

15   to say, there's nothing he's saying that would be an

16   appropriate 30(b)(6) binding admission?

17          Was the testimony so outside the scope of what

18   they had suggested they wanted a witness for the company

19   about, that it would be unfair to view him as an appropriate

20   representative for the company?

21          MR. GAERTNER:  It depends on the question, Your

22   Honor.  It does.

23          THE COURT:  All right.  So I hear Ms. Farnan

24   saying, well, they never said anything as they were going

25   through as to any question that they thought was beyond the

Gray - cross

1  scope of the appropriate level of questioning for this

2  person.

3            Is that an accurate representation?

4            MR. GAERTNER:  I think in general, it is, Your

5  Honor.

6            THE COURT:  Okay.

7            MR. GAERTNER:  And we rendered the objection at

8  the beginning, but that's right.  As we went along, we did

9  not.

10           THE COURT:  You know what, I don't have to

11  make a decision right now at this point and I'm not going

12  to.

13           I will say that as a general matter, I'm

14  unimpressed with the sort of general blanket statement

15  that a 30(b)(6) witness that you offered somebody who can't

16  bind the company in any way, even though you did not point

17  out at any point specifically, he can't talk about that for

18  the following reasons.  That's an unimpressive and

19  unpersuasive position.

20           But I don't have to make my mind up about it

21  now.  I will let you guys fight it out as we get to

22  post-trial briefing and findings of fact and conclusions of

23  law.  If you want to take a stand or you want to try to

24  persuade me, now, wait a second, that's just not fair, I'm

25  not telling you that you can't do that.  I'm just giving you

Kulkarni - designations

1   a general heads-up that it does not move me very much, Mr.

2   Gaertner.

3              MR. GAERTNER:  Thank you, Your Honor.

4              THE COURT:  So let's go ahead and play it.

5              MS. FARNAN:  Your Honor, I may I approach with

6   the remainder of the binders for this witness?

7              THE COURT:  Yes.

8              (Ms. Farnan handed binders handed to the Court.)

9              MS. FARNAN:  Your Honor, as I indicated, this

10  will be testimony by video.

11             THE COURT:  All right.  Before we start, I

12  wanted to say this.  If you need a break at some point, I'm

13  prepared to go through this and break, but if you want to

14  break sooner, give me a sign.

15             All right.  Good.  Good enough.  Thanks.

16             (The videotaped deposition of Sushrut Krishnaji

17  Kulkarni was played as follows.)

18             "Sushrut Krishnaji Kulkarni having been first

19  duly affirmed, was examined and testified as follows:

20             "Question:  Could you state your full name for

21  the record.

22             "Answer:  Sushrut, Krishnaji Kulkarni.

23             "Question:  And do you have any residences in

24  the United States?

25             "Answer:  No.

Kulkarni - designations

1       "Question:  Okay.  And what is your current

2   title at Zydus?

3       "Answer:  Senior -- senior vice president.

4       "Question:  And are you senior vice president of

5   any particular department?

6       "Answer:  I'm head of PTC.  Is the

7   Pharmaceutical Technology Centre.

8       "Question:  Okay.  And how long have you had

9   that position?

10      "Answer:  Since November 2012.

11      "Question:  And what are your responsibilities

12  in that position?

13      "Answer:  I am responsible for all development

14  activities which are carried out in this development center.

15      "Question:  Okay.  And were you involved

16  continuously from 2007 or -- until September of 2012 with

17  the Lialda project?

18      "Answer:  Initially, I was directly involved for

19  up to 2009 or 2010, probably.  Then it was a supervisory

20  role.

21      "Question:  Okay.  And did your involvement in

22  those years relate to coming up with the formulation for

23  Zydus's generic version of Lialda?

24      "Answer:  Yes.

25      "Question:  Okay.  And then when you returned to

Kulkarni - designations

1   Zydus in November of 2012, did you continue to be involved

2   in the generic Lialda project at Zydus?

3           "Answer:  At a supervisory level.

4           "Question:  And does that remain the case to

5   this day?

6           "Answer:  Yes.

7           "Question:  All right.  I take it you understand

8   that you're here today as a 30(b)(6) deponent on behalf of

9   the defendants, Zydus and Zydus Cadila?

10          "Answer:  Yes.

11          "Question:  Do you have any personal knowledge

12  of the '720 patent?

13          "Answer:  No.

14          "Question:  Have you ever seen it?

15          "Answer:  Yes.

16          "Question:  Do you recall the first time you

17  ever saw the '720 patent?

18          "Answer:  I don't remember exactly.  Probably

19  2007 somewhere.

20          "Mr. Lief:  Let me mark as Kulkarni Exhibit 102

21  a document bearing Bates Nos. ZYDUS_MES2353657 through

22  235843.

23          "The Witness:  Thank you.

24          "Mr. Lief:  And let me also mark as Kulkarni

25  Exhibit 103 a document bearing Bates Nos. ZYDUS-MES25337

Kulkarni - designations

1   through 25799.

2           "Question:  With respect to Kulkarni

3   Exhibit 102, have you seen this document before?

4           "Answer:  Yes.

5           "Question:  And can you tell me what this

6   document is?

7           "Answer:  This is a batch manufacturing record

8   for EMM196.

9           "Question:  If we turn and go forward to Bates

10  page ZYDUS_MES235660.  Do you have that page?

11          "Answer:  Yes.

12          "Question:  Can you tell me what is shown on

13  this page?

14          "Answer:  This is a manufacturing formula for

15  EMM196.

16          "Question:  Okay.

17          "Answer:  First three steps.

18          "Question:  And is this a list of the

19  ingredients that are in EMM196, I guess continuing on to the

20  next page, 235661.

21          "Answer:  Yes.

22          "Question:  Now, focusing on page 235660, I see

23  there three headings.  One heading says 'compaction,' one

24  heading says 'granulation,' and one heading says

25  'lubrication.'  Do you see that?

1              "Answer:  Yes.

2              "Question:  And what is the significance of each

3      of those headings?

4              "Answer:  These are the steps in manufacturing

5      of EMM196.

6              "Question:  Okay.  And are those done in

7      sequence?  In other words, does the compaction step come

8      before the granulation step, which then in turn comes before

9      the lubrication step?

10             "Answer:  Yes.

11             "Question:  Okay.  In the compaction step,

12     underneath that heading, I see three ingredients listed.  Do

13     you see that?

14             "Answer:  Yes.

15             "Question:  And am I correct that those

16     ingredients in the compaction step are mesalamine, colloidal

17     silicon dioxide, AEROSIL-200 Pharma, and magnesium stearate?

18             "Answer:  Yes.

19             "Question:  Okay.  Are any of those ingredients

20     binders?

21             "Answer:  No.

22             "Question:

23             "Mr. Lief:  Okay.  Why don't we mark as Kulkarni

24     Exhibit No. 104 a document bearing Bates Nos. ZYDUS_MES23363

25     through 23422.

Kulkarni - designations

1              "Question:  Now, looking at Kulkarni

2      Exhibit 104, let me ask you, first of all, have you seen

3      this document before?

4              "Answer:  Yes.

5              "Question:  Okay.  Now, this document comes

6      from -- am I correct -- comes from the ANDA submission that

7      Zydus made for its generic version of Lialda before the

8      EMM196 batch had been made; correct?

9              "Answer:  Yes.

10             "Question:  Okay.  Is it your understanding that

11     the statements made in this quality overall summary document

12     for the earlier exhibit batch still apply to exhibit batch

13     EMM196?

14             "Answer:  Yes.

15             "Question:  And then, again, in Exhibit Kulkarni

16     102, at page 235660, the next ingredient on the list for

17     batch EMM196 is magnesium stearate.

18             "What is the function of magnesium stearate in

19     row 3 there?

20             "Answer:  Lubricant.

21             "Question:  Okay.  And what is your

22     understanding of what a lubricant does?

23             "Answer:  Improve the flow of powder.

24             "Question:  Now, with respect to magnesium

25     stearate as used here in row 3 for batch EMM196, do you know

1    whether it is hydrophobic?

2                "Answer:  Yes.

3                "Question:  Yes, it is?

4                "Answer:  Yes.

5                "Question:  What is your basis for saying it is

6    not lipophilic?

7                "Answer:  Magnesium stearate is hydrophobic

8    because it repels water.  And it is not lipophilic because

9    it has not affinity towards lipid.  That's my understanding.

10               "Question:  Would you agree with me that in that

11   first phase, the compaction phase, there are no hydrophilic

12   materials?

13               "Answer:  No.

14               "Question:  No, you agree with me or --

15               "Answer:  Yes.

16               "Question:  -- no, you disagree with me?

17               "Answer:  No hydrophilic material.

18               "Question:  Okay.

19               "Answer:  Except API.  API, it's soluble in

20   aqueous."

21               THE COURT:  Can you stop that?  Yes.  Is it

22   possible for you to just back that?  Because I couldn't hear

23   that last statement, that last answer.

24               "Question:  Would you agree with me that in that

25   first phase, the compaction phase, there are no hydrophilic

Kulkarni - designations

1   materials?

2               "Answer:  No.

3               "Question:  No, you agree with me or --

4               "Answer:  Yes.

5               "Question:  -- no, you disagree with me?

6               "Answer:  No hydrophilic material.

7               "Question:  Okay.

8               "Answer:  Except API.  API, it's soluble in

9   aqueous.

10              THE COURT:  Okay.  Stop.  And point me to the

11  page because I am still having a hard time hearing his

12  response.

13              What page are we on of the deposition at this

14  point.

15              (The Court and court clerk confer.)

16              MR. LIEF:  Your Honor we're told it's page 55.

17              No, maybe not.  52.

18              THE COURT:  Okay.  Thanks.  Go ahead.

19              "Question:  The mesalamine itself --

20              "Answer:  Yeah.

21              "Question:  -- is soluble in water?

22              "Answer:  Yeah.

23              "Question:  Okay.  But the other two

24  ingredients, colloidal silicon dioxide and magnesium

25  stearate, are not hydrophilic to your understanding;

 1    correct?

 2              "Answer:  Yes.

 3              "Question:  The next step says 'granulation' or

 4    the next title says 'granulation' I should say.  And there

 5    are several ingredients listed under there.

 6              "In row 4, it says 'carboxymethylcellulose

 7    sodium.'  And then in parentheses, it says, '(Blanose CMC

 8    7HF pH.)'  Do you see that?"

 9              "Answer:  Yes.

10              "Question:  With respect to that ingredient,

11    carboxymethylcellulose sodium, what is its role in batch

12    EMM196?

13              "Answer:  This is a release retardant.  It's a

14    matrix former.

15              "Question:  When you say 'release retardant',

16    are you saying that chemical plays a role in controlling the

17    release of the drug, mesalamine, from the tablet?

18              "Answer:  Yes.

19              "Question:  Okay.  And it does that by forming a

20    matrix within EMM196?

21              "Answer:  Yes.

22              "Question:  Okay.  And is carboxymethylcellulose

23    sodium a hydrophilic chemical in this product?

24              "Answer:  In my opinion, it is hydrophilic

25    material.

Kulkarni - designations

1          "Question:  Going down to the next ingredient,

2     which is "sodium starch glycolate type A (Glycolis/Roquette),

3     what is the function of that ingredient in batch EMM196?"

4          "Answer:  It is disintegrant.

5          "Question:  Okay.  And what is a disintegrant?

6          "Answer:  Disintegrant is ingredient which helps

7     to disintegrate the tablet.

8          "Question:  Okay.  In that sense, does it play a

9     role in the rate of release of the drug from the product?

10          "Answer:  Rate of release is a function of

11    entire tablet.

12          "Question:  Okay.  So the answer is, yes, it

13    does play a role?

14          "Answer:  Yes.

15          "Question:  And is sodium starch glycolate type

16    A a hydrophilic material in this product?

17          "Answer:  Yes.

18          "Question:  Does microcrystalline cellulose play

19    any role in retarding the release or slowing the release of

20    mesalamine from the product that is EMM196?

21          "Answer:  In my opinion, no, it does not.

22          "Question:  Returning to the prior page, which

23    is ZYDUS_MES235660.  With respect to the three -- actually,

24    the four chemicals that are listed below the heading

25    'granulation,' rows 4 through 7 -- carboxymethylcellulose

1    sodium, sodium starch glycolate type A, hypromellose 15

2    CPS and purified water -- are any of those chemicals

3    hydrophobic?

4              "Answer:  No.

5              "Question:  Okay.  Are any of those chemicals

6    lipophilic?

7              "Answer:  No.

8              "Question:  How small are the particles, if

9    you know, that come out of the oscillating granulator when

10   EMM196 is made?

11             "Answer:  I don't know.  I don't have idea.

12             "Mr. Lief:  Continuing in Kulkarni Exhibit 102.

13   If we could turn to what is page ZYDUS_MES235695.

14             "Question:  Do you have that?

15             "Answer:  Yeah.

16             "Question:  And do you see there's a Step No.

17   5.0 and then 5.1 shown on this page?

18             "Answer:  Yeah.

19             "Question:  Step 5.1 has a heading 'preparation

20   of pre-mix,' and then there are various sub-steps that are

21   described in there.

22             "Can you tell me what is being done in Step 5.1?

23             "Answer:  This is a preparation of pre-mix for

24   compaction.

25             "Question:  Okay.  And so is this the three

Kulkarni - designations

1  ingredients that are going to be put through the roll

2  compactor?

3              "Answer:  Yes.

4              "Question:  Okay.  And so that includes the

5  mesalamine, the colloidal silicon dioxide, and the magnesium

6  stearate?

7              "Answer:  Yes.

8              "Question:  And is it correct that those three

9  ingredients are mixed together in what's called an 'egg

10  shell blender?'

11             "Answer:  Yes.

12             "Question:  What is an 'egg shell blender?'

13             "Answer:  It's a blender having the shape of egg

14  shell, oval-shaped.

15             "Question:  Okay.  All right.  And for how long

16  are those three ingredients, how long were they mixed on

17  this page for batch EMM196?

18             "Answer:  It is for ten minutes.

19             "Question:  Ten minutes.  And what is the

20  purpose of the mixing of those three ingredients?

21             "Answer:  It's a uniform mixture of colloidal

22  silicon dioxide and magnesium stearate.

23             "Question:  And so it's to create a uniform

24  mixture of those three ingredients together?

25             "Answer:  To create a mixture, yeah.

1           "Question:  All right.  Turning back to

2   Exhibit 102, which was, again, the current EMM196 batch.

3           The material -- the mesalamine, colloidal

4   silicon dioxide, and magnesium stearate -- goes through the

5   roll compactor with these settings?

6           "Answer:  Excuse me.  You're on which page?

7           "Question:  I am sorry.  I am on page ZYDUS_MES

8   235700.

9           "The materials -- the mesalamine, colloidal

10  silicon dioxide and magnesium stearate -- go through the

11  roll compactor, and then am I correct that material in Step

12  6.3.4 is then put through an oscillating granulator?  Is

13  that correct?

14          "Answer:  Yes.

15          "Question:  Okay.  And the result that comes out

16  of the oscillating granulator is granules; correct?

17          "Answer:  Yes.

18          "Question:  And the granules that come out of

19  the oscillating granulator, what chemicals are in those

20  granules?

21          "Answer:  These are compacts of mesalamine.

22          "Question:  Now, if we go to what is marked as

23  ZYDUS_MES235716.

24          "Again, this is in Exhibit 102.  There's a Step

25  No. 10.0 here that has a heading:  'Granulation Lot A.'  Do

1    you see that?

2              "Answer:  Yes.

3              "Question:  Okay.  And then in Step 10.1, it

4    says 'transfer.'  Do you see that?

5              "Answer:  Yeah.

6              "Question:  And under 'transfer,' the first line

7    reads, 'mesalamine compacted.'  And then it says (Lot A of

8    Step No. 9.0.)

9              "Do you see that?

10             "Answer:  Yes.

11             "Question:  Now, when it says 'mesalamine

12   compacted,' am I correct that that's referring back to the

13   compacted granules that have the mesalamine, silicon

14   dioxide, and the magnesium stearate in them?  Correct?

15             "Answer:  Yes.

16             "Question:  Okay.  And then it reads in the next

17   two lines, 'carboxymethylcellulose sodium and sodium starch

18   glycolate' and then it says 'into the HSMG bowl.'  Do you

19   see that?

20             "Answer:  Yes.

21             "Question:  Okay.  And so this is a step where

22   you're taking the granules that were from the oscillating

23   granulator and now adding on top of them these

24   carboxymethylcellulose sodium and sodium starch glycolate

25   materials in a new mixing bowl; correct?

Kulkarni - designations

1          "Answer:  Yes.

2          "Question:  Okay.  Now, the granules that come

3   out of this series of steps in Step 10, I guess 10.1, you

4   know, and sub-steps of that, 10.1.2, those granules are

5   bigger granules than the granules that came out of the

6   oscillating granulator of the compacted mesalamine material;

7   correct?

8          "Answer:  Yes.

9          "Question:  If you go to page ZYDUS_MES235722.

10         "Answer:  Yeah.

11         "Question:  Now, you have a Step 10.3, and it

12  has a heading, 'milling.'  Do you see that?

13         "Answer:  Yeah.

14         "Question:  Underneath that, there's a step

15  10.3.2.  Do you see that?

16         "Answer:  Yeah.

17         "Question:  And that says:

18         "'Manually mix colloidal silicon dioxide with

19  dried granules of Step No. 10.2.'  And then it goes on.

20         "Do you see that?

21         "Answer:  Yeah.

22         "Question:  So the colloidal silicon dioxide

23  that was used in that first compaction process doesn't find

24  its way out of those granules to be a glidant in this later

25  step?

Kulkarni - designations

1       "Answer:  No.

2           "Question:  And is that also true of the

3   magnesium stearate that's used in the earlier compaction

4   process?

5           "Answer:  Yes.

6           "Question:  Do you have, in your experience in

7   formulation, do you have any recollection -- again, other

8   than this formulation -- of using magnesium stearate as

9   part of a compaction process at the beginning of the

10  manufacturing process?

11          "Answer:  I don't remember.

12          "Question:  You have no recollection of that, as

13  you sit here today?

14          "Answer:  Yes.

15          "Question:  If we go back to what we had marked

16  as Exhibit 104, which is the quality overall summary from,

17  really, the earlier batch, 345, as it was submitted, and as

18  we discussed, it is your belief that this applies to 196 as

19  well?

20          "Answer:  Yes.

21          "Question:  If we look at what is page

22  ZYDUS_MES23378.  At the bottom of that page, there's --

23  well, in the middle of the page, there's a table that

24  compares the ingredients of the branded Lialda product with

25  Zydus's proposed generic product; correct?

Kulkarni - designations

1          "Answer:  Yeah.

2          "Question:  And then below that table, there is

3     a paragraph that reads:

4          "'Despite the apparent differences in

5     composition between the proposed formulation and RLD, these

6     differences are considered irrelevant in the context of

7     having a potential effect with respect to therapeutic

8     equivalence.  This is based upon the noted similarities

9     between the two products, both in terms of dosage form and

10    dosage form design.'  And it goes on.  Close quote.

11         "Did I read that correctly?

12         "Answer:  Yeah.  Yes.

13         "Question:  Okay.  And is it your testimony that

14    those statements are still true with respect to the new

15    batch, EMM196?

16         "Answer:  Yes.

17         "Question:  If you turn, again, in Kulkarni

18    Exhibit 104, to page ZYDUS_MES 23384.

19         "And with respect to, in the left-hand column,

20    there's a, I guess I'll call it an oval towards the bottom

21    that has -- it says 'magnesium stearate and AEROSIL-200.'

22    Do you see that?

23         "Answer:  Yeah.

24         "Question:  Okay.  And then there's an arrow

25    from there that goes to an oval that says 'lubrication.'

Kulkarni - designations

1    Do you see that?

2                "Answer:  Yes.

3                "Question:  All right.  And then from

4    "lubrication,' there's two arrows, one that goes to 'tableting

5    properties,' and one that goes to 'dissolution.'  Do you see

6    that?"

7                "Answer:  Yes.

8                "Question:  And what is your understanding of

9    what that arrow that goes from 'lubrication' to

10   'dissolution' indicates with respect to EMM196?

11               "Answer:  That's an error.  That arrow is in

12   error.  This should have been from 'tableting properties.'

13               "Question:  Okay.  And do you have any reason to

14   believe that the formulators who came up with the generic

15   version of Lialda for Zydus did not review this page,

16   ZYDUS_MES23384?

17               "Answer:  That's an error which happened in this

18   document.

19               "Question:  Now, that was submitted at the

20   same time that this quality overall summary was submitted;

21   correct?

22               "Answer:  Yeah.  It's a part of the ANDA.

23               "Question:  Okay.  And subsequent to your

24   deposition, though, where you first testified that this was

25   an error, have you revised or amended the quality overall

Kulkarni - designations

1   summary to remove that arrow from 'lubrication' to

2   'dissolution.'

3                "Answer:  No, we have not submitted.

4                "Question:  Is there any reason you couldn't

5   have done that?  In other words, you couldn't have

6   roll-compacted everything together in the first step,

7   including the hydrophilic chemicals?

8                "Answer:  It's a formulation strategy decided by

9   a scientist --"

10               THE COURT:  Can you stop that for a moment.

11               I just want to point out, this has been very

12   helpful to have it highlighted in the transcript.  That last

13   piece was not highlighted.  To the extent that you folks are

14   intending to limit the record to what is highlighted, you

15   are going to need to fix that because it looks like the last

16   bit of testimony which appears on page 104 of the transcript

17   was not highlighted.

18               MS. FARNAN:  Your Honor, I think that was an

19   oversight.  That was an counter-counter designation.

20               THE COURT:  Yes.  However it got in.  I am just

21   trying to make -- you guys are building your record, right?

22   Whatever you want to submit have in the record is fine with

23   me within bounds of reason.  I am just making clear that

24   there is a piece that we just heard which is not highlighted

25   in here, and when you are doing your setup of your proposed

Kulkarni - designations

1    findings of fact and conclusions of law, and I am looking at

2    the record, I am just trying to avoid a dispute later on.

3    Okay?  Thanks.  Go ahead.

4         "Question:  And your understanding is the

5    formulators preferred to have the first compaction step be

6    only mesalamine, silicon dioxide, and the magnesium stearate?

7         "Answer:  Yes:

8         Mr. Lief:  All right.  Let me mark as Kulkarni

9    Exhibit 113 a document bearing Bates Nos. ZYDUS_MES239470

10   through 369518.

11        "Question:  And with respect to this document,

12   Kulkarni Exhibit 113, have you seen this document before?

13        "Answer:  Yes.

14        "Question:  Okay.  And what is this document?

15        "Answer:  This is the instruction manual for

16   roll compactor.

17        "Question:  Okay.  And is this the roll

18   compactor that was used in making EMM196 batch?

19        "Answer:  Yes.

20        "Question:  If you turn to what is page 369476,

21   there is a page there that has the heading:  'Design of the

22   machine and principle of operation.'  Do you see that?

23        "Answer:  Yes.

24        "Question:  Okay.  And the first sentence reads:

25        "This is a dry granulation method."

1          Did I read that correctly?

2          "Answer:  That's -- I can't read.

3          "Question:  That's correct?

4          "Answer:  Yeah.

5          "Question:  Okay.  And do you agree with that,

6     that roll compaction is a dry granulation method?

7          "Answer:  Yeah, dry granulation can be done

8     through roll compact.

9          "Question:  Strike that.

10         "At the end of the Zydus process, in the

11    compaction process, where you do the roll compactor and the

12    oscillating granulator, do you get particles of different

13    sizes?

14         "Answer:  Yes.

15         "Question:  And do you get, amongst those

16    particle sizes, what would be called 'fines?'

17         "Answer:  Yes.

18         "Question:  If you look at the last sentence

19    here on this page, it reads:

20         "'The addition of binders to the material being

21    processed greatly reduces the production of fines.'

22         "Did I read that correctly?

23         "Answer:  Which line are you referring to?

24         "Question:  The very last sentence on page

25    369476.

1          "Answer:  Yeah.

2          "Question:  See that?

3          "Answer:  Yeah.

4          "Question:  Okay.  Now, am I correct that in the

5     roll compaction process that Zydus -- in the roll compaction

6     process that Zydus undertook in EMM196 of the three

7     ingredients that are included -- the mesalamine, the

8     colloidal silicon dioxide and the magnesium stearate -- none

9     of those are binders?

10         "Answer:  Yes.

11         "Question:  And so is it fair to say that, given

12    this, this observation that the addition of binders reduces

13    the production of fines, Zydus was not particularly trying

14    to reduce the fines in the compaction step?  Correct?

15         "Answer:  Zydus's objective was to compact

16    mesalamine.  That's the objective with which we will

17    undertake compaction.

18         "Question:  Um-hmm.  But you didn't have an

19    objective to reduce fines?

20         "Answer:  Our objective was to increase bulk

21    density.

22         "Question:  Irrespective of fines?

23         "Answer:  Yeah.

24         "Mr. Lief:  Let me mark as Kulkarni Exhibit 114

25    a document bearing Bates Nos. ZYDUS_MES 235643 through 235645.

Kulkarni - designations

1       "Question:  And let me ask you, with respect to

2    Kulkarni Exhibit 114, have you seen this document before?

3       "Answer:  Yes.

4       "Question:  And what is this document?

5       "Answer:  It's a certificate of analysis of

6    magnesium stearate from Cadila and from Dr. Paul Lohmann.

7       "Question:  Who is Dr. Paul Lohmann?

8       "Answer:  He is a supplier of magnesium

9    stearate.

10      "Question:  And is this the certificate of

11   analysis for the magnesium stearate that is -- that was used

12   in the exhibit batch EMM196 that Zydus has submitted to the

13   FDA?

14      "Answer:  Yes.

15      "Mr. Lief:  Let me mark as -- let me mark as

16   Kulkarni Exhibit 117 a document bearing Bates Nos.

17   ZYDUS_MES212122 through 212135.

18      "Question:  Okay.  And in the trail of e-mails

19   there -- in the trail of e-mails there, am I correct that

20   you are both a recipient and a sender of various e-mails in

21   this trail?

22      "Answer:  Yes.

23      "Question:  Okay.  And if you look at the

24   attachment, which begins at page 212125, and goes through

25   page 212135, have you seen that document before?

1          "Answer:  Yes.

2          "Question:  Okay.  And am I correct on the

3   beginning page here, 212125, to this PowerPoint, the subject

4   matter is:  'Mesalamine delayed release tablets, 1.2 grams?'

5          "Answer:  Yes.

6          "Question:  The e-mails that we're looking at

7   are all -- look like July of 2009?

8          "Answer:  Yes.

9          "Question:  Okay.  And so coming back to the

10  PowerPoint that's attached to these e-mails, the next page

11  of the document, page 212126, what is, what is on this page?

12         "Answer:  These are Orange Book information for

13  mesalamine DR tablets, 1.2 gram.

14         "Question:  Now, if you go to the next page,

15  which is ZYDUS_MES212127, there is a slide here that talks

16  about 'MMX multi-matrix system' and then in parentheses it

17  says (MMXTM technology) and it says 'background.'  Do you

18  see that?

19         "Answer:  Yes.

20         "Question:  And this reads, quote:

21         "'This new delivery system uses lipophilic and

22  hydrophilic excipients enclosed within a pH dependent film

23  coating that is resistant to gastric acid, thus delaying

24  release of the drug until the tablet is exposed to a pH of 7

25  or higher (usually in the terminal ileum).  When this film

Kulkarni - designations

1    disintegrates, intestinal fluids interact with the tablet,

2    causing it to swell and creating an outer viscous gel mass.

3    As the tablet passes through the colon, parts of the outer

4    gel mass are expected to detach from the tablet core,

5    releasing 5-ASA near to the colonic mucosa.  The lipophilic

6    excipient is interspersed with the tablet core and is

7    thought to reduce the rate of 5-ASA dissolution by slowing

8    the penetration of aqueous fluids."

9              "Did I read that correctly?

10             "Answer:  Yes.

11             "Question:  Okay.  And this paragraph that I

12   just read, is it fair to say that that is a summary by Zydus

13   of the technology in the Orange Book patent?

14             "Answer:  I really don't know from where it has

15   been taken.  Somebody -- some -- might be some from Internet

16   or some, some other literature.

17             "Question:  Okay.  And with respect to the final

18   product that Zydus is proposing for its generic version of

19   Lialda, would it be a correct statement to say that it has

20   'a pH dependent film coating that is resistant to gastric

21   acid?'

22             "Answer:  Yes.

23             "Question:  Okay.  And would it also be a

24   correct statement to say that when that film disintegrates

25   from the Zydus product, 'intestinal fluids interact with the

Kulkarni - designations

1  tablet, causing it to swell' and create 'an outer viscous

2  gel mass?'

3                "Answer:  Yes.

4                "Question:  Okay.  And in that regard, with

5  respect to the swelling, that derives from the presence of

6  hydrophilic excipients in the proposed Zydus product;

7  correct?

8                "Answer:  Yes.

9                "Mr. Lief:  All right.  Let me mark as Kulkarni

10  Exhibit 118 a document bearing Bates Nos. ZYDUS_MES263467

11  through 263473.

12                "Question:  Looking at this document, Kulkarni

13  118, do you see that this is a trail of e-mails from around

14  May and June of 2008?

15                "Answer:  Yeah.  Yes.

16                "Question:  If you look at the bottom of page

17  263468, the last paragraph there, it talks about the 'OB

18  patent (U.S. 6,773,720).'  Do you see that?"

19                "Answer:  Yes.

20                "Question:  And that is the patent-in-suit in

21  this case, the Orange Book patent; correct?

22                "Answer:  Yes.

23                "Question:  Okay.  And in discussing that

24  patent, it says the following:

25                "'The OB patent (U.S. 6,773,720) which is having

Kulkarni - designations

1    PCT filing June 2000 and granted on August 2004 in which it

2    is mentioned a controlled release delayed release mesalazine

3    (5-ASA) pharmaceutical composition.  In the example, the

4    given patent is mentioning the enteric coated formulation.

5    The example also describes that the formulation release is

6    delayed in gastric fluid.  It claims 80 to 95 percent of the

7    drug in the formulation along with the combination of

8    hydrophilic and hydrophobic material to form the matrix."

9            "Did I read that correctly?

10           "Answer:  Yes.

11           "Question:  Do you recall, at this time at

12   Zydus, people talking about the Orange Book patent as a

13   patent that involved the combination of hydrophilic and

14   hydrophobic chemicals?

15           "Answer:  Yes.

16           "Mr. Lief:  Let me mark as Kulkarni Exhibit 119

17   a document with Bates Nos. ZYDUS_MES266926 through 266933.

18           "Question:  Okay.  With respect to Kulkarni

19   Exhibit 119, am I correct that this, on its first page, is

20   a trail of e-mails during the January, early January 2008

21   period?

22           "Answer:  Yes.

23           "Question:  And am I correct that some of these

24   e-mails are -- the bottom one seems to be to you?  And then

25   the top one, you send that and you forward it to Raju Satya;

Kulkarni - designations

1     correct?

2               "Answer:  Yes.

3               "Question:  And that top e-mail from you to Raju

4     Satya on January 2nd, 2008, you write:

5               'Dear Dr. Raju,

6               'Attached below, please find formulation

7     strategies of mesalamine DR tablets (1.2 gram) for your

8     review.

9               "Regards, Sushrut Kulkarni.

10              "Did I read that correctly?

11              "Answer:  Yes.

12              "Question:  And then attached are several

13    different formulation proposals for a -- I guess a generic

14    version of Lialda; is that correct?

15              "Answer:  Yes.

16              "Question:  Okay.  And after those, what looks

17    like three pages, pages 266927 through 266929, where you

18    have those formulations.  Then starting on page 266930

19    through to the end, there seems to be a PowerPoint attached

20    to that as well?

21              "Answer:  Yes.

22              "Question:  See that?

23              "Answer:  Yeah.

24              "Question:  Am I correct that amongst the ideas

25    that were being contemplated at Zydus in this time period of

Kulkarni - designations

1    around January 2008 for ways to possibly get around the

2    Orange Book patent, which is the patent-in-suit in this

3    case, one of the thoughts was:  We can have an inner

4    hydrophobic matrix with an outer hydrophilic matrix, and

5    that would circumvent the patent.

6                    "Answer:  Yes.

7                    "Question:  And so, for instance, if you look at

8    page ZYDUS_MES 266933, there's a PowerPoint slide whose

9    heading is:  'Formulation strategy to circumvent OB Patent

10   No. U.S. 6,773,720 B1.'

11                   "Do you see that?

12                   "Answer:  Yeah.

13                   "Question:  And amongst the strategies, number 2

14   says, the inner matrix is hydrophobic in nature instead of

15   being lipophilic.

16                   "Do you see that?

17                   "Answer:  Yes.

18                   "Question:  Now, in fact, what you've ultimately

19   done in your -- in the product you're proposing to the FDA

20   is, in fact, to have a hydrophobic material inside the

21   granule surrounded by a hydrophilic material; correct?

22                   "Answer:  We have not done hydrophilic matrix.

23   We have done -- we have used magnesium stearate as a

24   lubricant.  And we have added -- and we have used only

25   hydrophilic matrix of sodium CMC.

Kulkarni - designations

1          "Question:  All right.  So set aside the issue

2     of whether it's a matrix or not.

3          "The magnesium stearate that's in those

4     compacted granules after that first step is hydrophobic;

5     correct?

6          "Answer:  Yes.

7          "Question:  And then outside of that, you have

8     all these hydrophilic materials that form your matrix;

9     correct?

10         "Answer:  Yes.

11         MR. LIEF:  Okay.  I would like to mark as

12    Kulkarni Exhibit 125 a document bearing Bates numbers

13    ZYDUS_MES 347367 through 347402.

14         "Question:  And let me begin by asking you:

15    Have you ever seen this document, Kulkarni Exhibit 125,

16    before?

17         "Answer:  No.

18         "Question:  Okay.  Are you familiar with the

19    type of document this is at Zydus?

20         "Answer:  It's an in-process analysis, raw data.

21         "Question:  Okay.  When you say 'an in process

22    analysis,' what does that mean, 'in process'?

23         "Answer:  During manufacturing of a batch, this

24    analysis is being done, is done.

25         "Question:  Okay.  And so if you look at the

Kulkarni - designations

1    first page of Kulkarni Exhibit 125, which is ZYDUS_MES

2    347367, am I correct that this is an in process analysis

3    that was done during the manufacture of EMM196?

4              "Answer:  Yes.

5              "Question:  Okay.  If you could turn to page

6    347373.

7              "Answer:  Yeah.

8              "Question:  And -- and if you need to look at

9    any other pages around it, but can you tell me what is

10   reported on this page?

11             "Answer:  This is dissolution data.

12             "Question:  Okay.  And it's dissolution data for

13   EMM196?

14             "Answer:  Yes.

15             "MR. LIEF:  And then if I can mark as Kulkarni

16   Exhibit 126 a document bearing Bates numbers Zydus_MES

17   350240 through 353502.

18             "BY MR. LIEF:

19             "Question:  And with respect to Kulkarni Exhibit

20   126, have you seen this document before?

21             "Answer:  No.

22             "Question:  Okay.  Have you seen -- strike that.

23             "Are you familiar with a what this document is

24   at Zydus, what type of document this is ?

25             "Answer:  Yes.

Kulkarni - designations

1                "Question:  And what type of document is this?

2                "Answer:  This, this is analytical lab notebook.

3                "Question:  Looking at page ZYDUS_MES 350397, do

4      you see in the upper right-hand corner there it says, 'batch

5      number,' and then it says '1200-F108'?

6                "Answer:  Yes.

7                "Question:  Okay.  And can you confirm for me

8      that the dissolution conditions here on this page 350397 in

9      Kulkarni Exhibit 126, are the same pH 7.2 phosphate buffer,

10     paddle 100 RPM, as those that we saw in Kulkarni Exhibit 125

11     at page 347370?

12               "Answer:  Yes.

13               "Question:  Okay.  And coming back to Kulkarni

14     Exhibit 126, if you look at page ZYDUS_MES 350400 -- do you

15     see that?

16               "Answer:  Yeah.

17               "Question:  Do you see that there are results

18     reported on this page for what appears to be batch F108, for

19     dissolution?

20               "Answer:  I can't read the number.  There are --

21     there are --

22               "BY MR. LIEF:

23               "Question:  There are data there?

24               "Answer:  Yeah.

25               "Question:  But they're not legible, really?

Kulkarni - designations

1    They're very small?

2              "Answer:  Yeah.

3              "Question:  Okay.  Let me -- let me mark as

4    Kulkarni Exhibit 127 a document bearing Bates numbers

5    ZYDUS_MES 0349718 through 0349795.

6              "BY MR. LIEF:

7              "Question:  And with respect to Kulkarni Exhibit

8    127, have you seen this document before?

9              "Answer:  Yes.

10             "Question:  You've seen this?

11             "Answer:  Yes.

12             "Question:  Okay.  And what is this document?

13             "Answer:  It is a lab notebook for formulation.

14             "Question:  Okay.  And it's for various

15   formulations that Zydus tried for its mesalamine delayed

16   release tablets?

17             "Answer:  Yes.

18             "Question:  Okay.  And if we go to page, Bates

19   page ZYDUS_MES 349763 --

20             "Answer:  Yeah.

21             "Question:  Am I correct that on this page

22   349763, there is a formulation set forth for Zydus'

23   mesalamine DR tablet batch No. 1200 F108.  Is that correct?

24             "Answer:  Yes.

25             "Question:  In terms of the formulation itself

Kulkarni - designations

1    for F108, is this formulation made in a way where the

2    mesalamine is initially combined with colloidal silicon

3    dioxide and magnesium stearate, and then compacted?

4              "Answer:  No.

5              "BY MR. LIEF:

6              "Question:  Okay.  And so in this formulation,

7    F108, the magnesium stearate is only added at the end,

8    before compression?

9              "Answer:  Yes.

10             "Question:  Okay.  Other than that, can you

11   confirm for me that the ingredients in F108 are the same

12   ingredients as in Zydus' final exhibit batch, EMM196?

13             "And to do that, you may want to look at

14   Kulkarni Exhibit 102, at page ZYDUS_MES 235660.

15             "Answer:  It is same.

16             "Question:  Same ingredients; correct?

17             "Answer:  Yeah.

18             "Question:  And, again, as comparing the

19   ingredients in F108 with the final Zydus exhibit batch,

20   EMM196, am I correct that the amount of each ingredients in

21   each tablet is also the same?

22             "Answer:  Yes.  It is same.

23             "Question:  Mr.  Kulkarni, I have a few

24   questions here.  And bear with me; I haven't had as much

25   time as Mr. Lief to prepare here.

Kulkarni - designations

1          "I'd like to take you back to some testimony

2     about the materials that are used in the compaction step in

3     EMM196.

4              So if you could pull out the batch manufacturing

5     record, which is 102, if you could please, Mr. Kulkarni --

6     just so I have a good point of reference -- page to the

7     document -- I'm sorry, page to the page ending in -5660 of

8     Exhibit 102.

9              "Answer:  Yes.

10             "Question:  Does this page reflect the materials

11    that are used in the compaction step of batch EMM196?

12             "Answer:  Yes.

13             "Question:  Is the manufacture -- I'm sorry.

14    Let me take a step back.

15             "What is the name of the colloidal silicon

16    dioxide used in batch EMM196?

17             "Answer:  An Aerosil-200.

18             "Question:  Is it Aerosil-200 Pharma?

19             "Answer:  Yeah.  Aerosil-200 Pharma.

20             "Mr. Gaertner:  What number are we on?

21             "The Reporter:  128.

22             "Question:  During Mr. Lief's examination, you

23    might recall a point in time when he asked you to agree with

24    him whether or not the materials in the compaction phase

25    have any lipophilic excipients.  Do you remember generally

Kulkarni - designations

1   that conversation with Mr. Lief this morning?

2             "Answer:  Yes.

3             "Question:  Now, we just established that one of

4   the materials in the compaction phase is the colloidal

5   silicon dioxide known Aerosil -200 Pharma; is that right?

6             "Answer:  Yes.

7             "Question:  Now, I've just marked as Kulkarni

8   Exhibit 128 materials of -- from the website of Evonik

9   Industries that is the manufacturer of Aerosil.  I'd like

10  you to take a moment to review that, please.

11            "Okay.  Yeah.  And could you read into the

12  record the title of this information, please?

13            "Answer:  Hydrophilic fumed silica.

14            "Question:  And does this indicate to you, Mr.

15  Kulkarni, that the colloidal silicon dioxide used in the

16  compaction step in batch EDM196 is hydrophilic?

17            "Answer:  Yes.

18            "Question:  So in your view, Mr. Kulkarni, does

19  the compaction step in batch EMM196 include a hydrophilic

20  excipient?

21            "Answer:  Yes."

22            (End of videotaped deposition.)

23            MS. FARNAN:  Your Honor, at this time, we would

24  move into evidence PTX-205, which was Kulkarni Exhibit 117;

25  PTX-208, which was Kulkarni Exhibit 104; PTX-217, which was

1    Kulkarni Exhibit 103; PTX-287, which was Kulkarni Exhibit

2    102; PTX-288, which was Kulkarni Exhibit 127; PTX-294, which

3    was Kulkarni Exhibit 113; PTX-295, which was Kulkarni

4    Exhibit 114; PTX-298, which was Kulkarni Exhibit 118;

5    PTX-299, which was Kulkarni Exhibit 119; PTX-303, which was

6    Kulkarni Exhibit 125; and PTX-304, which was Kulkarni

7    Exhibit 126.

8              THE COURT:  All right.  Mr. Gaertner?

9              MR. GAERTNER:  No objections, Your Honor.

10             THE COURT:  All right.  They are all admitted

11   without objection.  Thank you.

12             (Above-referenced Exhibits admitted into evidence.)

13             MS. FARNAN:  And, in addition, Your Honor, we

14   had notified Zydus by e-mail, a couple of the exhibits that

15   we've just admitted, PTX-208, PTX-217, PTX-287, PTX-295 and

16   PTX-303 are part of the defendant's ANDA.

17             And we had notified them at the time we moved a

18   portion of the ANDA in, we were going to move the entire

19   ANDA in, multiple volumes.  Your Honor does not have all

20   of it.  We will provide them to the Court, but I can read

21   into the record now and move the entire ANDA in at the same

22   time.

23             MR. GAERTNER:  The notice we received was under

24   Federal Rule of Evidence 106, which is that if an adverse

25   party moves an incomplete document in, then the other party

1    can get up and ask to move the rest of it in.  We're not

2    moving that in, so I don't see how Rule of Evidence 106

3    applies.

4            MS. FARNAN:  Your Honor, I guess we're surprised

5    at an objection, because we did not hear one when we sent

6    our e-mail yesterday.  And this is a case that is an

7    artificial act of infringement, the filing of the ANDA.  And

8    the ANDA, of course, is evolving over time, but at the end

9    of the day, it's one complete submission to the FDA that it

10   was segmented because it evolves over time.  We think it's

11   largely irrelevant.

12           Again, this is a document we're admitting.

13   We're an adverse party to the ANDA and we're just seeking to

14   have the entire ANDA in the record.

15           THE COURT:  Yes.  Well, I will tell you what.

16   We're going to take a break.  I will let the two of you

17   actually talk about this.  All right?  See if you can't

18   come to some reasonable agreement, or at least to the point

19   on the objection and the response so that I can pick it

20   up.

21           We'll go ahead and take a ten-minute break, be

22   back here at noon, and run it for another half-hour,

23   45 minutes, and then take our lunch break.  All right?

24   Okay.  We're in recess.

25               (Short recess taken.)

```
 1                    (Proceedings resumed after the short recess.)

 2                    THE COURT:  All right.  Thank you.  Please be

 3       seated.

 4                    Your next witness, Mr. Haug?

 5                    MR. HAUG:  Yes, Your Honor.  We're actually

 6       going to skip over one deposition video.

 7                    If we may continue the discussion on the

 8       exhibits that we had just before the break over the lunch

 9       break, that may obviate the need for that deposition,

10       depending upon if we can reach agreement.

11                    THE COURT:  All right.

12                    MR. HAUG:  So I'm answering the question we

13       don't have an answer yet on the meet and confer.

14                    THE COURT:  Okay.

15                    MR. HAUG:  But we will after lunch.

16                    And the next witness I will let my partner, Mr.

17       Lief, introduce.

18                    THE COURT:  All right.  Mr. Lief?

19                    MR. LIEF:  Good afternoon.

20                    THE COURT:  Good afternoon.

21                    MR. LIEF:  We're going to play the de bene esse

22       deposition of trial testimony of Dr. Davies, who did some

23       testing in the case, and the testing relates to the issue

24       of the location of mesalamine in the accused product.

25                    As a scheduling issue, I'm told the entire
```

1    deposition is about 46 minutes, including the cross

2    questioning, and so --

3            THE COURT:  Let's roll it through.  If everybody

4    is fine with that, that will be the last thing you do before

5    the lunch break.  Okay?

6            MR. GAERTNER:  Judge, Mike Gaertner.  I just

7    want to give you a heads-up.

8            During the deposition there were some objections

9    raised, and since you weren't there, I don't know how you

10   want to handle them in terms of the scope of the testimony

11   as beyond the report.  I want to flag the issue with you.

12   It could be that you just want to address it when the

13   objection comes up and I'm fine with it, but I wanted to let

14   you know that that is going to occur.

15           THE COURT:  Let's actually deal it in context.

16   In other words, if there are objections that you still want

17   to stand on, I will expect you to rise, Mr. Gaertner, or

18   whoever is handling the matter.

19           As soon as you see him on his feet, then let's

20   have the videotape stop rolling and we can deal with the

21   objection then.  Is that all right?

22           MR. GAERTNER:  Yes.  My colleague, Andrea Wayda,

23   will be doing that.

24           THE COURT:  That's fine.

25           MR. LIEF:  Your Honor, if I might approach, I

Davies - designations

1    don't know how many copies?

2            THE COURT:  One for the clerk, if I might, one

3    for me, and one for the record.

4            (Deposition binders handed to the Court.)

5            (The videotaped deposition of Martyn Christopher

6    Davies was played as follows.)

7            "Question:  Would you state your full name for

8    the record.

9            "Answer:  My name is Martyn Christopher Davies.

10           "Question:  And what is your profession?

11           "Answer:  I'm a university professor at the

12   University of Nottingham in the U.K.  I'm also, I started a

13   pharmaceutical company called Molecular Profiles, now called

14   Juniper Pharma."

15           THE COURT:  Can we stop just a second here?  Am

16   I going to look in vein for highlighting?  Is this one

17   highlighted?  No, yes?

18           MR. LIEF:  I think this is the entirety of the

19   transcript.

20           THE COURT:  This is the whole thing all the way

21   through.  Okay.  Got it.  Thanks.

22           "Question:  I would like you to look in your

23   book at Plaintiffs' Trial Exhibit 520.  Can you tell us what

24   this document is?

25           "Answer:  This document is my curriculum vitae.

Davies - designations

1          "Question:  And is the information reported in

2     that document accurate and up to date?

3          "Answer:  I believe it is.  There may be one or

4     two publications coming up this month, but I believe it's up

5     to date.

6          "Question:  And --

7          "MR. LIEF:  We would move Plaintiffs' Trial

8     Exhibit 520 into evidence, and as I understand it it's

9     without objection.

10         "DR. WAYDA:  No objection.

11         "Question:  Can you tell us, what is the focus

12    of your work in the pharmaceutical sciences?

13         "Answer:  The focus of my work is in the

14    development and characterization of pharmaceutical dosage

15    forms.

16         "Question:  And how long have you been involved

17    in the characterization or analysis of pharmaceutical dosage

18    forms?

19         "Answer:  I've been involved since my

20    undergraduate days through to my post-graduate days in my

21    academic and industrial career, that must be over 30 years

22    that I've been involved in characterization and testing of

23    pharmaceutical dosage forms.

24         "Question:  If we could turn to Plaintiffs'

25    Demonstrative Exhibit No. 2.1.  Can you tell me what this

Davies - designations

1    is?

2                    "Answer:  This is a summary of my curriculum

3    vitae.

4                    "Question:  And could you point out for us some

5    of the highlights listed here?

6                    "Answer:  Yes.  I graduated as a pharmacist top

7    of my class.  I did my Ph.D. in the School of Pharmacy at

8    the University of London.  I am a university professor.

9    I've published over 400 scientific publications.  I've

10   trained over 100 post doctor, post-graduate staff, around

11   about 20 of whom have gone on to full academic posts, many

12   have gone into industry.

13                   I founded a company called Molecular Profiles,

14   which is now known as Juniper Pharma, and we won two Queen's

15   Awards for industry in category of enterprise.  That's the

16   top category, top award for industry in the U.K.

17                   "I've had a number of awards.  I've been made

18   fellow in a number of learned societies, including the Royal

19   Society of Chemistry.  I've been president of the Controlled

20   Release Society, which is the premier society of drug

21   delivery, internationally.

22                   "I've also -- our school and the laboratory at

23   our school was given the Queen's Award for industry in

24   collaboration with Molecular Profiles in recognition of

25   the work in translating, our work through the industry.

Davies - designations

1          "Question:  Dr. Davies, have you been accepted

2     as an expert in the field of pharmaceutical science and

3     formulation in other Federal Courts?

4          "Answer:  Yes, I have.

5          "Question:  And could you briefly tell us some

6     of those.

7          "Answer:  For instance, I gave evidence in a

8     trial related to the drug called omeprazole.  I gave

9     evidence where I did testing using a range of analytical

10    techniques to address specific issues, both included

11    infrared spectroscopy, those included imaging techniques, to

12    determine the structure of formulations.

13         "I also undertook -- for example, another case I

14    did was related to Exelon (phonetic), and again, in that

15    case I did testing to show the distribution of the drug

16    through the product, and I used Raman spectroscopy and

17    mapping for that.

18         "Mr. Lief:  We would move the Court that

19    Mr. Davies be admitted as an expert in the fields of

20    pharmaceutical science and in the analysis and

21    characterization of pharmaceutical drug formulations.

22         "Ms. Wayda:  No objection."

23         THE COURT:  Okay.  Go ahead.

24         "Question:  Dr. Davies, what were you asked to

25    do in this case?

Davies - designations

1                    "Answer:  I was asked to look at, specifically I

2       was asked to look at the distribution of the drug mesalamine

3       through the Zydus ANDA product.

4                    "Question:  And have you done that?

5                    "Answer:  I have.

6                    "Question:  And what is your conclusion?

7                    "Answer:  My conclusion is that the drug mesalamine

8       is distributed homogenously throughout the Zydus product.

9                    "Question:  And what is that opinion based

10      upon?

11                   "Answer:  It's based on the testing that I

12      undertook.  Testing, my analytical testing where I looked at

13      the Zydus ANDA formulation.

14                   "Question:  And what samples of the Zydus

15      product did you test?

16                   "Answer:  I tested two different batches of the

17      Zydus ANDA product.  I tested the EMM196 and I also tested

18      EMM345, which were the -- I believe the 196, which I

19      referred to as the 196 batch, the batch produced most

20      recently, under the most recent manufacturing conditions.

21      That's what I've been advised by counsel.

22                   "Question:  And what types of testing did you

23      perform on those products?

24                   "Answer:  I performed two specific tests.  I

25      performed testing using Raman spectroscopy.  I also used

Davies - designations

1    optical microscopy in my analysis of the product.

2              "Question:  Who developed the analytical

3    procedure for the testing of the Zydus ANDA product?

4              "Answer:  I did.  I designed the experiments,

5    and the experiments were undertaken by technicians at my

6    company, Juniper Pharma.  I took that work, reviewed the

7    data and came to my conclusions.

8              "Question:  If we could turn to Plaintiffs'

9    Trial Exhibit 523, can you tell us what is this document?

10             "Answer:  This document is the laboratory

11   notebook from Juniper Pharma highlighting the experiments

12   that we undertook.

13             "Question:  Is Plaintiffs' Trial Exhibit 523 an

14   accurate and complete copy of the lab notebook?

15             "Answer:  Yes, it is.

16             "Question:  And is this the type of document you

17   would keep at Juniper Pharma in the ordinary course of

18   business?

19             "Answer:  It is indeed.

20             "Mr. Lief:  We would move Plaintiffs' Trial

21   Exhibit 523 into evidence.

22             "Dr. Wayda:  No objection."

23             THE COURT:  It is admitted.

24             (PTX-523 was admitted into evidence.)

25             "Question:  Turning to Exhibit 2.2, can you tell

Davies - designations

1    us what is shown here?

2            "Answer:  Yes, this is a demonstrative I

3    prepared which explains the experimental procedures that I

4    undertook.

5            "Question:  And can you briefly describe for us

6    those procedures?

7            "Answer:  Yes.  So starting from the left, the

8    first, the Zydus tablet was cut using a razor blade, and

9    then we used an microtome with a diamond blade to precisely

10   cut the surface such that we produced a smooth, clean

11   surface suitable for imaging.

12           "We then undertook optical images using an

13   optical microscope, and we also undertook, which provides a

14   light microscopy of the surface of the cross-section.  And

15   on  that same cross-section, we then undertook images using

16   a Raman microscope, which provides a chemical image of the

17   surface.

18           "Question:  With respect to the microtoming

19   procedure, is that a procedure that you performed

20   before?

21           "Answer:  It is a procedure performed routinely

22   day in and day out at Juniper Pharma.  We've done that for,

23   gosh, and in the academic environment, we must have done

24   that for 20 years.  It's a routine approach.

25           "Question:  If we turn --

Davies - designations

1           "Answer:  That's how we can look at the internal

2   structure and chemistry of formulations.

3           "Question:  If we could turn to PDX-2.3, can you

4   tell us what is shown in that demonstrative?

5           "Answer:  Yes.  This is just illustrating the

6   experiments that I undertook with the optical microscopy.

7   And on the left-hand side we have a general microscope,

8   which shows the tablet on the sample stage, shows an

9   eyepiece through which I can look through, there's the

10  lens just above the tablet, and there's a camera above

11  which allows the recording of the images that we see.

12          "So in the optical microscope, the light coming

13  from the surface of the tablet is collected through the

14  lens, and then it's captured with a camera, digitally, and

15  that is shown on a computer as is shown here.

16          "We did that at times one, times two, times

17  three magnification, under the Nikon microscope, and times

18  20 with a Olympus microscope.

19          "Question:  If we look at Plaintiffs' Trial

20  Exhibit 524, and this is a six-page document.  Can you tell

21  us first what is shown on the first three pages?

22          "Answer:  Yes.  These first three pages relate

23  to the optical images taken at times one, times two, and

24  times three for the 196 batch.

25          "Question:  And what is shown on the last three

Davies - designations

1    pages of PTX-524?

2              "Answer:  Those are the corresponding images

3    for the times one, times two, times three for the 345

4    batch.

5              "Mr. Lief:  We would move Plaintiffs' Trial

6    Exhibit 524 into evidence.

7              "Ms. Wayda:  No objection.

8              THE COURT:  It's admitted.

9              (PTX-524 was admitted into evidence.)

10             "Question:  If we could turn to Plaintiffs'

11   Trial Exhibit 536, again, this is a six-page document.

12             "I would like to ask you first, with respect to

13   PTX-536, what is shown on the last three pages?

14             "Answer:  The last three pages are the times,

15   again, times one, times two, times three images taken of the

16   196 batch.

17             "Question:  And then with respect to PTX-536,

18   what is shown on the first three pages?

19             "Answer:  These were the corresponding images of

20   times one, times two, times three of the 345 batch.

21             "Mr. Lief:  We would move into evidence

22   plaintiffs' trial Exhibit 536.

23             "Ms. Wayda:  No objection.

24             "Except if you could take what the different is

25   between these two exhibits, 526 or -- 524 and 536?

Davies - designations

1              "Mr. Lief:  I don't know that we need to.  Would

2      we condition an objection if we don't?

3              "Ms. Wayda:  No, no objection.

4              "Question:  Can you briefly describe for us what

5      Raman spectroscopy is?

6              "Answer:  Yes, I have demonstratives that show

7      that.

8              "Question:  Why don't we take a look at

9      Plaintiffs' Demonstrative Exhibit 2.4.  And what is shown

10     here?

11             "Answer:  Again, here we have, on the left-hand

12     side of the image we show a general Raman microscope.  There

13     is a laser light shown.  There is also an eyepiece.  There

14     is also an optical fiber which collects scattered light, and

15     you see the top is placed on the sample stage.

16             "So in a Raman analysis, and Raman is widely

17     used in the pharmaceutical industry as a technique to

18     chemically characterize drugs and excipients.  It provides

19     a chemical fingerprint which is unique for a particular drug

20     or excipient.

21             "And in the experiment, as is shown, you if you

22     have a -- if you have a monochromatic light, which hits the

23     surface, and then you have light which is scattered off that

24     surface.  And it's that scattered light that's collected by

25     the eyepiece and analyzed in the spectrometer; and as shown

Davies - designations

1    on the right-hand side, you produce the spectrum.  This is

2    just an ideal spectrum which is being shown.

3              "With the microscope, you can focus to a

4    particular point, and that's shown in the red dot here.  And

5    that spectrum is shown with a -- provides a spectrum which

6    is a unique fingerprint, and the position of the peaks

7    within the spectrum are diagnostic of the chemical structure

8    and the bonds that exist within the molecule.

9              "Now, with a Raman microscope, one can move that

10   point across a sample and take images -- sorry -- take

11   spectra at the points across the sample.  One can then say,

12   look for a unique peak for a particular compound, such as a

13   drug, at each point of those red dots, look for that unique

14   piece, and then produce a chemical image, as you see here on

15   the computer screen.

16             "So it's a chemical analysis technique.

17             "Question:  Have you used Raman analysis before

18   for pharmaceutical products?

19             "Answer:  I've used Raman analysis since the

20   1990s, and we've used Raman mapping in the pharmaceutical

21   company, and also in our academic work over the last ten

22   years at least.

23             "Question:  If we could turn to Plaintiffs'

24   Trial Exhibit 901, and I will ask you, do you recognize

25   901?

Davies - designations

1          "Answer:  Yes.  This is a page from my expert

2     report and it shows Figure 1, which is the Raman spectrum.

3          "Question:  Dr. Davies, we've supplied present

4     counsel with the Plaintiffs' Trial Exhibit 901.  Again,

5     could you briefly tell us what this is?

6          "Answer:  Yes.  This is a Raman spectrum of the

7     reference drug, mesalamine.  So it's just the pure drug.

8     And you see in the horizontal axis, it has the wavelength

9     and the vertical axis counts intensity.

10          "You see that there is the most dominant peak

11     that occurs around about, towards the middle of the spectra,

12     right about 817, and we used that peak, because that peak is

13     diagnostic of the drug, and we integrated over the region

14     795 to 835.  And we did that in all the Raman spectra that

15     we looked at in a particular region, and we produced the

16     Raman map just of that area, that peak.

17          "Question:  If we could turn to Plaintiffs'

18     Trial Exhibit 902, do you recognize this image?

19          "Answer:  Yes.  This is a Raman image taken on a

20     region of 1 millimeter by one millimeter on the

21     cross-section, the same cross-section that we analyzed by

22     optical microscopy.

23          "Question:  And do you know which batch of the

24     Zydus product this comes from?

25          "Answer:  Yes, it's the 196.

Davies - designations

1              "Question:  Again, turning to Plaintiffs' Trial

2      Exhibit 903, what is this?

3              "Answer:  This is another area of the same

4      cross-section of the 196 batch, again, one millimeter by one

5      millimeter.

6              "Question:  Turning to Plaintiffs' Trial

7      Exhibit 904.  What is this?

8              "Answer:  This is again another Raman image

9      looking for the drug mesalamine, and the same as the 196,

10     but in this case it's the 345 batch.  Again, it's a one

11     millimeter by one millimeter, same cross-section that was

12     imaged by optical microscopy.

13             "Question:  And finally, turning to Plaintiffs'

14     Trial Exhibit 905.  What is this?

15             "Answer:  Again, it's another image of

16     mesalamine.  Another region of the same cross-section of the

17     345.

18             "Mr. Lief:  And with that, we would move into

19     evidence plaintiffs' Trial Exhibits 901, 902, 903, 904, and

20     905.

21             "Ms. Wayda:  No objection to PTX-902, 903, 904,

22     905.

23             "With that redaction, defendants have no

24     objection to PTX-901."

25             THE COURT:  Admitted.

Davies - designations

1          (Above reference exhibits admitted in record.)

2          "Question:  Looking at the imaging that you

3    produced, does mesalamine exist throughout the picture --

4    the region that you analyzed?

5          "Answer:  Yes, it does.  Mesalamine exists

6    throughout the image.

7          "Question:  And do you see mesalamine throughout

8    the features that you would identify as granules within

9    these pictures?

10          "Answer:  Yes, I do.

11          "Question:  Do you see mesalamine outside of the

12    granular features?

13          "Answer:  Yes, I do.

14          "Question:  Turning to Plaintiffs' Demonstrative

15    Exhibit 2.6.  What is shown here?

16          "Answer:  This is an optical image where I've

17    highlighted a black box, the region that I analyzed by

18    Raman.  And this is for the 196 batch.  This is also an

19    optical image which I annotated regarding the presence of

20    granules and particles.

21          "Question:  Again, what does the black outlined

22    rectangle represent?

23          "Answer:  The black outlined rectangle

24    represents the area analyzed by Raman, by the two maps of

25    the Raman that we undertook within the 196 batch.

Davies - designations

1          "Question:  If we turn to Plaintiffs'

2    Demonstrative Exhibit 2.11, what is shown here?

3          "Answer:  Yes.  Perhaps if we could just go back

4    to the previous image, I could explain where this comes

5    from.  I apologize, the previous image.

6          "Mr. Lief:  To 2.6, please.  Not this one.

7          "Answer:  I've highlighted within the black box

8    two regions, G1 and G2, both of which relate to, show the

9    presence of granules.  I've highlighted the presence of

10   granules.

11         "And this next image --

12         "Question:  2.11.

13         "Answer:  -- shows that region of that first box

14   with, and this is G1.  This is the optical image.

15         "Question:  All right.  And the circled item

16   with the letter G in it, what is that?

17         "Answer:  That is a region that I've highlighted

18   as a granule.

19         "Question:  Did you find that type of granule

20   throughout the cross-section that you looked at with optical

21   microscopy?

22         "Answer:  Yes.

23         "Question:  If we could look at PDX-2.12.  Can

24   you tell us, what is this?

25         "Answer:  This is the Raman image of that same

Davies - designations

1    region that we just looked at by optical microscopy.

2              "Question:  And in this picture, do you find

3    mesalamine throughout?

4              "Answer:  Yes, I do.  There is mesalamine

5    throughout.

6              "Question:  Okay.  And if we --

7              "Ms. Wayda:  I am going to object to this line

8    of examination and questioning.  I believe that Dr. Davies

9    just --

10             THE COURT:  Okay.  Do you want to explain your

11   objection, at this point, Ms. Wayda?

12             MS. WAYDA:  Your Honor, we objected to this line

13   of questioning because it was outside the scope of his

14   expert report.  If you look back at the granule that has

15   been marked as a G, that granule and that marking was only

16   done at his deposition.  That was an exhibit that we

17   created.  Within the ambit of his expert report, he never

18   associated a specifically marked granule with the Raman map

19   that he obtained.

20             If it would help the Court, I can hand you up

21   the expert report and show you why there has never been an

22   association with a specific granule and a specific Raman

23   map.  Therefore, it is our contention that this testimony

24   was outside the scope of his expert report.

25             THE COURT:  Okay.  Before we get into the expert

Davies - designations

1    report, I'll hear from Mr. Lief, and then I will hear from

2    you again.

3              MR. LIEF:  Your Honor, because we anticipated

4    this issue, we prepared a memo on it.  It might help.  I can

5    hand that up, but I would obviously summarize the argument.

6              THE COURT:  Hold on to your memo and give me

7    your argument.  Okay?

8              MR. LIEF:  All right.  Within his expert report,

9    he stated, in what is paragraph 12 of his report, Raman

10   analysis and optical microscopy showed the presence of

11   mesalamine distributed homogenously throughout two

12   representative cross-sections of the Zydus tablets.

13             That's the Raman.

14             He also stated in paragraph 20:  In my opinion,

15   the particles and/or granules range from approximately

16   10 micrometers up to approximately 500 micrometers.  These

17   features were distributed across the whole of the tablet

18   cross-section.

19             Now, what these demonstratives do is simply take

20   those two sentences and give you the visual of that.

21             There is case law on this including case law

22   from Delaware, where testimony, Forest Labs v Ivax, 237 FRD

23   106, where the testimony is of a nature that either it's, I

24   would suggest it's actually in the report from what I read

25   you, but even where it's a combination of two things that

Davies - designations

1    are in the report, that is permissible.  It is an

2    elaboration that is permissible.

3                    THE COURT:  Sure.  Okay.

4                    Dr. Wayda, do you want to respond?

5                    MS. WAYDA:  Yes, I would, Your Honor.  Thank you

6    for the opportunity to respond.

7                    Anticipating this action and frankly not being

8    sure how we would preserve the record on this point in the

9    event that there was a continuation of the objection and

10   Shire continuing to say it should come into evidence, in

11   order to preserve the record later in this deposition,

12   during my cross-examination I asked Dr. Davies, who is the

13   best authority on what he had in his expert report, whether

14   or not this image and this particular opinion was actually

15   in that report.

16                    We could wait until we get to it, but I will

17   tell you that on page 43 of the deposition transcript, I

18   asked him:

19                    "Question:  But neither in your deposition on

20   February 18th, 2016, nor in your expert report did you

21   associate a specific granule in the optical micrograph with

22   a specific region of a Raman map that is located in your

23   expert report; correct?

24                    "Answer:  Again, I am not sure that's correct.

25   I would say that Raman, that specific granule, I would

Davies - designations

1   agree, I didn't say that in my expert report.

2           THE COURT:  Okay.  Well, here is what it sounds

3   like to me your opposing counsel is saying.  I don't think

4   anybody is saying that in the report, he included that

5   image and said, look, I looked at that specific granule.

6   What I hear them saying is he said in the report, I saw the

7   mesalamine throughout, and I saw it in the granules, and

8   here is a picture of it that in the deposition itself, it

9   is happening.  I mean I think I got that from Mr. Lief's

10  comments.

11          So assume if he were standing here, sitting here

12  on the stand and they threw up a picture there and they

13  said, is this illustrative of what you said in your report?

14  Your objection would be what?  We haven't seen this picture

15  before?  What would it be?

16          MS. WAYDA:  Your Honor, I think if you recall

17  the testimony, I didn't object when they said it was

18  illustrative.  I think they can make that particular

19  combination cobbled together from his expert report.

20          He simply never identified in his expert report

21  the area of the map of the cross-section where the Raman

22  was obtained, nor did he say that particular granule was

23  associated with that Raman map, and that is what we're

24  objecting to.

25          THE COURT:  So it's that specific image because

Davies - designations

 1    he didn't point to that one.

 2              MS. WAYDA:  That's right.  In fact, I have to

 3    tell you in paragraph 20 of his expert report, there are no

 4    marked granules.  His first deposition, he couldn't mark a

 5    granule.  It only took the second deposition that he would

 6    actually prepare an illustration of what he believed to be a

 7    granule so that we could understand what he was talking

 8    about in paragraph 20 of his report.

 9              THE COURT:  And are you going to be presenting

10    somebody in dispute that there are granules here?

11              MS. WAYDA:  We will present Dr. Gardella in our

12    phase of the case who will dispute that anything can be

13    gathered from those granules other than the fact that there

14    appears to be mesalamine intensity associated with the

15    entirety of the Zydus cross-section.

16              THE COURT:  Well, I'm going to overrule the

17    objection.  I am going to go ahead and let the testimony

18    stand.  You are going to have a chance to -- you did have a

19    chance to cross-examine while hearing that in greater

20    detail.  You will have your own expert on the stand.  I

21    think based on the quote I heard from the report, which I

22    don't hear you disputing, this was fairly within what he

23    was describing, even if that specific image wasn't there.

24    So we may have much ado about not much right here, so let's

25    go ahead and move forward.

Davies - designations

1                Is there something else you would like to say?

2                MS. WAYDA:  No, I was going to say thank you for

3    your consideration, Your Honor.

4                THE COURT:  Thanks.

5                MR. LIEF:  Thank you, Your Honor.

6                THE COURT:  Okay.  Let's keep rolling.

7                "Ms. Wayda:  (Continuing)  He testified that

8    this Raman image relates to the same area that was looked at

9    by optical microscopy.  That is outside the scope of his

10   expert report.  We will move to strike any testimony like

11   this as outside the scope and under the rule, Federal Rule

12   of Civil Procedure 26(a).

13               "Question:  If we could turn to Plaintiffs'

14   Demonstrative Exhibit 2.13.

15               "What is this?

16               "Answer:  This is the optical microscope image

17   taken of the second white box that I showed.  This is the

18   second granule that I have highlighted, within the region of

19   that black box of the optical image.

20               "Question:  And, again, were those type of

21   granules in your optical microscopy found throughout the

22   cross-section?

23               "Answer:  Yes.  Again, this is taken from the

24   196 batch.

25               "Question:  And if we could turn to PDX-2.14.

Davies - designations

1    What is shown here?

2              "Answer:  Again, this is the same area of the

3    Raman image that relates to the optical image that we see

4    for the granule G2.

5              "Ms. Wayda:  Defendants object, same objection.

6    Outside the scope of the expert report in violation of

7    Federal Rule of Civil Procedure 26(a).

8              "Question:  Within this picture --

9              THE COURT:  Hold it.

10             "Question:  Within this picture, is mesalamine

11   present throughout the picture?

12             "Answer:  It is.

13             "Question:  Do you have an opinion as to whether

14   these images that we've looked at are representative of the

15   entirety of the tablet?

16             "Answer:  I believe they are representative of

17   the entirety of the tablet, and as represented by the optical

18   images that I looked at, I looked at optical images on both

19   the batches, the 196 and the 345.  And both showed the same

20   features within those optical images so I believe they are

21   representative.

22             "Question:  Could you summarize for us the

23   opinions you have provided today with respect to the

24   location of mesalamine within the Zydus ANDA tablet?

25             "Answer:  I believe mesalamine is located

Davies - designations

1   throughout the Zydus product.  I believe, as my data shows,

2   it is homogenously distributed throughout the product.

3            "Question:  Is that conclusion surprising to you?"

4            THE COURT:  Okay.  Your objection?

5            MS. WAYDA:  Yes, Your Honor.  I objected again

6   to being outside the scope.  Dr. Davies was the Raman

7   spectroscopist and person testifying about optical

8   microscopy.  He gave no opinions anywhere in his expert

9   report whether or not what was in the formulation or would

10  result from the formulation was surprising.  He goes on to

11  try and give an opinion as a pharmaceutical formulator.

12  That is outside the scope.

13           THE COURT:  Okay.  Mr. Lief.

14           MR. LIEF:  Dr. Davies had seen the formulation

15  for Zydus's product, and this last concluding question

16  really plays off an undisputed fact that some 80 plus

17  percent of their product is mesalamine.  And, therefore,

18  it's not surprising that it is everywhere.  I don't think

19  it's terribly ...

20           THE COURT:  Well, if he didn't opine on it and

21  make a statement about this being a surprising feature, then

22  it is not coming into evidence here now.  So that objection

23  is sustained.  Go ahead and skip that part of the deposition.

24           Is that the last question?

25           MR. LIEF:  That was the last question.

Davies - designations

1          THE COURT:  Okay.  Then we'll go ahead and move

2     to whatever cross-examination there was.  All right?

3          "Question:  Is that conclusion surprising to

4     you?

5          MS. WAYDA:  Objection outside the scope.

6          THE COURT:  Skip it.

7          "Answer:  It is, based on, to me as a

8     pharmaceutical formulator ...

9          "Cross-examination by Dr. Wayda.

10         "Question:  Good morning, Dr. Davies.

11         "Answer:  Good morning.

12         "Question:  On direct, you testified that you

13    used Raman mapping to locate mesalamine in the Zydus ANDA

14    product; is that correct?

15         "Answer:  That's correct.  From a chemical

16    viewpoint, that's correct.

17         "Question:  And would you agree with me that

18    Raman spectroscopy is an established analytical technique

19    that may be used to identify the presence and location of

20    chemicals within a pharmaceutical sample?

21         "Answer:  I would agree with that.  It can be

22    used for that reason.

23         "Question:  And this would include identifying

24    the presence and location of chemicals other than the active

25    ingredient, in this case mesalamine, within a pharmaceutical

Davies - designations

1    sample; correct?

2              "Answer:  It depends on the context, but I

3    agree, it could be done, but it depends on the context.

4              "Question:  Now, you know that there are other

5    chemicals in the Zydus ANDA product besides mesalamine;

6    correct?

7              "Answer:  There are other excipients, correct.

8              "Question:  And when we're discussing these,

9    would it be all right with you if we refer to these other

10   chemicals as excipients?

11             "Answer:  Correct.

12             "Question:  For example, you understand that

13   magnesium stearate is in the Zydus ANDA product; right?

14             "Answer:  Correct.

15             "Question:  And colloidal silicon dioxide is in

16   the Zydus ANDA product; correct?

17             "Answer:  That's correct.

18             "Question:  And the sodium CMC is in the Zydus

19   ANDA product; correct?

20             "Answer:  That's correct.

21             "Question:  And you also note that sodium starch

22   glycolate hypromellose, also known as HPMC and

23   microcrystalline cellulose are in the Zydus ANDA product;

24   correct?

25             "Answer:  That's correct.

Davies - designations

1          "Question:  You weren't asked to determine the

2    presence of and the location of any of these excipients in

3    the Zydus ANDA product; correct?

4          "Answer:  That's correct.  I was asked to look

5    at the presence of the drug within the product.

6          "Question:  And so you did not determine if

7    those other materials are present in the Zydus ANDA product

8    in your Raman mapping; right?

9          "Answer:  I mapped for the drugs, specifically,

10   that's correct.

11         "Question:  And you did not see any evidence or

12   the presence of these other excipients in the Zydus ANDA

13   product in your Raman mapping studies; correct?

14         "Mr. Lief:  I'll object to the form, and also as

15   beyond the scope of the direct."

16         THE COURT:  I am just, we're playing it the same

17   waive.  If you have an objection you want to stand on here,

18   you have to let me know.  Otherwise, this is going to keep

19   rolling.

20         MR. LIEF:  I think the objection here is his

21   entire direct testimony was about the location of

22   mesalamine.  There were a few questions about what he didn't

23   do which I guess are okay but then we start to get into a

24   line of questions about, you know, isn't it the case I take

25   it effectively there are no excipients in there or something

Davies - designations

1    like that or you didn't find the evidence of that.  I think

2    that is beyond the scope of the direct.

3               THE COURT:  All right.

4               MS. WAYDA:  Your Honor, the entire scope of Dr.

5    Davies' direct was about Raman mapping, and you saw quite a

6    few demonstrative exhibits about the mechanics of how you

7    collect a Raman spectra.

8               Dr. Davies neglected to tell you how you need to

9    do the analysis in order to be sure that your Raman maps are

10   correct and accurate.  And so I was probing whether or not

11   he had done that necessary analysis in order to able to

12   reach a determination that it was only mesalamine that was

13   present in these maps and no interfering peaks associated

14   with the excipients in the Zydus ANDA product.

15              THE COURT:  All right.  You know, I think that's

16   legitimately on the edge of going beyond the scope of the

17   direct, but I'm overruling the objection.  I will go ahead

18   and hear it.

19              "Answer:  I was not asked to look for the other

20   excipients.  I saw -- I saw the impact of the excipients,

21   particularly in terms of the fluorescence, which I relate to

22   in my report.

23              "Question:  Now, before performing the Raman

24   analysis on the cross-sections of the Zydus ANDA product to

25   look for mesalamine, we looked at PTX-901 where you showed a

Davies - designations

1    reference spectrum for mesalamine; correct?

2            "Answer:  That's correct.

3            "Question:  And so you obtained that reference

4    spectrum, PTX-901.  What is the purpose of that reference

5    spectrum?

6            "Answer:  The purpose of that spectrum was so

7    that I could be sure that I was looking for the drug itself.

8            "Question:  And is it fair to say --

9            "Answer:  So that I could identify the specific

10   peak, in this case, formulation mesalamine.

11           "Question:  And is it fair to say that you did

12   not obtain a reference spectra for any other chemical in the

13   Zydus ANDA product?

14           "Answer:  I was aware of the other spectra, but

15   I did not obtain specifically for the batches that we used

16   of those excipients, that's correct.

17           "Question:  And you did not look at reference

18   spectra for the other excipients in the Zydus ANDA product

19   in the literature, did you?

20           "Answer:  Not in the literature, because we

21   already knew of the presence, I knew of the presence of the

22   peaks related to the different excipients, because --

23   because we look at such excipients regularly.

24           "Question:  And I believe in your expert report,

25   and in the previous depositions, when you saw the Raman

Davies - designations

1    spectra that you obtained for the Zydus ANDA product, the only

2    peaks that you saw were peaks assignable to mesalamine; correct?

3            "Answer:  That's correct.  When you can look at

4    the individual data, the spectrum of the individual pixels,

5    and the pixels that I saw were of mesalamine.

6            "Question:  And there were no other peaks

7    associated with any other material other than mesalamine,

8    correct?

9            "Answer:  That's correct.  Mesalamine is such

10   a strong scatterer, and it's present in the formulation, 90

11   percent of the formulation.  It's a much stronger scatterer

12   than the excipients.  In other words, it gives a much more

13   intense spectrum.

14           "Question:  Now, you looked at with Mr. Lief at

15   some PTX exhibits, as well as the demonstratives, at which

16   you looked at granules, and I believe one of those was

17   marked as PTX-906.  If you turn in your small book there,

18   we have a similar image.  It is DX-44A-318 in your book.

19   PTX-906, if the operator can bring that up on the screen.

20           Excuse me.  That's the wrong image.  I believe

21   it's PTX-1006 -- no, PTX-906.  I think this was marked

22   previously.  Okay.

23           If you turn with me then, and look at

24   DX-44A-318.  I believe you marked this at deposition and

25   identified various granules and particles.  Do you remember

Davies - designations

1    this exhibit?

2              "Answer:  I'm sorry, I'm lost now.  Which

3    exhibit?

4              "Question:  It's DX-44A-318.

5              "Answer:  Yes.

6              "Question:  Do you have that?

7              "Answer:  I do.  Sorry.

8              THE COURT:  Let me stop you there.

9              (Videotape stopped.)

10             THE COURT:  Is the thing that's shown on the

11   screen, the image that's shown on the screen that's marked

12   PTX-906, is that the same defense exhibit that he's looking

13   at, too?  In other words, am I looking at what he's looking

14   at as he's testifying right now?

15             MS. WAYDA:  Yes Your Honor.  We resolved this

16   off the record.  PTX-906 is the same as DX-44A-318, which is

17   also the same as DTX-1006.

18             THE COURT:  All right.  So for my purposes, I'm

19   looking go at PTX-906.  It is what he's looking at.  That's

20   all I need to know.

21             Thank you very much.  Start it again.

22             "Question:  You identified particles by marking

23   a 'P' outside of the particle; correct?

24             "Answer:  I did.

25             "Question:  And you identified granules by

Davies - designations

1    circling them and marking a 'G' inside; is that correct?

2              "Answer:  That's correct.

3              "Question:  Now, your optical microscopy alone

4    doesn't tell you what's in these granules or particles,

5    correct?

6              "Answer:  That's correct.  The optical microscopy

7    tells you when you look at the cross-sections, that there

8    are different -- as I say in my report, different features,

9    granules or particles.  You would know as a formulator the

10   different components that are present within the formulation.

11             "Question:  Turn now in your book to DX-44A-317.

12             "I would ask you the same questions here.  I

13   believe there were small dots with a 'P' by them, are that

14   which you identified as particles in this exhibit?

15             "Answer:  That's correct.

16             "Question:  And these circled areas where you've

17   identified granules, are those what you identified as

18   granules in this exhibit?

19             "Answer:  Those are some of the granules that I

20   see, yes.

21             "Question:  And as I believe you just testified,

22   you created both of these exhibits at your February 18, 2016

23   deposition, correct?

24             "Answer:  I believe that's correct.

25             "Dr. Wayda:  I'm going to mark and move into

Davies - designations

1    evidence as DTX-1006 the exhibit marked DX-44A-318, and

2    mark as DTX-1007 the deposition exhibit identified as

3    DX-44A-317.

4              "Mr. Lief:  No objection.

5              THE COURT:  They're admitted.

6              (DX-48-318 and DX-44A-317 were admitted into

7    evidence.)

8              "Question:  Now, optical microscopy doesn't tell

9    you where the excipients are described or distributed in the

10   cross-section of the Zydus ANDA product, correct?

11             "Answer:  Well, in terms of the chemistry, the

12   location that would be undertaken by Raman, optical

13   microscopy which we routinely use, shows you the different

14   structures and features that one sees in a cross-section, as

15   you would expect as such a process of manufacture.

16             "Question:  But I believe you just testified

17   even in your Raman microscopy or spectroscopy, you did not

18   see or look for any evidence of the excipients in the Zydus

19   ANDA product, correct?

20             "Mr. Lief:  Objection.  Form.  Compound and

21   mischaracterizes.

22             "Answer:  I don't believe I said that.  I

23   think I said that I was asked to look for mesalamine and I

24   focused on that.  And I also saw evidence of the presence

25   of excipients, particularly those which have a high

Davies - designations

1    fluorescence, which tend to mask the Raman signal.

2              "I also looked at the individual spectrum for

3    the data, and it's dominated by mesalamine -- it is such a

4    strong scatter."

5              THE COURT:  I hope I've made the record clear

6    already, but I'm going to make it clear now.

7              If nobody rises, I'm taking the objection as

8    waived, so if the tape rolls and there's no further

9    commentary here in the courtroom, whatever objection was

10   stated in the deposition is waived and it's not going to be

11   relied on further.  Okay?

12             Go ahead.  Keep rolling.

13             "Question:  But I believe you testified earlier

14   that you did not see any other peaks in the Raman spectra

15   for the Zydus ANDA product, apart from those associated with

16   mesalamine, correct?

17             "Answer:  No peaks that we could attribute,

18   that's correct.  It's dominated -- the drug, which is

19   already strongest, gives the strongest signal is present in

20   90 percent of the tablet formulation before the coating is

21   put on, and it gives a much stronger signal than the other

22   excipients, and it is distributed throughout that region

23   that we examined.

24             "Question:  So with either Raman spectroscopy or

25   optical microscopy, are you able to identify where the

Davies - designations

1    excipients are located in the Zydus ANDA product, correct?

2              "Answer:  Again, I wasn't asked to do that.  I

3    was asked to look at the presence of the drug, and show

4    where the drug was within that product.

5              "Question:  Sir, you're not offering an opinion

6    as to where the excipients are located in the Zydus ANDA

7    product, correct?

8              "Answer:  I'm just -- I'm not offering that

9    opinion.  I'm offering an opinion related to the presence of

10   the drug.

11             "Question:  So you testified that the granules

12   contain mesalamine, but you did not determine and you are

13   not offering an opinion on whether or not the granules

14   contain magnesium stearate; correct?

15             "Answer:  Again, I've not been asked to give an

16   opinion on that.

17             "Question:  And would your answer be the same if

18   I asked you with respect to the colloidal silicon dioxide?

19             "Answer:  Again, I've not been asked to give an

20   opinion on that.

21             "Question:  Would your answer be the same with

22   respect to sodium CMC?

23             "Answer:  Again, I've not been asked to give an

24   opinion on that.  I've been asked to show where the drug is,

25   and I've demonstrated that.

1          "Question:  And to shorten this up, would your

2     answer be the same for the other excipients in the Zydus

3     ANDA product, hypromellose, microcrystalline cellulose and

4     sodium starch glycolate?

5          "Answer:  They would.  I've been asked to show

6     the presence of the drug throughout the formulation, is it

7     present throughout the formulation.  And I've done that.

8          "Question:  And I asked you those questions with

9     respect to the granules.  Would your answers be the same if

10    I asked you the same questions regarding the excipients, not

11    mesalamine, but the excipients with respect to the particles

12    in the Zydus ANDA product?

13         "Answer:  Well, it depends on what you mean by

14    that.  The structures that I see in the same regions that

15    I imaged by Raman, all those structures which contain the

16    drug and excipients show the presence of the drug throughout

17    those structures.

18         "Question:  But you did not find any evidence

19    for any of the excipients in the Zydus ANDA product in any

20    of the particles in the Zydus ANDA product, correct?

21         "Mr. Lief:  Objection to the form, and

22    objection, mischaracterizes.

23         "Answer:  Again, I -- you clearly see the

24    presence of the different structures in the optical

25    microscopy, if I understand you correctly, which are

1    produced by the manufacturing method, where we know the drug

2    and excipients, the same features that we see on the optical

3    microscopy I show contain the drug, whether they be the

4    granule or the regions around that granule.

5              "Question:  Now, and the only thing that you

6    could say is located within the Zydus ANDA product is

7    mesalamine based on your Raman mapping, correct?

8              "Mr. Lief:  Objection, form, mischaracterizes.

9              "Answer:  Again, that's what I was asked to look

10   for is the drug, is distributed clearly from the optical

11   microscopy.  There are different structures and features

12   that are present in the formulation, which would you expect.

13   By the way, it's a pharmaceutical formulation.  You would

14   expect it to show those features.

15             "Question:  Now, in the exhibits that we marked

16   and have been entered into evidence as DTX-1006 and 1007,

17   and you can look at them in your book if you'd like, marked

18   granules and particles.

19             "Do you have any evidence or were you asked to

20   look at the chemical composition of the materials outside of

21   those granules and outside of those particles?

22             "Answer:  Well, in the context of the same

23   regions that I -- as I showed in my demonstratives, those

24   regions that I marked as granules contain drug, but the

25   regions outside that I marked as granules contained the

Davies - designations

1    drug.  That's what I was asked to look at, to look at the

2    distribution of the drug in the Zydus formulation, and

3    that's what I've done.

4           "Question:  And you were not asked to look at,

5    and I believe you did not detect, any evidence for any of

6    the excipients in the Zydus ANDA product, namely, magnesium

7    stearate, colloidal silicon dioxide, sodium CMC,

8    hypromellose, microcrystalline cellulose, and sodium starch

9    glycolate, correct?

10          "Answer:  I was asked to look at the

11   distribution of the drug throughout the Zydus ANDA product,

12   and that's what I did.  I focused on the drug.

13          "Question:  And you did not focus on the

14   excipients, correct?

15          "Answer:  I did not, because I was asked to look

16   at the drug.  The drug was present in 90 percent of the

17   tablet formulation.  It's also the strongest scatterer.

18          "Question:  And in your Raman spectra that you

19   obtained on the Zydus ANDA product, you found no evidence

20   of any other peaks associated with anything other than

21   mesalamine, correct?

22          "Mr. Lief:  Objection, mischaracterizes.

23          "Answer:  Again, I don't think that's quite

24   correct.  I certainly found evidence of the, as I showed,

25   the presence of the other excipients due to the impact of

Davies - designations

1   fluorescence within the spectrum.

2           "Question:  Are any of the excipients in the

3   Zydus ANDA product fluorescing agents?

4           "Answer:  Again, experience indicates with regard

5   to Raman, particularly in pharmaceutical formulations, in the

6   processing itself, can have an impact on the compound and it

7   can cause fluorescence, and fluorescence, particularly for

8   excipients can be, it is, can be detected.

9           "Question:  But the fluorescence that you

10  indicate that you detected, you did not associate that

11  with any particular excipient in the Zydus ANDA product,

12  correct?

13          "Answer:  That's correct, because the

14  fluorescence is so strong.

15          "Question:  And I believe you testified on

16  direct that the G1 and G2 optical microscopy granules that

17  you looked at could be associated with a similar or same

18  region on the Raman map; is that a fair characterization of

19  your testimony?

20          "Answer:  That's correct.  It was the same

21  region of the Raman that we showed the presence of the --

22  that's correct.

23          "Question:  Now, we have an objection to that

24  line of testimony, but in order to preserve your testimony

25  on the record, I'm going to go forward and ask you a few

Davies - designations

1    questions.

2              "You did not identify any specific particles or

3    granules in your optical micrographs in your actual expert

4    report, correct?

5              "Answer:  That's correct.  Because I thought it

6    was self-evident from the optical images that I was

7    observing.

8              "Question:  But you did not mark anything like

9    DTX-1006 and DTX-1007 and include it in your expert report,

10   did you?

11             "Answer:  That's correct, I didn't for the

12   reasons I believe are self-evident.

13             "Question:  And you did not correlate, as you

14   tried to do in your direct testimony today, any features,

15   particles or granules with any of the Raman maps in your

16   actual expert report, correct?

17             "Answer:  I'm not sure that's correct.  I

18   certainly talked about the fact that the Raman, where I

19   took the Raman maps, were reflected to be typical or

20   representative cross-sections based on the optical images,

21   and that would be based on my analysis of the optical image

22   of that region.

23             "Question:  But in your direct testimony I heard

24   you say that the G1 granule was associated with the same

25   Raman map that was shown in a previous demonstrative.

Davies - designations

1    That's not the same as representative, correct?

2              "Answer:  Oh, I don't know that.  Clearly, I

3    marked that at my deposition, but the features that I saw in

4    the optical image of that region where I took Raman

5    analysis, I believe were representative of the entire

6    tablet.

7              "Question:  But neither in your deposition on

8    February 18, 2016, nor in your expert report did you

9    associate a specific granule in the optical micrograph with

10   a specific region of a Raman map that's located in your

11   expert report, correct?

12             "Answer:  Again, I'm not sure that's correct.  I

13   would say that Raman -- that specific granule, I would

14   agree, I didn't say that in my expert report.  But I do say

15   that the Raman map showed that the mesalamine is distributed

16   throughout, that is to say that the regions that I looked at

17   by Raman and the optical microscopy were representative of

18   the entire tablet, representative in the context in which I

19   described that the granules and particles are distributed

20   throughout the entire tablet.

21             "Question:  Now, you're not offering an opinion

22   in this case that any of the testing that you've done shows

23   an inner lipophilic matrix in the Zydus ANDA product;

24   correct?

25             "Mr. Lief:  Objection, beyond the scope of the

1    direct.  Objection, beyond the scope of the direct.

2              "Answer:  I've not been asked to give that

3    opinion.

4              "Question:  And, similarly, you're not

5    offering an opinion that any of your testing shows an outer

6    hydrophilic matrix in the Zydus ANDA product, correct?

7              "Answer:  I'm not offering an opinion on that.

8              "Ms. Wayda:  No further questions.  Thank you,

9    Dr. Davies.

10             "The Witness:  Thank you.

11             "Mr. Lief:  Plaintiffs have no questions on

12   redirect of Dr. Davies."

13             (End of videotaped deposition.)

14             THE COURT:  All right.  Thanks very much.  We

15   will take an hour for lunch.  See you back here at

16   2:00 o'clock.

17             (Luncheon recess taken.)

18             *     *     *

19             Afternoon Proceedings, 2:00 p.m.

20             THE COURT:  Good afternoon.  Thanks.  Please be

21   seated.

22             Let's go ahead and get started.  What do we have

23   teed up for the afternoon, Mr. Haug?

24             MR. HAUG:  Okay.  The first thing, Your Honor,

25   is we were able to reach agreement on admissibility on some

```
 1    exhibits that we otherwise would have played a deposition to --
 2              THE COURT:  All right.
 3              MR. HAUG:  -- to lay a foundation for, et
 4    cetera.  So I'd like to list those exhibits if I may, Your
 5    Honor.  They are all, almost all from the ANDA.  They're
 6    portions of, sections of the ANDA, of the Zydus ANDA.
 7              So that would be PTX-93, PTX-97, PTX-98,
 8    PTX-130, PTX-142, PTX-143, PTX-144, PTX-145, PTX-167,
 9    PTX-169, and PTX-170.
10              THE COURT:  Mr. Gaertner.
11              MR. HAUG:  So we offer those, Your Honor.
12              MR. GAERTNER:  No objection, Your Honor.  I
13    think we're in the process, and as I told Mr. Haug, it is my
14    understanding we will stipulate to the admissibility of our
15    ANDA sections.  In exchange, they'll stipulate to the
16    admissibility of the NDA so we don't have to have people up
17    here on regulatory documents.
18              There is one thing -- and we will read the
19    numbers of the NDA in a moment.  There is one issue that
20    just came up when I was talking to Mr. Haug, it does trouble
21    me a little bit.
22              THE COURT:  Before you -- let's deal with this
23    piece first.
24              MR. GAERTNER:  Oh, certainly.  No objection to
25    that.
```

1          THE COURT:  No objection to that.  All those

2     exhibits are admitted without objection that Mr. Haug just

3     read the numbers of which he just read into the record.

4          (Above-referenced exhibits admitted in record.)

5          THE COURT:  Okay.  Go ahead, Mr. Gaertner.

6          MR. HAUG:  I am sorry.  And I believe I just

7     heard Mr. Gaertner say that he is willing to agree that all

8     of the ANDA would come in provided that we were agreeing the

9     NDA would come in.

10          THE COURT:  Well, that solves -- there you go.

11     Good thinking.  Let's let both sides submissions to the

12     United States Government come in.

13          MR. GAERTNER:  Yes, they're very small, Your

14     Honor.

15          A broader issue that was raised, it seems to me

16     it is an issue I raised with the pretrial order, that the

17     plaintiff still seems to be taking the position that they

18     preserve rights to object to authenticity and foundation

19     to certain documents even though those objections are not

20     listed in the pretrial order.

21          The reason that gives me pause, Judge, is, of

22     course, we have experts who are going to rely on internal

23     documents.  They have experts that rely on internal

24     documents.  I think the vast majority of them, no objections

25     show up, and I am trying to figure out what that means

1     because if I need a fact witness to put in a document, and

2     it hasn't been objected to, so I can have an expert talk

3     about it later, for instance, that is a pretty significant

4     change from what I understood you telling us at the pretrial

5     conference which was if there is no objections, it is coming

6     in as long as somebody talks about it.

7              So I want to flesh that out now because we need

8     to know going forward how we're going to prepare our case.

9              THE COURT:  Well, I am a little surprised we are

10    still talking about this.

11             Mr. Haug, is there a reason why we're still

12    talking about this?

13             MR. HAUG:  Well, there is a reason.  Because

14    Zydus's counsel is raising this as an issue saying that

15    there are no objections to any exhibits if there is a

16    witness that talks about an exhibit, and that was never

17    agreed to.  So that is the dispute.

18             The pretrial order very clearly says, I am

19    reading from paragraph 22:  The parties reserve their right

20    to raise all objections to exhibits as set forth in Exhibits

21    6 and 7, the listing of the trial exhibit does not

22    constitute an admission as to the admissibility of the trial

23    exhibit.  It goes on and basically says the Federal Rules of

24    Civil Procedure apply.

25             And the issue is not going to be -- if they want

1    to have a Shire document come in, that is fine, or a Zydus

2    document.  It can only come up if it's a third party

3    document, a true hearsay document.  And we're not agreeing

4    that simply because an expert gets on the stand and says he

5    has a document that is shown from the third party that it's

6    admissible simply because he is talking about it.  That is

7    our objection.  But I think we're talking about this in the

8    abstract.  There is no objection.

9            THE COURT:  We are talking about it in the

10   abstract, and I guess we'll wait and see what happens, but

11   here is the deal.  If a party has listed as an exhibit a

12   document, the purpose of this whole pretrial process is to

13   put that stuff on the table and work it out.  All right?

14           So it is a correct statement of the Federal

15   Rules of Evidence that an expert can rely on a document and

16   the reliance on the document does not make the document

17   itself admissible.  That is a true statement.

18           It is also a true statement that if a party

19   lists an exhibit in the pretrial order and there is not some

20   objection listed to it, it is going to -- you know, I'll get

21   into it, I'll go back, I'll read.  I'll go back myself and

22   re-read what the local rules say, I'll re-read what the

23   document, the pretrial order itself says, but I tried to

24   be pretty clear, and that is if you know you have got a

25   document, you guys should be working out what are the

Little - direct

1   objections to it, to the fullest extent you can, before the

2   trial.  Okay?

3           So now we'll wait and see what's happens.

4   Right?  I don't think I have added anything to what I said

5   before in a meaningful way, but if it comes to it, I guess

6   we'll be duking it out.  Well, was this listed?  Wasn't it?

7   Did you list objections but you didn't list that?  I guess

8   we'll get into it when we get into it.

9           MR. GAERTNER:  Okay.  Thank you, Judge.

10          THE COURT:  Mr. Haug.

11          MR. HAUG:  Shire's next witness will be

12   Professor or Dr. Steven Little.

13          If I may approach?  Oh, I am sorry.

14          THE COURT:  Yes.  Go ahead and swear the

15   witness.  Thanks.

16          (Documents passed forward.)

17          ... STEVEN RONALD LITTLE, having been first duly

18   sworn, was examined and testified as follows ...

19          THE COURT:  Thanks.  Please be seated.

20          Yes, you may approach.

21          THE COURT:  You may proceed, Mr. Haug.

22          MR. HAUG:  Thank you, Your Honor.

23                  DIRECT EXAMINATION

24   BY MR. HAUG:

25   Q.    Dr. Little, you should have one binder with the

Little - direct

1    exhibits and also a smaller binder with some slides.  Do you

2    have that?

3    A.    Yes, I do.

4    Q.    Okay.  What is your profession?

5    A.    I am a scientist and professor of chemical

6    engineering.

7    Q.    And please turn to tab PTX-623.

8    A.    (Witness complies.)

9    Q.    And are you familiar with this document?

10   A.    Yes, it is my CV.

11   Q.    Is the information reported in your CV accurate and

12   up-to-date?

13   A.    Yes.  With the absence of perhaps a couple of

14   appointments and some period publications, it seems to be a

15   complete copy.

16            MR. HAUG:  We offer PTX-623.

17            MR. MILLER:  No objection, Your Honor.

18            THE COURT:  It is admitted without objection.

19            (PTX-623 is admitted into evidence.)

20            MR. HAUG:  Thank you.

21   BY MR. HAUG:

22   Q.    Dr. Little, can you briefly describe your educational

23   background?

24   A.    Sure.  I received my Bachelor's in Chemical

25   Engineering from Youngstown State University in the year

Little - direct

1    2000.

2                I then went on to receive my Ph.D. in Chemical

3    Engineering in 2005 from MIT.

4    Q.    And what was the subject matter of your Ph.D. thesis?

5    A.    Well, it was controlled release.  Specifically,

6    polymer matrices for controlled release.  And I focused also

7    on pH sensitive polymers.

8    Q.    And can you also briefly describe your professional

9    experience since obtaining your Ph.D.?

10   A.    Sure.  In 2006, I started as an Assistant Professor

11   in the Department of Chemical Engineering at the University

12   of Pittsburgh.

13                Then in the year 2012, I was promoted to the

14   title of Associate Professor of Chemical Engineering at the

15   University of Pittsburgh.

16                That year, I also was promoted to the title of

17   Chair of the Department of Chemical Engineering at the

18   University of Pittsburgh.

19                Then last year, I was promoted to the title of

20   Professor of Chemical Engineering.

21                And then later on, that year, I was promoted to

22   the title Endowed Professor of Chemical Engineering.

23   Q.    And what positions do you currently hold at the

24   University of Pittsburgh?

25   A.    I am the William Keckler Whiteford Endowed Professor

Little - direct

1    in the Departments of Chemical Engineering, Bioengineering,

2    Pharmaceutical Sciences, Immunology, Ophthalmology at

3    McGowan Regenerative Medicine at the University of

4    Pittsburgh.

5              I am also the Director of the Controlled Release

6    and Biomedical Research Laboratories at the University of

7    Pittsburgh.

8    Q.    What are your current responsibilities at the

9    University of Pittsburgh?

10   A.    Well, I teach courses.  For instance, I teach a

11   course on controlled release at the University of

12   Pittsburgh.  I also teach courses on what is called

13   transport phenomenon knowledge, which is essentially the

14   study of the movement of mass heat and momentum, which all

15   have an underlying similarity in terms of the processes.

16             An example of that would be the movement of

17   drugs through a polymer matrix.

18             In addition to teaching, I also am the PI of a

19   laboratory which works on a variety of projects funded by

20   private foundations.

21             THE COURT:  What is a PI?

22             THE WITNESS:  Principal investigator, which

23   essentially means that I am the director of the program.

24             In addition to that, we work on about

25   $10 million of research over the last handful of years.  And

Little - direct

1    that is some examples.

2    BY MR. HAUG:

3    Q.      Thank you.  Are you involved in any professional

4    activities outside of the university?

5    A.      Yes, I am.  I am also the co-founder of a spin-off

6    company from the university called Chrono, Inc., which is

7    custom designed and formulation controlled release products.

8    Q.      Have you authored any publications on the topic of

9    controlled release pharmaceutical formulations?

10   A.      I have.  I am an author and coauthor on about 70

11   publications that are peer reviewed in the field.  In

12   addition, a couple of peer reviewed book chapters in the field.

13   Q.      Have you been appointed to any positions related to

14   controlled release?

15   A.      I am.  A number of years ago, I was elected as the

16   chair of the drug delivery special interest group, society

17   for biomaterial, which is an international society.  In that

18   role, I led and managed the programming on controlled

19   release, continuing education on controlled release in the

20   society.

21            After that appointment, I was actually elected

22   to the Board of Directors of that society.

23   Q.      Have you served as a reviewer for any journals in the

24   field?

25   A.      Yes, I review for about 50 journals in the field.

Little - direct

1    Q.    Are you a recipient of any awards or honors that come

2    to note or come to mind?

3    A.    Yes, I list these on my CV, but I have approximately

4    30 awards that I have been given that I am very proud of.

5          Just to give an example, last year I was named

6    ASCE's what is called the Curtis W. McGraw research winner

7    which is given to one person in every engineering discipline

8    every year.

9    Q.    Have you been accepted by any court as an expert

10   prior to your testimony today?

11   A.    Yes, I have.  About three years ago, I was determined

12   to be an expert in the Southern District of Florida in Shire

13   v Watson.

14         Also, last year in that same case in the

15   Southern District of Florida in controlled release

16   formulation and testing.

17         Also, I was considered an expert here in the

18   District of Delaware before Judge Sleet in I believe it was

19   Salix v Lupin case.  And that was in controlled release

20   formulation and testing.

21         Then also I believe last year, it was in New

22   Jersey, and it was Supernus v Actavis, and in that case, I

23   was determined to be an expert in the area of pharmaceutical

24   sciences, and that includes pharmaceutical formulation.

25         MR. HAUG:  Shire offers Dr. Little as an expert

Little - direct

1   witness in the field of controlled release formulation and

2   testing.

3              MR. MILLER:  Your Honor, I have no objection.

4              THE COURT:  All right.  Dr. Little is accepted

5   as an expert witness.  Go ahead.

6   BY MR. HAUG:

7   Q.    Dr. Little, have you been asked to provide any

8   opinions in this case?

9   A.    Yes, I was.  I was asked in regard to Zydus's ANDA

10  product whether or not it was my opinion that it was a

11  controlled release oral pharmaceutical composition.  And if

12  I did observe controlled release behavior, I was asked for

13  my opinion as to what was responsible for that behavior.

14  Q.    Have you formed an opinion as to whether the tablet

15  core of Zydus's product is a controlled release oral

16  pharmaceutical composition?

17  A.    Yes, it's my opinion that it is a controlled release

18  oral pharmaceutical composition.

19  Q.    Have you formed an opinion as to what is responsible

20  for the controlled release exhibited by Zydus's tablet core?

21  A.    Yes.  It is my opinion that the controlled release is

22  provided for by two separate matrices, a lipophilic matrix

23  and a hydrophilic matrix.

24  Q.    Please turn to PTX-1 in your binder.

25  A.    (Witness complies.)

Little - direct

1    Q.      Are you familiar with this patent?

2    A.      I am.  It's the patent-in-suit, U.S. 6,773,720.

3    Q.      What is the title of the patent?

4    A.      It is mesalazine controlled release oral

5    pharmaceutical compositions.

6    Q.      I guess for the record, and as an expert, I would ask

7    you a question, are the terms "mesalazine" and "mesalamine"

8    synonymous?

9    A.      Yes, they are.

10   Q.      What is the filing date of this patent, if you know?

11   A.      The filing date is June 14th, 1999.

12   Q.      And who are the named inventors?

13   A.      The named inventors are Roberto Villa, Massimo

14   Pedrani, Mauro Ajani and Lorenzo Fossati.

15              MR. HAUG:  We offer PTX-1.

16              MR. MILLER:  I think it is in evidence.

17              THE COURT:  Admitted without objection.

18              (PTX-1 is admitted into evidence.)

19              MR. HAUG:  Thank you.

20   BY MR. HAUG:

21   Q.      Now, focusing on the abstract of the patent, which is

22   PTX-1, what is the '720 patent generally directed to?

23   A.      So if you look at the abstract, essentially it's

24   saying that it is directed to a controlled release oral

25   pharmaceutical composition, and it contains the active

Little - direct

1    ingredient which is 5-amino-salicylic acid.  That's the

2    chemical name for the non-proprietary names we were just

3    hearing earlier.  So 5-amino-salicylic acid is mesalamine

4    and mesalazine.

5            And there is two portions to this, A and B here,

6    two main components.  There is an inner lipophilic matrix

7    consisting of substances with a melting point below 90

8    degrees Celsius in which the active ingredient is there.

9    And then you have the outer hydrophilic matrix in B in which

10   the lipophilic matrix is dispersed.  And then you can have

11   other excipients.

12   Q.    Dr. Little, do you need any water?

13   A.    I just, I am having a hard time getting this open.

14           MR. HAUG:  Your Honor, may I hand the witness a

15   bottle of water?

16           THE COURT:  Yes, bring up a bottle of water.

17           While you are wrestling with the bottle of

18   water, let me ask you this, Doctor.

19           Mesalamine and mesalazine, are those proprietary

20   names?  How did we end up with those for 5-amino-salicylic

21   acid?

22           THE WITNESS:  So 5-amino-salicylic acid is I

23   guess it's the name --

24           THE COURT:  Compound.

25           THE WITNESS:  -- you would learn in organic

Little - direct

1    chemistry, right?  So there is a specific naming that you

2    learn, chemistry-wise.  The name mesalamine and mesalazine,

3    these are called proprietary names.

4           So there are different organizations that

5    determine these names.  So, for instance, in the United

6    States, I am trying to remember, there is an acronym and

7    that organization determines the name for the United States,

8    and that is mesalamine.  And then there is, I think it is

9    the international one, and then the British one or something

10   like that, and that is mesalazine, and they're the same

11   thing.  They're just different names.

12           THE COURT:  Good enough.  Thanks.

13   BY MR. HAUG:

14   Q.    Dr. Little, please turn to PTX-1.3.  We're still in

15   the patent.  And specifically, to column 2, lines 42 to 43.

16           Can you briefly describe to the Court what is

17   described here?

18   A.    Okay.  Sure.  So this is in the background of the

19   invention.  And there's the two paragraphs here.  So there

20   are two things.

21           The first portion of it is it says that when you

22   are preparing sustained, controlled release dosage forms of

23   this medicament that's active in the gastrointestinal tract,

24   like mesalamine, it's saying that it's important to ensure

25   that you have controlled release from this first phase

Little - direct

1    following administration.  When I say first phase, this is

2    what it means.  It says when inert matrices have the maximum

3    release rate inside the logarithmic phrase.  So I need to

4    break this down.

5         First of all, inert matrices here in this

6    particular patent are synonymous if you read the

7    introduction with lipophilic matrices.  It also describes

8    in here how these kind of matrices, the type of behavior

9    that they produce, is that you have a lot of release at the

10   beginning.  The rate is pretty high.  And then what happens

11   is the rate decreases with time and actually decreases

12   exponentially with time.  And there's science behind that.

13   But essentially what you are going to have is, you're going

14   to have a lot coming out and then you're going to have a

15   little coming out.

16        So what this paragraph says is that it's

17   important to slow down that initial high rate phase when you

18   are delivering it to the gastrointestinal tract topically

19   like this.

20        And then the second part of this, it says, said

21   object has been obtained by the present invention, which

22   also allows to prepare compositions characterized by a high

23   content in active ingredient.  And this is also something

24   that's unique.  So you've got a material that's delivered

25   directly to the intestinal tract on topically, so you have

Little - direct

1    to smooth that out.  You also have a very high amount of

2    drug, and those things go together.

3    Q.    Please turn now to PTX-1.4, and to column 4.  And

4    please explain what is set forth here.

5    A.    Okay.  So this is a portion of the patent that lists

6    the examples.  And starting here in column 4, it goes

7    through column 5.

8              What's shown on the screen here is one of

9    these examples, but there are five of these examples, and

10   they represent exemplary -- they're exemplary formulations

11   that represent the invention.

12   Q.    All right.  Would you please turn to PTX-1.5 and

13   specifically to where it says claim 1?

14             Do you see that?

15   A.    Yes, I do.

16   Q.    And without reading the whole claim into the record,

17   can you just at least walk the Court through what is

18   required by this claim?

19   A.    Okay.  Sure.  So underneath of line 4, which is what

20   is claimed is, you have claim 1.  It says, similar to the

21   abstract.  It's a controlled release oral pharmaceutical

22   composition and it lists the active.  That comprises A, B

23   and C.

24             So A again, the inner lipophilic matrix.

25   And then it says, consists of substances selecting from the

Little - direct

1    group consisting of and then there's a list of things.

2    Those things have a melting point below 90 degrees C.

3                    And then the active ingredient is dispersed

4    both in the lipophilic matrix and also in the hydrophilic

5    matrix, which is discussed in B.  So B is an outer

6    hydrophilic matrix wherein the lipophilic matrix is

7    dispersed, and that outer hydrophilic matrix consists of

8    compounds selected from the group consisting of and it lists

9    those things.

10                   And then C says you can optionally have

11   other excipients in there.  And then underneath of that

12   it says, this is the loading amount.  It says, wherein

13   the active ingredient is present in an amount of 80 to

14   95 percent by weight of the total composition.

15                   And then the last part just says that the

16   active ingredient is dispersed both in the lipophilic matrix

17   and in the hydrophilic matrix.

18                   THE COURT:  Let me ask a question.  It says an

19   inner lipophilic matrix and an outer hydrophilic matrix.  It

20   also says that the hydrophilic matrix is such that the

21   lipophilic matrix is dispersed.

22                   THE WITNESS:  Yes.

23                   THE COURT:  What does that mean?

24                   THE WITNESS:  Okay.  So first I want to make

25   sure I understand what you said, because you said there was

Little - direct

1    an inner lipophilic and outer hydrophilic.

2              THE COURT:  Right.  That's what it says there.

3    Right?

4              THE WITNESS:  Yes.

5              THE COURT:  All right.  I'm just trying to get

6    you to, from your perspective as an expert, to explain to me

7    what it means to have the lipophilic matrix, which I take to

8    be the inner lipophilic matrix, dispersed --

9              THE WITNESS:  Right --

10             THE COURT:  -- in the outer hydrophilic matrix.

11             THE WITNESS:  I guess sort of a way to visualize

12   that, if you have the lipophilic matrix and that then is

13   going to be in pieces and that's going to be dispersed

14   throughout the hydrophilic matrix.  So you're going to have

15   volumes here that are separate from the hydrophilic matrix,

16   but those volumes are dispersed throughout of the hydrophilic

17   matrix.

18             THE COURT:  All right.  Go ahead.

19             MR. HAUG:  Certainly.

20   BY MR. HAUG:

21   Q.    What does claim 3 recite, if you know?  If we could

22   just move on.

23   A.    It says that those compositions that we just read are

24   in the form of tablets, capsules, or minitablets.

25   Q.    All right.  Thank you.

Little - direct

1              So I'd now like to focus on your opinion

2      that the Zydus tablet core is controlled release.

3              Why does your analysis focus on the tablet core

4      of Zydus' product?

5      A.     Well, it's my understanding that the Court has

6      determined in this case that coatings that would be on a

7      formulation are not a part of the controlled release oral

8      pharmaceutical composition, so I focus on what's underneath

9      the coatings of the core.

10     Q.     And what is your understanding of the meaning of

11     controlled release?

12     A.     Well, controlled release is anything that's longer

13     than immediate release.  Immediate release has a good

14     definition.  For immediate release is about 75 percent total

15     release in 45 minutes.

16             So if you have more than 75 percent release in

17     45 minutes, that's immediate release.  If you have less than

18     75 percent, that's lower.  So that is controlled release.

19     You can also pick a time point later on.  Say two hours,

20     three hours.  It could take that long for you to get to 75

21     percent release.  That's controlled release.

22     Q.     What evidence did you consider in forming your

23     opinion that the Zydus tablet core is controlled release?

24     A.     I considered the dissolution data that was provided

25     by Zydus to the FDA, and I also considered dissolution data

Little - direct

1    on Zydus's ANDA product that was performed by Vivian Gray

2    the Court saw earlier.

3    Q.      Would you please turn to PTX-626?

4    A.      (Witness complies.)

5    Q.      Can you identify this document?

6    A.      This is the letter that was provided.  My

7    understanding is this is a letter that was provided by Zydus

8    to the FDA, including dissolution data.  If you look down

9    here on the box a little bit lower down, three quarters of

10   the way down, you can see the batch number which is EMM196.

11   Q.      Please turn to PTX-626.11.

12   A.      (Witness complies.)

13   Q.      Generally speaking, what is shown on table 7 on this

14   page, if we can highlight that?

15   A.      Sure.  This is the actual dissolution data, and the

16   data is represented by the numbers at the bottom which are

17   percents of what was released.  This is for the test product

18   which is in the left-hand column.  That test product is

19   batch number EMM196.  And on the right, it is for the

20   reference product which in this case is Lialda.

21   Q.      Which data in this table reflects dissolution of the

22   Zydus tablet core?

23   A.      Okay.  It's the data that's underneath of evaluation

24   stage.  There's also numbers above evaluation stage.

25   They're all zeros, but those are in the pre-treatment

Little - direct

1    stages, and the Court saw that earlier, that they're put

2    into an acidic solution of the representative pH and then

3    early you test in pH 6.4.  Those are all zeros.  Once it

4    gets past that point and it gets into the higher pHs, that's

5    when the enteric coating is designed to dissolve away.

6              So this enteric coating is something that

7    protects it from the stomach until it gets past that, and

8    then you would expect it to dissolve pretty rapidly, and, in

9    fact, that's what you see in Zydus' ANDA product.

10   Q.    Did you prepare a demonstrative -- withdrawn.

11             Are you aware of Ms. Gray's dissolution studies

12   that she did?

13   A.    Yes, I am.

14   Q.    Have you reviewed that data and the images created?

15   A.    Yes, I have.

16   Q.    And did you prepare a demonstrative with Ms. Gray's

17   images to illustrate what's happening here regarding

18   dissolution?

19   A.    Yes, I have.

20   Q.    If we could go to your slides.  I think it will be

21   PDX-4.1.

22   A.    Okay.  So this is the slide that I prepared.  One was

23   essentially showing a composite of images that go through up

24   to 30 minutes in pH 7.2.  But the first two images, this one

25   and this one (indicating), those are in the pre-treatment

Little - direct

1    stages, so this one is in the acidic stage.  This one is in

2    the pH 6.4 stage.

3                So there's a color coating that's on top of

4    these that are dissolved away in the stomach.  That's

5    why you see this one is red and this one is white.  But

6    underneath of that color coding is essentially this enteric

7    coat that I'm talking about.  It's relatively smooth on the

8    surface.

9                What you see is when you put it in pH 7.2, which

10   is right here (indicating), not very long after that, you go

11   down to here.  You can see that coating is gone, which is

12   exactly what it's designed to do.  These pH sensitive

13   polymers are designed that once you get them into a

14   different pH, it almost is like a switch.  Just dissolves

15   away by design.

16   Q.     It would be helpful, Dr. Little, in particular if you

17   are using the laser pointer to identify exactly what you are

18   referring to --

19   A.     Of course.

20   Q.     -- because the record won't pick that up.

21   A.     So the first image in the acidic stage is PTX-900.18.

22                The second image in pH 6.4 is PTX-900.38.

23                The third image on the top is PTX-900.67.

24   That's in the start.  PH 7.2, phosphate buffer.

25                The bottom after 15 minutes in pH 7.2 phosphate

Little - direct

1    buffer is PTX-900.85.

2          In the bottom right is after 30 minutes and

3    pH 7.2 phosphate buffer, and that's PTX-900.108.

4    Q.    Thank you.

5          Go back to PTX-626.  Move to page 12.  That

6    would be 626.12.

7    A.    Yes.

8    Q.    Please tell us what is shown here.

9    A.    Sure.  This is a little difficult to see here because

10   of the photocopy, but this is essentially a draft, a plot of

11   the data that is only from the evaluation stage down.  So

12   this graph does not include zeros.  It would be in the

13   pre-treatment stages.

14         So what you see here in times zero hour, that's

15   the start of when the tablet was placed in pH 7.2 phosphate

16   buffer, which is on your left, and pH 7.5 phosphate buffer,

17   which is on your right.

18         What you see is on the Y axis here is the

19   percent of drug released, so you would go from 0 to 100, and

20   on the Y, on the X axis, my apologies, X axis on this, the

21   time point, one, two, four, six and eight hours.

22         And the key, you can see here that there's the

23   Zydus product, and then you can also see that it's Lialda

24   here as well.

25   Q.    Do you know why they're using phosphate buffer?

Little - direct

1    A.    Well, so as the Court heard earlier, phosphate buffer

2    is something that's used in these experiments.  It's

3    standard and it represents the conditions later on in the

4    gastrointestinal tract and in the colon.

5    Q.    Did you prepare a demonstrative with regard to this

6    data?

7    A.    I did.  The data there was not super clear, so I just

8    replotted it.

9    Q.    What is shown, what are you showing here on your

10   PDX-4.2?

11   A.    Sure.  It's the same thing, just replotted with the

12   zero starting here.  What you can see is the release starts

13   over essentially a six-hour period.  That is when it reaches

14   almost 100 percent, but it definitely is after four hours by

15   that point in time, you're still not, you know, you just get

16   to 70 percent at that point in time.

17   Q.    How, if at all, does this data inform your opinion as

18   to whether Zydus' tablet core is controlled release?

19   A.    This is a controlled release product.

20   Q.    Why?

21   A.    Because the release takes longer than 75 percent in

22   45 minutes.

23   Q.    Did you consider any other evidence in forming an

24   opinion as to whether the Zydus tablet core is controlled

25   release?

Little - direct

1   A.      Yes.  I also considered similar dissolution data that

2   was provided by Vivian Gray, and it also shows that the

3   tablet takes longer than, takes longer than 45 minutes to

4   release 75 percent of the drug.

5   Q.      All right.  We'll come back to some of Ms. Gray's

6   data.

7           First, I would like to ask you about your

8   opinion.  What is responsible for the controlled release of

9   the Zydus product?

10  A.      Okay.

11  Q.      What is responsible for it?

12  A.      It's my opinion that what's responsible for this

13  controlled release is two separate matrices, one that's

14  lipophilic and the other one that is hydrophilic.

15  Q.      What evidence did you consider in forming your

16  opinion?

17  A.      Well, I considered the patent specifications, the

18  patent claims.  I considered the claim construction.  I

19  considered the batch records, which include the composition

20  and the manufacturing process for the ANDA product.

21          And, in addition to that, I considered not only the

22  images that were provided by Ms. Gray, which shows the time

23  course as the tablet goes through that time course that

24  you are seeing right here, but also the dissolution data

25  itself in terms of how it matches up with what the '720

Little - direct

1   patent says.

2   Q.     I would like to discuss your opinion that Zydus, the

3   Zydus tablet core contains two separate matrices.  So please

4   turn to PTX-1 again, and specifically to column 3, lines 57

5   to column 4, line 5.

6   A.     Mm-hmm.

7   Q.     And can you describe what's shown here, or explain

8   what's shown here?

9   A.     Sure.  So this is the portion of the patent in the

10  disclosure of the invention that talks about what the

11  behavior would be in the system if you had an inner

12  lipophilic matrix that was surrounded by an outer

13  hydrophilic matrix, and it just describes how that system

14  would make it.

15              And I will just read it.  It says, in terms

16  of dissolution characteristics, the compositions of the

17  invention provide a release profile of the active ingredient

18  more homogeneous than the traditional systems.  And this is

19  important because this is the point of using two matrices

20  together, so you have more homogeneous than either one of

21  them.

22              It says, in fact, the immediate penetration

23  of water inside the superficial layer of the hydrophilic

24  matrix and the consequent swelling due to the distension of

25  the polymeric chains of the hydrogels, gives rise to a high

Little - direct

1    viscosity hydrated front which prevents the further

2    penetration of water, linearly slowing down the dissolution

3    process to a well determined point which is located about

4    half the thickness.

5              And then it says, until further penetration of

6    water causes disintegration of the hydrophilic layer and

7    therefore the release of the content, consisting of

8    lipophilic granules.

9              So Your Honor was talking before about being

10   dispersed.  So this is what would be dispersed, these

11   lipophilic granules.  And as it erodes away, you would see

12   these come out.  However, those things then induce the

13   diffusional mechanism typical of those structures, and

14   that further slows down the dissolution profile.

15             So, again, this describes what would happen,

16   what a tablet would look like if you actually did this.  And

17   then it says, essentially, that through both of these

18   together, that you would get a more homogeneous release

19   profile.

20   Q.    And what does the specification mean by more

21   homogeneous?

22   A.    Right.  So I created a demonstrative to show this.

23   Yes.

24             So what I've done here, on the left-hand side is

25   I've included a little excerpt from column 1, which talks

Little - direct

1    about the release profile that you would get from the

2    individual matrices.  And then on the right I've shown what

3    that looks like in terms of a dissolution profile, which is

4    what we've been seeing here.

5           So I will start with the top, and this is

6    lipophilic matrix.  And, again, that's used synonymously in

7    this particular patent with inert matrices.  So it says,

8    inert matrices, for example, generally entail nonlinear, but

9    exponential release of the active ingredient.

10          So on the right-hand side I'm depicting what

11   this would look like.  You have a high amount of release at

12   the beginning and then it starts to drop.  In fact, it drops

13   mathematically in an exponential matter.  It gets

14   exponentially smaller as it goes.  Hence, a lot at the

15   beginning, low at the end.

16          A hydrophilic matrix, on the other hand, is

17   described as having a linear behavior until a certain

18   fraction of the active ingredient has been released.  Then

19   they significantly deviate from linear release.

20          So I'm trying to depict that on the bottom here

21   with this profile (indicating), which would stay straight

22   for awhile, but then it would deviate from that.  And

23   remember, we're talking about a pretty high solubility drug.

24   It's 80, 90 percent, 80 to 95 percent in here.  So once it

25   gets to the point where, you know, you've got full hydration

Little - direct

1    and you start to see surface area increase, all of that

2    surface area can contribute more to the dissolution of

3    the drug, so typically what you have happen, you would have

4    it go up.

5    Q.    What would it look like if you were only -- if you

6    only had mesalamine?

7    A.    Well, if you only had mesalamine, it would just be

8    released all at the beginning because there's nothing to

9    keep it from dissolving.  As I said, mesalamine is a very

10   highly soluble drug.

11   Q.    So I'd like to ask you now about the claim

12   construction that formed your opinion.  All right?

13          Which claim constructions did you consider in

14   forming had your opinion that the Zydus product contained

15   two separate matrices?

16   A.    All right.  So I'm listing them here, the inner

17   lipophilic matrix and outer hydrophilic matrix.  My

18   understanding is inner lipophilic matrix is construed to be

19   a matrix that exhibits lipophilic properties and is separate

20   from the outer hydrophilic matrix.

21          An outer hydrophilic matrix is a matrix that

22   exhibits hydrophilic properties and is separate from the

23   inner lipophilic matrix.

24   Q.    How do these constructions inform your opinion that

25   the Zydus tablet core comprises separate matrices?

Little - direct

1    A.    Well, what I would be doing then, based on these

2    constructions, is I would be looking for two separate

3    matrices.  And what I would want to do, I would want to see

4    that they're separate and I would want to see that they

5    exhibit their respective properties.

6    Q.    And how do you know that the matrices in Zydus'

7    tablet are separate?

8    A.    Well, I can see that from the -- well, I can see what

9    I would expect to have happened from the manufacturing

10   process and also the composition.  But I can actually see it

11   in the pictures that were provided by Ms. Gray.

12   Q.    All right.  Let's turn to Zydus' manufacturing

13   process for a bit.

14         Please turn to PTX-287.  Are you familiar with

15   this document?

16   A.    Yes, I am.  This is the batch records for Zydus' ANDA

17   product, and the batch number here is EMM196.

18   Q.    And how did this inform your opinion, if at all, as

19   to whether Zydus' product comprises separate matrices?

20   A.    All right.  Well, these batch records include the

21   manufacturing process, and specifically, the compositions of

22   what's in the tablet, and even more specifically, the

23   composition as to what goes into each part of the

24   manufacturing process.

25         THE COURT:  Can you identify what page we're

Little - direct

1    looking at here?

2              MR. HAUG:  We are turning to -- I think we're

3    looking at page 4.

4              THE COURT:  Page 4?

5              MR. HAUG:  287.  PTX-287, page 4.

6    BY MR. HAUG:

7    Q.    Once again, what was shown there?

8    A.    All right.  So what the Court sees here again, this

9    EMM196 at the top, I think this was actually shown earlier

10   in one of the deposition testimonies.  But you can see here

11   the general stages of formulation underneath of bill of

12   material here.  So in all caps, "COMPACTION" is listed as a

13   word, and then you see the materials that are added in that

14   compaction stage.

15              That product as a result of that goes into the

16   granulation stage, which is next, in addition to these

17   materials that are listed here.  Then that material in turn

18   goes into the lubrication stage along with these materials.

19              And then if you actually go to the next page,

20   you can see that those, that final product is -- goes

21   through a functional coating.  It lists those materials.

22   And then this film coating that contains this Opadry brown

23   that gets that color that the Court saw earlier.

24              MR. HAUG:  We offer PTX-287.

25              MR. MILLER:  No objection.

Little - direct

1              THE COURT:  All right.  Admitted without

2    objection.

3              (PTX-287 was admitted into evidence.)

4    BY MR. HAUG:

5    Q.    And before we continue, you earlier testified about

6    PTX-626, which was a Zydus document from the ANDA.  We also

7    offer PTX-626.

8              MR. MILLER:  Defendants have no objection.

9              THE COURT:  All right.  That, too, is admitted

10   without objection.

11             MR. HAUG:  Thank you.

12   (PTX-626 was admitted into evidence.)

13   BY MR. HAUG:

14   Q.    Staying now back on PTX-287, have you prepared a

15   demonstrative to explain this process?

16   A.    Yes, I have.

17   Q.    All right.

18   A.    So what I did here was kind of what I just saw the

19   Court through here with words earlier.  I put the materials

20   on the right-hand side that are listed under what the stage

21   is called in the prior chart from the batch record.

22              So if this is listed out here -- and I will

23   take the Court through this.  Most notably, I think this is

24   important, is that you have in this manufacturing,

25   particular manufacturing process, you have two separate

Little - direct

1    granulation stages.

2              So what a granulation is, is it's something

3    that is supposed to take the materials, which are usually

4    mixed up before you do it, and stick them together.  That is

5    the purpose of the granulation.  Okay?

6              So there are two different types.  Not only is

7    there two granulation stages, but there are two different

8    types of granulation.  The first one is called a dry

9    granulation, which is what you use this compactor for.  That

10   sticks things together because of the malleability of the

11   individual components.

12             And you press them together with a compaction

13   roller, so the rollers go like this.  What happens is each

14   of those things, because of the malleability, they get

15   pressed together and stick because of almost like a zipper,

16   because you press them like that.

17             So that's where the first stage sticks things

18   together.  The second stage is a wet granulation process.

19   You essentially spray on like a polymer glue.  It's

20   solubilized first.  You spray on water and just like, you

21   know, sand in a sandcastle sticks together because of the

22   water bridges between them that's how you stick those

23   together.  It goes through a drying stage that takes the

24   water away, but that's how it sticks.

25             So if we just start at the top again, I will

Little - direct

1   show you.

2            So this -- mesalamine is the active agent.  You

3   have colloidal silicon dioxide and you have magnesium

4   stearate.  These things are put through rollers and they're

5   stuck together.  What comes out of that roller is

6   essentially a flat ribbon that comes out.  That goes into an

7   oscillating granulator, and then that oscillating granulator

8   basically breaks that ribbon up into little granules.  Those

9   granules go through a sieve, and that sieve I think was

10  about .8 millimeters.

11           So you would expect the product, those granules

12  to come out of there to be less than .8 millimeters.  They

13  wouldn't be exactly .8.  They would be like maybe 500 and

14  less than that, okay, that would fall actually through those

15  holes.

16           Those things then are taken to the next stage,

17  okay?  So you have the thing from the first stage and then

18  you have the other things, sodium CMC and sodium starch

19  glycolate.  Those are hydrophilic materials.  And what is

20  going to happen in the granulation stage is you have

21  purified water and hypromellose which is the polymer I was

22  referring to before.  That is sprayed on top of these mixed

23  up ingredients and these hydrophilic ingredients are going

24  to stick to the outside of what came out of that first

25  stage.  Okay?

Little - direct

1          That then gets filtered through a 1.2 millimeter

2     filter, which is bigger, so now you have a bigger mass with

3     little masses inside of it surrounded by hydrophilic

4     material.  That is going to be filtered out.

5          And then you have the final two stages which is

6     the final blending and lubrication where the materials are

7     added here, and then the tableting stage where it is pressed

8     down.

9          And then if you go down, if you were to continue

10    going, I don't list those here, but those are the coatings.

11    Q.    How did the Zydus process inform your opinion that

12    the Zydus tablet contains two separate matrices?

13    A.    Well, as I described earlier, you actually have in

14    this particular manufacturing process, two separate matrix

15    forming steps essentially.  You have the first one where you

16    have the compaction of those materials at the top with the

17    mesalamine, colloidal silicon dioxide, and magnesium stearate,

18    and what is placed around it is the hydrophilic.  And so

19    that forms what I expect the formulation to look like.

20    Q.    I would now like to ask you about your opinion that

21    the two matrices in the Zydus tablet exhibiting separate

22    properties.  What evidence did you consider in forming that?

23    A.    Right.  So besides what I would expect to see from

24    the manufacturing process and the chemicals, I also utilized

25    the images and the dissolution data that was provided by

Little - direct

1    Vivian Gray.

2    Q.    How did Ms. Gray's images and data inform your opinion?

3    A.    Well, I will take you through it in a minute, but

4    essentially what it shows is that you can actually see the

5    two separate matrices and, more specifically and more

6    convincingly, I think you can see them in pretty much the

7    exact same way that the '720 patent describes.  You can see

8    them as I read it earlier.

9    Q.    And I would like you to turn to PTX-900.84.

10   A.    (Witness complies.)

11   Q.    I think you have the slide.  It's up on the screen,

12   PDX-4.7.  What does this show?

13   A.    This is the -- the first image I am showing is after

14   nine minutes in pH 7.2 phosphate buffer.

15         You can see here it is about less than five

16   percent release.  And what you can see here is underneath of

17   this enteric coat that I showed you before, you can actually

18   see the contents that are underneath of it swelling out and

19   kind of coming out from underneath of it in that part.  So

20   that swelling is something that you notice here.

21         You can also see the tablet edges which were

22   previously very sharp are starting to round out.  So what

23   is underneath of that edge is the materials that we saw

24   earlier, and what you see is they're kind of swelling and

25   bulging out to sort of round those edges off.

Little - direct

1    Q.      How do you know that the swelling is attributable to

2    the CMC and SSG in the outer volume?

3    A.      Well, I think that that is what you would expect CMC

4    and SSG to do.  They're very well known to be hydrophilic

5    matrix formers.  And if you put them in a formulation like

6    this, I think that would be responsible for the swelling.

7    Q.      All right.  Please turn to PTX-900.93.

8    A.      So this is after 18 minutes, and pH 7.2 phosphate

9    buffer.  And what is released here is about 5 to 15 percent.

10            And what is most notable in this picture is that

11   you can actually see these granules that we have been

12   talking about here coming out.

13            And you can, if you look here very carefully,

14   you can see the pits.  And I used arrows here, but I will

15   try to use my laser pointer, too.  You can see them all over

16   the place here.

17            So this is not smoothly, dissolving down.  You

18   actually see eroding away a little bit of the outer surface.

19   And as that happens, you see the places where the granules

20   used to be and the granules are coming out.

21   Q.      How do you know that the particles in these images

22   are granules?

23   A.      Well, as I described earlier, that first compaction

24   stage densifies those granules, and you have a certain

25   chemical composition that is going to give it a property,

Little - direct

1    and then around it you have these hydrophilic materials

2    which are swelling up.  So if you have that separate

3    properties, what you expect might happen and what I think

4    you are seeing here happen is that what is swelling up

5    around it is pushing and popping these little granules out

6    and that is why you are seeing them there.

7    Q.     Have you formed an opinion as to whether these

8    granules exhibit a separate property from the outer hydrated

9    mass?

10   A.     Yes.  As I said, you can see that they would be

11   exhibiting a separate property.  Otherwise, you wouldn't see

12   these pits.  If they would be exhibiting the same property

13   of what is around them, then you wouldn't see that.

14   Q.     Please turn to PTX-900.239.

15   A.     (Witness complies.)

16   Q.     What does this image show?

17   A.     So what you are seeing here is after two hours, at

18   11 minutes and pH 7.2 phosphate buffer.

19          And this image, by this point you released about

20   70 percent, and this image you see what you saw before.  You

21   are still seeing granules come out of this as we go.  But

22   most notably by this point, you see it appears as if the

23   tablet is smaller.  That is because you are starting to see

24   this hydrophilic stuff eroding away.  The layer sort of

25   disintegrates as it goes down, and that is why you are

Little - direct

1    seeing this.

2    Q.     And please turn now to PTX-900.186.

3    A.     (Witness complies.)  So this is a composite image

4    that I created.  And I picked three different time points:

5    One hour 29 minutes is PTX-900.186.  Two hours and

6    11 minutes in the middle is PTX-900.239.  And on the right,

7    three hours, ten minutes, PTX-900.266.

8           And the only reason I did this is to show this

9    erosion over time.  You see this layer gets, as it goes away

10   it gets smaller and it gets smaller.

11   Q.     The slide you are referring to is PDX-4.10?

12   A.     Yes.  4.10.

13   Q.     Please turn now to PTX-900.281.

14   A.     (Witness complies.)

15   Q.     What is shown in this image?

16   A.     This is after three hours and 40 minutes in pH 7.2

17   phosphate buffer.  At this point, 98 percent has been

18   released, about, and you see it is essentially getting very

19   small at this point, almost none of it left, and you have

20   the final granules in this coming out.

21   Q.     Are all of these images that we have been looking at

22   in the evaluation stage?

23   A.     Yes, they are.

24   Q.     So it's after the enteric coat comes off; is that

25   right?

Little - direct

1    A.       Yes, and that is this time point up above.  It's

2    three hours and 40 minutes since it was placed in that

3    buffer stage.

4    Q.       I'd like you to turn to PTX-900.285.

5    A.       This is after four hours in pH 7.2 phosphate buffer.

6    And at this point, approximately 100 percent has been

7    released, and you see the tablet has pretty much fully

8    disintegrated.

9    Q.       That's on slide PDX-4.12; right?

10   A.       Yes.

11   Q.       Dr. Little, we have just gone through a selection of

12   Ms. Gray's images.  How, if at all, do these images relate

13   to the patent's description of separate matrices?

14   A.       Yes, I created a demonstrative to show you this.

15            I'll start in this top column.  And I have

16   listed three images:  PTX-900.68, which is the first one;

17   PTX-900.78, which is the middle one; and PTX-900.82, which

18   is the one on the right.  And with those, I'll just read

19   what I read before.

20            It says:  Immediate penetration of water inside

21   the superficial layer of the hydrophilic matrix and the

22   subsequent swelling, which is what I see in the pictures.

23            If you go to the next column, or row -- I am

24   sorry -- down, I have two images.  On the left, PTX-900.85

25   and PTX-900.180.  And those are representative at least of

Little - direct

1     what I was saying before, which is the further penetration

2     of water causes the disintegration of the hydrophilic layer.

3                 And, therefore, if you go to the next one.  I'll

4     read the PTX numbers in a second.

5                 What it says what will happen as a result of the

6     erosion is the release of the content which consists of

7     lipophilic granules would then go into that particular part

8     that it is supposed to do.

9                 And we saw that throughout up here, but you

10    see it here, and we see it here.  As it erodes down, the

11    granules come out.

12                And the first image is PTX-900.186,

13    PTX-9030.239, and PTX-900.266.

14    Q.    Please turn now to PTX-900.1053.

15    A.    (Witness complies.)

16    Q.    Are you familiar with this data?

17    A.    Yes.  This is the dissolution data that was provided

18    by Ms. Gray in a similar format that the Court has seen

19    here.  There is percent mesalamine dissolved on the Y axis

20    and hours on the X.

21                Here, though, you are seeing the pretreatment

22    stages of 0, right here.  So the time point in which the

23    evaluation stage begins is at three hours, and it goes to

24    seven.

25                THE COURT:  What exactly is the pretreatment

Little - direct

1      stage for that?

2                     THE WITNESS:  Yes, that is a good question.  So

3      when these are analyzed, what happens is essentially to,

4      usually the goal of this is to prove that the enteric

5      coating doesn't come off in the more acidic stages like it

6      is designed to not come off.  So you don't see any release

7      in these pretreatment stages.  And by that, I mean the more

8      acidic media that represents the pH of the stomach and the

9      early intestine.  Okay?  So that is the .1 molar normal HCL

10     and the pH 6.4 phosphate buffer.

11                    At three hours, what has happened is that the

12     tablet is placed into pH 7.2 or 7.4 phosphate buffer.  That

13     represents the conditions under which that enteric coat will

14     go away; and what you are seeing then is the release

15     behavior from the underlying core.

16                    THE COURT:  All right.  Thank you.

17     BY MR. HAUG:

18     Q.    Were you finished with the data shown on this slide?

19     A.    Yes.  I was going to add that because the core

20     releases over this three to seven hours, I've, in the next

21     slide, just shown that, to just show release from the core.

22                    Essentially, what you are seeing here is that you

23     -- I'll say that you don't see.  You don't see this bursting

24     behavior or this high rate of release that logarithmically

25     decreases, which is what you would expect to see if you only

Little - direct

1    have a lipophilic matrix.  And what you also don't see is

2    you also don't see some amount of steady release until you

3    get to the point where it increases or even decreases.

4         What you see is you see this steady throughout

5    the entire course.  And from release data overall, this is a

6    very, very steady homogenous release profile.

7    Q.    Now, you mentioned earlier I believe that the patent

8    describes a significant deviation from linear release.  Do

9    you recall that?

10   A.    Yes.

11   Q.    When only a hydrophilic matrix is used; is that

12   correct?

13   A.    Yes.

14   Q.    Does Ms. Gray's dissolution data show this type of

15   deviation?

16   A.    No, it doesn't.

17   Q.    How did Ms. Gray's dissolution data inform your

18   opinion there are two separate matrices in Zydus's tablet?

19   A.    As I described, what you are seeing here is

20   consistent with two matrices that are working together to

21   provide something that is more homogenous than if you had

22   just either one of the two.  And that is entirely consistent

23   with both the pictures that show two separate matrices very

24   clearly, and it also is consistent with the manufacturing

25   process, which would show what I would expect to see which

Little - cross

1    is manufacturing two separate regions that would exhibit

2    separate properties.

3    Q.    And so what is your overall conclusion about the

4    release profile of Zydus's ANDA product?

5    A.    That it is entirely consistent with my opinion that

6    what is responsible for the controlled release behavior

7    is two separate matrices, one lipophilic and one hydrophilic.

8                    MR. HAUG:  Thank you.  No further questions.

9                    THE COURT:  Cross-examination.

10                   MR. MILLER:  Your Honor, may I approach the

11   bench?

12                   THE COURT:  You may.

13                   (Binders passed forward.)

14                   MR. MILLER:  Your Honor, may I approach the

15   witness?

16                   THE COURT:  You may freely approach the witness.

17   Thank you.

18                   (Binder passed forward.)

19                        CROSS-EXAMINATION

20   BY MR. MILLER:

21   Q.    Good afternoon, Dr. Little.

22   A.    Good afternoon.

23   Q.    It's good to see you again.

24   A.    Good to see you.

25   Q.    It's your opinion that magnesium stearate and

Little - cross

1    colloidal silicon dioxide impart a lipophilic nature to

2    Zydus's roll-compacted mesalamine and make up what you

3    believe is the inner lipophilic matrix; correct?

4    A.    What I can say from my observations, that I see an

5    inner lipophilic matrix.  I see that behavior and it plays

6    out in the release profile.  I think it's my opinion that

7    the magnesium stearate is imparting the lipophilic

8    properties, but it's the overall, the overall behavior that

9    I see that informs my opinion.

10   Q.    You submitted an expert report in this case; correct?

11   A.    Yes.

12   Q.    Could we go to that?  That is Tab 4 in your binder.

13   And I would ask you to turn to page 28, at paragraph 56.

14            It reads:  I agree with Dr.  Hoag's conclusion

15   that magnesium stearate and colloidal silicon dioxide impart

16   a lipophilic nature to Zydus's roll-compacted mesalamine

17   and make up the inner lipophilic matrix.

18            Did I read that correctly?

19   A.    Yes, you did.  What I am trying to say here is this

20   overall material behavior because it is everything that

21   would be in here.

22   Q.    It is your opinion that any resistance to water

23   exhibited by the so-called inner volume in Zydus's ANDA

24   product is due to the addition of magnesium stearate and

25   colloidal silicon dioxide; correct?

Little - cross

1   A.      Well, I think you see resistance to the penetration

2   of water is what I am saying here.

3            And what specifically -- what I will say

4   specifically is responsible for that is most likely, and I

5   think probably more than most likely, the magnesium

6   stearate, but what I can tell is just from the overall

7   material, so it is everything that is there, which is why I

8   list both of them.

9   Q.      You recall being deposed in this case; correct?

10  A.      Yes.

11  Q.      And you recall that I was present?

12  A.      You were present, yes.

13  Q.      And a stenographer was present as well?

14  A.      I am sorry?

15  Q.      A stenographer was present as well?

16  A.      Yes.

17  Q.      And you were under oath?

18  A.      Yes.

19  Q.      Could you turn to your deposition transcript which is

20  Tab 5 in your binder?

21  A.      Um-hmm.

22  Q.      And I would ask you, if you would, to go to page 166.

23  A.      (Witness complies.)

24  Q.      At line 14, I asked:

25            "Question:  Does the colloidal silicon dioxide

Little - cross

1   that Zydus uses in its product oppose or resist the

2   penetration of water?"

3                And you answered:

4                "Answer:  Well, what I can say is that the

5   combination of magnesium stearate and colloidal silicon

6   dioxide with the mesalamine does.  I can say that

7   definitely."

8                Did I read that correctly?

9   A.    Yes, and I say that definitely because what I am

10  saying is that is the overall material that I see that has

11  the effect.  And I think we were having a conversation about

12  this at the deposition as to what is responsible.  I can say

13  definitely that it is the overall material that exhibits the

14  effect.

15  Q.    Let's, while we're on your deposition transcript, tab

16  5, let's go to page 179, at line 11.  I asked:

17                "Question:  And do you know what's causing in

18  your opinion the resistance to water in the blended

19  mesalamine?"

20                And you answered:

21                "Answer:  Well, it certainly has something to do

22  with the composition because in the one case, there is not

23  all the ingredients and the other one there is, so the

24  combination of those excipients imparts in some way, shape

25  and form this resistance to water.  I can say that.

Little - cross

1          I asked you:

2          "Question:  Do you know whether or not the

3    colloidal silicon dioxide in the blended compacts is causing

4    resistance to water?"

5          And you answered:

6          "Answer:  It may not be imparting resistance.

7    It may.  I can tell you that the whole thing together is

8    imparting resistance."

9          And I asked:

10         "Question:  But if I asked you correctly, you

11   are not sure what it is that is causing that resistance?"

12         And after your counsel objects, you answer:

13         "Answer:  I know that it is a resistance that is

14   based compositionally on the addition of added magnesium

15   stearate and colloidal silicon dioxide."

16         Did I read that accurately?

17   A.    Yes, that is exactly what I have been saying here.

18         MR. HAUG:  Objection, Your Honor.  I am not sure

19   what counsel is doing.  It looks like impeachment but it is

20   not impeachment.  He is reading from a deposition.

21         THE COURT:  He is doing that.  Mr. Miller, are

22   you?

23         MR. MILLER:  No, I thought I was getting a

24   little resistance on whether he was including colloidal

25   silicon dioxide as one of the things that imparted

Little - cross

1    resistance to water, so I wanted to clarify his answer at

2    the deposition.

3            THE COURT:  Well, maybe I am not, maybe I am a

4    little thick here, but I am hearing him testify pretty

5    consistently with what is on the page and what he is saying

6    on the stand.

7            So this is your time.  Go ahead and if you think

8    you have got a space between what he is saying on the stand

9    now and what he said there, I am prepared to let you try to

10   explore it.

11           MR. MILLER:  No, that was it.  I am done with

12   that portion of it.  I'm going to move on.

13           THE COURT:  Go ahead.

14           MR. MILLER:  Thank you.

15   BY MR. MILLER:

16   Q.    Thank you.  Now, magnesium stearate is most commonly

17   used as a lubricant; is that correct?

18   A.    I would say that you're correct, that it is most

19   commonly used as a lubricant, but this does not mean that it

20   can't impart properties because of basic chemical picture

21   beyond that.

22   Q.    And magnesium stearate can be used as a lubricant

23   before roll compaction; is that correct?

24   A.    It can be, yes.

25   Q.    And colloidal silicon dioxide is also used as a

Little - cross

1    glidant; is that correct?

2    A.    Yes, that's one of the ways it's used.  Yes.

3    Q.    And it can also be used as a porization element; is

4    that correct?

5    A.    Yes.

6    Q.    You testified about the dissolution testing Boston

7    analytical performed on three of Zydus' tablets that we also

8    heard Ms. Gray testify about this morning; is that correct?

9    A.    Yes.

10   Q.    In tab 2 in your binder, you'll find PTX-547R.  That

11   is the Boston analytical report; is that right?

12   A.    It appears to be, yes.

13   Q.    If you could go to page 7 of PTX-547R.  The

14   penultimate bullet point down there says that tablets were

15   observed to be dissolved completely after four hours

16   fifteen minutes.

17            Is that correct?

18   A.    That's what it says, yes.

19   Q.    And if you turn to tab three in your binder, you'll

20   find PTX-900.1053.

21   A.    I'm sorry.  Could you say that again?

22   Q.    Sure.  Tab 3 in your binder.

23   A.    Okay.

24   Q.    It's that one-page document.

25   A.    Yes.

Little - cross

1    Q.      That you testified about.

2            And you'd recognize this as the mean dissolution

3    profile of the Zydus tablets from the Boston analytical

4    testing; is that correct?

5    A.      Yes.

6    Q.      And just to clarify again, the reason we're seeing a

7    flat line until hour three is that hour three is when the pH

8    7.2 buffer was added; is that correct?

9    A.      Yes.

10   Q.      And as indicated by Boston analytical in PTX-547.R

11   what you see here is that mesalamine is essentially

12   completely released by about four-and-a-half hours in the

13   Zydus ANDA product; is that correct?

14   A.      Let's see.  So that would be what?  On this curve,

15   seven hours and fifteen minutes, because it's four hours

16   after the start of three I presume is the way this was

17   written?

18   Q.      Yes.

19   A.      Yes.

20   Q.      Yes.

21   A.      Okay.  Yes.

22   Q.      Let's look at one of the pictures from this

23   dissolution testing that you reference in your testimony.

24   And I think we can do it from your slide deck, PDX-4.8, and

25   that was PTX-900.93 for the record.

Little - cross

1      You testified that you know the composition of

2  the particles floating in dissolution; is that correct?

3  A.    What I said was that they would be the inner

4  granules, and I told the Court what would be in the inner

5  granules.

6  Q.    So your testimony is that you can tell just by

7  looking at those particles that they're composed of

8  mesalamine, colloidal silicon dioxide and magnesium

9  stearate; is that correct?

10 A.    Well, what I'm saying is, is that at least most of

11 what you see here coming out is going to be represented by

12 what was in those pits, so that's going to be those inner

13 granules, and you both know that what was put into them was

14 the active ingredient, the colloidal silicon dioxide and the

15 magnesium stearate.  You know that the process that they

16 used was a roll compaction, which is going to basically,

17 like I described, zipper things together, is what it's

18 designed to do.  And then I guess you wouldn't expect that

19 to change.  I mean, perhaps the mesalamine is released out

20 of there over time, so that comes out, but the rest of the

21 stuff you would expect to be there, and that's entirely

22 consistent with what we saw this morning with Zydus'

23 formulator that said that would be the composition of the

24 inner granule.

25 Q.    But you did not do any analytical testing to

Little - cross

1   determine what the content of those particles are; is that

2   correct?

3   A.     No.  I didn't feel like I needed to.  And, in

4   addition, I don't know exactly how I would do that.

5   Q.     But that is a no, you did not do any analytical

6   testing to determine the content of those particles?

7   A.     No.  I didn't feel like I needed to do that.

8   Q.     And you testified, correct me if I'm wrong, that you

9   know that the so-called inner volumes come from those gaps

10  or those pits in the dissolving tablet that the red arrows

11  are pointing to, for example; is that correct?

12  A.     For example, yes.

13  Q.     Now, you weren't there when these tests were

14  performed; is that correct?

15  A.     No, I was not.

16  Q.     So you did not watch the tablets in realtime as they

17  were dissolving?

18  A.     No.

19  Q.     And there was no video of the dissolution; is that

20  right?

21  A.     No.  The images that were given.

22  Q.     So there are only still photos; is that correct?

23  A.     There are a lot of still photos, but, yes, still

24  photos.

25  Q.     So you cannot pinpoint precisely where any of those

Little - cross

1    particles that you are calling the inner volume come from

2    the intact tablet there; is that correct?

3    A.    Well, I mean, the one here that I'm pointing to on

4    the left-hand side that looks like it's coming out of the

5    pit.

6    Q.    I'm sorry.  You had the laser pointer.  Can you do

7    that for me?

8    A.    Sure.  It's right here (indicating).  But, I mean,

9    regardless, you have all of these pits, and you have the

10   exact same size of what you see coming out of here, that's

11   entirely consistent with what I would expect to see from the

12   manufacturing process.

13   Q.    Just to clarify, are you testifying that you can see

14   a particular particle coming out of a particular pit?

15   A.    Well, I'm just saying right here, it looks like a

16   pit is forming and there's a piece here.  Even if it isn't,

17   I think, you know, all of these that are coming out that

18   are just right near the surface are the same size of these

19   pits.

20   Q.    You did not do any testing to measure the size of the

21   particles; is that correct?

22   A.    Well, I used a ruler and I know what the size of the

23   tablet is, right, so I can measure that.  And I know then I

24   can scale based on the ruler.

25   Q.    You did not do that in this case, did you?

Little - cross

1   A.      Yes.  I think we talked about that in my deposition,

2   how I did that.

3   Q.      You measured the particles that are floating in the

4   dissolution?

5   A.      Like I said, like I told you, I used the images that

6   you are seeing here.  I used a ruler on the whole thing.  If

7   we had a big ruler, we could do it here.  And then what you

8   can do is scale it based on what you know the dimensions of

9   the tablet are.  And then you can measure what the particles

10  are and do the same scale.

11              So what you get is the size scale just like

12  we discussed in the deposition that is exactly what I would

13  expect to see that would come through a .8-millimeter

14  filter, which is in that first dry granulation stage, and

15  is, in fact, exactly the same as the size of the inner

16  granules that you saw in Dr. Davies' results earlier.

17  Q.      So even though this is in solution --

18              THE COURT:  Hold on just a moment.

19              MR. MILLER:  I'm sorry.

20              THE COURT:  Just for my own reference later.

21  When Dr. Little said he saw a pit forming, he was pointing

22  with his laser pointer at the red arrow on the left of

23  PDX-4.8, which is PTX-900.93.

24              Go ahead.

25              MR. MILLER:  I should have done that myself,

Little - cross

1    your Honor.  Thank you very much.

2    BY MR. MILLER:

3    Q.    So if you take a ruler to this, this is a product in

4    solution; is that correct?

5    A.    Yes.

6    Q.    It's an image of a product in solution?

7    A.    Yes.

8    Q.    So if you take a ruler to it, you're assuming, are

9    you not, that everything is in the same plane?

10   A.    Well, I mean, I think that it most certainly can be

11   some, a little bit more forward and some backward.  I mean,

12   a dissolution vessel is this stage.  Right?  So you are

13   looking at this tablet inside of this that's this big.  So

14   you can have a little bit of back and forth.

15            THE COURT:  All right.  Again, this is all going

16   on the record, so when you say this big, Doctor, and you put

17   your hands together, it looks to me like you're making a

18   cupping shape with your hand that looks to be about four

19   inches across or something.

20            THE WITNESS:  It's a one liter vessel.  So, you

21   know, it's about, you know, as wide as maybe my fist.  And

22   then a tablet, we all know what a large tablet --

23   unfortunately, we have to take big ones sometimes.  They're

24   hard to swallow.  It's a relatively large tablet,

25   1.2 milligrams of active.  So you can imagine that's in a

Little - cross

1    vessel that's about the size of my fist.  If you put a

2    tablet on the top of your fist, it's not a whole lot of

3    before and after.

4                    THE COURT:  All right.  Fine.  Thank you.

5                    MR. MILLER:  You're welcome, Your Honor.

6    BY MR. MILLER:

7    Q.     Now, I would like to turn to the '720 patent and talk

8    about some of the passages that you referred to in your

9    testimony.  It's tab 1 in your binder.

10   A.     Mm-hmm.

11   Q.     It's DTX-1.  You cited the '720 patent in column 1,

12   lines 32 to 33.  If we could go there.

13   A.     Mm-hmm.

14   Q.     For the proposition that inert matrices generally

15   entail nonlinear, but exponential release of the active

16   ingredient?

17   A.     Yes.

18   Q.     You did not cite in your testimony any scientific

19   literature that supports this statement; is that correct?

20   A.     Well, as we discussed in my deposition, these are

21   concepts that are fairly well-known.  I mean, we teach the

22   students in the class.  So these are based on -- this is

23   based on understanding of the scientific literature.

24   Q.     But the only publication you cite in your testimony

25   to support the proposition that inert matrices generally

Little - cross

1    entail nonlinear, but exponential release of the active

2    ingredient is in the '720 patent?

3    A.    Yes.

4    Q.    You also cited the '720 patent at column 1, lines 34

5    to 36 for the proposition that hydrophilic matrices have

6    linear behavior until a certain fraction of active

7    ingredient has been released and they significantly deviate

8    from linear release.

9          Is that correct?

10   A.    Yes.

11   Q.    And, again, in your testimony today, you did not cite

12   any scientific literature or references that support this

13   statement; is that correct?

14   A.    Yes.  Again, these are concepts that are known in the

15   field and they're known based on the scientific literature,

16   so I didn't feel like I needed to reference that.

17   Q.    You also cited a statement in the '720 patent at

18   column 3, lines 57 to 59, that the claimed composition of

19   the invention provide a release profile that is more

20   homogeneous than traditional systems.

21          Correct?

22   A.    Yes.

23   Q.    And, again, you did not cite anything to support this

24   statement aside from the '720 patent; is that correct?

25   A.    Well, so this is sort of an inference, right.  You

Little - cross

1    can look at the two release profiles that you would, you saw

2    between the individual systems and you could literally,

3    logically see how it would provide a more homogeneous

4    release profile.  So I didn't feel like I needed to cite

5    literature for that.

6    Q.    And because of that statement, includes the more

7    homogeneous, it explicitly refers to a comparison with

8    so-called traditional systems; is that correct?

9    A.    Yes.  It's in comparison to what would be observed

10   with each of the individuals.

11   Q.    And you performed no test in this case comparing

12   compositions of the '720 patent to traditional systems

13   to verify that the release profile of the patents'

14   compositions are more homogeneous than traditional systems;

15   correct?

16   A.    No, I didn't need to do that, because you can see the

17   final release profile and you don't see either one of the

18   telltale, so you don't need to do comparison.

19   Q.    I'd like to talk a little bit about your testimony

20   comparing drug release profiles from Zydus' product with

21   those of Lialda.

22         You testified earlier about comparison between

23   Zydus' ANDA product and Lialda that appeared in Zydus'

24   submissions to the FDA; is that correct?

25   A.    No, I didn't.

Little - cross

1    Q.     Did we have, I believe it was PTX-626 that was up.

2           I believe we're looking at ZYDUS_MES 0236592,

3    and that's PTX-6612.  And I believe you testified that these

4    are comparing Zydus' ANDA product with Lialda; is that

5    correct?

6    A.     Well, what I said was in the, in the key you can see

7    that both of them are there.  The darker one is the ANDA

8    product.  The lighter one, which you can't even see at all,

9    at least my eyes can't see at all, it says Lialda.

10          So if you went to the document that I referred

11   you to afterwards that more clearly show these profiles to

12   the Court, I listed the pH 7.2 and pH 7.5.

13   Q.     So you have no opinion regarding similarity or

14   dissimilarity between the dissolution profiles of Zydus'

15   ANDA product and Lialda; is that correct?

16   A.     Well, I didn't, I didn't bring it up on the direct,

17   but if you were to actually look at it, and, again, it's

18   tough to see, you could take the data out and you can look

19   at it.  I mean, they're essentially the same, but I didn't

20   talk about it in the direct.

21   Q.     And you have not seen any specific test results

22   showing that Lialda embodies the claims of the '720 patent;

23   is that correct?

24   A.     So as we talked about this in the deposition, too.

25   Right?  I mean, Lialda is covered, it's in the Orange Book

Little - cross

1  listed as covered by the '720 patent.  I understand that

2  there were -- there's people from Zydus that were deposed

3  that said that it's covered by the '720 patent.  There are

4  people from Shire that said it was disclosed by the '720

5  patent.  But that's all I know.

6  Q.    Okay.  So you have not seen any specific test results

7  showing that?

8  A.    I have not seen specific test results, but I presume

9  that there's something behind what Zydus' representatives

10  and Shire's representatives testify in terms of this as

11  being covered under the '720 patent, but I have not

12  personally seen the data.

13            MR. HAUG:  I was going to object.  This is

14  clearly beyond the scope of direct.  Dr. Little said nothing

15  about the '720 patent as it may relate to the Lialda product.

16  If that's the last question.

17            MR. MILLER:  That's the last question.

18            THE COURT:  All right.

19  BY MR. MILLER:

20  Q.    Let's look at the examples of the '720 patent.  Can

21  you turn back to DTX-1 in your binder?  That's tab 1.

22  Doctor, actually go to columns 5 and 6.  That's the last

23  example, Example 5.

24            Can you see the last full paragraph here?  And I

25  think this is column 6, but still describing Example 5.

Little - cross

1          It states that the dissolution profile of these

2   tablets after a lag time of permanence in the stomach and

3   partly in the intestine provides the release of no more than

4   30 percent within the first hour, no more than 50 percent

5   within two hours, no more than 70 percent within four hours,

6   no more than 90 percent within eight hours.

7          Did I read that accurately?

8   A.    Yes.  For this particular exemplified formulation, I

9   think that you read that correctly.

10  Q.    And Example 4 states that, tablets, the tablets

11  described here release no more than 90 percent within eight

12  hours.

13         Is that correct?

14  A.    That's what it says, yes.

15  Q.    Similarly, Examples 3 and 2 describe dissolutions

16  with no more than 90 percent release within eight hours; is

17  that correct?

18  A.    Yes.  That's what this says.

19  Q.    And, finally, Example 1 at column 4 states that the

20  dissolution profile of these tablets shows the release of an

21  active ingredient in an amount lower than 90 percent at the

22  eighth hour, thus proving that the double matrix effectively

23  controls release.

24         Did I read that accurately?

25  A.    Well, what it says is that the whole release profile

Little - cross

1    you're describing here is proven that the double matrix

2    effectively controls the solution.  So the way I would read

3    this as someone of skill in the art even reading this whole

4    thing is that the whole release profile is not

5    representative of what you would see with bursting at the

6    beginning or it goes for a certain period of time, then it

7    would deviate.  That profile is not represented by what you

8    show there, so that's what I read.

9    Q.    But you agree that every single example in the '720

10   patent describes the similar release rate where no more than

11   90 percent of mesalamine is released by hour eight; is that

12   correct?

13   A.    Well, I mean, I didn't -- I mean, I guess I would

14   have to go through and look at each of these and see where

15   the time points are and see what you are talking about in

16   terms of how similar they are.  I would imagine there's

17   going to be some range because they're different

18   formulations, but, you know, I mean, essentially what it's

19   doing to me when I read those, it's talking the whole

20   release profile.  And the point of it, in my opinion, that

21   it does not have that initial bursting and it does not have

22   that dumping.  And that's what I read.

23   Q.    And turn back in your binder to tab 3, PTX-900.1053.

24   This is a Boston analytical profile that we saw earlier.

25   And you agreed that this shows a hundred percent release of

Hoag - direct

1   mesalamine in Zydus' ANDA product by about four-and-a-half

2   hours; is that correct?

3   A.     Yes.

4           MR. MILLER:  I have no further questions.

5           THE COURT:  Thank you.

6           Any redirect?

7           MR. HAUG:  No redirect.  Thank you.

8           THE COURT:  Thank you, Doctor.

9           THE WITNESS:  Thank you.

10          (Witness excused.)

11          THE COURT:  Your next witness?

12          MR. HAUG:  The next witness Shire will call will

13  be Dr. Hoag, and my partner, Angus Chen, will examine the

14  witness.

15          THE COURT:  All right.

16          MR. CHEN:  Good afternoon, Your Honor.  Angus

17  Chen, Frommer Laurence & Haug.  Shire now calls Professor

18  Stephen W. Hoag.

19          ... STEPHEN W. HOAG, having been duly sworn as a

20  witness, was examined and testified as follows ...

21          THE COURT:  Thank you.  Please be seated,

22  Doctor.

23          MR. CHEN:  May I approach, Your Honor?

24          THE COURT:  You may, Mr. Chen.

25          (Mr. Chen handed a notebook to the Court.)

Hoag - direct

1          MR. CHEN:  May I approach the witness?

2          THE COURT:  You certainly may.

3          (Mr. Chen handed a notebook to the witness.)

4          THE COURT:  I will tell you what.  I will start

5     him off with mine.

6          MR. CHEN:  Thank you for the loan, Your Honor.

7          THE COURT:  Thank you.  Okay.  We've got it

8     worked out.  Go ahead and have Mr. Gaertner have his.  I've

9     got mine.  You can give it back to the court reporter after.

10          MR. CHEN:  Okay.

11          THE COURT:  We are on a roll.

12          MR. CHEN:  Thank you.  Thanks for the assist.

13                    DIRECT EXAMINATION

14     BY MR. CHEN:

15     Q.     Professor Hoag, could you please summarize what you

16     were asked to do for this case?

17     A.     Yes.  I was asked to determine whether the addition

18     of magnesium stearate and colloidal silicon dioxide to

19     mesalamine results in some resistance to the penetration of

20     water due to the poor affinity towards aqueous fluid.

21     Q.     Thank you, Professor Hoag.  Let's start with a little

22     bit of your background first.  What is your current

23     position?

24     A.     I'm a professor at the University of Maryland School

25     of Pharmacy.

Hoag - direct

1    Q.     What are your responsibilities as a Professor of

2    Pharmacy?

3    A.     At the School of Pharmacy, I teach in the

4    pharmaceutical sciences.  I do research in the area of

5    pharmaceutical sciences.  And I also do service to the

6    school, the university, and the pharmaceutical community.

7    Q.     And what types of classes do you teach at the

8    University of Maryland?

9    A.     At the University of Maryland, in the Pharm. V or

10   undergraduate level, I teach part of a survey course in the

11   general pharmaceutical sciences.

12              At the graduate level, I teach a course on

13   the theory of solids, a course on unit operations and

14   formulation development.

15              I also teach part of a course on the drug

16   development process.

17              And I teach part of a course in statistics with

18   experimental design and spectroscopy.

19   Q.     And for how long have you been involved,

20   approximately, in pharmaceutical formulations?

21   A.     Including my graduate work, it's been almost 30 years

22   or slightly over 30 years.

23   Q.     What is the highest educational degree that you hold?

24   A.     I hold a Ph.D. in Pharmaceutical Sciences from the

25   University of Minnesota, Twin Cities Campus.

Hoag - direct

1          I also hold a Bachelor of Science in

2    Biochemistry from the University of Wisconsin, in Madison,

3    Wisconsin.

4    Q.     What was the subject of your thesis?

5    A.     My thesis involves the subject of tablet compaction.

6    Q.     After you obtained your Ph.D., could you summarize

7    briefly what you did?

8    A.     After receiving my Ph.D., I did a brief stent at 3M

9    Pharmaceuticals.

10          I also was a Visiting Professor at Abbott

11   Laboratories.

12          My first academic position was at Oregon State

13   University where I also had a joint appointment in the

14   Department of Physics.

15          And then I joined the University of Maryland,

16   School of Pharmacy.

17   Q.     You mentioned earlier you do research as part of your

18   activities.  What is the focus of your research?

19   A.     Well, my focus, my research is on solid oral dosage

20   forms, tablets and capsules.  I look at process development,

21   formulation development, the testing, and the monitoring of

22   processes for these products.

23   Q.     And Professor Hoag, have you been awarded any

24   research grants for your work?

25   A.     Yes, I have had approximately 60 grants.  As a

Hoag - direct

1    principal investigator, I received about almost $3

2    and-a-half million of grant funding.  And also as a

3    co-investigator, I received other funding.  Basically, my

4    lab has been funded continuously.

5    Q.    Can you describe your laboratory facilities at this

6    university?

7    A.    At the University of Maryland, we have all the

8    equipment needed to make tests and evaluate pharmaceutical

9    products.  We have about three 500 square foot labs.

10          And also, I am the director -- we have a GMP

11   facility for which I am the director of.

12   Q.    And I think we heard GMP earlier, but could you

13   remind the Court?

14   A.    It stands for good manufacturing practices.

15   Q.    Thank you.  And have you authored any publications?

16   A.    Yes, I have had about 70 peer reviewed publications,

17   another 20 or so non-peer reviewed publications.  And with

18   my colleague Larry Augsburger, we have written three books

19   on tablet compaction.

20   Q.    And do you serve on any advisory committees?

21   A.    Yes.  I have been nominated to the FDA Compounding

22   Advisory Committee.

23          I am also on the USP Committee, the council of

24   experts.

25          On the Handbook of Excipients Editorial Board.

Hoag - direct

1    And,

2                    The Journal of Pharmaceutical Development

3    Technology Editorial Board.

4    Q.    Is USP the same United States Pharmacopeia that we

5    heard of earlier today?

6    A.    Yes, that is correct.  They create the standards that

7    the FDA in part enforces.

8    Q.    What do you do on the USP council?

9    A.    On the USP council, I am on the physical test methods

10   committee, so we write test methods.  We also make sure that

11   all the test methods are current and up-to-date and evaluate

12   those.  And if people have trouble performing tests, we also

13   help people in community troubleshoot their problems.

14   Q.    And for how long have you been on the USP council?

15   A.    I was first elected in 2000, and then I have been

16   reelected a couple of times.  There is a five year term for

17   these.

18   Q.    And do you perform any consulting work in the industry?

19   A.    Yes.  I do consulting for the pharmaceutical

20   industry, the name brand and generic companies.

21   Q.    And can you generally discuss or summarize your

22   consulting activities?

23   A.    When I do consulting, it involves formulation issues,

24   excipients, process development, things of that nature.

25   Q.    And besides your teaching activities at the

Hoag - direct

1    university, have you taught in other forums?

2    A.    Yes, I teach a series of short courses.  So they're

3    non-degree courses that often last for about a week.  So we

4    will go to a company and teach to the company.

5         Also, we have done things for government

6    agencies like the FDA, or individuals may come.  We also

7    have hands on short courses at our school.  And people come

8    in and will do a hands on course with us.

9    Q.    And have you received any awards of note in your

10   career?

11   A.    Yes.  I am a fellow of the American Association of

12   Pharmaceutical Sciences.

13        I won the Ralph Shangraw Award for excellence in

14   excipient research.

15        I also, from the USP, received an award for

16   excellence in standard setting activities.

17        And then I have won some like best poster

18   presentations at meeting awards.

19   Q.    Professor Hoag, have you previously testified in

20   federal court as an expert in pharmaceutical sciences?

21   A.    Yes, I have testified in four trials previously.

22   Q.    And did the Court accept you as an expert in any of

23   those cases?

24   A.    Yes, they did.  In all cases.

25   Q.    Could I please ask you to turn to PTX-572 in your

Hoag - direct

1    binder?

2    A.      (Witness complies.)

3    Q.      Do you recognize this document?

4    A.      This is a copy of my CV.

5    Q.      Is it current?

6    A.      Yes.  There may have been a few publications excepted

7    only minor differences.

8            MR. CHEN:  Your Honor, we move PTX-572 into

9    evidence.

10           MR. GAERTNER:  No objection, Your Honor.

11           THE COURT:  It is admitted without objection.

12           (PTX-572 is admitted into evidence.)

13           MR. CHEN:  Thank you, Your Honor.

14           At this point, Shire offers Professor Hoag as an

15   expert in pharmaceutical formulation and process design and

16   testing.

17           MR. GAERTNER:  No objection, Your Honor.

18           THE COURT:  All right.  He is accepted as an

19   expert.  Please go ahead.

20           MR. CHEN:  Thank you.

21   BY MR. CHEN:

22   Q.      Professor Hoag, you stated earlier that you were

23   asked to determine whether the addition of magnesium

24   stearate and colloidal silicon dioxide to mesalamine results

25   in some resistance to the penetration of water.  Can you

Hoag - direct

1   summarize how you analyzed that question?

2   A.     To address this question, we used what is called a

3   drop penetration test.

4   Q.     And can you provide a high level description of what

5   a drop penetration test is?

6   A.     The drop penetration test is where you prepare a

7   sample.  You take that sample and then you apply a known

8   amount of water to that sample and then measure how long it

9   takes for that water to penetrate into the sample.

10  Q.     And is the drop penetration test used in the

11  pharmaceutical industry?

12  A.     Yes, it's commonly used.

13  Q.     And do you teach the drop penetration test at all?

14  A.     Yes.  When I discussed the subject of granulation,

15  say, my short courses or to the graduate students or the

16  pharmaceutical students, when I teach that, I do include the

17  drop penetration test.

18  Q.     How many drop penetration tests have you performed

19  yourself in your career?

20  A.     In my career, on the order of hundreds.

21  Q.     Okay.  And how are drop penetration tests conducted?

22  A.     The drop penetration tests that you mentioned

23  requires a sample.  So one way of performing this is that

24  you can prepare a powder bed, prepare that at a constant.

25  You know, you pretreat the powder, or you can prepare a

Hoag - direct

1    compact.

2           With a compact, basically what you are doing is

3    you are taking a powder and you are squeezing that powder

4    together until it forms a cohesive solid.

5           A compact is a little bit different in this

6    context than a tablet because when we make a compact, we use

7    the minimal amount of force to consolidate that material.

8    And if you look at a tablet, that is done with much more

9    force.

10   Q.    And for your test in this case, did you use a powder

11   bed or a compact?

12   A.    I used the compact.

13   Q.    Why did you choose to use a compact?

14   A.    I choose to use the compact because I can control

15   the variables that affect the water penetration.  It's a

16   method I have experience with.  And it can also be used to

17   minimize the differences between the control and the test

18   specimen.

19   Q.    Okay.  And returning back to how the drop penetration

20   tests are conducted in general.  What are the different

21   techniques for applying water in a drop penetration test?

22   A.    To apply water to your sample, one way of doing that

23   is to use a pipet, so you can pipet a known amount of water

24   on the surface.

25           Another is to use a capillary to introduce water

Hoag - direct

1    to the surface.

2    Q.    For your test in this case, which method did you

3    choose to use to apply water?

4    A.    I used the capillary method.

5    Q.    Why did you use the capillary method?

6    A.    I used the capillary method.  It is a known method.

7    It is something I have experience with, and it nicely

8    illustrates the water penetration into the sample.

9    Q.    Let me pause for a second and ask you, can you

10   describe what a capillary is?

11   A.    A capillary is a very thin tube you can use to

12   introduce water to the sample.

13   Q.    And how often do you use the capillary tube method in

14   a drop penetration test?

15   A.    I frequently use that when I am doing those types of

16   studies.

17   Q.    Okay.  Do you teach the capillary method?

18   A.    Yes.  As I mentioned, in my short courses to the

19   graduate students, also when I have given lectures to the

20   FDA, I have taught this method.

21   Q.    Okay.  Now, let's look at the specific test that you

22   conducted here in this case.  What ingredients did you use

23   in the compacts that you made?

24   A.    I have a demonstrative prepared for that.

25             MR. CHEN:  Can we pull up PDX-5.1, please.

Hoag - direct

1   BY MR. CHEN:

2   Q.     Go ahead.

3   A.     And so here, on the left side, in the control group,

4   is the compact made out of 100 percent mesalamine.

5          On the right side, where we have our test

6   specimen, that is comprised of mesalamine 99.3 percent,

7   magnesium stearate 0.33 percent, and colloidal silicon

8   dioxide, 0.41 percent.

9   Q.     And how did you manufacture the compacts that you

10  used?

11  A.     If you look at the bottom of this figure here, it

12  briefly gives an outline of how we manufacture that material.

13         You can see we started off with sieving the

14  material.  Oftentimes when you are doing pharmaceutical

15  processing, you sieve the material to remove aggregates that

16  may arise from the material.  And basically the sieving,

17  you are running it through a wire mesh to break up the

18  aggregates.

19         You then blend that material in a blender.

20         In the case of mesalamine control, we obviously

21  did not blend that.

22         Then we took a roller compactor, sometimes call

23  it, it is called a compactor.  The roller-compactor has two

24  co-rotating wheels or rollers that compress the material

25  together to form either a ribbon or flake.

Hoag - direct

1          We then take that ribbon or flake and gently

2    mill that to produce granules.

3          And then, finally, we took those granules and,

4    on a tablet press, we formed our compacts.

5    Q.    To help us understand a little bit better visually,

6    did you take any pictures of your experimental setup?

7    A.    Yes, I did take a picture of the experimental setup.

8    Q.    I am sorry.  Just for one second for the record,

9    we're looking at PDX-5.2.

10          And can you please describe what we see here in

11   this picture?

12   A.    So this is our experimental setup.

13          The top part of the figure there shows the

14   mounting bracket for the capillary tube.

15          What we did is we mounted that tube, and we made

16   sure that it was vertical and that it is perpendicular to

17   the surface of the tablet.  So we mounted that.  Once that

18   capillary tube was mounted, it was not moved or altered.

19          That black line just slightly down from the

20   mounting bracket shows a marker of how much water we filled

21   into it.

22          Below that, you can see the meniscus of the water.

23          And then you can see the tablet.

24          Now, there is a little bit of an optical

25   illusion there.  The tablet is a flat-faced tablet.  So

Hoag - direct

1    sometimes you see tablets that are rounded, but, you know,

2    we wanted the camera to look at the top a little bit.  So

3    that tablet is completely flat.

4              THE COURT:  So just from my information, when

5    you say the "meniscus," do you mean the surface level of the

6    water?

7              THE WITNESS:  Exactly.  That curved water there.

8    So you can tell what the height of the water is there.

9              THE COURT:  Thank you.

10   BY THE WITNESS:

11   A.    And to introduce the tablet, that is on a mounted

12   base.  As I said, we fix the capillary.  Then when we wanted

13   to have the tablet come in contact with the water, we raise

14   the tablet up on a base.  So there is what they call a lab

15   jack that could lift that up.

16   Q.    Professor, did you take any pictures of your

17   experiment in progress?

18   A.    Yes, we did.  Here are some side-by-side comparisons.

19   These are four pictures over a series of times.  So you can

20   see there is four times there.

21              The yellow lines indicate where the height of

22   the water is at that specific time.  And also these pictures

23   are excerpts from the video that we took.

24              MR. CHEN:  And just for the record, we were

25   looking at PDX-5.3.

Hoag - direct

1    BY MR. CHEN:

2    Q.     Now, Professor, you mentioned a video.  Did you

3    prepare an excerpt -- actually, did you prepare a video to

4    show the Court?

5    A.     Yes, this is the video that we prepared.

6               So basically you have the control on the left.

7    That is pure mesalamine.

8               And then the magnesium stearate plus colloidal

9    silicon dioxide and mesalamine.

10              Here you can see it's a sped up picture to save

11   time.  And you can see on the left how quickly the mesalamine

12   is going down, the pure mesalamine.

13              And you can see now all that water is released.

14              Now you can see on the right side where the

15   yellow line is, the meniscus going down.

16              And now you can see that the water has

17   penetrated into the test specimen.

18   Q.     And can you turn to the tab PTX-579 in your binder,

19   please?

20   A.     Yes.

21   Q.     Is that a DVD with a copy of the video?

22   A.     Yes.  This is a DVD that is prepared with that.

23              MR. CHEN:  Your Honor, we would like to move

24   PTX-579 into evidence.

25              MR. GAERTNER:  No objection, Your Honor.

Hoag - direct

1          THE COURT:  It is admitted without objection.

2          (PTX-579 is admitted into evidence.)

3     BY MR. CHEN:

4     Q.    Now, Professor Hoag, did you replicate your test?

5     A.    Yes, we replicated both the control and the test

6     specimen three times.

7     Q.    Okay.  And can you please turn to PTX-577 in your

8     binder?

9     A.    (Witness complies.)

10    Q.    Do you recognize that document?

11    A.    This is a copy of our lab notebook that we recorded

12    the results in.

13    Q.    Okay.  And can you turn to the page, there is stamps

14    in the middle, on the bottom, PTX-577.6.

15    A.    (Witness complies.)

16    Q.    What is shown on that page?

17    A.    On this page are the summary of the drop penetration

18    times.

19          So you could see there are the times that we

20    recorded for each measurement, the three times.  And below

21    that are the average and the standard deviations.

22          MR. CHEN:  Your Honor, we would like to move

23    PTX-577 into evidence.

24          MR. GAERTNER:  No objection, Your Honor.

25          THE COURT:  It is admitted without objection.

Hoag - direct

1          (PTX-577 is admitted into evidence.)

2   BY MR. CHEN:

3   Q.      Now, Professor Hoag, did you prepare a demonstrative

4   to summarize your results?

5   A.      Yes, we do have a summary demonstrative here.

6   Q.      And is PDX-5.4 that demonstrative?

7   A.      That is correct.

8   Q.      Can you explain what we're looking at here?

9   A.      Okay.  These are classic bar graphs.  So we have the

10  three compacts that we tested on the X axis.  So on the left

11  side, you have the control.  And the height of those bars

12  represents how many seconds it took for that water to

13  penetrate into the compact.

14          So if you look at the left, you can see that for

15  those three compacts, we had an average time of 48.5 seconds.

16          We also calculated the standard deviation for

17  these.  So you could see those are 2.4 seconds.

18          And then we use the concept of an I beam to plot

19  plus or minus one standard deviation.  So at the top of

20  those bars, those little I beams represent one standard

21  deviation, so you can get an idea of the variability in

22  those measurements.

23          Then on the blue, we use mesalamine, colloidal

24  silicon dioxide, and magnesium stearate.  And again, the

25  average is 123.5.

Hoag - direct

1           And, again, we plotted the standard deviation,

2    which is 13.7 in the I beam.

3           So this helps you kind of understand the

4    variability and the differences relative to the variability

5    of the measurements.

6           And these results show that there is a

7    statistically significant difference between the rates of

8    or the penetration time between the control and the test

9    specimen.

10   Q.    And in summary, Professor Hoag, what conclusion can

11   you draw from your experiments?

12   A.    So these results show that in fact the addition of

13   magnesium stearate and colloidal silicon dioxide to

14   mesalamine does result in resistance to the penetration of

15   water compared to the mesalamine compact, pure mesalamine

16   alone.

17   Q.    I am sorry.  And in your opinion, what is providing

18   resistance to the penetration of water?

19   A.    In my opinion, it's the magnesium stearate.

20   Q.    And why is that?

21   A.    Because it's such a hydrophobic material.

22           MR. CHEN:  Thank you.  No further questions.

23           THE COURT:  All right.  You may cross examine.

24           MR. GAERTNER:  May we approach, Your Honor?

25           (Binders handed to the Court.)

Hoag - cross

CROSS-EXAMINATION

1

2     BY MR. GAERTNER:

3     Q.     Good afternoon.  I don't think we've had a chance to

4     meet.  My name is Mike Gaertner.  I represent Zydus.

5     A.     Good afternoon.

6     Q.     Dr. Hoag, you described your capillary method as a

7     known method.

8              MR. GAERTNER:  I'm sorry about that, Your Honor.

9              (A binder was handed to the witness.)

10             THE WITNESS:  Thank you.

11    BY MR. GAERTNER:

12    Q.     Okay, Dr. Hoag.  Sorry for that mild interruption

13    there.  I'm sure things will proceed smoothly from here on

14    out.  I want to go over your testimony a little bit today

15    and make sure I understand things properly.

16             Now, you testified that your capillary method is

17    a known method; is that right?

18    A.     That is correct.

19    Q.     Okay.  Now, and you consider your capillary method to

20    be a drop penetration test; is that right?

21    A.     Yes.  It's among that category of tests.

22    Q.     All right.  Now, there are hundreds of articles and

23    references to the drop penetration test; is that correct?

24    A.     That's correct.

25    Q.     And you did not cite in your deposition, I'm sorry,

Hoag - cross

1    in your expert report an article that used the same method

2    in this case, did you?

3    A.      I know of methods, but I did not directly cite an

4    article.

5    Q.      Okay.  In fact, you're not aware of a single

6    peer-reviewed scientific reference that uses the same method

7    that you used in this case; is that correct?

8    A.      Actually, I am aware of methods in the literature

9    that do use this.

10   Q.      Okay.  But in your expert report, you did not provide

11   any references to those; is that correct?

12   A.      In my expert report, I did not directly cite such a

13   reference.

14   Q.      Okay.  And when you were asked at your deposition

15   whether you're aware of any peer-reviewed articles, you were

16   aware of none at that time; is that correct?

17   A.      Well, at my deposition, there were several statements

18   made.  One was like, did you develop this method yourself?

19   And I said that I had seen it in the literature, but

20   couldn't recall at that time the exact reference.

21   Q.      All right.  And that's what I'm focusing on, Dr.

22   Hoag, not your alleged development.  It's just that at your

23   deposition, you couldn't recall a single peer-reviewed

24   article that used the same method that you used in this

25   case; is that correct?

Hoag - cross

1   A.      At the deposition, as I believe the word was

2   something, the exact method, yes.

3   Q.      Now, you've cited two articles in your expert report

4   in connection with your drop penetration test, a reference

5   by Dr. Hapgood as the lead author.

6              Do you remember that reference?

7   A.      Yes.

8   Q.      And a reference by Dr. Kayrak-Talay, who was the lead

9   author.

10             Do you remember that reference?

11  A.      Yes.

12  Q.      Now, you consider the Hapgood reference and the

13  Kayrak-Talay reference to be authoritative references; is

14  that correct?

15  A.      Yes, I do.

16  Q.      And authoritative references on the application of

17  the drop penetration test.  I should be clear.  Is that

18  fair?

19  A.      Yes.

20  Q.      And one of the reasons that you believe that they're

21  authoritative references is that they're peer-reviewed;

22  isn't that correct?

23  A.      That is correct.

24  Q.      Now, aside from your expert report in this case, you

25  have not delivered an expert report in which you used the

Hoag - cross

1    same method as you've done in this case; is that correct?

2    A.    Could you repeat that question?

3    Q.    Sure.  Aside from your expert report in this case,

4    you have not prepared an expert report in any other case in

5    which you have used the same method as you've done in this

6    case; is that correct?

7    A.    That's correct.

8    Q.    And you have not published any articles in any

9    peer-reviewed references describing the capillary method

10   that you use in this case; is that correct?

11   A.    I have done studies, but they have not led to the

12   publication of peer-reviewed articles.

13   Q.    So you have no study results that have been published

14   in peer-reviewed articles using this capillary method; is

15   that correct?

16   A.    That's correct.

17   Q.    Now, I'm trying to make sure I get a handle around

18   what it is that you are offering an opinion on.

19              In your expert report, you stated that you

20   endeavored to simulate the inner volume of the granules of

21   the Zydus ANDA product.

22              Is that what you endeavored to do?

23              MR. CHEN:  Your Honor, objection.  Outside the

24   scope of direct.  Professor Hoag did not mention anything on

25   the --

Hoag - cross

 1          MR. GAERTNER:  Your Honor --

 2          THE COURT:  Let me hear the question again.

 3          MR. GAERTNER:  I'm confused about the opinion

 4   that he offered because it differs from the one in his

 5   expert report.

 6          THE COURT:  So --

 7          MR. GAERTNER:  Okay.

 8          THE COURT:  Let me hear the question again.

 9          MR. GAERTNER:  Sure.

10          THE COURT:  Let me have it again.

11          MR. GAERTNER:  In his expert report, he stated

12   that he endeavored to simulate the inner volume of the

13   granules of the Zydus ANDA product.

14          THE COURT:  That's the question?  Okay.  Well,

15   overruled.  Until I hear where this is going, I don't know

16   whether it's within the scope or not.

17          Go ahead.  Thank you.

18          MR. CHEN:  Thank you, Your Honor.

19   BY MR. GAERTNER:

20   Q.    Is that correct?

21   A.    Does that mean I answer the question?

22          THE COURT:  That means you answer the question.

23          THE WITNESS:  Okay.  Could you repeat the

24   question?

25   BY MR. GAERTNER:

Hoag - cross

1    Q.     Sure.  You remember submitting an expert report in

2    this case; is that correct?

3    A.     Yes.

4    Q.     All right.  Now, in your expert report, you stated

5    that you endeavored to simulate the inner volume of the

6    granules of Zydus' ANDA product; is that correct?

7    A.     That terminology, or, yes, that is in the expert

8    report.

9    Q.     Now, are you offering an opinion on the alleged

10   lipophilicity of the inner volumes of the Zydus ANDA

11   product?

12   A.     Really, what I'm offering an opinion on is the test

13   that I've described in my testimony.

14   Q.     All right.  And I'm trying to understand, are you

15   testifying as to the lipophilicity of the alleged granules

16   in the Zydus product or the tablets that you put together

17   and ran your drop penetration test on?

18   A.     My opinion is related to the study that I described

19   and those tablets that I showed in the video.

20   Q.     Okay.  So the study that you described was on the

21   tablets that you made, not on the granules that are alleged

22   to be in the Zydus ANDA product; is that correct?

23   A.     Well, I mean, as you recall in my expert report,

24   there was some statement about that they are the -- that was

25   a basis of what I designed those granules, but I'm not

Hoag - cross

1    offering an opinion about whether they, you know -- I'm just

2    offering an opinion about that test there.

3    Q.    Yes.  Well, I'm trying to bring that to this case,

4    Dr. Hoag, and make sure that I ask you questions that are

5    within the scope and that make sense for the Judge.

6             Are you offering an opinion today about the

7    alleged lipophilicity of what is called the granules in the

8    Zydus ANDA product?

9    A.    No.

10   Q.    Dr. Hoag, you also have been hired as an expert by

11   the plaintiffs in another Lialda generic case against Mylan;

12   is that correct?

13   A.    I didn't hear the first part of that.

14   Q.    Sure.  You're also serving as an expert for the

15   plaintiffs in this case and another case they have against

16   Mylan; is that correct?

17   A.    That is correct.

18   Q.    All right.  And you prepared an expert report in that

19   case; is that correct?

20   A.    That is correct.

21   Q.    In which you tested the Mylan product for alleged

22   lipophilicity; is that correct?

23   A.    That was in that report, yes.

24   Q.    Okay.  And in the Mylan expert report, you used a

25   different test than you used against the Zydus product; is

Hoag - cross

1    that correct?

2    A.     That's correct.

3    Q.     Now, with respect to the drop penetration time, Dr.

4    Hoag, I'm trying to get a sense for when in that time you

5    can decide the difference means that a tablet like you

6    tested is lipophilic.

7                   Now, there was a period of time, I think it

8    was, and I will get my notes here -- you've got it on your

9    PDX-5.4 and there's a time difference there.  That on

10   average, what you call your control compacts for

11   48.5 seconds and your test at an average of 123.5.  Okay?

12                  You can look at it on your own chart --

13   A.     Yes.

14   Q.     -- on PDX-5.4.

15                  Now, you talked about the difference in

16   time water absorption into the compacts that you made.  At

17   what point in time can you determine whether or not you

18   consider in this example the compact on the right, which is

19   in the blue bars, is lipophilic?

20   A.     When there's a significant difference between the

21   test and the compact.

22   Q.     Okay.  And in this example, the blue bars are the

23   compacts you made.  Two-and-a-half times longer would be

24   absorbed in the contacts than the large bar compacts; is

25   that right?

Hoag - cross

1    A.      Approximately, yes.

2    Q.      And is that what you would characterize as a

3    significant difference?

4    A.      Well, statistically significant is based on

5    statistical principles.  The difference you see between two

6    measurements is unlikely to be the result of chance, so that

7    there's enough difference that you are fairly certain that

8    there's a real difference between those samples.

9    Q.      Now, in your expert report you did not point to any

10   scientific references which would give a person of ordinary

11   skill in the art a basis to determine whether or not a

12   specific time difference in water penetration time, even if

13   your capillary method is accepted, would result in a finding

14   of lipophilicity; is that correct?

15   A.      Could you repeat that question, please?

16   Q.      Sure.  It was a mouthful and I apologize for that.

17           I want to go back to your expert report.  In

18   your expert report, you do not cite to any scientific

19   references in which a person of ordinary skill could look to

20   determine when in a point of time something would be judged

21   lipophilic in your capillary test; is that correct?

22   A.      Yes.  The test is a relative scale, so you have a

23   control, and then you have your test specimen, and when

24   there's a statistically significant difference, then you can

25   draw conclusions about the rate of water penetration.

Hoag - cross

1    Q.      All right.

2    A.      And the resistance to water penetration.

3    Q.      Sure.  And my point, in your expert report, you did

4    not cite to any scientific references which applied that

5    standard or test; is that correct?

6    A.      Well, I mean, there's 500 million statistic books out

7    there.  If there's a real difference between materials, I

8    don't feel like this is such a common knowledge that was

9    required to be submitted.

10   Q.      Sir, I'm just asking you a really small question.

11   In your expert report, did you cite to any scientific

12   references that applied that sort of a test?

13   A.      The test being a "T" test?

14   Q.      The test that you applied here to measure

15   lipophilicity in your opinion?

16   A.      Well, the Hapgood article.

17   Q.      Now, the Hapgood article is a drop penetration test;

18   is that correct?

19   A.      Right.

20   Q.      All right.  You did not perform a drop penetration

21   test as is described in the Hapgood article; is that

22   correct?

23   A.      I used the capillary version of the drop penetration

24   test.

25   Q.      Well, the Hapgood reference does not describe a

Hoag - cross

1   capillary method, does it?

2   A.     No, it does not.

3                 MR. GAERTNER:  One moment.

4                 (Pause while counsel conferred.)

5                 MR. GAERTNER:  I have nothing further, Your

6   Honor.

7                 THE COURT:  All right.  Thank you.

8                 Any redirect, Mr. Chen?

9                 MR. CHEN:  No, Your Honor.  Thank you.

10                THE COURT:  Thank you, Dr. Hoag.

11                THE WITNESS:  Thank you.  Do I just leave this

12  here?

13                THE COURT:  Why don't you just take that, Mr.

14  Chen?  Thanks so much.

15                (Witness excused.)

16                THE COURT:  Mr. Haug?

17                MR. LIEF:  Our next witness will be Dr. Scott

18  Hanton.  He performed some tests that go to melting point

19  issues.

20                THE COURT:  All right.  Thank you.

21                ... SCOTT HANTON, having been duly sworn as a

22  witness, was examined and testified as follows ...

23                MR. LIEF:  If we might approach with the books?

24                THE COURT:  You may.  Both the bench and the

25  witness.

Hanton - direct

1          (Notebooks handed to the Court and to the witness.)

2                    THE COURT:  Please proceed.

3                    DIRECT EXAMINATION

4     BY MR. LIEF:

5     Q.     Dr. Hanton, good afternoon.  Can you tell us, what's

6     your profession?

7     A.     I'm an analytical chemist and business manager.

8     Q.     And can you briefly describe your educational

9     background?

10    A.     I earned a Ph.D. in physical chemistry from the

11    University of Wisconsin at Madison and a Bachelor's degree

12    in chemistry from the Honors College at Michigan State

13    University.

14    Q.     And could you briefly describe your career after you

15    earned your Ph.D.?

16    A.     Once I finished my education, I went to work at Air

17    Products and Chemicals, in their global analytical sciences

18    department.  I served there in a variety of capacities, from

19    research bench chemist to technical manager.

20                    As the technical manager, I was responsible

21    for a variety of laboratories, including chromatography,

22    including GL and LC spectroscopy, which included FTIR and

23    NMR, thermal analysis, which included DSC and TGA, and mass

24    spectrometry.

25                    That business was outsourced by Air

Hanton - direct

1    Products to Intertek in 2010.  I've been at Intertek since,

2    where I'm now the general manager and the chief scientist.

3    Q.    And there were a few acronyms in there.  If I could

4    get them explained on the record.  You said GC?

5    A.    GC is gas chromatography.

6    Q.    And any others?

7    A.    DSC is differential scanning calorimetry.  TGA is

8    thermogravimetric analysis.  FTIR, Fourier transform

9    infrared analysis.

10   Q.    All right.  After Air Products, you said you went to

11   Intertek.  Can you describe your role at Intertek?

12   A.    Yes.  I am responsible for the entire business of the

13   research labs at Intertek in Allentown, Pennsylvania.  There

14   I work closely with integrated teams of analytical chemists,

15   where we do primarily problem solving, new methods

16   development, analysis, and testing on chemicals and

17   materials.

18   Q.    All right.  Apart from your industry experience, have

19   you published any scientific articles?

20   A.    Yes.  I've done independent research and I have

21   published about 35 peer-reviewed papers and book chapters.

22   Q.    If we could turn in your book to PTX-549, and could

23   you tell us what this document is?

24   A.    Yes.  This is my C.V.

25   Q.    And is the information contained in this C.V.

Hanton - direct

1   accurate and up to date?

2   A.    Yes, it is, save for a few minor additions of a

3   presentation or paper and a slight change in title.

4   Q.    All right.

5            MR. LIEF:  We would move PTX-549 into evidence.

6            MR. GAERTNER:  No objection.

7            THE COURT:  Admitted without objection.

8            (PTX-549 was admitted into evidence.)

9            MR. LIEF:  And we would offer Dr. Hanton as an

10  expert in chemical analysis and analytical techniques.

11           MR. GAERTNER:  No objection.

12           THE COURT:  All right.  The doctor is admitted

13  as an expert.  Please proceed.

14  BY MR. LIEF:

15  Q.    Dr. Hanton, what have you been asked to do in this

16  case?

17  A.    I've been asked to conduct property and thermal

18  property analysis on magnesium stearate that's from the

19  Zydus ANDA product.

20  Q.    If we could take a look at PDX-6.1.  Can you tell me

21  what this is?

22  A.    This is a summary of the analyses that we did on the

23  samples.  Infrared analysis is using absorption of infrared

24  light to get a fingerprint of a chemical substance to

25  identify chemical substances.

Hanton - direct

1          TGA is where we take a small amount of a

2     material, put it into a furnace where it has a constant

3     temperature ramp and measure the weight of it during that

4     ramp.  We're looking to see if any portion of the substance

5     might leave with high temperature.

6          Gas chromatography with mass spectrometry is a

7     technique that's commonly used to separate complex mixtures

8     and identify the substances therein.

9          Gas chromatography with flame ionization is very

10    similar.  It's a technique to separate complex mixtures and

11    quantify the substances there in.

12         Differential scanning calorimetry is measuring

13    the transfer of heat into a material to find out whether it

14    absorbs or emits heat.  It's comparing a sample to an empty

15    pan.

16    Q.    All right.  Are these techniques routine analytical

17    techniques?

18    A.    Yes.  These are routine tests that are commonly used

19    both at Intertek and in the field.  They are very reliable

20    to measure chemical composition and thermal properties.

21    Q.    And who developed the specific procedures that were

22    used at Intertek for these tests for this case?

23    A.    I developed the procedures that we used for these

24    samples.  I worked closely with the scientists who did the

25    work.  I supervised them, and then I reviewed and signed off

Hanton - direct

1   on the work as it was conducted.

2   Q.    If we could turn to PDX-6.2.  Can you tell us what is

3   shown here?

4   A.    Here, we see individual pages from the notebooks

5   where the work was documented.  On each of these pages we

6   see that the sample, magnesium stearate that was analyzed

7   has an identification number of ZYDUS_MES 0346399, and that

8   relates back to a batch number of 0908123024.

9   Q.    All right.  I would like you to turn in your book to

10  several PTX's, PTX-559, 560, and 561.

11         And if you could identify what those three

12  documents are.

13  A.    Yes.  These are the laboratory notebooks that were

14  used for the analysis of these samples where the procedures

15  and results were documented.

16  Q.    All right.  Is it Intertek's regular practice to use

17  lab notebooks for document testing?

18  A.    Yes, it is.

19  Q.    And were these lab notebooks maintained in the

20  ordinary course of Intertek's business?

21  A.    Yes, they were.

22         MR. LIEF:  We would move PTX-559, 560, and 561

23  into evidence.

24         MR. GAERTNER:  No objection.

25         THE COURT:  Admitted without objection.

Hanton - direct

1    (PTX-559, 560 and 561 were admitted into evidence.)

2    BY MR. LIEF:

3    Q.    I'd like to turn to PTX-558.  And can you tell us

4    what this is?

5    A.    Yes.  This is the results of the infrared analysis

6    that we conducted.  On the Y axis going up and down, you can

7    see the absorbance, which is telling us how much of a

8    particular stretch or band is present in the sample.

9          On the X axis, we're seeing the wave numbers,

10   which corresponds to the color frequency of the light that

11   was used.  In this particular figure, we're comparing two

12   different infrared traces.  The blue one comes from the

13   magnesium stearate from the ZYDUS_MES product, and the red

14   one comes from a magnesium stearate from the USP standard.

15   They're very similar, essentially identical, except for a

16   little difference around 3259 wave number.

17   Q.    And what is the significance of the 3259 wave number?

18   A.    That is the area of the IR spectrum where a hydrate

19   would absorb.  So this is showing us that both samples are

20   hydrated and that the Zydus magnesium stearate is a bit more

21   hydrated than the USP standard.

22             MR. LIEF:  We would offer PTX-558 into evidence.

23             MR. ABRAMOWITZ:  No objection.

24             THE COURT:  It's admitted.

25             (PTX-558 is admitted into evidence.)

Hanton - direct

1    BY MR. LIEF:

2    Q.    You mentioned you conducted a thermogravimetric

3    analysis or a TGA.  Can you briefly describe in a little bit

4    more detail what that means?

5    A.    Yes.  In a TGA experiment, we'll take a small amount

6    of the sample, place it into a pan and put it on a very

7    precise balance to weigh how much material is present.  We

8    then put that into a furnace and expose the sample to a

9    constant temperature ramp to relatively high temperatures.

10            The object is to find out if any material is

11   leaving the sample due to that high temperature exposure.

12            MR. LIEF:  All right.  If we could turn to

13   PTX-552.

14   BY MR. LIEF:

15   Q.    Can you tell us what this is?

16   A.    This is the result of our TGA experiment.

17            On the left axis going up and down is the

18   percentage of weight of the sample.  At the top, we see

19   100 percent where we started.  The bottom, please note is at

20   96 percent.  So we're only showing the weight loss region of

21   interest.

22            The X axis is the temperature, so that is the

23   temperature that the furnace went to, that was exposed to

24   the sample during the course of the experiment.

25            And during this TGA experiment, we see weight

Hanton - direct

1    loss as shown by the green curve.  And the total weight loss

2    for this experiment was about 3.7 weight percent.

3                    MR. LIEF:  Again, we would offer PTX-552 into

4    evidence.

5                    MR. ABRAMOWITZ:  No objection.

6                    THE COURT:  It is admitted without objection.

7                    (PTX-552 is admitted into evidence.)

8    BY MR. LIEF:

9    Q.    I'd now like to pull up PTX-554.  And can you tell us

10   what this is showing?

11   A.    This is a result of the GC/MS experiment.

12                   On the Y axis, going up and down, is the

13   intensity of the ions that we observed during the

14   experiment.

15                   On the X axis is the time by which they were

16   separated in the instrument.

17                   We see a variety of species within the magnesium

18   stearate sample, the most important of which are magnesium

19   stearate and magnesium palmitate.

20   Q.    And again you had mentioned an acronym there "GC/MS."

21   Can you tell us what that stands for?

22   A.    GC/MS stands for gas chromatography with mass

23   spectrometry.

24                   MR. LIEF:  We would offer PTX-554 into evidence.

25                   MR. ABRAMOWITZ:  No objection.

Hanton - direct

1          THE COURT:  It is admitted without objection.

2          (PTX-554 is admitted into evidence.)

3          MR. LIEF:  Turning to PTX-557.

4    BY MR. LIEF:

5    Q.    Can you tell me what this is?

6    A.    This is the result of the GC flame ionization

7    experiment.

8          Again, on the Y axis is the intensity of species

9    we see at the detector.

10         The X axis is the time of solution coming out of

11   the GC experiment.

12         We see very similar results that we saw in the

13   GC/MS experiment.

14         We see the same series of species observed

15   within the sample.  Again, the most important and the

16   highest peaks are the magnesium stearate and magnesium

17   palmitate.

18         THE COURT:  Tell me what you mean when you say

19   "species" in this context.

20         THE WITNESS:  In this context, they're different

21   individual chemicals that are part of the sample.

22         THE COURT:  All right.  Thank you.

23         MR. LIEF:  So we would move PTX-557 into evidence.

24         MR. ABRAMOWITZ:  No objection, Your Honor.

25         THE COURT:  It is admitted without objection.

Hanton - direct

1          (PTX-557 is admitted into evidence.)

2     BY MR. LIEF:

3     Q.     I'd like to turn to what, as an acronym, we have been

4     calling DSC or differential scanning calorimetry.  Can you

5     explain a little bit more what that is?

6     A.     Yes.  In a differential scanning calorimetry

7     experiment, we take a small amount of the sample in question

8     and put it into one pan.  And then in another pan, we leave

9     empty.  Both of those pans are inside of a furnace.

10          So we're going to now raise the temperature in a

11    linear rate and measure the heat flow that is going through

12    the pans.  Of course, being in a furnace, they're going to

13    get hot, but we are measuring the relative differential of

14    the heat flow from the sample into the empty pan.  And at

15    any given temperature during the DSC experiment, the sample

16    might absorb heat, we see that in the negative, or give off

17    heat, we would see that in the positive.  And the instrument

18    is then adding those together, and we see the net heat

19    change at any given temperature.

20    Q.     If we turn to PTX-553, can you tell us what this is?

21    A.     Yes.  This is the result of the DSC experiment that

22    we did on the magnesium stearate sample.

23          On the Y axis, going up and down, is that heat

24    flow that I measured, I described.

25          On the X axis is the temperature rate of what

Hanton - direct

1    the temperature is going through in the oven.

2            The green curve is showing the heat flow, the

3    differential heat flow through the sample as compared to the

4    empty pan.  And at any given point, it is measuring the net

5    of heat released from the sample or heat absorbed by the

6    sample.

7            And in this particular experiment, we see two

8    key endotherms.

9    Q.    And when you say "endotherm," what do you mean by

10   that word?

11   A.    And endotherm is demonstrating where the sample is

12   absorbing heat compared to the empty pan.

13   Q.    All right.  And I also see on there some numbers for

14   that first endotherm on the left.  What is the number up top

15   there?

16   A.    We see for each of the two key endotherms, we're

17   measuring onset temperature.  That onset is measured by

18   taking the steepest point of the slope where we see the

19   endotherm and extending it backwards to the drawn baseline

20   across the top of the endotherm.

21           Where that steepest slope intersects with the

22   baseline is the onset temperature.

23           For the first endotherm, that onset temperature

24   is 82.9 degrees C, and for the second endotherm, that onset

25   temperature is 126.2 degrees C.

Hanton - direct

1    Q.     Is the way you describe determining the onset

2    temperature for the endotherm, is that a standard technique

3    for determining onset?

4    A.     Yes, it is.

5              MR. LIEF:  We would offer PTX-553 into evidence.

6              MR. ABRAMOWITZ:  No objection.

7              THE COURT:  That's fine.  And it's admitted

8    without objection.

9              (PTX-553 is admitted into evidence.)

10             THE COURT:  And you can certainly object to my

11   questioning, if you want, but I have a question about that.

12   So can you, Mr. Lief.

13             What is the scientific principle or reason, if

14   you can answer without speculating, why you would have two

15   endotherms?  What is going on?

16             THE WITNESS:  There is some change in the

17   chemistry, and so there is multiple effects that can occur

18   where chemistry may -- in this case, their endotherms may

19   absorb heat, so there can be two or more different processes

20   where heat is absorbed.

21             MR. LIEF:  And just as a --

22             THE COURT:  With the same compound?

23             THE WITNESS:  The compound may be changing

24   during the course of this experiment.

25             THE COURT:  Because of the heat.

Hanton - direct

1                    THE WITNESS:  Because of the heat.

2                    THE COURT:  All right.  Thank you.

3                    MR. LIEF:  Just as a foreshadowing, I believe

4      our next expert, probably tomorrow morning, Dr. Pinal, will

5      address those questions very specifically based upon this.

6                    THE COURT:  All right.  Thank you.

7                    MR. LIEF:  Did I move 553 into evidence?

8                    THE COURT:  I believe you did, and it was

9      admitted without objection.

10                   MR. LIEF:  All right.

11     BY MR. LIEF:

12     Q.     If we could turn to Plaintiffs' Demonstrative

13     Exhibit 6.3.  Can you tell us what is shown here?

14     A.     Here are the key conclusions from the analytical

15     testing I conducted on the magnesium stearate.

16                   First of all, the infrared analysis confirms

17     that the sample I tested is indeed magnesium stearate and it

18     show that it is in its hydrated form.

19                   The TGA analysis shows a 3.7 percent weight

20     loss.  It is consistent with a hydrated magnesium stearate

21     that lost the water of hydration.

22                   The GC analysis showed that the sample contains

23     65.4 percent magnesium stearate, and 33.4 percent magnesium

24     palmitate, and small amounts of other fatty acid substances.

25                   The DSC analysis shows two key endotherms, the

 1   first having an onset at 82.9 degrees C and the second have

 2   having an onset of 126.2 degrees C.

 3              MR. LIEF:  Thank you.  No further questions.

 4              THE COURT:  All right.  Thanks.

 5              Cross-examination.

 6              MR. ABRAMOWITZ:  We have no cross-examination.

 7              THE COURT:  All right.  Thank you, Doctor.  You

 8   may step down.

 9              THE WITNESS:  Thank you.

10              THE COURT:  Mr. Haug.

11              MR. HAUG:  We have run out of witnesses.

12              THE COURT:  Okay.

13              MR. HAUG:  We do have a deposition but I don't

14   know that we want to --

15              THE COURT:  Well, I'm happy to, if you have a

16   depo and you can use our last 15 minutes or so here.

17              (Counsel confer.)

18              MR. HAUG:  Actually, Your Honor, I am told we're

19   not because it was a deposition we don't have to put in

20   because of our agreement.

21              THE COURT:  All right.  Then let me ask you some

22   logistical questions; all right?

23              How are we doing in terms of moving the case

24   along?  Are we about on track?  Are we ahead of schedule?

25   Where are we?

1          MR. HAUG:  For us, Your Honor, we're very much

2     on schedule.  As you know, we have had seven or eight

3     witnesses today.  So we were hoping to get through all

4     our list, and we did.  So I think we're on schedule.  I

5     suspect we will probably finish our case, subject to

6     cross-examination, obviously, sometime tomorrow for sure.

7     How long of a day, I don't know.

8          THE COURT:  All right.

9          MR. GAERTNER:  Yes, I just wondered.  Obviously

10    I want to make sure of everybody's thought and view if Mr.

11    Haug has an idea.  In the afternoon?

12         MR. HAUG:  Well, I think we have three, two or

13    three more witnesses, so I would say sometime early

14    afternoon maybe, again, subject to cross.  They're key

15    experts so I don't know how long they will be.

16         THE COURT:  Sure.  But the important thing is we

17    want to have Mr. Gaertner's folks teed up and ready to start.

18         I imagine we'll have some argument or motion

19    practice perhaps, but we ought to have something ready to

20    go in the afternoon, it sounds like, from the defense side.

21    Okay?

22         MR. HAUG:  And they have already identified

23    people they say are ready to go as soon as we finish

24    tomorrow.

25         THE COURT:  All right.  Let me encourage both

1    sides, if you would, to take a moment then this afternoon

2    to visit with the courtroom deputies to make sure that

3    everything you thought was in evidence is actually marked on

4    the record as in evidence and that the time is consistent,

5    reasonably so, with what you expect the time allocation to

6    be.

7              And with that, we'll go ahead and recess.  I'll

8    see you all tomorrow at 9:00 a.m.

9              (Proceedings adjourned at 4:19 p.m.)

10

11       I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

12

13                            /s/ Brian P. Gaffigan
                              Official Court Reporter
14                            U.S. District Court

15

16

17

18

19

20

21

22

23

24

25