1            IN THE UNITED STATES DISTRICT COURT

2           IN AND FOR THE DISTRICT OF DELAWARE

3                 - - -

    SHIRE DEVELOPMENT INC., SHIRE      :     CIVIL ACTION
4   PHARMACEUTICAL DEVELOPMENT, INC.,   :
    COSMO TECHNOLOGIES LIMITED, and    :
5   GIULIANI INTERNATIONAL LIMITED,     :
                                :
6           Plaintiffs,          :
    v                             :
7                              :
    CADILA HEALTHCARE LIMITED (d/b/a    :
8   ZYDUS CADIL) and ZYDUS            :
    PHARMACEUTICALS (USA) INC.,       :
9                             :      NO. 10-581-KAJ
          Defendants.      - - -

10

                     Wilmington, Delaware
11               Thursday, March 31, 2016
               *Bench Trial - Volume D*

12

                       - - -

13

    BEFORE:        HONORABLE **KENT A. JORDAN**, U.S.C.C.J.

14

     APPEARANCES:           - - -

15

          RICHARDS, LAYTON & FINGER, P.A.
16         BY:   FREDERICK L. COTTRELL, III, ESQ.,
             KELLY E. FARNAN, ESQ., and
17            JASON J. RAWNSLEY, ESQ.

18             -and-

19           FROMMER LAWRENCE & HAUG, LLP
          BY:   EDGAR H. HAUG, ESQ.,
20            ANGUS CHEN, ESQ.,
           JASON A. LIEF, ESQ.,
21            DAVID A. ZWALLY, ESQ.,
           ANDREW WASSON, and
22            ELIZABETH MURPHY, ESQ.
           (New York, New York)

23

                 Counsel on behalf of Plaintiffs

24

25   Valerie Gunning            Brian P. Gaffigan
    Official Court Reporter      Official Court Reporter

1    APPEARANCES:   (Continued)

2

3                PHILLIPS, GOLDMAN, McLAUGHLIN & HALL, P.A.
                 BY:   JOHN C. PHILLIPS, JR., ESQ., and
4                      DAVID A. BILSON, ESQ.

5                      -and-

6                LOCKE LORD, LLP
                 BY:   MICHAEL J. GAERTNER, ESQ.,
7                      KEITH D. PARR, P.C.,
                       JAMES T. PETERKA, ESQ.,
8                      DAVID B. ABRAMOWITZ, ESQ.,
                       ANDY J. MILLER, ESQ.,
9                      WASIM K. BLEIBEL, ESQ., and
                       TIMOTHY F. PETERSON, ESQ.
10                     (Chicago, Illinois)

11                     -and-

12               LOCKE LORD, LLP
                 BY:   ANDREA L. WAYDA, ESQ.
13                     (New York, New York)

14                         Counsel on behalf of Defendants

15

16

17

18

19

20

21

22                         - oOo -

23                     P R O C E E D I N G S

24               (REPORTER'S NOTE:  The following bench trial was

25   held in open court, beginning at 9:02 a.m.)

```
 1                    THE COURT:  Good morning.  Please be seated.

 2                    Mr. Gaertner.

 3                    MR. GAERTNER:  Your Honor, before we call our

 4     next witness, you might recall Mr. Haug had mentioned

 5     earlier that we had an agreement where we stipulated to some

 6     of their exhibits regarding our ANDA and plaintiffs

 7     submitted to some of our exhibits regarding our NDA.

 8                    I'd like to now move into evidence our side of

 9     that stipulation, if we could.

10                    THE COURT:  All right.

11                    MR. GAERTNER:  So at this time, Your Honor, the

12     defendants offer into evidence DTX-6, DTX-7, DTX-8, DTX-154,

13     DTX-243, DTX-244, DTX-245, DTX-246, DTX-247, DTX-248,

14     DTX-249, DTX-250, DTX-251, DTX-252, DTX-253, DTX-255,

15     DTX-257, DTX-809, DTX-810, and DTX-852.

16                    THE COURT:  Thank you.

17                    MR. HAUG:  No objection.

18                    THE COURT:  It's admitted without objection.

19                    (Above-referenced exhibits admitted into evidence.)

20                    THE COURT:  Your next witness then.

21                    MR. ABRAMOWITZ:  Good morning, your Honor.

22     David Abramowitz.

23                    Before we call the next witness, just one

24     housekeeping matter.  In looking at the exhibits that were

25     admitted from Monday, it looks like we forgot to admit
```

O'Halloran - direct

1    Figure 2 of DTX-2009 which was used on cross of Dr. Pinal.

2    We'd like to offer that into evidence.

3              MR. LIEF:  I am not sure exactly what it is, but

4    given our agreement about the figures and things, I guess no

5    objection.

6              MR. ABRAMOWITZ:  It's Figure 2 of the Vold

7    article.

8              MR. LIEF:  That's fine.  No objection.

9              THE COURT:  All right.  It's admitted without

10   objection.

11             (Figure 2 of DTX-2009 is admitted into evidence.)

12             MR. ABRAMOWITZ:  Your Honor, we next call

13   Dr. Thomas O'Halloran who conducted the melting point tests

14   on the magnesium stearate.

15             THE COURT:  All right.

16             ....  THOMAS V. O'HALLORAN, having been first

17   duly sworn, was examined and testified as follows ...

18             MR. ABRAMOWITZ:  Your Honor, may I approach?

19             THE COURT:  You may.

20             (Documents passed forward.)

21                      DIRECT EXAMINATION

22   BY MR. ABRAMOWITZ:

23   Q.    Good morning, Dr. O'Halloran.

24   A.    Good morning.

25   Q.    Can you please state your full name for the record?

O'Halloran - direct

1    A.      My name is Thomas Vincent O'Halloran.

2    Q.      And could you please state what your current position

3    is?

4    A.      I am currently the Charles E. and Emma H. Morrison

5    Professor of Chemistry and Molecular Bioscience at

6    Northwestern University.

7            I am also the Senior Advisor to the director of

8    the Robert H. Lurie Comprehensive Cancer Center.  And,

9            I am Founding Director of the Chemistry of Live

10   Processes Institute at Northwestern.

11   Q.      Can you briefly summarize for the Court your

12   educational background after high school?

13   A.      Yes.  I attended the University of Missouri,

14   Columbia, and obtained the Bachelor of Science Degree in

15   Chemistry in 1979, and a Master's Degree in Chemistry in

16   1980.

17           I then went to Columbia University and obtained

18   a Ph.D. in 1985.

19           Then I spent a year post-doctoral fellowship at

20   Massachusetts Institute of Technology.

21   Q.      Before you obtained your current position at

22   Northwestern, could you briefly summarize your professional

23   experience?

24   A.      I stated in 1986 as an Assistant Professor at

25   Northwestern in the Chemistry Department, and I was promoted

O'Halloran - direct

1    through the ranks to Associate Professor of Tenure, to Full

2    Professor, which is my current position.

3    Q.    Could you generally give the Court an idea about the

4    focus of your academic research?

5    A.    So my research follows three fundamental paths.

6          First of all, we synthesize and characterize

7    metal organic compounds to use them as probes of biological

8    function.

9          We also investigate metal complexes of proteins

10   and other biomolecules to understand how metal responsive to

11   switches work in biology.  And,

12         Also, the third focus is ultrasensitive

13   bio-analytical chemical methods to understand the biology of

14   metal.

15   Q.    Is magnesium stearate a salt, a metal salt, an

16   organic compound?

17   A.    Yes, it is.

18   Q.    Can you turn to DTX-55 in your binder?

19   A.    Okay.

20   Q.    Is that a true and accurate copy of your CV up to the

21   point it was provided?  And does it detail your -- I'll

22   leave it at is it a true and accurate copy?

23   A.    Yes, it is an accurate copy with one minor change.  I

24   am no longer the Associate Director For Basic Science

25   Research in the Robert H. Lurie Comprehensive Cancer Center.

O'Halloran - direct

1    I am now the Senior Advisor to the Director.

2    Q.    Does it accurately reflect your academic professional

3    experience and achievements?

4    A.    Yes, with the exception of a couple more recent

5    papers.

6    Q.    Could you turn in your CV to page 12?

7    A.    Yes.

8    Q.    Looking at the papers listed as Nos. 60 and 61, is

9    there something specifically important about those papers

10   that you find relevant to this case?

11   A.    These are some of the types of organic synthesis and

12   characterization, novel compounds that involve metal organic

13   compounds.  And between these two papers, we published ten

14   different melting points determined by the capillary melting

15   point determination process.  These papers have been cited

16   over 400 times in the literature.

17   Q.    Have you published other papers in peer-reviewed

18   journals?

19   A.    Yes.

20   Q.    About how many?

21   A.    Over 150, and they have appeared in some of the

22   leading journals in the field of science:  Nature Cell,

23   Nature Chemical Biology, Journal of Controlled Drug Release,

24   among others.

25   Q.    Have you served as a reviewer for peer-reviewed

O'Halloran - direct

1    journals and grants?

2    A.    Yes, I almost in a constant state of reviewing grants

3    and other people's grants as well as journal articles.

4    Q.    Turning to page 5 of your CV.

5          At the bottom, have you consulted any companies

6    in the pharmaceutical and biological area?

7    A.    Yes, ma'am.  Yes, this is of great interest to me in

8    the application of our academic findings.  I have consulted

9    at Eli Lilly, Hoffmann-La Roche, at Proctor and Gamble,

10   Ciba Geigy, at that stage its name, Sandoz, Johnson Matthey,

11   Wyeth, as well as several startup biotech companies that I

12   am the co-founder of that are developing organic compounds

13   and metal organic compounds to become pharmaceutical agents.

14   Q.    With respect to your synthetic research, what's your

15   history in using melting point as part of your research?

16   A.    So this is one of the most fundamental methods that

17   is taught in chemistry, taught to chemistry undergraduates.

18   So since the late 70s, I have been using this as a method

19   of characterization and used it throughout my career.  I now

20   supervise students and post-docs that use it.

21   Q.    Dr. O'Halloran, do you have training in using melting

22   point capillary apparatus such as oil baths?

23   A.    Yes, I used a variety of instruments over my career,

24   including the oil bath apparatus is that is typically used

25   for a melting point determination.

O'Halloran - direct

1          MR. ABRAMOWITZ:  Your Honor, defendants would

2     offer DTX-55, Dr. O'Halloran's CV, into evidence.

3          MR. LIEF:  No objection.

4          MR. ABRAMOWITZ:  And defendants tender

5     Dr. O'Halloran as an expert in analysis of metal organic

6     compounds, including the determination of melting point

7     through the capillary method.

8          MR. LIEF:  No objection.

9          THE COURT:  All right.  Then the CV is admitted

10    without objection.  And I'll view the Doctor as an expert.

11          (DTX-55 is admitted into evidence.)

12          THE COURT:  Go ahead.

13    BY MR. ABRAMOWITZ:

14    Q.     Dr. O'Halloran, turn in your binder to Exhibit DTX-53.

15    A.     (Witness complies.)

16    Q.     Is that a true and accurate copy of a supplemental

17    declaration reflecting testing that you provided in this

18    case?

19    A.     Yes, it is.

20    Q.     Now, Dr. O'Halloran, could you please provide the

21    Court sort of a brief description of what you were asked to

22    do in this case?

23    A.     I was approached by counsel to conduct a capillary

24    melting point determination on a sample of magnesium

25    stearate that they provided.

O'Halloran - direct

1    Q.     Were you asked to give any opinion with respect to

2    the melting point of the magnesium stearate in the context

3    of claim 1 of the '720 patent?

4    A.     No, I am not familiar with that patent.

5    Q.     Did your laboratory conduct such a capillary melting

6    point test?

7    A.     Yes.  I directed a senior post-doctoral research

8    scientist in the laboratory to conduct this test.

9    Q.     Before you carried out the test, did you review

10   any documentation that was associated with the magnesium

11   stearate sample?

12   A.     Yes.  So counsel provided me with the United States

13   Pharmacopeia National Formulation Methods For Melting Point,

14   741.  This is a standard laboratory methodology that would

15   be accepted by the Court.  And I reviewed that as well as

16   the monograph on magnesium stearate.  I inspected those and

17   determined what the best process for determining capillary

18   melting point range for this compound.

19   Q.     Did the sample arrive to you with a certificate of

20   analysis at any number indicating where the batch was from?

21   A.     Yes.  So the sample was delivered by counsel in a

22   sealed container that bore the internal batch number

23   0908123024.

24   Q.     Did the CFA indicate who the manufacturer of that

25   particular sample was?

O'Halloran - direct

1    A.      Yes.  The manufacturer, as indicated, it was

2    manufactured by Dr. Paul Lohmann and had a corresponding

3    Dr. Paul Lohmann batch number of 1017233.

4    Q.      And in formulating your efforts to test the magnesium

5    stearate by capillary method, were you guided by any

6    procedure in the USP?

7    A.      Yes.  The USP is written in a very general way to

8    allow laboratories around the country using different

9    apparatus to come to accurate measurements, and it defines

10   those parameters.

11           The monograph instructs the investigator to

12   determine the class of substance from the monograph on

13   the compound.  And when I looked through that, through the

14   monograph of magnesium stearate, it listed no class.

15           MR. ABRAMOWITZ:  Dylan, could you pull up

16   Exhibit 3 of PTX-53.

17   BY MR. ABRAMOWITZ:

18   Q.      Dr. O'Halloran, we're looking at the second

19   supplement USP 37-NF 32 released June 31, 2014.  Is this the

20   USP NF supplement that you used to guide your testing

21   procedures?

22   A.      Yes, this is the most recent one.  I also referred

23   to the previous one in the development.  And there is no

24   substantial changes between this and the previous.

25           MR. ABRAMOWITZ:  Could we go to page 6823 of the

O'Halloran - direct

1    second page of the exhibit, Dylan?

2    BY MR. ABRAMOWITZ:

3    Q.    So looking at the second paragraph under the first

4    title change to read, it is starts with "eight procedures."

5          Did this paragraph help guide you in determining

6    how to take the melting point of magnesium stearate?

7    A.    Yes.  Since there was no class definition in the

8    monograph of magnesium stearate, I proceeded to treat it

9    as a class 1a substance as instructed in the monograph.

10         THE COURT:  I've got to ask a question here.

11   What did these classifications mean, Doctor?  What does

12   it mean for magnesium stearate to have no class?  A

13   representation of its manner?  What does it mean?

14         THE WITNESS:  So each class designation

15   prescribes certain methods of handling and of investigating

16   the substance.  So the more unusual the characteristics or

17   the more volatile, et cetera, then class definition then

18   specifies in the definition in the USP how to handle that

19   substance.

20         And so it's a gradated process, class 1a being

21   the simplest kind of frequently white powders that don't

22   really need special consideration.

23         THE COURT:  Okay.  So that has to do with safety

24   concerns for people handling it?

25         THE WITNESS:  As well as the chemical

O'Halloran - direct

1    properties.  As the chemical properties become more

2    difficult to handle at room temperature under an open

3    flask, for instance, or if it's difficult to put into a

4    tube, then it begins to have additional class definition

5    characteristics.  And it can go up to class 3 and class 4,

6    get quite complex.

7              THE COURT:  So it's about laboratory handling.

8    It doesn't necessarily represent anything about what is

9    pertinent to what is at issue in this case about melting

10   point, or does it?

11             THE WITNESS:  That's right.  It's not pertinent.

12   If there was a class 2 designation of the compound in the

13   monograph, then deeper into this monograph, it says if it's

14   a class 2 substance, you should flame-seal the capillary.

15   It just gives some additional steps so that there can be

16   reproducibility in the field.

17             THE COURT:  Okay.  Thank you.

18             Go ahead, Mr. Abramowitz.

19             MR. ABRAMOWITZ:  Dylan, can we go to page 6824

20   and look at the procedure for class 1a?

21   BY MR. ABRAMOWITZ:

22   Q.    Dr. O'Halloran, can you read the procedure for class

23   1a into the record?

24   A.    Prepare the test substance and charge the capillary

25   as directed in the procedure for class 1, apparatus I.  Heat

O'Halloran - direct

1    the bath until the temperature is about 10 degrees below

2    the expected melting point and is rising at a rate of about

3    1 degrees centigrade per minute.  Insert the capillary as

4    directed in the procedure for class 1, apparatus I when the

5    temperature is about 5 degrees below the lower limit of the

6    expected melting range, and continue heating until the

7    melting is complete.  Record the melting range as directed

8    in procedure for class 1, apparatus I.

9              MR. ABRAMOWITZ:  And since it talks about the

10   procedures for class 1, can we go up to the prior two

11   paragraphs, Dylan.

12   BY MR. ABRAMOWITZ:

13   Q.    Dr. O'Halloran, could you read those into the record,

14   just so we in the what is going on with class 1?

15   A.    So, to reduce the substance under test to a very fine

16   powder, and unless directed otherwise, render it anhydrous

17   when it contains water of hydration by drying it at the

18   temperature specified in the monograph, or when the

19   substance contains no water of hydration, dry it over a

20   suitable desiccant for no longer than 16 hours (or at the

21   conditions stated in loss of drying, if appropriate ).

22              Would you like me to read further?

23   Q.    Yes.  Can you continue on how you prepare the sample

24   for testing?

25   A.    And read this?  Okay.

O'Halloran - direct

1           Charge a capillary glass tube, one end of which

2    is sealed, with a sufficient amount of the dry powder to

3    form a column in the bottom of the tube, 3 millimeters in

4    height when packed down as closely as possible by moderate

5    tapping on a solid surface.  Due to the instrument design,

6    alternative samples sizes may be instructed by the

7    instrument manufacturer.

8           THE COURT:  So I have another question, then,

9    Doctor.

10          Given that first paragraph, does that mean

11   that by definition, when you perform this procedure, you're

12   going to be melting an anhydrous version of the magnesium

13   stearate?

14          THE WITNESS:  Sometimes the hydration state of

15   the sample is not known, and so the monographs instruct you

16   to inspect the compound's characteristics as described in

17   the monograph -- this would be the monograph for magnesium

18   stearate -- and then proceed according to instruction.

19          In the case of magnesium stearate, it does

20   not indicate any waters of hydration; and so under that

21   condition, you would proceed as a class 1a substance and

22   dry it over desiccant.

23          THE COURT:  Okay.  Let me try to be more

24   specific.  Have you been here through the testimony of the

25   witnesses.

O'Halloran - direct

1          THE WITNESS:  For a few of them, but not all.

2          THE COURT:  All right.  I don't think I have

3    given away anything about my thinking when I observed that

4    there has been a lot of back and forth about whether the

5    hydrated version of magnesium stearate melts or is merely

6    dehydrated at a lower temperature at or around 88, 89,

7    sub-90 degrees centigrade, but everybody agrees there is a

8    melt of the hydrated version at some higher temperature.  So

9    the real fight here, hours and hours of fight, much labor

10   has been invested in whether you describe what is happening

11   at that lower temperature is a melt or not.

12          My question to you is simply, when this document

13   tells you this is the procedure for testing whether or

14   doing some kind of a melt test, it seems to say at the very

15   outset that you should render the powder anhydrous.  So what

16   I am asking you is, someone following this procedure, by

17   definition, do they end up testing the melt of the anhydrous

18   version and not ever asking the question of whether the

19   hydrated version melts or not?  Do you understand?

20          THE WITNESS:  Yes, I understand your question.

21          It turns out you can't always know the hydration

22   state of the sample without a lot of additional experiments.

23   And sometimes even heating at a certain temperature does not

24   render the release of all the water in the sample.  There

25   are many different types of water of hydration.

O'Halloran - direct

1              So when I was asked, I was not asked to opine

2      on any of these things.  In fact, I did not know whether or

3      not there was any water hydration.  I was asked to take the

4      substance as it was provided and make a measurement on it

5      using the class.  And I determined that it should be a class

6      1a definition, and I dried it for 16 hours over a desiccant.

7              So that is the procedure that I followed.  And I

8      am pretty confident that the material as I heard yesterday

9      was it could have been hydrated, but I actually have no

10     evidence of that, and I was not asked to opine on it.

11             THE COURT:  All right.  Thank you, Doctor.

12             MR. ABRAMOWITZ:  Your Honor, maybe I can help

13     clarify your point.

14     BY MR. ABRAMOWITZ:

15     Q.    In drying the sample for your test, did you heat it

16     at all?

17     A.    No, I used the recommendation to dry it over a

18     suitable desiccant for no longer than, no less than -- I am

19     sorry, NLT is no less than -- 16 hours, and that is by the

20     instruction in the monograph.

21     Q.    And is that at room temperature?

22     A.    That was desiccation at room temperature.

23             And so the desiccant, Your Honor, is a calcium

24     sulfate that is a very dry material.  It sits in the bottom

25     of the glass container which is sealed and any types of

O'Halloran - direct

1    moisture or loosely bound waters of hydration are typically

2    removed by that 16 hours in a desiccant.

3              THE COURT:  Well, when you use a desiccant as

4    opposed to heat to remove water, is the end result through

5    either of those routes that you end up with anhydrous

6    magnesium stearate?

7              THE WITNESS:  It depends on the sample.  And I

8    do not have the expertise in, and I have not studied the

9    literature on magnesium stearate to say to which degree it

10   would be completely removed.  And I think that is what a lot

11   of the other experts were brought to opine on.

12             And so I actually did not know the hydration

13   state.  And I have no opinion on what, how many waters, how

14   tightly bound they were.  All I can tell you is that I've

15   determined this fundamental kind of the most basic class of

16   test on when a compound turns to liquid state from a solid.

17   And I have done that on the compound that was described

18   here.

19             THE COURT:  Okay.  Thanks.

20             Mr. Abramowitz.

21             MR. ABRAMOWITZ:  Why don't we just turn to 6823,

22   the paragraph entitled Apparatus.

23   BY MR. ABRAMOWITZ:

24   Q.    Now, Dr. O'Halloran, did you use a specific melting

25   point apparatus to carry out your test?

O'Halloran - direct

1   A.      Yes.  So I looked at both these options and I

2   decided, knowing that there was controversy over the melting

3   point, that I should observe, you know, I should instruct

4   the post-doctoral research scientists to observe each

5   temperature change of the status of the sample.  So I chose

6   a manual approach as opposed to an automated approach

7   described under Apparatus II.

8           Apparatus I describes a fully manual process.

9   I won't read it, but it has an oil bath, and it can have a

10  controlled source of heat that is determined through an

11  electronic current flow with a thermistor that will register

12  the temperature.  So it gives some automation.  That is

13  actually part of the description of Apparatus II.

14          I elected to use the Buchi B-540 which has

15  characteristics that are directly in between Apparatus I and

16  Apparatus II.  In other words, it does not have an automated

17  light beam interrogation of the sample and just prints out

18  your melting point range.  It gives the investigator a full

19  control observation.  But it does have a heating block

20  instead of an oil bath.  So that is why it's kind of in

21  between the two definitions.

22  Q.      Could you explain the mechanical characteristics of

23  the Buchi B-540?

24  A.      So Buchi B-540 is a small benchtop apparatus that

25  has a large magnifying glass so that one can see these 1

O'Halloran - direct

1    millimeter capillary tubes in great detail.

2              It has a metal block inside and a ceramic

3    cover and has three holes that allow insertion of three

4    capillaries, so three substances can be observed

5    simultaneously in it.

6              Then has an LED on the front or a display

7    that gives the current temperature.  And then it also has

8    programmable ramps so the heating can be applied through an

9    electronic process in a stepwise manner.

10   Q.    Can you actually describe how the test was carried

11   out?

12   A.    So I instructed the post-doctoral research associate

13   to break the seal on the sample that was provided by counsel

14   and transfer some of it into a separate vial into the

15   desiccator, and it was there for over 16 hours when he

16   removed it and then filled a capillary to a level of three

17   millimeters, tapping it down, and using the prescribed

18   method in the 741 monograph.

19             He then placed the capillary along with two

20   standards, vanillin and phenacetic acid.  These are USP

21   standards that are certified to melt in a very specific

22   range.

23             And he filled those the same way and inserted

24   them into each other within the melting point apparatus.  It

25   was preheated to a temperature of 70 degrees.  And while the

O'Halloran - direct

1    monograph says to go to 10 degrees before the melting point,

2    and then slow down the rate of heating to one degree

3    centigrade per minute, we took the cautious approach of just

4    heating one degree per minute throughout the entire range

5    from 70 degrees to past the full melting point.

6    Q.    Did you give any instructions to your post-doctoral

7    scientists about how to record the results of the

8    experiment?

9    A.    Yes, I asked them to continuously observe the sample

10   and to record any types of physical changes that he observed

11   in the sample or within the capillary, to note any droplets

12   of water or anything that he would see that are relevant.

13   Q.    And were you personally present during the

14   experiment?

15   A.    Yes, I was there at the beginning and the setup and

16   for the first half hour, and then I left, and I came back

17   when the temperature was getting close to the anticipated

18   melting range.  And so I observed with him and watched him

19   record in his notebook.

20   Q.    What were the results for the experimental samples in

21   the standards?

22   A.    So the experimental samples showed no physical change

23   until a temperature of 139.7 degrees.  And then we observed

24   a kind of a collapse in the height of the sample.  We call

25   that "solid shrink."  It shrank about 20 or 30 percent, but

O'Halloran - direct

1     it did not show any sign of liquid.  So by the monograph, we

2     did not record that as the beginning or the onset of the

3     melting.

4              Then a few degrees later, at 143 degrees, we

5     see a liquid and solid mixture.

6              Then the monograph instructs us to note the

7     temperature where the sample is first seen to be completely

8     liquid.  And that is 145.5 degrees.

9     Q.    And where is the standard melt?

10    A.    So one of the standards was vanillin, and its melting

11    temperature that we observed was 81.5 degrees to 82.8.  So

12    that was its melting point range that we observed.

13             The United States Pharmacopeia standards

14    indicate that the melting point should be between 81 and 83.

15    So that standard did exactly what we expected if the

16    instrument was working.

17             We then observed the melting point of the second

18    standard that was phenacetin, and it melted at 135 to

19    136.1 degrees.  So from the beginning of liquid appearance

20    until it was fully liquid.

21             By the USP standards, the acceptable range is

22    134 to 136.6.  So these standards have about a two degree,

23    three degree melting point range.

24    Q.    What do the melting point standards tell you?

25    A.    The fact that both of these standards melted as

O'Halloran - direct

1   according to what was described as the behavior of the

2   standard material, this indicated that the Buchi B-540 was

3   operating properly.

4   Q.     And are the relevant findings from the laboratory

5   notebook where these observations were recorded presented in

6   Exhibit 9 of your declaration, DTX-53?

7   A.     Yes, the details from the samples delivery and the

8   handling of the sample through the end of the experiment are

9   all detailed there.

10          MR. ABRAMOWITZ:  Your Honor, we would offer

11   Exhibit 9 of DTX-53 into evidence.

12          MR. LIEF:  No objection.

13          THE COURT:  It's admitted without objection.

14          (Exhibit 9 of DTX-53 is admitted into evidence.)

15          MR. ABRAMOWITZ:  I just want to clarify for the

16   record that to make sure that everybody is on the same page

17   here.

18   BY MR. ABRAMOWITZ:

19   Q.     Dr. O'Halloran, did you consider or opine any DSC

20   testing in Zydus's ANDA product?

21          THE COURT:  I am sorry.  You need to say that

22   again a little bit more slowly.

23   BY MR. ABRAMOWITZ:

24   Q.     Dr. O'Halloran, were you asked to consider or opine

25   any DSC testing?

823

O'Halloran - cross

1   A.      No, I wasn't.

2   Q.      Were you asked to consider or opine on any TGA

3   testing?

4   A.      No, I wasn't.

5   Q.      Were you asked to consider or opine any hot stage

6   testing?

7   A.      No, I was not.

8   Q.      Were you asked to consider or opine on the opinions

9   or expert reports in your depositions of any other expert in

10  your case?

11  A.      No, I did not see them.

12  Q.      Were you asked to consider or opine whether magnesium

13  stearate exists in a hydrated compound?

14  A.      No, I was not.

15  Q.      Were you asked to opine or consider any of the peer

16  reviewed literature or treatises that describe the melting

17  point of magnesium stearate?

18  A.      No, I was not.

19          MR. ABRAMOWITZ:  Your Honor, we have no further

20  questions of Dr. O'Halloran.

21          THE COURT:  Cross-examination, Mr. Lief.

22                  CROSS-EXAMINATION

23  BY MR. LIEF:

24  Q.      Good morning, Dr. O'Halloran.

25  A.      Good morning.

O'Halloran - cross

1    Q.    Dr. O'Halloran, am I correct that you have never

2    worked --

3                 MR. GEORGEK:  May I hand this up?

4                 MR. LIEF:  Oh.  May we hand this up?

5                 THE COURT:  Yes, you can freely approach the

6    witness.

7                 (Binders passed forward.)

8    BY MR. LIEF:

9    Q.    Dr. O'Halloran, am I correct that you have never

10   worked with magnesium stearate before this case?

11   A.    Correct.

12   Q.    With respect to the sample that you received from

13   counsel, am I correct that before anything was done to it,

14   you have no idea, one way or the other, whether that sample

15   was hydrated or anhydrous; correct?

16   A.    That is correct.

17   Q.    Am I also correct that in the past, you have

18   determined whether various materials were hydrated or

19   anhydrous by using testing?

20   A.    By using?

21   Q.    Testing.

22   A.    Testing, yes.

23   Q.    And you know how to do that; correct?

24   A.    Correct.

25   Q.    But none of that type of testing was done here;

O'Halloran - cross

1   correct?

2   A.      Correct.

3   Q.      Now, after you received the sample from counsel, I

4   believe as you testified on direct, you did place it in an

5   desiccator for 16 hours pursuant to the procedure we saw;

6   correct?

7   A.      Exactly, that's correct.

8   Q.      When the sample then came out of that desiccator, am

9   I correct that you have no idea whether that sample that

10  came out of the desiccator was hydrated or anhydrous?

11  A.      That is correct.

12  Q.      And, again, you did no testing on that material to

13  determine that; correct?

14  A.      Correct.  For a class 1a substance, that is not

15  specified any longer.

16  Q.      Okay.  And if I heard you correctly, you didn't look

17  at the patent in this case?

18  A.      That is correct.

19  Q.      And you didn't look at any literature on magnesium

20  stearate either?

21  A.      That's correct.

22  Q.      And so you didn't take any of that into account in

23  determining what test you should do; correct?

24  A.      That is correct.

25  Q.      Okay.  And so to summarize, with respect to the

O'Halloran - cross

1    material that you actually tested and put into the melting

2    point capillary equipment, you simply don't know, one way or

3    another, whether it was anhydrous; correct?

4    A.    That's correct.  I can only tell you my observation

5    that the material looked identical in and out of the

6    desiccator.  That is a clear vessel, and it freely flowed,

7    so it did not take on obvious signs of hydration -- or

8    changes in hydration.

9    Q.    And, Dr. O'Halloran, were you here in court when Dr.

10   Sacchetti testified?

11   A.    No.  Dr. Sacchetti is from what institution?

12            THE COURT:  Wisconsin.

13            THE WITNESS:  Wisconsin.

14   BY THE WITNESS:

15   A.    Yes, I was there for that, for the plate melt.

16   Q.    The plate melt?

17   A.    Yes.

18   Q.    And did you hear him testify about in his view some

19   digital evidence of melting at 130?

20   A.    Yes.

21   Q.    Now, I take it, this capillary tube thing is a visual

22   method of its own?

23   A.    That is correct.

24   Q.    Your visual method, you found the melting point of,

25   what was it, 145?

O'Halloran - cross

1    A.      It was 143 to 145 point something.

2    Q.      And do you find it curious that these two different

3    visual methods gave numbers some 13 degrees apart from each

4    other?

5    A.      So I wish I knew I could tell you that I have done

6    the hot plate melting determination with the microscope, but

7    I have not, so I am just not familiar with how samples might

8    differ between that method and the capillary melting point

9    determination.

10          I did note there was a solid shrink, so there is

11   some phase change or something going on that.  I don't know

12   what the chemical nature of that is.  Remember, I mentioned

13   that at 139.

14   Q.      At 139, you saw something?

15   A.      The solid shrink, yes.

16   Q.      But not at 130?

17   A.      Not at 130.

18   Q.      Right.  Now, in your experience in chemistry, is it

19   possible for a liquid to form without it being visible?

20   A.      For a liquid to form.  If the droplet is below the

21   size of some X microns, then you wouldn't see a droplet of

22   liquid.  That's possible.

23   Q.      And so that is conceivable that at the very earliest

24   stage of a phase change, you wouldn't be able to see the

25   liquid.  That is conceivable; correct?

Gardella - direct

1    A.      That is correct.

2                    MR. LIEF:  Thank you.  No further questions.

3                    THE COURT:  Any redirect?

4                    MR. ABRAMOWITZ:  No.

5                    THE COURT:  All right.  Thank you, Doctor.

6                    THE WITNESS:  Thank you.  Do I take these?

7                    THE COURT:  Yes, that would probably be helpful.

8    Thanks very much.

9                    MS. WAYDA:  Good morning, Your Honor.

10                   THE COURT:  Good morning.

11                   MS. WAYDA:  Andrea Wayda for Zydus.

12                   Zydus calls as its next witness, Dr. Joseph A.

13   Gardella, Jr. to provide his opinions on Dr. Davies' Raman

14   color mapping and optical microscopy of the cross-sections

15   of the Zydus ANDA product.

16                   Your Honor, may we approach the bench and the

17   witness to deliver the materials?

18                   THE COURT:  You may.

19                   (Documents passed forward.)

20                   ... JOSEPH A. GARDELLA, JR., having been first

21   duly sworn, was examined and testified as follows ...

22                   MS. WAYDA:  May I proceed, Your Honor?

23                   THE COURT:  You may, please.

24                           DIRECT EXAMINATION

25   BY MS. WAYDA:

Gardella - direct

1    Q.    Good morning, Dr. Gardella.  Can you state your name

2    and address for the record?

3    A.    Yes.  My name is Joseph A. Gardella, Jr.  And I live

4    at 178 Admiral Road in Buffalo, New York.

5    Q.    What is your profession?

6    A.    I am a professor and a researcher in pharmaceutical

7    sciences, materials, chemistry with patents and publications

8    in fields, relevant fields like controlled release and drug

9    delivery.

10   Q.    Did you prepare a list of demonstratives or a slide

11   deck to assist you in providing your testimony today?

12   A.    Yes, I did.

13             MS. WAYDA:  Your Honor, you will find the slide

14   deck in your notebook.  And,

15             Mr. Green, if you can put up the second slide.

16   BY MS. WAYDA:

17   Q.    Dr. Gardella, I am showing you DDX-7.2.  Using this,

18   can you please describe your educational background?

19   A.    Yes.  As shown on the slide DDX-7.2, I received a

20   Bachelor's Degree in Chemistry and a Bachelor's Degree in

21   Philosophy from Oakland University in 1977.

22             I then continued for a Ph.D. in Analytical

23   Chemistry from the University of Pittsburgh with David

24   Hercules that was awarded in 1981.

25             I then left to go to Utah to do a post-doctoral

Gardella - direct

1    research fellowship in the area of Vibrational Spectroscopy

2    with Edward Irene at the Chemistry Department of Utah from

3    '81 to '82.

4    Q.    Could you also briefly describe your professional

5    experiences since obtaining your PhD?

6    A.    Yes.  Following my post-doctoral stint, I was

7    appointed as a faculty member in the Department of Chemistry

8    in the University of Buffalo, State University in New York,

9    where I moved up through the ranks and then was promoted

10   finally to my current position as a State University of New

11   York Distinguished Professor of Chemistry.  And I hold the

12   John and Frances Larkin Endowed Professor of Chemistry.

13             Over that period, I have published somewhere

14   more than 250 peer-reviewed publications in the fields that

15   are shown here, including controlled release and drug

16   delivery, tissue engineering, mapping, and the details of

17   quantitative details of mapping, chemical analysis.

18   Q.    Using DDX-7.3, can you please describe for the Court

19   your qualifications and specialties in the pharmaceutical

20   sciences that are relevant to this case?

21   A.    Certainly.  As shown on this slide, No. 3, I have

22   especially over the last two years worked in experimental

23   chemical mapping by a variety of techniques, including Raman

24   spectroscopy.  And I have special expertise during that

25   period in the details of statistical analysis of the data

Gardella - direct

1    and numerous publications in pharmaceutical and chemical

2    data analysis and imaging and mapping analysis.

3              Further, over the last 33 years, I have been

4    teaching basic introductory and advanced statistics and

5    analytical methodology to students; in particular, of

6    relevance here to pre-pharmacy and Pharm.D program students

7    at the University of Buffalo.

8    Q.    Can you please turn to your binder and look with me

9    at DTX-119?

10   A.    (Witness complies.)

11   Q.    Do you recognize this document?

12   A.    Yes.  This is my CV as of June 2014.

13   Q.    And is the information contained in your curriculum

14   vitae accurate and up-to-date?

15   A.    Up-to-date to that point in June of 2014, yes.

16   Q.    Could you please describe for us the changes to your

17   CV since June 2014?

18   A.    Yes.  Over the nearly two years, I have published

19   more papers and added additional students to my research

20   group.  I have given more talks, all of them just routine

21   yearly progress, taught more courses.

22              MS. WAYDA:  Your Honor, at this time we offer

23   DTX-119 into evidence.

24              MR. HAUG:  No objection.

25              THE COURT:  Admitted without objection.

Gardella - direct

1          (DTX-119 is admitted into evidence.)

2     BY MS. WAYDA:

3     Q.     Dr. Gardella, have you previously acted as an expert

4     in the area of pharmaceutical sciences?

5     A.     Yes.  Over the last 17 years, I have served as an

6     expert in pharmaceutical work in about 10 different projects

7     or matters.

8     Q.     And in those matters, have you been accepted by the

9     Court as an expert?

10    A.     Yes.  I've been accepted by the Court as an expert in

11    cases in the United States and in England; and then served

12    as an expert in pharmaceutical cases in medical products

13    cases in Canada, Sweden, and Germany.

14          MS. WAYDA:  At this time, Your Honor, we offer

15    Dr. Gardella as an expert in the area of quantitative and

16    qualitative analysis of materials, including pharmaceutical

17    formulations using a variety of mass, electron, and

18    vibrational spectroscopy techniques, including Raman

19    spectroscopy.

20          MR. HAUG:  No objection.

21          THE COURT:  He is here an expert.  Go ahead.

22          MS. WAYDA:  Thank you, Your Honor.

23    BY MS. WAYDA:

24    Q.     Dr. Gardella, using DDX-7.4, can you please explain

25    to the Court what your understanding is what you have been

Gardella - direct

1   asked to do in this case?

2   A.    Yes.  I was asked to review and analyze, as shown

3   here in data, both the optical microscopy results and the

4   Raman mapping studies performed by Dr. Davies on the Zydus

5   ANDA product.  And,

6         Secondly, I was asked to determine if Dr.

7   Davies' Raman mapping studies supported Dr. Sinko's

8   reference to those data and reliance on his Raman data in

9   support of his opinion that the Zydus ANDA product contains

10  mesalamine "dispersed -- this is in quotes -- "dispersed

11  both in a lipophilic matrix and in a hydrophilic matrix."

12  Q.    Turning to the next slide, DDX-7.5.

13        Would you please give a high level summary to

14  the Court of what you have concluded from your work?

15  A.    Sure.  Dr. Davies' Raman maps simply show mesalamine

16  distributed throughout the Zydus ANDA product, and they

17  provide no information on how much mesalamine is present in

18  any particular area.  And,

19        In summary, the Raman data really provide no

20  basis for Dr. Sinko to refer to them and rely on that in

21  support of his conclusion as stated previously.

22        And the optical micrographs provide no data

23  regarding whether or not the mesalamine or excipients in the

24  Zydus ANDA product are located in any matrix at all.  They

25  provide no information on the identity or properties of any

Gardella - direct

1   material located in any "particles" or "granules."

2   Q.    Dr. Gardella, I think it would be helpful to the

3   Court if you could walk through what you did in analyzing

4   your Raman mapping data or Dr. Davies' Raman mapping data

5   in order to reach those conclusions.  And I believe you

6   prepared a slide --

7   A.    Sure.

8   Q.    -- on 7.6.

9            THE COURT:  Hold on just a second.  Just for

10  the sake of our court reporters, even though in ordinary

11  conversation, it is normal for people to sort of speak over

12  one another, you have to wait for the question to finish

13  before you start answering, and you have to wait for his

14  answer to finish before you start asking your next question.

15  Okay?

16           THE WITNESS:  I apologize.

17           THE COURT:  That's fine.

18           All right.  Go ahead, please.

19           THE WITNESS:  Sure.

20  BY THE WITNESS:

21  A.    As shown on this next demonstrative is a summary of

22  the procedure that I undertook.  So first I would say that

23  counsel obtained a copy of the software that operates the

24  Raman microscope that Dr. Davies used, and so that I -- and

25  Dr. Davies had provided the underlying digital data, and so

Gardella - direct

1    I could open his digital files and relate those to the

2    things in his report.  He did not provide in his report a

3    procedure of how he analyzed the data, so I used the

4    standard procedure that I have laid out here in these

5    steps.  If I could just walk through them, Your Honor.

6            So the first thing I did, because Dr. Davies

7    didn't collect any data in his digital files of the Raman

8    spectra of authentic excipients in the Zydus AND product, I

9    found Raman -- I researched and documented in my report

10   sources of reference, Raman spectra of excipients in

11   particular, looking for measurements made by the same

12   instrumentation that Dr. Davies used because of a

13   sensitivity to certain factors in Raman spectroscopy.

14           For magnesium stearate, silicon dioxide,

15   microcrystalline cellulose, carboxymethylcellulose, sodium --

16   hydroxypropylmethylcellulose, and sodium starch glycolate.

17   Those, as I understood and reported in my report, are those

18   used in the Zydus ANDA product.

19   Q.    Now, let me stop you here, Dr. Gardella.  Why was

20   it important for you to obtain reference spectra of those

21   excipients?

22   A.    Well, there is a couple of reasons that I have laid

23   out here.  There was no discussion of any excipients except

24   some discussion about the excipients and their fluorescence

25   in Dr. Davies' reports, and he didn't lay out a procedure of

Gardella - direct

1    how he -- and all I had was his report.  There was no

2    details about the procedures.

3                    So these are just the standard approaches when

4    you are analyzing a commercial pharmaceutical product in my

5    experience is to gather all the information about authentic

6    material as you can.  And,

7                    No. 2 then, the first thing I wanted to ask is

8    to make sure is that none of the signals, the peaks from the

9    excipients would interfere with the region that Dr. Davies

10   used to integrate a peak that then was transformed in the

11   color coding of the maps.

12                   THE COURT:  Hold on just a moment, if you would.

13                   What do you mean, Doctor, when you say

14   "integrate a peak?"

15                   THE WITNESS:  So as Dr. Davies discussed in

16   his testimony that was shown here, there was a peak in the

17   reference spectra of mesalamine that he recorded in his

18   report, and it was in the digital files at 817 wave numbers

19   is the unit in the spectrum.

20                   And he integrated, summed up all the signals

21   together.  He didn't just use the signal at the top of the

22   peak.  It is a standard procedure.

23                   THE COURT:  So you are saying integration of the

24   map matters.

25                   THE WITNESS:  Exactly.

Gardella - direct

1          THE COURT:  All right.  Thanks.  Go ahead.

2          THE WITNESS:  So that was what was actually

3   used, and the only thing that was used to make these color

4   maps.

5   BY MS. WAYDA:

6   Q.     Dr. Gardella, if I may stop you there.  When I look

7   at that map, and perhaps the Court is as well, I see what

8   seems to be a lot of structure in that map.  Could you

9   please explain to us what we're looking at when we see that

10  map?

11  A.     Sure.  This is just simply a ranking of the

12  integrated intensity on a thermal, what is called a thermal

13  color scale that ranges from black to white and going

14  through orange and brown and yellow.  It's a very standard

15  way to rank different intensities in a way that is commonly

16  used to visual recognition.

17          So it was my job to really, not knowing anything

18  about what the maps were in his report other than the

19  mesalamine is to really interrogate the underlying digital

20  data and try to understand, first, how the maps were created

21  and, secondly, what they meant.

22  Q.     Okay.  Can you continue with your third point on

23  DDX-7.6?

24  A.     So once I determined from No. 2 that none of the

25  excipients had peaks, strong peaks that would interfere with

Gardella - direct

1    that choice of a peak that Dr. Davies and his staff used

2    to create the maps, I then identified in my report the

3    strongest peaks characteristic of each excipient so that

4    if I, in interrogating the underlying data, found evidence

5    of detection of the excipients, I could have created

6    individual maps of each of the excipients in a manner

7    similar to what Dr. Davies did for mesalamine and overlaid

8    them to show if there was any spacial distribution of each

9    excipient relative to each other and to mesalamine.

10   Q.    Please continue.

11   A.    And I then interrogated both, as described in my

12   report, both the average overall spectrum for the entire

13   area that was mapped and used the data analysis to examine

14   spectra in individual parts down to the level of individual

15   pixels.

16        Dr. Davies testified in his deposition that he

17   examined the individual pixels, values for the individual

18   pixels in the same way.  I did it by looking at the

19   individual spectra.

20   Q.    Dr. Gardella, let me ask you, why is it important in

21   your mind to look at each individual pixel?

22   A.    Well, as you noted, if you examine these maps,

23   there is a suggestion of different regions because of the

24   different colors, especially the black color, and so I just

25   really wanted to look.

Gardella - direct

1              In Dr. Davies report, he also reported the black

2    color included fluorescence which, in his report, he said

3    related to some unspecified excipient.  So I just wanted to

4    look at those individual reasons to see what the difference

5    was between brown areas, black areas, yellow areas, white

6    areas, and see how the individual spectra -- you know, if

7    there was any evidence perhaps in, for example, if there was

8    an area that was black and had fluorescence, was there any

9    evidence of an excipient in that area?  Dr. Davies didn't

10   discuss those kinds of steps.  So I was just doing what I

11   would do in analyzing the data.

12   Q.    And to be clear, Dr. Davies included no information

13   on how he analyzed his Raman maps in his report; correct?

14   A.    The only thing that was stated is that he

15   integrated -- he and his staff integrated the individual,

16   that range from 795 to 835, and that integrated area was

17   used to create the maps.

18   Q.    And please continue with point 5 on DDX-7.6.

19   A.    In the black areas then, I was particularly concerned

20   with deciding -- since Dr. Davies had reported on the presence

21   throughout; there is, in analytical chemistry, we establish,

22   especially in regulatory situations, we establish criteria

23   using illuminative detection to tell us whether something is

24   present or whether it is not detected; so I wanted to do

25   that, look at the peak of interest to see what the black

Gardella - direct

1    colors meant and what was the minimum color value.  And

2    then I constructed color coded maps which represent the

3    distribution of mesalamine across the cross section of the

4    Zydus ANDA product in the same way.

5    Q.    To be clear, PTX-902 in the left side of DDX-7.6,

6    what is shown there?

7    A.    This is simply a map of that intensity, integrated of

8    only that peak, and represents the presence of mesalamine

9    throughout the area that is mapped.

10   Q.    Turning to your next slide, DDX-7.7.  Can you please

11   summarize for the Court what you concluded from your review

12   of Dr. Davies' native data files and Dr. Davies' Raman

13   mapping studies?

14   A.    Yes, the Raman data only shows that mesalamine is

15   distributed throughout the Zydus ANDA product.  And I want

16   to be clear that his data provides no information on how

17   much mesalamine is present in any one area.  And,

18              Secondly --

19   Q.    But --

20   A.    -- this really -- sorry.

21   Q.    Let me stop you there.  There is different colors.

22   Why wouldn't that tell you a brighter color is more

23   mesalamine and a lighter color or a darker color is less

24   mesalamine?

25   A.    Sure.  In my report, I discussed from peer-reviewed

Gardella - direct

1   papers the standard procedures about what you need to do to

2   turn those intensities into concentrations.  That wasn't

3   done, and there was really no information available to do it

4   from the experimental data that was provided.

5          THE COURT:  Pardon me for interrupting.  Is

6   there a correlation?  Is there a meaningful inference that

7   can be drawn by looking at the variations in the color

8   intensity and understanding something about the

9   concentration of mesalamine associated with that?

10         THE WITNESS:  No, not by the strict rules we

11   have to go by in this.  Raman spectroscopy is not a really

12   simple technique that has a quantitative relationship simply

13   between the intensity and the concentration.  There are

14   other reasons discussed in my report as to why a slight

15   variation in intensity could be due to roughness of the

16   surface or other things that affect the scattering process.

17   So it's unlike other sort of spectroscopic techniques where

18   there is really a straightforward relationship between

19   intensity that it is well known and you can then imply.  You

20   know, in Raman mapping, that is not the case.  Careful

21   calibration has to be done.

22         THE COURT:  All right.  Thank you.  Go ahead.

23         THE WITNESS:  And I should say, if I could, Your

24   Honor that Dr. Davies never, in either of his depositions or

25   his report, implied that there was anything other than the

Gardella - direct

1    presence throughout.

2              THE COURT:  All right.  Thank you.

3    BY MS. WAYDA:

4    Q.     Dr. Gardella, if you can continue with the second

5    point on DDX-7.7.

6    A.     Yes.  Just in what I understood about what Dr.

7    Sinko -- was told to me about what Dr. Sinko offered as an

8    opinion, I don't believe there is any basis for him to rely

9    on Dr. Davies' Raman data in support of his opinion that the

10   Zydus ANDA product contains mesalamine dispersed both in a

11   lipophilic matrix and a hydrophilic matrix.

12   Q.     Let's turn to the next slide and try to unpack each

13   of these opinions.  What is the basis for the first

14   conclusion that you gave that is on DDX-7.7?  And please use

15   DDX-7.8.

16   A.     Yes.  Thank you.  Just this follows a bit from Your

17   Honor's question.

18              The Raman images contained in his reports and in

19   the digital data did not have any intensity scale associated

20   with them.  So I really didn't understand, nor could I

21   understand without interrogating visually all the pixels,

22   what the difference was between the dark areas and the

23   bright areas in terms of the signal intensity.

24              Usually you have a color bar associated with it,

25   and he, in his testimony that was played here on Monday, he

Gardella - direct

1    had a figure that, for the first time, had a color bar

2    associated with it.

3                The units on the color bar are from 0 to 5,000

4    and labeled as AU, which stands for arbitrary units.  And so

5    there is no way of knowing how much mesalamine corresponds

6    to the color selected or if the distribution is homogeneous.

7                MS. WAYDA:  Mr. Green, can you please put up

8    PTX-902.

9    BY MS. WAYDA:

10   Q.    Dr. Gardella, is this what you were referring to as

11   the original image as received in Dr. Davies' expert report?

12   A.    Yes, it is.  So as you can see, there is a scale bar

13   on it that tells you the size that is represented, but there

14   is no scale for the color which is normally provided when

15   you do this kind of mapping.

16   Q.    Now, Dr. Gardella, you used a term in your testimony

17   "arbitrary units."  What do you mean by arbitrary units?

18   A.    Usually we use the term "arbitrary units" to

19   represent that we have not done a calibration that changes

20   the signal intensity to a concentration.  And so in this

21   case, the arbitrary units, I have investigated by looking

22   into the original data.  The 0 to 5,000 represents the value

23   of the integrated signal that ranged from 0 to 5,000.  So we

24   call that arbitrary units because if you change some of the

25   characteristics of the instrumentation, you may get the same

844

Gardella - direct

1    map, but it may just range with a signal intensity from 0 to

2    200.  So it represents the same change in distribution but

3    it is an arbitrary unit until it is transformed into a

4    concentration.

5    Q.    Dr. Gardella, looking now at DDX-7.9, can you use

6    that demonstrative to provide an explanation to the Court

7    about your opinion regarding Dr. Sinko's use of the

8    mesalamine and the inner lipophilic and outer hydrophilic

9    matrices?

10   A.    So I will just summarize my conclusions.

11          None of the excipients in the Zydus ANDA product

12   could be detected in the Raman maps.

13          And Dr. Davies' Raman maps demonstrate the

14   presence of mesalamine, but there is no evidence to show

15   where that mesalamine is located with respect to any

16   excipients in the Zydus ANDA product.

17          And no matrices or structures of excipients

18   can be determined from the Raman data or maps; simply

19   differences in brightness are due only to the different

20   intensities of the mesalamine peak.

21   Q.    Now, to be clear, Dr. Gardella, neither you nor

22   Dr. Davies gave any discussion in your expert reports?

23          THE COURT:  Let me interrupt.  I apologize.

24          MS. WAYDA:  I am sorry, Your Honor.

25          THE COURT:  I missed the last thing you said.

1    Can you repeat the last thing you said?

2                    THE WITNESS:  Certainly.  I'll repeat the entire

3    thing.

4                    No matrices or structures of excipients can

5    be determined from the Raman data or the maps.  So the

6    underlying Raman data, the individual spectra, point by

7    point spectra or the maps.  So the differences in brightness

8    that you see are due only to different intensities of the

9    mesalamine peak.  That is all the information that is there.

10                   THE COURT:  Okay.  What does that mean,

11   "differences in brightness are due only to the different

12   intensities of the mesalamine peak?"  What does that mean?

13                   THE WITNESS:  So I'll start to say that it is

14   really literal.  There is nothing implied in it.  There are

15   differences in brightness that we see in the brightness

16   scale, and they're only due to different intensities --

17   intensities, not concentrations, just the intensities of

18   the mesalamine peak.

19                   THE COURT:  And what does the intensity relate

20   to?  If it does not relate to concentration, does it relate

21   to anything?

22                   THE WITNESS:  Yes.

23                   THE COURT:  Or is it just arbitrary?

24                   THE WITNESS:  No, certainly concentration is

25   important in the changing intensity, but so is the

Gardella - direct

1    scattering process itself which leads to intensity changes

2    in Raman.  And so if, and in my report, I talked about this

3    in particular about all the factors you have to control in

4    Raman mapping to change it.

5              So, for example, the most common thing is that

6    the scattering changes because you are at a different

7    roughness on the surface and you get less scattering even

8    though you have exactly the same amount of mesalamine in it.

9              THE COURT:  When you said that if there were

10   a scale provided, then you would know something about

11   concentration.  Did I hear that right?

12             THE WITNESS:  That's right.  If a scale had been

13   provided that took into account all of these factors, then

14   you -- so there was no scale, and I wanted to know was there

15   any processing?  Dr. Davies didn't tell us whether there

16   were any processing steps.  Was there any processing to

17   change that intensity into a concentration or a rough

18   estimate of concentration, or there are treatments you can

19   do in that software that take advantage of how smooth is the

20   surface and you can do those things.  There was nothing but

21   the intensity of the integrated peak as shown by Dr. Davies

22   when he gave his testimony, when it was filmed.  I was

23   present for that.

24             THE COURT:  Okay.  Thank you.

25             MS. WAYDA:  Your Honor, if I may follow-up on

Gardella - direct

1    your question and ask.

2    BY MS. WAYDA:

3    Q.    Dr. Gardella, is it possible to quantitate a Raman

4    color map?

5    A.    Yes.

6    Q.    Could you please briefly describe how that would be

7    done?

8    A.    Sure.  I described this in my report by referring to

9    an article by Gordon.  And what you would have to do is run

10   standards using all of the components that are present.

11   You'd have to make synthetic standards with different

12   amounts of mesalamine and then measure that intensity in

13   the presence of the other excipients and make a calibration

14   curve essentially, is what we called it in analytical

15   chemistry, in order to then change that intensity into a

16   concentration.

17             THE COURT:  Okay.  Thank you.

18             MS. WAYDA:  Your Honor, I'd just like to

19   follow-up on a question I was asking when I didn't notice

20   that you wanted to ask a question.  I apologize for that.

21   BY MS. WAYDA:

22   Q.    But I want to make clear, Dr. Gardella, and

23   Dr. Davies as well, you are not deriving your third opinion

24   there based on anything on the pharmaceutical formulation of

25   the Zydus ANDA product?

1    A.      That is correct.

2    Q.      Are you just basing it on the Raman data maps?

3    A.      That is exactly right.

4    Q.      Now, I'd like to turn now to the next series of

5    opinions that you gave, and that was on the optical

6    microscopy that Dr. Davies conducted on the cross-sections

7    of the Zydus ANDA product.  And I am going to ask you, did

8    you review the optical images recorded by Dr. Davies?

9    A.      Yes, there were six optical micrographs like this

10   one using a particular microscope and then 914, I think,

11   individual higher spacial resolution micrographs.  And I

12   examined all of them.  Those were for the two samples that

13   Dr. Davies analyzed, the EMH345 and EMM196.

14           I am showing here one of those again taken from

15   Dr. Davies testimony and from his deposition.  One of these,

16   where he was asked to and labeled with a G.  He circled or

17   enclosed with a pen granules that the labeled with Gs, and

18   then particles which are hard to see from here, particles he

19   circled and labeled them P.

20           He labeled about 10 granules across this, and I

21   don't know, maybe 10 things that he said were particles.

22   Q.      To be clear, this information on labeling of granules

23   and particles, was this included in Dr. Davies' expert

24   report?

25   A.      No.

Gardella - direct

1   Q.     What, if anything, did you conclude based on your

2   review of those optical images?

3   A.     Dr. Davies, in his report, concluded that the Zydus

4   ANDA product contained particles and/or granules and, as he

5   did in his deposition and his testimony, just said they

6   were particles and/or granules.

7              He started, I should say, by calling them

8   features in general and then talked specifically about

9   particles and granules.  And the image really provides no

10  additional information that would allow a conclusion that

11  the Zydus ANDA product has any particular structures,

12  matrices, lipophilic or hydrophilic matrices, because that

13  would require information of other chemical composition

14  of those structures, and there is no information from an

15  optical micrograph about the chemical composition.

16  Q.     And to be clear, Dr. Gardella, you are not offering

17  an opinion in this case on what constitutes a lipophilic

18  matrix or a hydrophilic matrix; correct?

19  A.     No, I am not.

20  Q.     You are basing your testimony there just solely on

21  the fact that magnesium stearate is a known lipophile?

22  A.     Well, that is correct.

23  Q.     And that other materials such as CMC and sodium

24  starch glycolate are hydrophilic materials?

25              MR. HAUG:  Objection, leading.

Gardella - direct

1      THE COURT:  Yes, sustained.

2   BY MS. WAYDA:

3   Q.     Now, were you in the courtroom for Dr. Davies'

4   testimony in which he equated an optical image of a granule

5   which we marked as G1 -- and if we could put up PDX-2.11 --

6   with a Raman map that he said corresponded to the same area

7   occupied by that granule labeled G1, and that was PDX-2.12.

8   Do you recall that testimony?

9   A.     Yes, I was present for the testimony.

10  Q.     Does Dr. Davies' testimony regarding the Raman map

11  and optical image for G1 changed any of your opinions in

12  this case?

13  A.     No, it does not.

14  Q.     And why not?

15  A.     Well, this was actually the very first time in his

16  trial testimony that he provided information about the

17  location of both the Raman maps and the digital optical

18  images.  And so I was able, after his testimony, to look at

19  these two things to see if there was anything that could

20  draw any conclusion between them.  And there really was no

21  information in the Raman maps other than the Raman data

22  showed that the mesalamine is distributed throughout the

23  entire sample.  That means inside what he calls a granule

24  and outside what he calls a granule.

25       MS. WAYDA:  Mr. Green, if we could please put up

1   PDX-2.13 and then PDX-2.14.

2   BY MS. WAYDA:

3   Q.     Would your testimony be the same with respect to the

4   second granule that he identified in his trial testimony G2

5   which is shown in the optical microscope image in PDX-2.13

6   and the Raman map that he said is associated with G2 in

7   PDX-2.14?

8   A.     My opinion is exactly the same as I have stated it

9   previously.  This is the first time that I saw any

10  correspondence between where the Raman maps were and where

11  the optical micrographs were, but, again, all the comparison

12  of these two show you is that mesalamine is distributed both

13  inside what he identified as a granule and outside.  And it

14  is just present.

15  Q.     Dr. Gardella, I believe you were also in the

16  courtroom for Dr. Little's testimony, and I am going to

17  refresh your recollection as to what he testified at trial

18  transcript, page 214, lines 11 through 16 in response to a

19  question about particles floating in the dissolution medium

20  obtained by Dr. Gray:

21           "Answer:   (Continuing)  so what you get is the

22  size scale just like we discussed in the deposition that is

23  exactly what I would expect to see that would come through a

24  .8-millimeter filter, which is in that first dry granulation

25  stage, and is, in fact, exactly the same as the size of the

Gardella - direct

1    inner granules that you saw in Dr. Davies' results earlier."

2               Do you recall that testimony?

3    A.      I do.

4    Q.      Now, in Dr. Davies' optical microscopy data and in

5    his expert report, did you see any evidence for "inner

6    granules" of 0.8 millimeters in size?

7    A.      All I saw were evidence, as Dr. Davies stated in his

8    reports and his depositions and in his testimony, that there

9    were particles and granules in the range from 10 microns to

10   500 microns distributed throughout.  And I didn't see any

11   correspondence between that conclusion and the size

12   distribution that Dr. Little was talking about.

13   Q.      There were how many optical images again that you

14   looked at?

15   A.      The sum total is a little bit over 920 of them.

16   Q.      And we only had information from Dr. Davies on G1 and

17   G2; is that correct?

18   A.      That's correct.

19   Q.      And did Dr. Davies conduct any particle size

20   distribution analysis of the granules that he alleged that

21   he saw in size between 10 and 500 microns?

22   A.      Yes.  As I had stated in my report, there was no

23   evidence of any quantitative technique for determining the

24   distribution of the sizes, meaning how many particles had a

25   particular size, and he only gave a broad range and stated

Gardella - direct

1    that particles and granules were in them, and never

2    separately said here is a range of sizes for granules, what

3    I consider a granule.  And he was asked this at I think

4    both his depositions and said he just made the range for

5    particles and granules.

6    Q.     So there is no evidence in this record that there

7    is anything more than G1 and G2 that corresponds to these

8    alleged .8 millimeter size granules that Dr. Little

9    testified about?

10   A.     That's correct.

11             MR. HAUG:  Objection ... (Sits down and waves

12   off objection.)

13   BY MS. WAYDA:

14   Q.     Finally, Dr. Gardella, could you please turn to

15   DDX-7.11 and take the opportunity to summarize your opinions

16   for the Court?

17   A.     So just to summarize in detail, I apologize for

18   reading this, but the Raman maps show mesalamine distributed

19   throughout the Zydus ANDA product.  They provide no

20   information on how much mesalamine is present in any one

21   area.

22             And the Raman data provides no basis for Dr.

23   Sinko to refer to it and rely on that data in support of his

24   conclusion that the Zydus ANDA product contains mesalamine

25   "dispersed both in a lipophilic matrix and a hydrophilic

Gardella - cross

1  matrix."

2          The optical micrographs also provide no data

3  regarding whether or not mesalamine or excipients in the

4  Zydus ANDA product are located in any matrix at all.  They

5  provide no information on the identity or properties of any

6  material located in any "particles" or "granules."

7          MS. WAYDA:  Thank you, Dr. Gardella.  No further

8  questions.

9          THE COURT:  Thank you.

10         Mr. Haug, your cross-examination.

11         MR. HAUG:  Good morning, Dr. Gardella.

12         THE WITNESS:  Good morning.

13         MR. HAUG:  My name is Ed Haug.

14         If we may approach, Your Honor?

15         THE COURT:  You may, both the bench and the

16  witness.  Thank you.

17            (Binders passed forward.)

18                  CROSS-EXAMINATION

19  BY MR. HAUG:

20  Q.    Dr. Gardella.

21  A.    Yes, Mr. Haug.

22  Q.    Let me start by asking you a very basic question.  Do

23  you agree that it would be a basic scientific principle,

24  that as a basic scientific principle, it is important to

25  have as much information and data as possible before drawing

Gardella - cross

1    conclusions?  Do you agree with that principle?

2    A.      I agree completely, yes.

3    Q.      Now, you know Dr. Davies quite well, don't you?

4    A.      Yes, I do.

5    Q.      And do you question his expertise in this area?

6    A.      Do I question his expertise?

7    Q.      In the area of Raman mapping, for example.

8    A.      I think the questions I was asked to evaluate were of

9    his data, not his expertise.  So I am only questioning the

10   details of the data and his report, and his information

11   from his deposition.

12   Q.      You gave a lot of opinions about what he didn't do;

13   right?  You are critiquing his data; right?

14   A.      That is what I was asked to do, yes.

15   Q.      Now, you have given a number of opinions.  One of

16   them is that Dr. Davies' Raman maps show mesalamine

17   distributed throughout Zydus's ANDA product; isn't that

18   right?

19   A.      I don't remember the exact wording but, yes, that is

20   a good summary of it.

21   Q.      Do you need your slide up to read it?

22   A.      No, no.

23   Q.      Okay.  But you agree with Dr. Davies, don't you,

24   in his opinion and conclusion that the Raman maps show

25   mesalamine distributed throughout the Zydus ANDA product?

Gardella - cross

1    Yes or no.

2    A.    I do.

3    Q.    You just say that there is no information about how

4    much mesalamine is present in any one area of the product;

5    is that right?

6    A.    That is one of the things I said, yes.

7    Q.    Right.  But you don't dispute that there is

8    mesalamine everywhere across the cross-section of the

9    tablet; right?

10   A.    Well, as I described in my deposition, I certainly

11   found individual pixels where there was no detectable

12   mesalamine, but that doesn't change my conclusion or

13   Dr. Davies' conclusion.

14   Q.    Now, you also give an opinion that the Raman data

15   does not provide a basis for Dr. Sinko to rely on it for

16   purposes of determining whether or not the mesalamine is

17   dispersed both in a lipophilic matrix and in a hydrophilic

18   matrix; is that correct?

19   A.    That's correct.

20   Q.    Now, you are not a pharmaceutical scientist; right?

21   A.    I don't know how you define that.

22   Q.    You are not an expert in pharmaceutical formulation,

23   for example, are you?

24   A.    Again, I want to be specific when I answer I've

25   been very clear that I do formulation in my laboratory as a

Gardella - cross

1   research method, and I have published in that as a

2   researcher; but as discussed, I think we made these

3   distinctions very clear in my deposition.  In terms of

4   commercial products manufactured by the pharmaceutical

5   industry, I am not.

6   Q.   Do you even know what an "inner lipophilic matrix"

7   is?

8   A.   I have read the patent, and I have not been asked to

9   opine on the definitions in the patent.  And I have spent

10  much of my career studying lipophilicity and hydrophilicity

11  in surface chemistry, so I have my own understanding of

12  what those words mean and what a matrix means.  But I have

13  not been asked to offer any opinions about that and have

14  undertaken no study of the literature to draw any

15  conclusions about that.

16  Q.   Do you have an opinion as to whether a "matrix" is

17  within the scope of the '720 patent?

18  A.   No, I don't.

19  Q.   Do you have an opinion as to what an "inner

20  lipophilic matrix" within the scope of the '720 patent?

21  A.   No, I have not been asked to opine --

22  Q.   Do you have an opinion as to what --

23  A.   -- on that.

24            THE COURT:  Hold on.

25            MR. HAUG:  I am sorry.

Gardella - cross

1          THE COURT:  You have got to let him finish the

2    answer.

3          MR. HAUG:  I apologize, Dr. Gardella.

4          THE COURT:  Go ahead.

5    BY MR. HAUG:

6    Q.    Do you have an opinion as to --

7    A.    I am sorry.  Can I interrupt you?  Can I just make

8    sure I got on the record what I said?

9    Q.    Sure.

10   A.    So as I said, I was not asked to offer an opinion on

11   that.

12   Q.    Thank you.  Do you have an opinion as to what an

13   "outer hydrophilic matrix" is within the scope of the '720

14   patent?

15   A.    I was not asked to provide an opinion about that.

16   Q.    Do you have an opinion as to whether or not

17   "mesalamine is dispersed both in a lipophilic matrix and in

18   a hydrophilic matrix" within the scope of the '720 patent?

19   A.    No, I do not.

20   Q.    You do have an opinion, however, that I heard that

21   Dr. Sinko was not correct to rely on the Dr. Davies' data

22   to say that there was mesalamine dispersed both in the

23   lipophilic matrix and in the hydrophilic matrix; is that

24   correct?

25   A.    That is correct.  I took literally the charge that I

Gardella - cross

1    was given, which was to analyze the statement that I was

2    given by counsel from Dr. Sinko's report; and I did the

3    best, as again discussed in my deposition, to just consider

4    the language in that statement and whether he could rely on

5    the Raman data to make any conclusions about that.

6    Q.    Thank you.  So you do not offer any opinion on the

7    presence of mesalamine fines anywhere that you see, do you?

8    A.    I only understand "fines," the term "fines" as it

9    has been discussed in this case.  So, no, I have no opinion

10   about that.

11   Q.    You do not offer an opinion on the presence of

12   mesalamine within the extragranular space, do you?

13   A.    I have offered an opinion about mesalamine.  I think

14   I offered an opinion about mesalamine very clearly in a

15   statement in my testimony here that Dr. Davies could -- data

16   from both, as he presented in his testimony with this new

17   information about the location of the Raman image and the

18   granules he identified that we discussed, I did offer an

19   opinion that mesalamine was both inside and outside the

20   areas that he designated as a granule.

21   Q.    And you have no opinion -- well, withdrawn.

22         You agree, do you not, that there are granules

23   shown in Dr. Davies' images; right?

24   A.    I only agree that Dr. Davies labeled something on

25   the optical image.  When asked what he meant by granules, he

Gardella - cross

1    labeled them and drew a G on them.

2    Q.      In your opinion, is whatever is in that circle that

3    he drew, there is mesalamine in there; right?

4    A.      And outside, yes.

5    Q.      And also outside?

6    A.      Yes.

7    Q.      Thank you.  You have no opinion that what is shown in

8    those images and what was circled by Dr. Davies, you have no

9    opinion that they are not granules; right?

10   A.      I am sorry.  That is a pretty double negative

11   complicated thing for just a silly scientist like me.  So

12   could you restate it?

13   Q.      Certainly.  Do you have an opinion as to whether or

14   not there are any granules in those images?

15   A.      My only opinion is to try and analyze how I

16   understood Dr. Davies' statement that there were features,

17   including particles and granules, that range from a

18   particular size.

19           So in looking at all of the data, I could see

20   features of many types, of many colors, of many shapes.  It

21   wasn't until the deposition that he actually labeled things

22   that he considered particles.  I was not going to draw any

23   conclusions other than to review what he did and how he came

24   to his conclusions.  And until he circled them, I didn't

25   know what the distinction was between a granule and another

861

Gardella - cross

1    similarly dark spot somewhere else that he didn't label.

2              He only labeled a few of them.  That doesn't

3    mean that he didn't consider all of the things.  Just taking

4    literally what he did, that he did not do in his report,

5    because his report simply has a sentence, a phrase that says

6    there are features that include particles and granules in

7    this size range, and that was all that was in his report.

8    Q.    Sitting here today, you have no opinion as to whether

9    there are or aren't granules in those images; right?

10   A.    My opinion is that he has identified granules, and

11   my job is to try and understand what the characteristics

12   of those granules are with respect to the data that is

13   presented.

14   Q.    You did not do any testing on your own; right?

15   A.    That is correct.

16   Q.    And you have a laboratory at your disposal where you

17   could do Raman imaging; right?

18   A.    I was not asked to do that.

19   Q.    You weren't asked to do any testing whatsoever; is

20   that correct?

21   A.    That's correct.

22   Q.    And did you ever advise counsel for Zydus that they

23   should do some testing?

24   A.    I was not asked to do that.

25   Q.    There is no reason that you couldn't have done

Gardella - cross

```
 1    testing on the samples, right?

 2    A.    I am just sticking to my statement that I was asked

 3    to do a particular thing.  There was a lot of work in going

 4    through the digital data and understanding the mapping

 5    results.  There wasn't a lot of information in Dr. Davies'

 6    report to do that.  So that was the focus of what I was

 7    asked to do, and that is what I did.

 8    Q.    Did you talk to any of Zydus's formulators about the

 9    manufacture of the product?

10    A.    No, I didn't.

11    Q.    Did you review any of the Zydus manufacturing

12    processes, for example?

13    A.    As listed in my report, I was given that information,

14    but all I used it for was to know the source and the type of

15    the excipients and then use that as information that allowed

16    me to find the reference spectra.

17    Q.    Have you been in court the entire time of this trial?

18    A.    Yes.

19    Q.    So you were here for the testimony of Mr. Kulkarni;

20    is that right?

21    A.    Yes.

22    Q.    Do you recall that?

23    A.    Yes.

24    Q.    Do you recall testimony from Mr. Kulkarni that

25    granules are formed in the Zydus process?
```

1   A.      I don't.  I really wasn't playing close attention to

2   that testimony.

3   Q.      So do you also not recall any testimony about

4   whether or not the magnesium stearate results in a uniform

5   distribution within the granules produced in the compaction

6   step?

7   A.      I was present, but that was not part of my

8   assignment, so I really wasn't paying close attention to

9   those.

10  Q.      So your opinion that you have given here today is in

11  no way premised upon Zydus's manufacturing process; is that

12  right?

13  A.      That's correct.  As I stated in my deposition, I have

14  no experience with those things.

15  Q.      Now, as I understand your criticism, if I can put

16  it that way, of what Dr. Davies did, it is that he didn't

17  measure the amount of mesalamine present throughout the

18  product; is that right?

19  A.      I just want to be clear about your entire question,

20  if you don't mind.

21          So just to review, I was given his report at

22  the time.  At the time of my report, all I had was the

23  information in his report and the digital data.  And so I

24  tried to take an objective approach to analyzing the data.

25  I don't consider that as criticism.  It is simply trying

Gardella - cross

1    to report the facts of the information that was provided

2    to me.

3                So in the more general case of criticism, yes,

4    that is a criticism.  I don't want there to be any confusion,

5    I didn't set out to deconstruct it or to do anything other

6    than to analyze the data.

7                So I think my conclusions are that the only

8    information that was available would not allow one to imply,

9    take the implication that the color coding had anything to

10   do with concentration.  Nor did Dr. Davies, by the way, make

11   any such conclusion in his deposition testimony when he was

12   questioned.

13               So I don't consider that a criticism.  I just

14   consider it an analysis of what I had at that moment in time.

15   Q.     You mentioned the colors in the Raman mapping?

16   A.     Yes.

17   Q.     That is the yellow, orange, red, whatever the

18   spectrum of colors are; correct?

19   A.     That's right.

20   Q.     Is it correct that yellow means it is more

21   concentrated than orange?

22   A.     No.

23   Q.     It is the other way around?

24   A.     No, no.  I said very clearly I was very concerned

25   about these color maps implying something.  And there was no

Gardella - cross

1   color scale provided in Dr. Davies' data even inside the

2   digital files.

3           So I could imply and do my own analysis to show

4   what the range of colors meant, as particularly concerned

5   about the black areas, what did that mean.  Dr. Davies said

6   in his report that there was fluorescence that he associated

7   with an excipient.  Again, these were just words.  I wanted

8   to really make sure I understood that because images are

9   very powerful things that are often misinterpreted, so I

10  wanted to be clear what those meant.

11          And so, again, I think Dr. Davies very clearly

12  said I am only saying it is distributed throughout.  He

13  said that multiple times.  And I agree with that.  And so I

14  didn't want the implication of these maps, as they're

15  presented, to be anything other than that.

16  Q.    Thank you.  You just don't know how much mesalamine

17  is located across the cross-section of the tablet; right?

18  A.    No one knows.

19          MR. HAUG:  Can we have PTX-1 up, please.

20  BY MR. HAUG:

21  Q.    You said you reviewed the patent; right?

22  A.    Yes.

23  Q.    Did you read it?

24  A.    I read it.

25  Q.    We'll have it in a second.  I am going to ask you to

Gardella - cross

1    look at claim 1.

2              Did you read claim 1?

3    A.     Yes, I did.

4              MS. WAYDA:  Objection, beyond the scope of

5    direct.

6              THE COURT:  I don't know whether it is or not.

7    Let's hear the question.

8    BY MR. HAUG:

9    Q.     Is there anything in claim 1 that speaks to how much

10   mesalamine needs to be anywhere?

11   A.     I am not offering an opinion at all about the details

12   of claim 1.  I just simply read it, and, again, if I could

13   tell you that I used it to understand what excipients were

14   at issue here.  And then I further refined that by looking

15   at the Zydus ANDA information to get exactly which

16   excipients would be needed to collect reference spectra.

17   Q.     Are you aware of the claim construction in this case?

18   A.     No, I am not.  I have, I have been given certain

19   definitions but the overall claim construction I have not

20   read.

21   Q.     Those are definitions that were given to you by

22   Zydus's counsel; is that correct?

23   A.     That's correct.

24   Q.     But you don't really understand them beyond what was

25   given to you, is that right?

Gardella - cross

1   A.      Sir, I wasn't asked to offer any information related

2   to the claims.

3   Q.      So, for example, you didn't read the Court's claim

4   construction about the word "dispersed" as used --

5   A.      I remember having a discussion about that but since

6   the word dispersed wasn't used in Dr. Davies report, I

7   followed what, you know, the language that he used and

8   not -- all I understand is there is a very specific

9   definition for dispersed.

10          I think I have heard it but it wasn't a factor

11  in anything that I considered.

12  Q.      Well, can I have DDX-7.11 up, please?

13          This is one of the slides of your book.

14          There we go.  7.11.  Thank you.

15          Second bullet.  Your opinions, summary of your

16  opinions, Dr. Gardella.  At the end, you say, the Zydus ANDA

17  product contains mesalamine "dispersed both in a lipophilic

18  matrix and in a hydrophilic matrix."

19          Did you write that or was that Zydus counsel?

20  A.      Zydus counsel gave me that phrase and quotes from Dr.

21  Sinko's report, as I understood it.

22  Q.      So is it fair to say that Zydus's counsel created

23  this slide for you?

24  A.      No.

25  Q.      You wrote it?

1    A.      I wrote it.

2    Q.      So?

3    A.      It's pretty close to exactly what was in my report.

4    Q.      Sitting here now, do you have an understanding of

5    what is meant by the quoted language?

6    A.      I, sitting here now?  Yes, I do.

7    Q.      What is it?  What does "dispersed both in a

8    lipophilic matrix and in a hydrophilic matrix" mean to you?

9    A.      It just means that the mesalamine is present

10   throughout both of those structures.

11   Q.      Let's talk a little bit about excipients.  You have

12   also critiqued what Dr. Davies did in the sense that he

13   didn't locate, if I can put it that way, the location, or he

14   didn't find the location of excipients.  Is that right?

15   A.      I don't think that is a critique.  I think I analyzed

16   his data because, again, in his report, he didn't say

17   anything.  He mentioned excipients, especially with respect

18   to fluorescence.  He didn't indicate that in his report, he

19   didn't indicate that he considered what the reference

20   spectra of the excipients were and so I only had the

21   information in his report and I undertook what I would

22   normally do if I was in his shoes.  And that is to collect

23   the information on the excipients and make sure that it

24   didn't, it wasn't present.  I just, everything that I said

25   in my testimony earlier --

Gardella - cross

1    Q.      Are you saying --

2    A.      -- they set a reference to.

3    Q.      Are you finished?

4    A.      (Nodding head.)

5    Q.      I am sorry.  Thank you.

6            Are you saying there are no excipients in the

7    Zydus ANDA product?

8    A.      No, I am not saying that at all.

9    Q.      Did you hear the testimony that Mr. Kulkarni gave

10   about excipients.

11   A.      Again, I wasn't paying close attention to that

12   testimony.  I was just present.

13   Q.      In any event, you didn't do an analysis yourself

14   about whether or not excipients are in the Zydus product and

15   where they might be located?

16   A.      I think I did an analysis to see if Dr. Davies' Raman

17   data showed any evidence of those things, and I described

18   what, I think very clearly what the steps would have been

19   had I been able to see signals that detected them in Dr.

20   Davies'.  Following depositions, I got more, you know, there

21   were more details of what he considered.  But at the time, I

22   started with no preconceived notions about it.  I knew what

23   the excipients were.  I certainly believed they're in the

24   formulation.  And it was my task to examine the data.

25           MR. HAUG:  Could we have DDX-711 again, please?

Gardella - cross

1   BY MR. HAUG:

2   Q.     I'd like you to focus on the third bullet point:

3   Optical micrographs provide no data regarding whether or not

4   the mesalamine or excipients in the Zydus ANDA product are

5   located in any matrix at all.

6              Is it still your testimony that the optical

7   micrographs provide no data regarding whether mesalamine is

8   in the product?

9   A.     That's correct.

10  Q.     It is or isn't your testimony that you agree it is in

11  the product?

12  A.     I agree it is in the product.

13  Q.     Well, this says optical micrographs provide no data

14  regarding whether mesalamine is in or excipients are in the

15  Zydus product and located in any matrix at all; right?

16  A.     Optical micrographs simply are the response from

17  lighting, shining a light on the sample and taking a

18  photograph of it.  They contain no chemical information,

19  no chemical information to identify what is there.  And I

20  don't -- sorry -- I don't believe Dr. Davies did anything

21  other than report them.

22             As I learned during his depositions, this is a

23  standard technique that they do when they cut a cross

24  section is to take a series of optical micrographs and as he

25  said multiple times during his deposition, he provided all

Gardella - cross

1    that digital data so we could examine them but,

2    fundamentally, as he also testified, they don't say anything

3    about the composition, meaning the identification of what is

4    mesalamine and what are excipients.

5    Q.    So if you combine the data provided in the optical

6    micrographs with the data from the Raman data, could you

7    then determine whether or not the mesalamine is in the Zydus

8    product?

9    A.    I think the Raman data provide Dr. Davies the

10   information that show the mesalamine is distributed.  That's

11   the only experiment that was done that contained chemical

12   information that I examined and had, as Dr. Davies said, a

13   spectrum that could be used to identify mesalamine and only

14   mesalamine.

15   Q.    Can you go to Tab 13 in your book, please?

16   A.    Sure.

17   Q.    And I'd like you to look at PDX-2.9.

18   A.    2.9, yes.

19   Q.    Okay.  You recognize this as coming from Dr. Davies'

20   testimony and testing; right?

21   A.    Yes, I do.

22   Q.    Given your view that mesalamine is throughout the

23   product, wouldn't you agree with me that there is mesalamine

24   both inside and outside the volumes marked at granules by

25   Dr. Davies?

Gardella - cross

1    A.     I think I said that in my direct testimony, yes.  I

2    should say that this was the first time in his testimony

3    that any of this sort of spacial location was provided.  So

4    it comes as somewhat of a surprise.

5    Q.     In any event, you agree with it?

6    A.     I do.

7    Q.     Now, at the beginning of your testimony, you said

8    that you have testified a number of times in other cases.

9    Do you recall that?

10   A.     Yes.

11   Q.     Okay.  And --

12   A.     I listed the last times in my report.

13   Q.     Okay.  And you also, at the beginning of this

14   cross, I asked you whether or not you agree with the basic

15   scientific principle that it is important to have as

16   much information and data as possible before drawing any

17   conclusions, and that you agree with that; isn't that right?

18   A.     I think generally, yes.

19   Q.     Have you ever been found by any court to have

20   contradicted that basic principle?

21   A.     You will have to explain what you mean by that.

22   Q.     If you go to tab 11, please, in your binder.

23   A.     (Witness complies.)

24   Q.     Do you have it?

25   A.     Tab 11, yes.

Gardella - cross

1    Q.    Tab 11.  It is a case there that says Elan

2    Corporation v Andrx Pharmaceuticals.  Do you see that?

3    A.    Yes, I do.

4    Q.    Do you remember being involved in that case?

5    A.    Yes, I do; with Judge Jordan but a different Judge

6    Jordan in Florida.

7    Q.    And you testified in that case, didn't you?

8    A.    Yes, I did.

9    Q.    If we go to page 44 of this opinion.  It is actually,

10   yes, page 44 in the lower right.

11         Do you see up at the top of the right-hand

12   column?

13   A.    Yes.

14   Q.    It says:  Dr. Gardella's Interpretation of the

15   TOF-SIMS Test Results, and it goes on.  Do you see that?

16   A.    Yes.

17   Q.    And from there, which starts with paragraph 544, in

18   the Court's findings of fact and conclusions of law, it goes

19   all the way through to paragraph 604, talking about your

20   testimony that you gave in that case, doesn't it?

21   A.    Yes.  It's been a long time since I have seen this.

22   Yes.

23   Q.    Well, this decision, when was this decision?  It was

24   in 2008; right?

25   A.    I don't remember when the decision in the Elan case

1    came.  The testimony was long before that.

2    Q.    The date I was referring to appears on the first page

3    of the decision.  Anyway, I'd like you to look at paragraph

4    553.

5         And the Court found:  Dr. Gardella formed his

6    expert opinion without reviewing Andrx's ANDA, except for

7    the summary flowchart it contains [trial transcript at 1621

8    (Gardella)].  Dr. Gardella agreed that the ANDA contains a

9    vast amount of detailed technical information relating to

10   the manufacture and composition of the Andrx product.

11        If we can go on to the next paragraph, 554.

12        When he wrote his report, Dr. Gardella was

13   unfamiliar with the dissolution profile of Andrx' product.

14   Dr. Gardella could not describe the dissolution equipment

15   type 1 and type 2 according to the U.S. Pharmacopeia.

16        Did I read all that correctly?

17   A.    I was not asked to do any of that work.  I was

18   asked -- again, I had a very limited charge in that case.

19   So all of those are facts, but I think they're limited by

20   what I was asked to do in that particular case.

21   Q.    So is it the case that in the Andrx case, you were

22   also confined to just the very narrow investigation, similar

23   to this case?  Is that what you are saying?

24   A.    Yes, that is what I recall.  It's been a long time.

25   Q.    I'd like you to go to paragraph 594.

Gardella - cross

1          And the Court's findings of fact and conclusions

2     of law, it is stated, 594:  Dr. Gardella agreed that, as a

3     scientist, it is important to have as much information and

4     data as possible before drawing conclusions, and he "firmly

5     believe[d]" in this basic scientific principle.  [Trial

6     transcript at 1614 (Gardella)].  Yet Dr. Gardella

7     contradicted himself by testifying that it would not have

8     been important for him to know what his own test results

9     were before drawing any conclusions about Elan's test

10    results.

11          Did I read that correctly?

12    A.    Yes, you did.

13          MR. HAUG:  Thank you, Dr. Gardella.  No further

14    questions.

15          THE COURT:  Any redirect?

16          MS. WAYDA:  No, Your Honor.  We conclude our

17    examination of Dr. Gardella.

18          THE COURT:  Okay.  Thanks, Dr. Gardella.  You

19    may step down.

20          THE WITNESS:  Thank you.

21          THE COURT:  Your next witness, please.

22          MR. GAERTNER:  Your Honor, Mike Gaertner.  We're

23    going to be playing a few short deposition transcripts in.

24    We'll give them to you in just one moment.

25          THE COURT:  Okay.

1              MR. BLEIBEL:  May I approach?

2              THE COURT:  You may.

3              MR. BLEIBEL:  Thank you.

4              (Binders passed forward.)

5              MR. BLEIBEL:  Good morning, Your Honor.

6              THE COURT:  Good morning.

7              MR. BLEIBEL:  Wasim Bleibel for Zydus.

8              The first video we will play is that of named

9    inventor on the '720 patent, Roberto Villa.  Mr. Villa's

10   deposition was taken over two days, so these two video clips

11   will be played in sequence.

12             At the time the deposition was taken, he was the

13   plant director at Cosmo, and he was identified as of the

14   30(b)(6) witness on the formulation and manufacturing

15   process for 1.2 gram delayed release mesalamine tablets.

16             And I will just warn you that in the second part

17   of this, of his deposition, it gets to be a little confusing

18   to follow what is going on, and so I'll just explain to you

19   he is asked by Mr. Parr to identify in his lab notebooks

20   examples that are shown in the '720 patent.  Those examples

21   are illustrative of the invention, as they termed it, in

22   greater detail.

23             So at the conclusion of the deposition portion,

24   if the Court would like me to walk them through the batch

25   numbers, the notebooks, and the page numbers, I would be

Villa - designations

1    more than happy to.

2              THE COURT:  Let's watch the video.

3              (Video played of Roberto Villa.)

4              "Question:  Could you, for the record, state

5    your full name?

6              "Answer:  Roberto Villa.

7              "Question:  And what is your current position at

8    Cosmo S.p.A.?

9              "Answer:  Plant director.

10             "Question:  In connection with the development

11   work to develop a controlled release formulation of

12   mesalamine, did you or the formulators working at Cosmo

13   attempt to develop a controlled-release formulation of

14   mesalamine using a single matrix?

15             "Answer:  Absolutely no.  Because, as far as I

16   can remember, it could be easily proved that you could not

17   have extended release having a single matrix.

18             "Question:  And what did you base your

19   recollection or your remembering on?

20             "Answer:  My recollection is based on the fact

21   that we have experience with an active in -- 1,200

22   milligrams of active ingredient in a tablet that does not

23   weigh more than 1 gram.  1.5 grams.

24             "Question:  Did you have any prior experience,

25   before doing the formulation work to develop a controlled-

Villa - designations

1    release formulation of mesalamine, with any drug product

2    where the amount of active ingredient in the tablet was only

3    1,200 milligrams but the tablet itself did not weigh more

4    than 1.5 grams?

5              "Answer:  No.  It's only my knowledge and the

6    common sense that you cannot produce a formulation of that

7    kind.

8              "Question:  And just to make the record clear,

9    did you attempt to do any test to determine whether

10   mesalamine could be formulated in a controlled-release

11   formulation using a single matrix?

12             "Answer:  Yes.  A number of preliminary trials

13   were performed.

14             "Question:  I'd like to direct your attention

15   now to the claims of this '720 patent, which start on column

16   6 at line 7.

17             "The Witness:  Si.

18             "Question:  Do you see claim 1 has three

19   sub-parts -- subparagraphs to it, Mr. Villa?

20             "Answer:  Yes.  a), b), and c).

21             "Question:  And c) states, quote:  'Optionally

22   other excipients.'

23             "Do you see that?

24             "Answer:  Yes.  Exactly.

25             "Question:  And looking at claim 1, which is a

Villa - designations

1    composition claim, where do these other optional excipients

2    belong or fit in the composition?

3              "Answer:  It's the same question that you

4    asked me earlier on -- earlier on.  These agents are all

5    excipients that are included in all outer formulations,

6    which are the disintegrating agents, flow agents,

7    lubricants, and so on.

8              "Question:  Did you contemplate that any of

9    these other excipients could be included in the inner

10   lipophilic matrix?

11             "Answer:  I would say absolutely no as

12   lipophilic substances.

13             "Question:  Do you mean that the items that you

14   mentioned, 'disintegrating agents, flow agents, lubricants,

15   and so on' are not lipophilic substances?

16             "Answer:  As far as I know, the only substance

17   which could be considered as lipophilic but is not used as a

18   lipophilic agent could be the magnesium stearate.

19             "Question:  The question was:  'And what do you

20   base that statement on?'

21             "And the statement that the witness made, as,

22   as it appears on my screen, and I am basing it on an

23   interpretation, obviously, and then the reporter's reporting

24   of it, it says:  'As far as I'd know, the only substance

25   can -- could be considered as lipophilic but is not used as

Villa - designations

1   a lipophilic agent could be the magnesium stearate?'

2              "Answer:  I base this on -- I base this

3   statement on our formulation, especially, because we used an

4   amount of magnesium stearate which is 14 milligrams,

5   1 percent only of the formulation, only in the outer phase.

6              "And we add this only by mixing the final

7   product for ten minutes.

8              "And, therefore, in this statement it is

9   considered, by all the holy texts, it is considered as a

10  lubricant.  'Lubricant' means that it allows for the tablet

11  to be removed from the device that makes it only after it

12  has been formed.  And it has no in inference at all on the

13  dissolution of the final product.

14             "This is my experience.  And it is the product

15  of all my work of trial and formulation of Alda (phonetic).

16             "Mr. Haug:  Lialda.

17             "The Interpreter:  Lialda.  I am sorry.

18             "Question:  Mr. Villa, when you talk about the

19  use of magnesium stearate, are you referring to the

20  commercial product that is manufactured by Cosmo and sold as

21  Lialda?

22             "Answer:  I am referring to the commercial

23  product line, which is sold.  But I am also referring to all

24  the other products that I have studied and participated in

25  the formulation of which use the magnesium stearate only as

Villa - designations

1    a lubricant.

2              "Question:  When you mentioned that you used

3    magnesium stearate which is 14 milligrams, 1 percent only of

4    the formulation, what do you mean when you mentioned the

5    words '1 percent only?'

6              "Answer:  Because in all the holy texts of

7    pharmacology and formulations, when we speak of magnesium

8    stearate used as a disintegrating agent, we can employ only

9    1 percent, no more than that.

10             "Question:  And when you refer to the 'holy

11   texts of pharmacology and formulations,' what specific texts

12   are you referring to?

13             "Answer:  I am referring to the Pharmacopeia and

14   to the handbooks that are available in all development

15   laboratories and in all pharmaceutical industries.

16             "Question:  Earlier, when you mentioned 'the

17   holy texts,' you referred to speaking of magnesium stearate

18   used as a disintegrating agent.

19             "What is a disintegrating agent?

20             "The Witness:  Sorry.  I just make a mistake,

21   but magnesium stearate is a lubricant.

22             "Question:  And if there is not enough magnesium

23   stearate is a tablet, will the embossing, identification

24   print be affected by the lack of sufficient magnesium

25   stearate?

Villa - designations

1           "Answer:  It's not only the print on top of the,

2     on the tablet, but it's, it's the whole process that is

3     affected.  For example, if you have a sticking defect, that

4     means that the whole -- and, and it means that the tablet

5     actually sticks to the machine that makes it.  And,

6     therefore, the whole, the whole tablet is jeopardized.  The

7     use of this product is related merely to the mechanical

8     action.

9           For the formulation of Lialda, this is what

10    happens.  I don't know about the rest.

11          (Video ends.)

12          MR. BLEIBEL:  This is the second portion.

13          THE COURT:  All right.

14          (Video played.)

15          "Question:  I'd like to have the court reporter

16    hand to you now what has been previously marked as DDX-104.

17          "I am showing you what has been marked as

18    DDX-104 previously.

19          "Mr. Villa, is this a document -- can you

20    identify this document for the record first?

21          "Answer:  This is a laboratory notebook, which

22    is a record of all the analyses that are performed during

23    pharmaceutical development.

24          "Question:  I'd like you to turn now to a

25    document that is marked previously as DDX-105.

Villa - designations

1                  "The Witness:  Si.

2                  "Question:  Mr. Villa, during the break, were

3       you able to go and find the source information for the

4       examples that are set forth in the '720 patent?

5                  "Answer:  Yes.

6                  "Question:  And what were you able to locate?

7                  "Answer:  I was able to locate the lot numbers

8       that refer to these examples.  And they are to be found in

9       notebooks 2 and 3.

10                 "Question:  Okay.  And do you have documents

11      that show which lot numbers there are -- they are?

12                 "Answer:  Yes.  I can tell you that Example 1

13      refers to Lot Nos. 5209 and 5210, in Notebook 2.

14                 "Question:  Can you hand up, Mr. Villa, the

15      document marked as DDX-106?  That's an official lab

16      notebook.

17                 "The Witness:  Si.

18                 "Question:  And is that on page COMESA7373 of

19      Deposition Exhibit No. 104?

20                 "Answer:  Exactly.

21                 "And then it continues on Notebook 3.

22                 "Question:  Example 1.  Okay.

23                 "Example 2?

24                 "Answer:  Example 2 is 5218-2.

25                 "Question:  Let's go back just briefly to

Villa - designations

1   Example 1.  And you mentioned that it continues on to

2   Notebook 3.

3            "Can you, first of all, tell us where in

4   Notebook 3 it continues on to?

5            "Answer:  5209 and 5210.

6            "Question:  Do you know the page numbers, COMESA

7   numbers?

8            "Answer:  7378.  7373.

9            "Question:  Can you read the, the first page,

10  the COMESA number for the first page of the experiment, and

11  continue to the end of the experiment, the COMESA number?

12           "Answer:  7373 'til page 7378.

13           "Question:  Okay.  Thank you.

14           "Lot 5210, where is that one, then, in the --

15           "Answer:  In one of the pages that I just

16  mentioned.

17           "Question:  Let's move on to Example 2 of the

18  '720 patent.  And if you can identify the pages, and it's

19  best if you do it by the COMESA number, the beginning and

20  the end.

21           "Answer:  COMESA, Example 2 is COMESA 7379,

22  7380.

23           "Question:  Do you have the lot number for that

24  example?  The lot number.

25           "Answer:  5218/1.

Villa - designations

1           "Question:  And for Example 3, then?  What is

2    the lot number for Example 3?

3           "Answer:  5223/1.

4           "Question:  And can you find it in the lab

5    notebooks then?  Or, actually, Mr. Villa, if you just give

6    us the lot numbers for each of the other examples --

7           "The Witness:  Yes, yes.

8           "Question:  -- I think that will be

9    satisfactory.  We can, we can find it ourselves.

10          "Answer:  The lot number for Example 3 is

11   5223/1.

12          "Example 4 is 5218/2.

13          "And Example 5 is 5223/2.

14          "Question:  I would like to direct your

15   attention now to the third lab notebook, which is DDX-106.

16          "Answer:  Yes.

17          "Question:  And let me ask you to look at the

18   Bates page stamped COMESA7177.

19          "Actually, this, I think it's the Lab Notebook

20   No. 1.

21          "Answer:  No. 1.  Okay.

22          "Question:  Yes.  Whose signature is there on

23   this particular lab notebook?

24          "The Witness::  Mine.  It's only the initial.

25          "Answer:  This is my signature, not in full.

1    It's only the initials.

2              "Question:  In the sentence that appears in this

3    lab notebook on page 7188, the page that you initialled as

4    'read and understood,' the sentence that appears at the top

5    is a, is a full sentence, is it not?  'Reduction in the

6    quantity of magnesium stearate and introduction of

7    lipophilic excipients.'  Correct?

8              "Answer:  Yes.  The object of this lab test is

9    exactly as described.

10             (Video ends.)

11             THE COURT:  All right.  The thing that would be

12   helpful to have on the record is how the -- and it doesn't

13   have to be done right now but the correlation between the

14   DDX numbers and the trial exhibit numbers they referred to.

15             Mr. Parr, in the deposition, was questioning him

16   and the witness was responding with respect to documents

17   identified by DDX numbers, which I assume are deposition

18   exhibit numbers.  If those things are in the record now

19   under a different number, and it appears they were from the

20   questions on the scene because there were separate stick

21   numbers that were trial numbers, you should put into the

22   record some kind of a document indexing those two numbers so

23   that I can know what is being talked about.  And I'll leave

24   it to you and opposing counsel to agree on that and get it

25   into the record.  All right?

1               MR. BLEIBEL:  Thank you, Your Honor.  We will do

2    that.

3               THE COURT:  All right.  What else do you have

4    for me?

5               MR. BLEIBEL:  At this time I would move into

6    evidence DTX-28, DTX-29, DTX-57, DTX-58, DTX-59, and DTX-60.

7               MR. HAUG:  No objection.

8               THE COURT:  Okay.  Fine.  They're admitted

9    without objection.

10              (Above-referenced exhibits are admitted into

11   evidence.)

12              THE COURT:  Do you have the DDX numbers that

13   those correspond to?

14              MR. BLEIBEL:  I do.

15              THE COURT:  Go ahead, read those in and we'll

16   take care of it right now.

17              MR. BLEIBEL:  So DDX-104 is DTX-57 and 58.

18              DDX-106 is DTX-28 and 29.

19              And DDX-105 is DTX-59 and 60.

20              THE COURT:  Okay.  Thank you.

21              Do you have anything else?

22              MR. BLEIBEL:  We have one more video clip.

23              May I approach?

24              THE COURT:  Sure, you may.

25              (Binders passed forward.)

Allen - designations

1            MR. BLEIBEL:  Just to make the record clear, the

2    notebooks I moved into evidence just a moment ago, let me

3    state --

4            THE COURT:  The exhibits?

5            MR. BLEIBEL:  Correct.  The exhibits I moved

6    into evidence, 57, 28, and 59 were the Italian notebooks.

7            MR. HAUG:  Objection.  Objection.  Your Honor, I

8    am sorry to interrupt, but I object to attorney argument

9    which I think is what this is going to be, correlating

10   documents.  If it's in the record and it can be correlated,

11   we can do that post-trial.

12           THE COURT:  Yes.  I don't want you testifying,

13   Mr. Bleibel.  If you have got a way to correlate the

14   information, that is fine, but don't start telling me what

15   things are unless you have got agreed on bases for telling

16   me what things are, okay?

17           MR. BLEIBEL:  Very good.

18           THE COURT:  All right.  Good enough.

19           MR. BLEIBEL:  All right.  The next deposition

20   designation we'll be playing today is Loyd Allen.  At the

21   time Mr. Allen's deposition was taken, he was Shire's

22   originally offered expert on melting point.

23           THE COURT:  Okay.

24           (Video was played as follows.)

25           "Question:  Could you please state your full

1   name for the record?

2              "Answer:  Okay.  It is Loyd Vernon Allen, Jr.

3              "Question:  You're the author of the mag

4   stearate monograph in the Second Edition of the Handbook of

5   Pharmaceutical Excipients, correct?

6              "Answer:  Correct.

7              "Question:  Looking at sentence, though,

8   Steffens indicates that the melting point provided in the

9   handbook is incorrect; correct?

10             "Answer:  No, that's not what this is saying;

11  because you can see other articles where it definitely

12  states at the beginning a melting is 88, 89 degrees, and it

13  has been interpreted that way for many years.

14             "Question:  So in putting together the handbook

15  monograph for the Second Edition, you just ignored this

16  physical property information in Steffens; correct?

17             "Answer:  I didn't ignore that information, but

18  during the Second Edition, I pretty well took the

19  specifications in the front end and spent more time on the

20  comments in the parts of the second half of the monograph.

21             "Question:  So are you saying you just pretty

22  much took specifications of the First Edition and didn't

23  futz with them; is that correct?

24             "Answer:  I just reviewed them real quickly in

25  Merck Index, chemical handbooks, and if they were correct

Allen - designations

1    there, then I kept them in.

2                "Question:  So you didn't actually look at the

3    scientific literature to see whether there had been a change

4    in how people in the industry thought about melting point at

5    that time; correct?

6                "Answer:  No, not in the specifications.

7                "Question:  Dr. Allen, if you look at paragraph

8    30 of Exhibit Allen 1, in your report.  When it came time

9    to do the Third Edition of the Handbook of Pharmaceutical

10   Excipients, you say the editors requested that all

11   monographs be updated; is that correct?

12               "Answer:  Yes.

13               "Question:  And was there a reason for updating

14   all the monographs?

15               "Answer:  It was just periodically whenever

16   you're doing a large volume like that, the editors or

17   individual authors may go in and do additional work.  Like

18   right now with Remington's, I have asked all my authors to

19   really go through and do an in depth revision of each of

20   those chapters.

21               "So it doesn't happen in every edition.  You

22   just sometimes simply update and then sometimes you do a lot

23   of revision and updating.

24               "Question:  You attached that Third Edition to

25   your report as Exhibit 6; correct?

Allen - designations

1              "Answer:  I believe that's correct.

2              "Mr. Abramowitz:  I will mark as Allen

3      Exhibit 7, the Handbook of Pharmaceutical Excipients, Third

4      Edition, that was attached as Exhibit 6 to his report.

5              "Question:  I just ask that you confirm for me

6      that this is the Exhibit 6 attached to your report.

7              "Answer:  Okay.

8              "Question:  You state in paragraph 30,

9      'Additional effort was expended and suppliers of the

10     excipients were contacted to provide their specifications

11     resulting in some changes in the monographs;' is that

12     correct?"

13             "Answer:  Correct.

14             "Question:  And did you, for the purpose of the

15     magnesium stearate monograph, did you contact additional

16     suppliers to get additional information?

17             "Answer:  Yes.

18             "Question:  One of the properties that you

19     changed in the third edition of the magnesium stearate

20     monograph was the melting range; is that correct?

21             "Answer:  Correct.

22             "Question:  The melting range was revised to 117

23     to 150 degrees C for commercial samples and 126 to 130 C for

24     high purity magnesium stearate; is that correct?

25             "Answer:  Correct.

1          "Question:  Would you say that this information

2     that you revised in the third edition of the handbook

3     represents an update of how the industry viewed the melting

4     point of magnesium stearate?

5          "Answer:  It appeared to me that the industry

6     was going more towards the specifications for the anhydrous

7     form of magnesium stearate, which is reflected -- which is

8     one of the four forms of magnesium stearate that we talked

9     about, and they were listing these ranges in their current

10    certificates of analysis.

11         "Question:  But if the hydrated form melted at a

12    lower temperature than 105 degrees C, would this process not

13    have worked?

14         "Answer:  As it is being heated, there can be

15    some changes in the crystalline structure where, as the

16    water is given off, part of the matrix may liquify, and then

17    as the water continues to be given off, the crystalline

18    structure changes to a higher melting point magnesium

19    stearate, which is common with polymorphic materials like

20    this.

21         "Question:  So to actually determine the melting

22    point of the sample that was used in Zydus's product,

23    someone had to test it; correct?

24         "Answer:  Correct.

25         "Question:  Is there an appropriate method to

Allen - designations

1   use to test that sample in order to determine its melting

2   point?

3           "Answer:  Obviously, the most common is DSC.

4           "Question:  You state at 47, 'The removal of

5   water may be accompanied by a change in crystal structure or

6   changes in the solid state.'  Do you see that?

7           "Answer:  Yes.

8           "Question:  You said, 'This change in structure

9   can be called a solid-solid phase transition;' is that

10  correct?"

11          "Answer:  Yes.

12          "Question:  So this endotherm at 90 in Allen 33,

13  or approximately 90, could be called a solid phase

14  transition; correct?

15          "Answer:  Could be, yes.

16          "Question:  And that would not be considered a

17  melting; correct?

18          "Answer:  Well, it could also be called a

19  solid -- or a liquid-solid or a solid-liquid phase

20  transition for a small component, which would be a

21  mesomorph, but I don't have any data for that.

22          "Question:  You have no data that supports that

23  it was a solid-liquid-solid transition or anything else;

24  correct?

25          "Answer:  Correct.

Banakar - direct

1                (Video ends.)

2                MR. BLEIBEL:  And that's the conclusion of the

3     deposition designations for Loyd Allen.

4                THE COURT:  All right.  Thank you.  Your next

5     witness.

6                MR. PETERKA:  Good morning, Your Honor.

7     Defendants call Dr. Umesh Banakar.

8                MR. MILLER:  May I approach, Your Honor.

9                THE COURT:  You may approach the bench and the

10    witness.

11               (Documents passed forward.)

12               ... UMESH BANAKAR, having been first duly sworn,

13    was examined and testified as follows ...

14               THE COURT:  Hi.  Good morning.  Please have a

15    seat.

16               Mr. Peterka, you may proceed.

17               MR. PETERKA:  Good morning, Dr. Banakar.

18               I am told we're waiting on our slides.  Hang on

19    one second, Your Honor.

20                       DIRECT EXAMINATION

21    BY MR. PETERKA:

22    Q.    While we're waiting, can you state your name and

23    current address for the record?

24    A.    Yes.  First name, Umesh, U-m-e-s-h.  Last name

25    Banakar, B as in boy, a-n-a-k-a-r.

Banakar - direct

1   Q.      And your address?

2   A.      My address is 10251 Tammer drive, T-a-m-m-e-r, Drive,

3   Carmel, Indiana 46032.

4   Q.      Have you prepared a slide presentation to help us

5   today in our discussion?

6   A.      Yes, I have.

7   Q.      Thank you.  If we could turn to slide 2.  I'd like to

8   talk a little bit about your qualifications to start with.

9           Are you currently employed?

10  A.      I am self-employed.  I provide technical consults

11  and consultation to pharmaceutical industry and activities

12  worldwide in the areas of pharmaceutical formulation

13  development, the evaluation particularly in dissolution

14  testing and also in human subjects.

15          THE COURT:  Doctor, would you mind just pulling

16  that microphone a little closer to you?

17          THE WITNESS:  Sure.

18          THE COURT:  Thank you.

19  BY MR. PETERKA:

20  Q.      Do you also teach formulation development and

21  evaluation to the pharmaceutical industry?

22  A.      Yes.  I teach these courses or I teach development of

23  pharmaceutical formulations to various groups which cover

24  pharmaceutical industry as well as associations, colleges,

25  so on and so forth.

Banakar - direct

1    Q.     Can you please describe your education?

2    A.     I have a Bachelor's Degree in Pharmaceutical

3    Sciences, and I have a Doctorate in Pharmaceutical

4    Technology with minor in Pharmaceutical Chemistry.

5              And I have also training which is through a very

6    focused program on controlled release technology.

7    Q.     Before you were a consultant, where did you work?

8    A.     I was a professor at three places.

9              One is, the first one I started off with was at

10   Creighton University in Omaha, Nebraska.

11             Then I was recruited at St. Louis College of

12   Pharmacy as Director of Research and Chairman of

13   Pharmaceutical Sciences division.

14             And then last one was at Butler University

15   School of Pharmacy where I was Chairman of Graduate School

16   as far as Chairman of Pharmaceutical Sciences division.

17             MR. PETERKA:  Can I have the next slide, 3, now.

18   BY MR. PETERKA:

19   Q.     Can you talk about some of your recognition and

20   awards?

21   A.     Over the course of my career, I have received

22   numerous awards in teaching and scholarly activity, and also

23   contributions to pharmaceutical sciences worldwide.  Some of

24   the noteworthy ones are on the slide.

25             I have done four assignments for the United

Banakar - direct

 1   Nations in which two were awarded Service to Country Award

 2   by United Nations.

 3            More recently, I was conferred the Outstanding

 4   Contributions to Dissolution Science Award by the Society of

 5   Pharmaceutical Dissolution Science.

 6   Q.    Thank you.  Are you a member of any professional

 7   organizations?

 8   A.    Yes.  I am a member of numerous professional

 9   organizations over the years.  One of the noteworthy ones

10   that I want to mention here is I founded the Society For

11   Pharmaceutical Dissolution Science, the first one of its

12   kind in the world.  And I am also the Chairman of the

13   Scientific Affairs aspect of it.

14            MR. PETERKA:  Next slide, please.

15   BY MR. PETERKA:

16   Q.    Can you just talk a little bit about your

17   publications?

18   A.    I have various publications in various formats in

19   area.  I have over 100 research articles, numerous chapters

20   in various textbooks.

21            I have several focused technical manuals.

22            I have textbooks written on dissolution,

23   pharmaceutical dissolution testing, pharmacokinetics, and

24   the most recent one has been the Desk Book of Pharmaceutical

25   Dissolution Science and Applications.

Banakar - direct

1              And recently, a six volume, 93 chapter series

2      was published on NanoBioMedicine.

3      Q.     Are you also a reviewer for any scientific journals?

4      A.     Yes.  I am a reviewer for numerous scientific

5      journals and also been on the member of various editorial

6      boards, have had 92 publications authored over the years.

7      Q.     Dr. Banakar, have you previously testified as an

8      expert in pharmaceutical cases?

9      A.     Yes, I have.

10     Q.     Have you ever testified on behalf of Shire?

11     A.     Yes, I have.

12     Q.     Have you been accepted as an expert in the areas

13     of pharmaceutical formulation and evaluation, including

14     controlled release technology and dissolution testing in

15     those cases?

16     A.     Yes, I have.

17     Q.     Is there anything else that you think further

18     demonstrates your expertise in the field of pharmaceutical

19     formulation evaluation?

20     A.     Yes.  I would like to mention that I have developed,

21     personally developed hundreds of pharmaceutical formulations

22     over the time span of 20-30 years that I have been in the

23     course of my career.

24             These formulations have been of various types:

25     Solid dosage forms, liquids, et cetera.  Immediate release

Banakar - direct

1    formulations, controlled release formulations.

2              Over 100 of those formulations have been for

3    U.S. market.

4              In addition to that, I have done thousands of

5    dissolution testings in my career, and I continue to do that

6    even today.

7    Q.    Can you turn in your book to DTX-3, please.

8    A.    I don't have a book here.

9    Q.    Oh, you don't.

10             MR. PETERKA:  May I approach?

11             THE COURT:  You may approach.

12             (Binders passed forward.)

13   BY MR. PETERKA:

14   Q.    All right.  Let's try that again.  Can you turn to

15   DTX-3 in your book?

16   A.    Yes.

17   Q.    Is this a copy of your CV?

18   A.    Yes, it is a copy of my CV.

19   Q.    And the information in the slides and additional

20   information we were just talking about, is that all

21   reflected in the CV?

22   A.    Yes, it is as current as October 2014.  There would

23   be additions which would not be in there.

24             MR. PETERKA:  I ask the Court recognize

25   Dr. Banakar as an expert in the areas of pharmaceutical

Banakar - direct

1    formulation and evaluation, including controlled release

2    technology and dissolution testing.

3                MR. HAUG:  No objection.

4                THE COURT:  All right.  We'll hear him as an

5    expert.

6                MR. PETERKA:  Thank you.

7                I believe your next slide, can I go back to the

8    presentation?  Slide 5.

9    BY MR. PETERKA:

10   Q.     This is a copy of the '720 patent?

11   A.     Yes.

12   Q.     Have you reviewed the '720 patent as has been

13   discussed during this trial?

14   A.     Yes, I have.

15   Q.     Have you reviewed the prosecution history?

16   A.     Yes, I have reviewed the prosecution history for the

17   '720, the '720 patent itself, various reports that have been

18   submitted over the period of this case.

19               I also looked at data and experimental work that

20   was provided in this matter.

21               And I have also applied my personal experience

22   in development.

23   Q.     I take it as a general basis, those are the bases for

24   the opinions you can express?

25   A.     That is correct.

901

Banakar - direct

1    Q.     Are you familiar with the Court's claim constructions

2    in this case?

3    A.     Yes, I am.

4              MR. PETERKA:  The next slide.  This is slide

5    DDX-10.6.

6    BY MR. PETERKA:

7    Q.     Are these the Court's claim constructions that you

8    are familiar with?

9    A.     These are the terms and the constructions provided by

10   the Court.  They are the claim constructions which I have

11   just stated in numerical order -- sorry, alphabetical order.

12   Q.     Did you apply those constructions in forming your

13   opinions in this case?

14   A.     Yes.

15             MR. PETERKA:  Can I go to the next slide,

16   please?

17   BY MR. PETERKA:

18   Q.     Dr. Banakar, in general, what will you be testifying

19   about today?

20   A.     Today, I am testifying whether Zydus's ANDA product

21   infringes claim 1 or claim 3 literally and under the

22   Doctrine of Equivalents.

23   Q.     Have you formed an opinion as to whether Zydus's ANDA

24   product will infringe claims 1 and 3 of the '720 patent?

25   A.     Yes, I have formed an opinion.  That opinion is

Banakar - direct

1   Zydus's ANDA product does not infringe claim 1 and claim 3

2   of the '720 patent both under literal as well as under

3   Doctrine of Equivalents.

4   Q.    And why, in your opinion, does Zydus's proposed ANDA

5   product not infringe the '720 patent claims, claims 1 and 3,

6   sir?

7   A.    The overview for noninfringement is based on this

8   slide where the claimed matrix, Zydus does not have the

9   inner lipophilic matrix, does not have the outer hydrophilic

10  matrix, and the active ingredient mesalamine is not

11  dispersed both in the lipophilic and in the hydrophilic

12  matrix.

13  Q.    Do those opinions apply to both claims 1 and claim 3?

14  A.    That is correct.

15          MR. PETERKA:  Go to the next slide, please.

16  BY MR. PETERKA:

17  Q.    Breaking down your noninfringement opinions further.

18  Why does Zydus's ANDA product, in your opinion, not have the

19  claimed "inner lipophilic matrix?"

20  A.    There are several reasons why that is true.  The

21  alleged "inner lipophilic matrix" does not consist of the

22  required excipients.

23          Additionally, it does not have the required

24  structure.

25          Furthermore, it does not exhibit lipophilic

Banakar - direct

1    properties.

2            And it does not function to control the release

3    of the drug.

4    Q.    Thank you.

5            MR. PETERKA:  Next slide, please.

6    BY MR. PETERKA:

7    Q.    I'd like to go to your first point that was on the

8    earlier slide there.  The first reason Zydus's ANDA product

9    does not have the claimed "inner lipophilic matrix," I

10   believe that was the magnesium stearate used in the Zydus

11   ANDA product does not have a melting point below 90 degrees C;

12   is that correct?

13   A.    That is correct.

14   Q.    Based on your experience in pharmaceutical

15   formulation, how would one determine the melting point of a

16   particular substance?

17   A.    The melting point of a particular substance is

18   determined by the standard test which is provided in United

19   States Pharmacopeia or USP which has the controlled or

20   standard required to perform the test which is in the

21   monograph in that USP.

22           MR. PETERKA:  Can I have the next slide, please.

23   BY MR. PETERKA:

24   Q.    And what is on this slide?

25   A.    This slide is the excerpt of melting point range or

Banakar - direct

1    temperature determined or procedure that is to be determined

2    to be followed and the standards and controls to be followed

3    as in monograph 741 in USP.

4    Q.    And are these from, this is from DTX -- I think there

5    is two versions on here; right?

6    A.    That is correct.

7    Q.    Can you explain those different versions?

8    A.    DTX-72 is 1995 USP.  DTX-52 is the second supplement,

9    2014 USP 37 National Formula 32.

10            THE COURT:  Mr. Peterka, if you are going to ask

11   him, I won't, but what is the difference between the two?

12            THE WITNESS:  2014 is the updated current one.

13            THE COURT:  That much I am with you on, but is

14   there a substantive difference between those two?

15            THE WITNESS:  The standards and controls are the

16   same.

17            THE COURT:  So there is no substantive

18   difference between those two?

19            THE WITNESS:  The editions have different

20   temperatures.

21            THE COURT:  Okay.  I'll let you question.

22   BY MR. PETERKA:

23   Q.    This is the monograph that you and Dr. O'Halloran

24   talked about earlier; correct?

25   A.    That is correct.

Banakar - direct

1    Q.    Have plaintiffs' experts conducted the USP melting

2    range or temperature test on the magnesium stearate used in

3    the Zydus ANDA product?

4    A.    No, the plaintiffs have not done the USP.  They are

5    not following the USP melting range and melting temperature

6    procedure for formulating the melting point of magnesium

7    stearate.

8                THE COURT:  And I should make clear what I'd

9    said between "these two."  I was a little unclear on the

10   record.  I apologize.

11               I was looking at DDX-10.10 and the excerpted

12   language you had put up there from the two versions of the

13   USP, the 1995 version around the 2014 version.  That was the

14   basis of my questions to Dr. Banakar.  Just so it is clear

15   on the record.

16               MR. PETERKA:  All right.  Thank you, Your Honor.

17               THE COURT:  Please continue, Mr. Peterka.

18   BY MR. PETERKA:

19   Q.    Did you hear Dr. O'Halloran's testimony this morning?

20   A.    Yes, I did hear Dr. O'Halloran's testimony this

21   morning.

22   Q.    And you reviewed his test results?

23   A.    Yes, I have reviewed his test results.  They are on

24   the next slide.

25   Q.    Did Dr. O'Halloran follow the USP procedure?

Banakar - direct

1    A.      That is correct.  He did.

2              MR. PETERKA:  Can we have the next slide.

3    BY MR. PETERKA:

4    Q.      And what is on this slide, Dr. Banakar?

5    A.      This is the slide where Dr. O'Halloran's test results

6    are in that table where it shows that the temperature at

7    which magnesium stearate sample began to melt was, is at

8    143 degrees Celsius, and it completely melted, end of melt,

9    at 145.5 degrees Celsius, within that range.

10             Also, the sample, the sample number indicates

11   the sample where it came from.  It came from the same lot of

12   magnesium stearate that was used in Zydus ANDA batch EMM196.

13   And the producer of that excipient magnesium stearate is

14   Dr. Lohmann.

15             MR. PETERKA:  Can we go to the next slide.

16   BY MR. PETERKA:

17   Q.      And this is what you were just talking about?

18   A.      That is correct.

19   Q.      Now, what does this show?

20   A.      This shows the material I just covered.  The top box.

21             MR. PETERKA:  Just for the record this is

22   DDX-10.13.

23   BY MR. PETERKA:

24   Q.      Sorry.  Go ahead.

25   A.      The top box is where the magnesium stearate is from,

Banakar - direct

1    Dr. Paul Lohmann.

2              This is the number, sample number.  That is the

3    batch number that came from.

4    Q.    And that corresponds to the batch you referred to

5    earlier?

6    A.    That is correct.  If you go to the previous slide,

7    that is the sample number.

8    Q.    Okay.  And the top document in this slide, that is

9    an excerpt in the Zydus batch manufacturing record; is that

10   correct?

11   A.    That is correct.

12   Q.    And that is DTX-18?

13   A.    That is correct.

14   Q.    Can you turn in your binder to DTX-18, please?

15   A.    (Witness complies.)  Okay.

16   Q.    And that is the batch manufacturing record for the

17   Zydus ANDA product, EMM196?

18   A.    That is correct.

19   Q.    Can we go back to the slide we were just on?  And the

20   bottom document that you were just matching up, the batch

21   number, the Zydus batch number with the vendor batch number,

22   that is from DTX-48.  Can we turn to DTX-48 in your book?

23   A.    Yes.

24   Q.    And what is DTX-48?

25   A.    DTX-48 is the Quality Control Department Certificate

Banakar - direct

1    of Analysis for magnesium stearate.

2    Q.    This is for the magnesium stearate in the EMM196

3    product?

4    A.    That is correct.

5              MR. PETERKA:  Okay.  To the extent it is not in

6    already, I'd move DTX-48 into evidence.

7              MR. HAUG:  No objection.

8              THE COURT:  It's admitted without objection.

9              (DTX-48 is admitted into evidence.)

10             THE COURT:  Mr. Peterka, I don't believe you

11   moved Dr. Banakar's CV in.  If you don't want it in?

12             MR. PETERKA:  That's a fair point.

13             THE COURT:  All the others are in.  And I am

14   just wondering, do you want it in?

15             MR. PETERKA:  I do.  Thank you, Your Honor.  Can

16   I move Dr. Banakar's CV, which I think is DTX-3, can I move

17   it into evidence, please.

18             MR. HAUG:  No objection.

19             THE COURT:  It's admitted without objection.

20             (DTX-3 is admitted into evidence.)

21   BY MR. PETERKA:

22   Q.    Did you hear Dr. Hollingsworth testify earlier in

23   this case?

24   A.    Yes, I did.

25   Q.    And do you agree with the opinions he expressed?

1    A.      Yes, I do.

2                MR. PETERKA:  Can I go to slide 14, now?  I am

3    sorry.  Yes.

4    BY MR. PETERKA:

5    Q.      I'd like to talk a little bit about the Doctrine of

6    Equivalents.  Are you familiar with the function-way-result

7    test?

8    A.      Yes, I am.

9    Q.      How does that work?

10   A.      In layman's terms, the substituted element performs

11   substantially the same function in substantially the same

12   way to achieve substantially the same result for the element.

13   Q.      In your opinion, is the magnesium stearate in the

14   Zydus ANDA product an equivalent of the excipient with

15   melting points below 90 degrees C that are listed in part

16   (a) of claim 1?

17   A.      In my opinion, the magnesium stearate used here is

18   not equivalent of substance that melts below 90 degrees

19   Celsius.

20               MR. PETERKA:  Can we go to the next slide.

21   BY MR. PETERKA:

22   Q.      What does the '720 patent teach about the way in

23   which the claimed lipophilic meltings below 90 degrees C

24   work?

25   A.      The '720 patent teaches that the low melting point

Banakar - direct

1    with low melting excipients soften and/or melt to

2    incorporate the active ingredient by simple dispersion in

3    that melt.

4          And then after the dispersion is cooled, after

5    cooling at room temperature, that creates the inner matrix.

6    Q.    Do other parts of the specification support your

7    opinion?

8    A.    Yes, they do.

9          MR. PETERKA:  Can I have the next slide.

10   BY THE WITNESS:

11   A.    There are several examples in the '720 patent that

12   shows the low melting point excipients are heated to

13   facilitate dispersion of the active ingredient, in this

14   case, mesalamine, in a lipophilic matrix.

15         If we go through the slide, there are four

16   examples.

17         Example 1, top left box, the drug, the two

18   excipients that are lipophilic are carnauba wax and stearic

19   acid.  With heating, they will melt and form and provide a

20   volume for the drug to be dispersed in it, to result in a

21   homogeneous dispersion when cooled that will give the

22   structure to the matrix.

23         The same thing with Example 2.  Same excipients,

24   lipophilic, carnauba wax and stearic acid, on heating.

25         Example 3, another excipient, lipophilic

Banakar - direct

1    excipient, beeswax and palmitic acid, with heating, the

2    drug, homogeneous dispersion, giving the structure on

3    cooling.

4              Example 5, again carnauba wax and stearic acid,

5    heating, resulting in homogeneous dispersion after the drug

6    is added to it.  And on cooling, it provides the structure.

7              MR. PETERKA:  And just for the record, that is

8    Examples 1, 2, 3, and 5 of the '720 patent.

9              Let's go to the previous slide.

10   BY MR. PETERKA:

11   Q.    That is the patent there, DDX-10.15 and that is from

12   the '720 patent, column 2, lines 48 through 59.

13   A.    That is correct.

14             MR. PETERKA:  Can I go to the slide 17.

15   BY MR. PETERKA:

16   Q.    So, in your opinion, does the magnesium stearate in

17   the Zydus ANDA product function in the same way as the

18   substances that melt below 90 degrees Celsius that are

19   described in the patent?

20   A.    No, the magnesium stearate in Zydus ANDA product is

21   not equivalent to the substance melting below 90, but

22   substance melting about 130 degrees is not equivalent to a

23   melting point below 90 degrees.

24             Secondly, the magnesium stearate does not

25   function in the same way as the claimed lipophilic

Banakar - direct

1    excipients that melt below 90 degrees and produce an

2    environment to facilitate the dispersion of mesalamine into

3    a matrix structure.

4    Q.    Do you agree with Dr. Sinko that magnesium stearate

5    in the Zydus ANDA product functions to control the release

6    of active ingredient?

7    A.    No, I do not agree that the magnesium stearate in

8    Zydus's product controls the dissolution of the release of

9    the drug.  And we're to talk about that later in my

10   testimony in detail.  And I have seen no evidence to that

11   effect either.

12              MR. PETERKA:  Could I have slide 18.

13              Moving on here to the next point, I'd like to

14   talk about the requirement of the claimed matrix consists

15   the substances consisting of the materials listed in part

16   (a) of claim 1.

17              Can I have the next slide, please.

18   BY MR. PETERKA:

19   Q.    Dr. Banakar, have you analyzed how Zydus makes its

20   product in coming to your opinions that we're talking about

21   today?

22   A.    Yes, I have done that.

23   Q.    And what is shown on this slide?  This is DDX-10.19.

24   A.    DDX-10.19, I put together the manufacturing overview

25   of Zydus's ANDA product, and how they process it to get to

Banakar - direct

1    the formulation of the product itself.

2                First step in the process is compaction.  The

3    components of that compaction are provided just below that.

4    Those components are then compacted.

5                And that compact is further sized.

6                The sizing will give those small compacts, which

7    are then granulated, wet granulated.

8                The granules are dried.

9                The dried granules are then lubricated with

10   magnesium stearate which form the precompression blend

11   because they are to prepare tablets out of it.

12               So then these, this precompression blend will be

13   compressed into tablets.

14               Then the resulting tablets are coated with

15   functional coats.  And.

16               Then, finally, they are coated with a film coat.

17   That is their final dosage form.

18   Q.    And the information on this slide is from DTX-17 and

19   DTX-18.  Can we just turn to those documents real quick in

20   your booklet?

21   A.    Yes.

22   Q.    We already looked at DTX-18.  Did we look at DTX-17,

23   though?  Can you take a look at that?

24   A.    (Witness complies.)  Yes.

25   Q.    And what is DTX-17?

Banakar - direct

1    A.    DTX-17 is the quality overall summary, the title page

2    of the quality overall summary of Zydus's ANDA product.

3                MR. PETERKA:  Can I go back to the slide,

4    please?

5                So I don't believe DTX-17 is in.  I'll move it

6    into evidence.  Defendants would offer it into evidence, if

7    there is no objection.

8                MR. HAUG:  No objection to DTX-17.

9                THE COURT:  Admitted without objection.

10               (DTX-17 is admitted into evidence.)

11   BY MR. PETERKA:

12   Q.    And just for the record, the information on this

13   slide that you were just talking about on DDX-10.19 is from

14   DTX-17 at ZYDUS_MES23436, and then again at 23458 through 60,

15   and 23462, and then also from DTX-18 at ZYDUS_MES0235660-61?

16   A.    That is correct.

17   Q.    Is there any particular step in the manufacturing

18   process that you are going to focus on today in connection

19   with your noninfringement opinions?

20   A.    The step that I am going to focus on is the first

21   one, which is the compaction step.

22   Q.    Can you explain what the compaction step is in the

23   Zydus ANDA product?

24   A.    Compaction step in general is we have a blend of dry

25   powders which contains one or more ingredients.  And that

Banakar - direct

1    blend is then compacted through the compaction with a

2    machine known as a roller compactor.  It was originally

3    known as a Chilsonator but now it is known as a roller

4    compactor.

5              THE COURT:  Can you repeat that, what it was

6    formerly known as?

7              THE WITNESS:  Chilsonator.  C-h-i-l-s-o-n-a-t-e-r,

8    or o-r.

9              THE COURT:  Thank you.

10             MR. PETERKA:  Can we go to the next slide while

11   we're at it.

12             THE WITNESS:  Yes.

13   BY MR. PETERKA:

14   Q.    All right.  Continue.  Thanks.

15   A.    This is the schematic representation of a roller

16   compactor from a reference, from the reference which is on

17   the left-hand side of the slide.

18             This is from the article authored by Miguelez.

19             MR. PETERKA:  Can you blow up the reference on

20   the top left, please?

21   BY THE WITNESS:

22   A.    That is the journal, International Journal of

23   Pharmaceutics, and the title of the publication is The

24   Effect of Lubrication on Density Distribution of Roller

25   Compacted Ribbons.

Banakar - direct

1          Authors are Miguelez-Moran, Wu, and Seville.

2    Q.    And is the International Journal of Pharmaceutics a

3    reputable journal?

4    A.    Yes, it is.

5    Q.    Do you consider it to be a reliable authority?

6    A.    Yes, it is.

7          MR. PETERKA:  Can I go back to the slide, please.

8    BY MR. PETERKA:

9    Q.    So I think you were in the process of explaining

10   roller compaction?

11   A.    Yes.  Well, there is material which is to be

12   compacted which is usually a fluffy material which is high

13   density, which means that one gram of drug requires a lot of

14   volume.

15         So if I have 1,200 milligrams of drug which is

16   to be administered in a dose, it would be too large for a

17   patient to consume or swallow.  So it will be compacted so

18   the particles will be smaller.  The particles of the

19   compacts will be larger particles, and that is what this

20   machine does.

21   Q.    Doctor, I think you said just before you do it for

22   API that has a high bulk density.

23   A.    That is correct.  The bulk density is low where the

24   one gram of drug requires a large volume, so it would be low.

25         Now, that material is then compacted with the

Banakar - direct

1   two rollers.  They rotate in opposite directions.  The

2   distance between these two rollers is adjusted to get the

3   thickness of the ribbon you want.

4            The powder material is processed through this.

5   It moves through this, and gets compacted.

6            And the result is a ribbon or a sheet of

7   material that comes out of it which is further processed to

8   granules.

9   Q.    Is roller compaction a common procedure in manufacturing

10  pharmaceuticals?

11  A.    Yes, it is a very common procedure.  It has been used

12  for 30-40 years as of today.

13  Q.    Have you ever used roller compaction?

14  A.    Yes, I use it very routinely as a matter of fact.  I

15  just used it a month ago.

16  Q.    Do you know why Zydus roller compacts mesalamine in

17  its ANDA product manufacturing process?

18  A.    Yes, I do.

19            Let's go to the next slide, please.

20            Zydus composition is compacted in the first

21  step, has three components to it, three ingredients:

22  mesalamine, colloidal silicon dioxide, and magnesium

23  stearate.

24            The important part, one of the important part is

25  mesalamine, the dose is 1,200 milligrams, a large dose, as I

Banakar - direct

1    was talking about.  And it is very fluffy material.  So I

2    need to compact it so that I can bring the size of the final

3    dosage form reasonable for the patient to swallow.  And that

4    is the reason why it is compacted.

5            So this composition is first put together and

6    blended where the silicon dioxide, colloidal silicon dioxide

7    acts as a glidant.  Glidant is basically an ingredient which

8    moves the material from one place to the other easily.

9            Then there is also lubricant added.  The

10   function of the lubricant is to ensure the material doesn't

11   stick to the rollers or anything as it is moving because if

12   it does, then it can jam the equipment, and if it happen

13   numerous times, that can lead to basically the breaking of

14   those cylinders and ruining the whole process.  So that is

15   the reason why lubricant is added.

16           Now, this composition is blended and then passed

17   through the roller compactor together, to compact.

18           To give you an idea about the composition itself

19   and in the perspective of the mass, there is 1,200 milligrams

20   of the drug in the tablet, 5 milligrams of colloidal silicon

21   dioxide, and 4 milligrams of magnesium stearate.  So the total

22   mass for the tablet is 1,209 milligrams.

23           Putting it into perspective.  If each milligram

24   is represented at one dot, there are 1,200 dots.  There are

25   4 dots for magnesium stearate and 5 dots for colloidal

Banakar - direct

1    silicon dioxide.  That is the composition that is compacted.

2    Q.     Thank you.

3                 MR. PETERKA:  Can I just go back to the previous

4    slide.

5                 And I would, defendants would like to move into

6    evidence Figure 1 out of the Miguelez reference, which is

7    Figure 1 of DTX-23.  If it's allowed into evidence I, would

8    call it, I'll call it DTX-23.A.

9                 MR. HAUG:  No objection.

10                THE COURT:  It is admitted without objection.

11                (DTX-23.A is admitted into evidence.)

12                MR. PETERKA:  Could I go back to slide 19?

13   BY MR. PETERKA:

14   Q.     So Dr. Banakar, after the compaction step, what

15   happens in the Zydus manufacturing process?  Just briefly

16   because we heard about this already.

17   A.     You compact the size to small compacts.  Then it is

18   mixed with other ingredients.  In this case, the important

19   ingredient is sodium carboxymethylcellulose, which is the

20   release controlling ingredient, along with other

21   ingredients, and that is wet granulated.

22                The wet granulation is then dried.

23                The dried granules are then lubricated with

24   magnesium stearate and a filler, the microcrystalline

25   cellulose and a glidant.

Banakar - direct

1              So that is then compressed through a tableting

2       machine, and the compressed tablet will be the result of

3       that compression.

4              Those tablets are then coated with functional

5       coats, and then finally film coated, which will give the

6       final dose and form.

7              MR. PETERKA:  Can go back to slide 21, please?

8              I think this is the slide we were just looking

9       at.

10      BY MR. PETERKA:

11      Q.      Now, you heard Dr. Sinko testify on Tuesday I think

12      that in his view the roller compaction step produces

13      granules containing colloidal silicon dioxide and magnesium

14      stearate.  Did you hear that?

15      A.      Yes, I did.

16      Q.      Assuming for the sake of argument the compaction

17      step in the Zydus ANDA product produces granules that are

18      macroscopically homogeneous structures in all their volume,

19      what would those structures consist of?

20      A.      Subsequent to or the result of the compaction would

21      produce structures or so-called granules which were primarily,

22      which will be of mesalamine or mesalazine in which there

23      will be colloidal silicon dioxide and magnesium stearate put

24      in it.

25      Q.      And what would be the rough percentages of the three

Banakar - direct

1    ingredients you just mentioned in the material that comes

2    out of the roller compaction step in the Zydus ANDA product?

3    A.    99.26 percent is mesalamine, .41 percent is colloidal

4    silicon dioxide, and .33 percent is magnesium stearate.

5              MR. PETERKA:  Can I go to the next slide,

6    please?

7    BY MR. PETERKA:

8    Q.    So looking at the list of materials in part (a) of

9    claim 1, does colloidal silicon dioxide appear in that list

10   of materials.

11   A.    No, it does not.

12   Q.    If there is a macroscopically homogeneous structure

13   in all its volume form in Zydus's compaction step, is the

14   colloidal silica unrelated to that element?

15   A.    No, it cannot be unrelated because as I just said, if

16   that so-called structure is formed, it will be the structure

17   of mesalamine in which colloidal silicon dioxide will be

18   dispersed in it, so it cannot be unrelated.  It is part of

19   the structure.

20   Q.    Does the '720 patent describe any lipophilic matrices

21   having colloidal silicon dioxide?

22   A.    Yes it does.

23             MR. PETERKA:  Can we go to the next slide?

24   BY MR. PETERKA:

25   Q.    What does it say about it?

Banakar - direct

1    A.      Column 1, lines 42 to 47 of U.S. patent '720, in the

2    section on background of the invention, the prior art

3    teaches colloidal silicon dioxide can be a part of the inert

4    matrix.  The colloidal silicon dioxide does the porization

5    or form the pore for the inner lipophilic inner matrix which

6    will have access to water or the fluid which otherwise it

7    would not have.  And that is where colloidal silicon dioxide

8    does the porization of that lipophilic content matrix.

9    Q.      And how does this support your opinion that colloidal

10   silicon dioxide is part of any macroscopically homogeneous

11   structure in all its volume that results from the Zydus

12   compaction step?

13   A.      In the compaction step, what I see is, it is going

14   to be particularly mesalamine in which colloidal silicon

15   dioxide will get dispersed.  Colloidal silicon dioxide is

16   hydrophilic, and it will be hydrophilic or that will be in

17   that compact.

18          MR. PETERKA:  If I can go back to the previous

19   slide.  Actually, slide 21.

20   BY MR. PETERKA:

21   Q.      Just for the record, the information that you were

22   reading for the amount of ingredients in the compaction

23   step, that is from DTX-17, ZYDUS-MES 23436?

24   A.      That is correct.

25   Q.      Back to the description of the porization.  How does

Banakar - direct

1   the porization element work?

2   A.    As I said, the porization element works in providing

3   access to fluids which otherwise it would not for the inner

4   lipophilic matrix aspect of the '720 patent.

5   Q.    Does a material have to swell upon contact with

6   water to be considered hydrophilic under the Court's claim

7   construction?

8   A.    Hydrophilic, the claim construction from the Court

9   has come down as "hydrophilic" means "affinity for water."

10  It has nothing to do with as or say anything about swelling

11  or not.

12  Q.    In your opinion, if there is a macroscopically

13  homogeneous structure in all its volume formed from Zydus's

14  compaction step, the roller compaction step, is silicon

15  dioxide an impurity in that structure?

16  A.    No, it cannot be an impurity because it is

17  intentionally added for a certain function.  It cannot be

18  impure.

19          MR. PETERKA:  I'd like to move on.  Can I have

20  the next slide, please.

21  BY MR. PETERKA:

22  Q.    I'd like to move on to talk a little bit about the

23  matrix structure.  Specifically, your opinion on this slide,

24  what does this slide say?

25  A.    The slide says:  Magnesium stearate in the Zydus ANDA

Banakar - direct

1   product is not "a macroscopically homogeneous structure in

2   all its volume."  For that, you will need to know what

3   exactly is this matrix.

4   Q.     And can you provide an example of what a matrix is

5   as that term has been construed in this case, which is "a

6   macroscopically homogeneous structure in all its volume?"

7              Go to the next slide.

8   BY THE WITNESS:

9   A.     Yes.  While prosecuting the '720 patent, the

10  patentees provided numerous literature information in order

11  to define or make the Examiner understand what is a matrix.

12             This is one of the reference.  The first

13  reference is Martin's Physical Pharmacy reference where

14  "matrix" is defined as monolithic or monolith.  It refers

15  to it as "a single mass or block of material."  And that

16  defines, monolithic device refers to a rate-controlling

17  polymer matrix throughout which the drug is dissolved or

18  dispersed.

19             In the next slide, there is a little bit more

20  explanation and illustration where this is originally

21  illustration.  This is a clean copy of it, where it says

22  monolithic is the matrix.

23             So this is the polymer matrix in which the drug

24  is uniformly dispersed, thus forming the monolith or the

25  structure.  So that is structure we see.  That is from this

Banakar - direct

1    same reference in a little more detail.  DDX-10.26.

2              Continuing on, next slide, please.

3              The second reference I provided was --

4              THE COURT:  Did we have a reference?  It may

5    have been on there, Doctor, and I just missed it, that last

6    slide.

7              MR. PETERKA:  Yes, I was going to go back and

8    clear it up.  Do you want me to do it now?

9              THE COURT:  Yes, sure.

10             MR. PETERKA:  Can I go to slide DDX-10.25.

11             This is from the Martin's Physical Pharmacy

12   reference that Dr. Banakar mentioned.  This is in DTX-2

13   which is the prosecution history at PLMESA03534294.  And I

14   don't believe DTX-2 is in evidence yet.

15             Defendants would offer DTX-2 into evidence.

16             MR. HAUG:  No objection.

17             THE COURT:  All right.  Admitted without

18   objection.

19             (DTX-2 is admitted into evidence.)

20             MR. PETERKA:  Then can I go to the next slide

21   right now.

22   BY MR. PETERKA:

23   Q.    This is the illustration you were just talking about;

24   right, Dr. Banakar?

25   A.    Yes.

Banakar - direct

1    Q.      This is also from the Martin's Physical Pharmacy

2    text?

3    A.      That is correct.

4    Q.      This appears, on the left I think we have the actual

5    copy from the prosecution history; is that right?

6    A.      That is correct.

7    Q.      On the right I think is a cleaner copy.

8            MR. PETERKA:  The one on the left is actually

9    from DTX-2 at PLMESA03534295.

10           The cleaner version from Martin's itself is

11   cited as DTX-13, page 516.

12           And if I would be allowed, defendants would move

13   into evidence the image on the right-hand side of DDX-10.26

14   from the Martin's Physical Pharmacy book as DDX-10.26A.

15           MR. HAUG:  No objection.

16           THE COURT:  All right.  It is admitted without

17   objection.

18           MR. PETERKA:  Thanks, Your Honor.

19           (DTX-13A is admitted into evidence.)

20   BY MR. PETERKA:

21   Q.      All right.  Dr. Banakar, I think you were moving

22   through these slides here.

23   A.      Yes.  The next one is the reference that the

24   patentees provided was another reference, Modern

25   Pharmaceutics, where again what we see is the drug dispersed

Banakar - direct

1    in this polymer matrix, and thus a matrix is created where

2    the drug is dispersed into the polymer.

3              And when present matrix is put into a medium

4    where the drug starts to dissolve out of it, after it is put

5    into the medium at time zero, as time progresses the drug

6    dissolves out of the matrix, and then at some time point, if

7    you want to look at it, what we see is part of the matrix

8    has the drug gone, which is dissolved out of it, and some of

9    it remaining.

10             Thus, we can see the ghost or the skeletal,

11   skeleton of the matrix.  So that is it, that is the matrix

12   that we should see, and the drug continues to dissolve out

13   of it.  Numerous terminology have been used, those

14   terminologies include a polymer ghost or a skeleton or a

15   honeycomb.  All of those mean the same thing, same thing

16   where the structure has lost the drug which originally was

17   formed with the dispersion.

18   Q.    And just to clear the record up -- I am sorry.  Were

19   you done?  Go ahead.

20   A.    No.

21             THE COURT:  Well, actually you know what?  It's

22   a good idea if it he does it for the record because you are

23   talking about something which could go on now for some pages

24   in the transcript where I am not going to know.  I am not

25   going to know where this is, going back and looking, unless

Banakar - direct

1    you put it into the record.

2            MR. PETERKA:  Right, I'll do it at the beginning

3    from now on.

4            THE COURT:  That will help.

5            MR. PETERKA:  We have on DDX-10.27, this is two

6    images.  The one on the left -- and, Dr. Banakar, please

7    keep your train of thought.

8            THE WITNESS:  Yes.

9            MR. PETERKA:  I have to interrupt you here for a

10   second.

11           The one on the left is from DTX-2.  It's at

12   PLMESA035334283-84.  It's an excerpt from the prosecution

13   history to text.  On the very top, there is a cutoff from

14   the prosecution history.  Under that, I believe somebody

15   wrote it to be a little more legible, and below that, the

16   third box on the left-hand side of the slide, is the image

17   that is on those pages of the prosecution history.

18           The image that is on the left is from Modern

19   Pharmaceutics.

20           On the right-hand side, we have again a cleaner

21   copy so the Court can actually see better what is going on

22   there.  And that is Figure 7 from Modern Pharmaceutics,

23   which is DTX-31 at page 587.

24           Defendants would move into evidence that image

25   on the right-hand side of DDX-10.27 as Exhibit DTX-31A, if

Banakar - direct

1    there is no objection.

2                    MR. HAUG:  No objection.

3                    THE COURT:  All right.

4                    MR. PETERKA:  Just to --

5                    THE COURT:  Admitted without objection.

6                    (DTX-31A is admitted into evidence.)

7                    MR. PETERKA:  Thanks, Your Honor.

8                    And just to back up one second.  I am told I

9    misnumbered the last exhibit.  The image on the right-hand

10   side of DDX-10.26 should actually be DTX-13A.

11                   THE COURT:  I'll ask you all to make sure you

12   have that cleaned up for the record.

13                   MR. PETERKA:  Thanks Your Honor.

14   BY MR. PETERKA:

15   Q.    All right.  Go back to DTX-27.  I think we were still

16   on this one, right?

17   A.    Yes.

18   Q.    All right.

19   A.    Just to summarize and to deal with that.

20                   This is Figure 7 which is cleaned up here and,

21   as I say, Figure 7.  Matrix devices, that is a matrix

22   device, as the name implies, consists of drug dispersed

23   homogeneously throughout a polymer matrix, as represented

24   here.

25                   And that was the representation of the polymer

Banakar - direct

1    matrix here and how it works.

2              Next slide, please.

3    Q.    All right.  Just let me stop you there and clear this

4    up.

5              MR. PETERKA:  This is DDX-10.28.  And this is

6    another excerpt from the DTX-2 in the prosecution history at

7    PLMESA03534309.

8              This is a translation of an Italian reference,

9    Il Prodotto Chimico submitted by Cosmo during the

10   prosecution history.

11             And defendants would offer into evidence --

12   well, it's already in.  We don't need to.

13             THE COURT:  All right.  Go ahead.

14   BY MR. PETERKA:

15   Q.    Go ahead, Dr. Banakar.

16   A.    This is the third reference that the patentees

17   provided which is from Il Prodotto Chimico where it is an

18   Italian journal.  It has been translated.

19             They have defined "matrix systems."

20             They are commonly known as those therapeutic

21   devices where the drug is uniformly dispersed in the whole

22   body made of polymeric material.  That is how the matrix is.

23             MR. PETERKA:  Can we have slide 29, please?

24   BY MR. PETERKA:

25   Q.    Have you seen any evidence in this case that the

Banakar - direct

1    magnesium stearate in the amount present in the Zydus roller

2    compaction step formed a macroscopically homogeneous

3    structure in all its volume?

4    A.    No, I have not seen any evidence to that effect.

5    Also, looking at the comparative picture here, as I said in

6    perspective, we have this much amount of magnesium stearate

7    which has to be dispersed to get that inner lipophilic

8    matrix.  Is very unlikely that is what would happen, in

9    which the drug mesalamine is dispersed in it.

10   Q.    So actually I may have misstated something.  I want

11   to make sure it's clear.

12         With respect to the material coming out of the

13   roller compaction step, the compaction step in the Zydus

14   ANDA product process, have you seen any evidence in this

15   case that the magnesium stearate in the amount present in

16   that material forms a macroscopically homogeneous structure

17   in all its volume?

18   A.    No, I have not seen that.

19   Q.    And if there is a structure that is, or a

20   macroscopically homogeneous structure that is produced from

21   that step, in your opinion, what does it consist of?

22   A.    As I said earlier, the structure that would be

23   created after the material has gone through the compaction

24   step would be basically mesalamine compacted with colloidal

25   silicon dioxide and magnesium stearate would be dispersed in

Banakar - direct

1    it.

2                MR. PETERKA:   Could I go to the next slide?

3    BY MR. PETERKA:

4    Q.    I want to move on to your next point.  What is on

5    this slide?

6    A.    This is another reason or another rationale provided

7    where mesalamine is not dispersed in "a macroscopically

8    homogeneous structure in all its volume" consisting of

9    magnesium stearate.

10   Q.    So have you seen any evidence that the mesalamine --

11   let me strike that and back up.

12             With respect to the material formed from the

13   compaction step in the Zydus ANDA product, have you seen any

14   evidence that mesalamine is dispersed in a "macroscopically

15   homogeneous structure in all its volume" consisting of

16   magnesium stearate?

17             We can go to the next slide.

18   A.    No, I have not seen evidence to that effect.

19             Let's look at what is dispersed.  "Dispersed" is

20   defined or construed as "sufficiently mixed to incorporate

21   one substance into another."

22             We are looking at '720 patent.  It says:

23   wherein the active ingredient mesalamine is dispersed ... in

24   said lipophilic matrix.

25             So there is reason I have said that mesalamine

Banakar - direct

1    is not dispersed in such a lipophilic matrix made of

2    magnesium stearate.

3                THE COURT:  Okay.  And Mr. Peterka, this is goes

4    for both sides, but it will be a real help to me if right at

5    the get-go, instead of saying next slide, you will say

6    DDX-10.31, and that way I you know when I will look at the

7    record this is what was on the screen and the witness on the

8    stand was talking about it.  That will be an assist.

9                MR. PETERKA:  I apologize, Your Honor.

10               THE COURT:  That's fine.  Go ahead.

11               MR. PETERKA:  This is slide DDX-10.31.

12               Can I have slide DDX-10.32?

13   BY MR. PETERKA:

14   Q.    I want to move on to your next point.  What is that?

15   A.    The next point is the alleged "inner lipophilic

16   matrix" does not "exhibit lipophilic properties" in Zydus's

17   ANDA product.  Therefore, it does not infringe.

18   Q.    What is your understanding of the meaning of the term

19   "lipophilic" as it relates to the claims?

20               THE WITNESS:  Can I go to the next slide,

21   DDX-10.33.

22   By THE WITNESS:

23   A.    The term "lipophilic" is construed as "poor affinity

24   towards aqueous fluids.

25               "Hydrophilic" is construed "has an affinity for

Banakar - direct

1    water."  And,

2              "Inner lipophilic matrix" is "a matrix that

3    exhibits lipophilic properties and is separate from the

4    outer hydrophilic matrix."

5              I have reviewed the report as well as I heard

6    Dr. Bellantone's testimony yesterday, and I agree with him

7    that Dr. Hoag's results do not show a matrix with lipophilic

8    properties.

9    Q.    So in your opinion, would the compacted mesalamine in

10   the Zydus ANDA product exhibit lipophilic properties?

11   A.    In my opinion, they will not provide lipophilic

12   properties.

13   Q.    Is there anything about composition of the compacted

14   mesalamine that supports your opinion that it does not

15   exhibit lipophilic properties?

16   A.    When you look at the composition, it has mesalamine

17   and colloidal silicon dioxide as well.

18             MR. PETERKA:  Can we go back to slide DDX-10.29.

19   BY THE WITNESS:

20   A.    The composition of the compact is mesalamine,

21   colloidal silicon dioxide, and magnesium stearate.

22             Colloidal silicon dioxide is hydrophilic.

23   Mesalamine is also hydrophilic with respect to this

24   composition.  And the compact will be mostly mesalamine, so

25   the property of such a compact will be hydrophilic.

Banakar - direct

1    Q.      We talked about colloidal silica a little earlier.

2    And I believe you said earlier that in your opinion,

3    colloidal silica is hydrophilic?

4    A.      That is correct.

5    Q.      Are there any additional references that support your

6    opinion that colloidal silicon dioxide is hydrophilic?

7                    MR. PETERKA:  And can I have slide DDX-10.37.

8                    I'm sorry.  Go back one side.  Thank you.

9                    THE WITNESS:  I think the slide is wrong.  It

10   should be 10.34.

11                   MR. PETERKA:  10.34.  Thank you.

12   BY THE WITNESS:

13   A.      Colloidal silicon dioxide here is this reference in

14   the Handbook of Pharmaceutical Excipients.

15                   Colloidal silicon dioxide is an excipient which

16   is monograph in this textbook of Handbook of Pharmaceutical

17   Excipients.

18                   If we look at what it says, it is hygroscopic.

19   That means it attracts water, so it has an affinity for

20   water, and it absorbs water in large quantities without

21   liquifying.

22                   MR. PETERKA:  Just for the record, this is

23   DTX-33 at pages 143 and 145.

24

25   BY MR. PETERKA:

Banakar - direct

1    Q.    This is from the Handbook of Pharmaceutical

2    Excipients, Third Edition.  Dr. Banakar, do you consider

3    this to be a reliable source?

4    A.    Yes, very reliable source because formulators go to

5    this source all the time to select excipients for their

6    composition.

7    Q.    This is the excerpt from the handbook for colloidal

8    silicon dioxide.  Can you read just what is on that excerpt?

9               THE COURT:  He just did.  That's enough for me.

10              MR. PETERKA:  Okay.  Thanks, Your Honor.

11              Dylan can you put up DTX-17, please?

12              Can I go to page 23425?

13   BY MR. PETERKA:

14   Q.    And, Dr. Banakar, can you please turn to DTX-17 in

15   your book?

16   A.    Yes.

17   Q.    What about mesalamine?  Can you tell me, I think you

18   mentioned earlier it was hydrophilic.

19   A.    Yes, I did.  What we see on the slide is mesalamine

20   and its solubility measurement or it's the experimentation

21   that Zydus did in order to determine the solubility.

22              These are various aqueous media in which

23   solubility was measured.  And it clearly showed that it is

24   soluble in these media, so it is hydrophilic, and it also

25   states here it is soluble, slightly soluble in water.

Banakar - direct

1    Q.      Can you turn to DTX-35 as well?

2    A.      (Witness complies.)

3    Q.      What is this document?

4    A.      DTX-35 is the Quality Control Department Certificate

5    of Analysis for mesalamine product of the compound itself.

6            We look at the second test that is done to

7    establish the quality of the mesalamine that is used.  It

8    says it is slightly soluble in water.  And the results are,

9    yes, is slightly soluble.  So it is hydrophilic.

10           MR. PETERKA:  Can I go back to the slide

11   presentation?

12           And we can go to DDX-10.35?

13           THE WITNESS:  Yes.

14           MR. PETERKA:  Let's back up a second.

15           So based on everything we discussed about the

16   colloidal silica and the mesalamine -- actually, strike

17   that.

18           Can we go to slide DDX-10.35.

19   BY MR. PETERKA:

20   Q.      What are we going to talk about now?

21   A.      See, the next reason for which noninfringement is

22   what I believe is magnesium stearate functions as a

23   lubricant in the Zydus ANDA product.

24   Q.      And why do you say that?

25           MR. PETERKA:  If you go to the next, DDX-10.36.

Banakar - direct

1    BY THE WITNESS:

2    A.    Magnesium stearate in pharmaceutical formulations

3    processing is universally known and accepted as a tablet

4    lubricant.  And this is the monograph for magnesium stearate

5    in Handbook of Pharmaceutical Excipients.  Monograph for

6    magnesium stearate, it says it is well known lubricant.

7              But if you look at the functional category, it

8    is a tablet lubricant that is used in .25 and 5 percent

9    weight by weight in composition.

10   Q.    And when are lubricants typically used in a

11   manufacturing pharmaceuticals?

12   A.    Lubricants are used when dry material or powders

13   have to be moved from one part of the -- one step to the

14   other step or one position to the other position in case of

15   compaction.  It is through the roller compactors.

16             If it is tableting during where the granules are

17   then compressed and they are to be ejected out of that die,

18   that is where we need a lubricant.  Otherwise, they will jam

19   the equipment.  And that is where the function of lubricant

20   is very essential.

21   Q.    I think you mentioned this.  You mentioned that

22   includes roller compaction; right?

23   A.    That was the first thing I said.

24   Q.    Are other materials besides active ingredient

25   lubricant typically used in roller compaction?

Banakar - direct

1    A.    Yes.  Other materials that are used are a glidant.

2    And glidant, as I said earlier, it helps moving from one

3    point to another point.  That is where the glidant comes in

4    where the material, dry material can move in a seamless

5    effort, or effortlessly.  Silicon dioxide is one glidant

6    that is used in moving dry materials or powders.

7    Q.    If you could turn in your book to DTX-23.  This again

8    this is the Miguelez article we looked at earlier.

9    A.    (Witness complies.)

10   Q.    And what does this article discuss in general?

11   A.    Give me one second.

12         THE COURT:  You know what?  Why don't we do

13   this?  Let's go off the clock.  We'll go on my clock now.  I

14   want to get some logistical things with you.

15         Doctor, you can go ahead and step down, if you

16   would like.  We're going to take a lunch break here at this

17   point, okay?  Thanks.

18         It just seems like a reasonable breaking point.

19   I want to make sure we're all on the same page.

20         What is your operating -- go ahead, Doctor.

21         (Dr. Banakar returns to the back of the courtroom.)

22         THE COURT:  Each side is working on how many

23   hours?  What is your total number of hours per side?

24         MR. HAUG:  12 and-a-half.

25         THE COURT:  Okay.  So we're all on the same

Banakar - direct

1    page.  I think you are going to want to check because I am

2    not sure but I think you have about an hour to go.  But you

3    should make sure you are where you are, recognizing that

4    you need to finish what your case is.  And I don't know

5    whether you feel like you need to save any time for

6    cross-examination, if there is a rebuttal case.  I don't

7    know if there will be.  But I don't want anybody caught by

8    surprise, and I don't know whether there is a rebuttal case.

9              Are you planning a rebuttal case, Mr. Haug.

10             MR. HAUG:  We haven't made a final decision, but

11   if I do, it's not going to be very long.

12             THE COURT:  Good enough.  So what I am going to

13   do then is recognize that you have some stuff.  And we're

14   not going to go too late into the afternoon, but that we

15   need to wrap it.

16             Is an hour going to be enough for you folks to

17   make the decisions you need to make to decide what you want

18   to do, if I take a break for an hour?  Are you going to be

19   okay or do you want me to try to be a nice guy?  Do you need

20   an hour and-a-half?  What do you need?

21             MR. PETERKA:  For the lunch break?

22             THE COURT:  Yes, that is what I am asking.  I am

23   taking a break now.  And I expect that when we come back,

24   it's going to be to the end.  Right?

25             MR. PETERKA:  Right.

Banakar - direct

1           THE COURT:  So I am going to try to give you an

2   opportunity.  You can confer with each other right now --

3   I'll sit here quietly -- and decide whether you think you

4   need more time.  Because once we're back in, I expect we'll

5   be in the mode where we're just taking it to the end.

6           MR. GAERTNER:  In an abundance of caution, I

7   think an hour and-a-half would be appreciated.

8           THE COURT:  All right.  That is fine with you, I

9   am assuming, Mr. Haug?

10          MR. HAUG:  No problem.

11          THE COURT:  All right.  Then I give you until

12  1:00 o'clock.  We'll come back, and that ought to give us

13  the afternoon.

14          MR. HAUG:  2:00 o'clock.

15          THE COURT:  Excuse me.  I scared you all.  I

16  meant 2:00 o'clock.  To come back at 2:00 o'clock.

17          Yes, that would have been great.  I'll give you

18  until 2:00 o'clock.  We'll be back and that will give you a

19  chance to march it right through the end.

20          Okay.  Thanks.  We will be in recess.

21          (Luncheon recess taken.)

22          *      *      *

23          Afternoon Session 2:04 p.m.

24          THE COURT:  Thanks.  Please be seated, Doctor.

25  Please be seated, ladies and gentlemen.

Banakar - direct

1           All right.  Mr. Gaertner?

2           MR. GAERTNER:  Oh, and I will ask Mr. Haug to

3    step up.  I know you just asked us to talk about a potential

4    rebuttal case after this, and I did have a conversation with

5    Mr. Haug about that.  And do you want me to characterize it?

6    I figured that I would let you do it so I don't misspeak,

7    Mr. Haug.

8           THE COURT:  All right.

9           MR. HAUG:  Well, we currently don't intend to

10   put on a rebuttal case.

11          THE COURT:  All right.

12          MR. HAUG:  Of something could happen in the

13   next hour that I may ask permission, but other than that,

14   no.

15          THE COURT:  All right.  Good enough.  Thank you,

16   Mr. Gaertner.

17          Thank you Mr. Haug.

18          MR. HAUG:  Thank you.

19          THE COURT:  Mr. Peterka, please continue with

20   your examination.

21          MR. PETERKA:  Thanks, Your Honor.

22   BY MR. PETERKA:

23   Q.   Good afternoon.  Before we left, we were talking

24   about DTX-23.  I want to move on from that, so we're not

25   going to discuss that.

Banakar - direct

1        Dr. Banakar, can you put up slide, I don't know,

2   41.  Keep going.  Back.  38.  All right.  40.  Got it.

3        Dr. Banakar, moving on to your next point that

4   magnesium stearate does not control release in the Zydus

5   ANDA product.  And I apologize if I speak faster now, but

6   given Judge Jordan's prompt before lunch, I think he has

7   kindly advised me I have a shorter period of time, so I want

8   to move a little faster.

9   A.    Okay.

10  Q.    I will apologize in advance.

11       The next pointe, there's no magnesium stearate

12  does not control the release of melamine.

13       In your opinion, do the experiments --

14       THE COURT:  You can speak fast, but you're still

15  going to have to speak slowly enough for the court reporter

16  to actually take it down.

17       MR. PETERKA:  That's correct.  All right.

18  BY MR. PETERKA:

19  Q.    All right.  In your opinion, do the experiments Dr.

20  Sinko discussed the other day when he was testifying, the

21  Zydus experts, do they show the magnesium stearate controls

22  release of the active ingredient in the Zydus ANDA product?

23  A.    No, they did not.

24       MR. PETERKA:  Can I see slide 41, please.

25  BY MR. PETERKA:

Banakar - direct

1   Q.      Let's talk about the comparison of F044 and F 048.

2   Do you recall that?

3   A.      Yes.

4   Q.      In your opinion, are the differences in dissolution

5   between these two batches attributable to the addition of

6   lubricant?

7   A.      No, for a number of reasons.  First of all, the

8   formulations that are being considered or compared are

9   formulation F044 and F048, F044 and F048.

10             Now, when you look at the composition that

11  is disclosed in this table, you see F044 has compacted

12  mesalamine at 1200 milligrams, and F048 has compacted

13  mesalamine at 1,2O09 milligrams.  This extra nine

14  milligrams, it says here, contains nine milligrams of

15  lubricant.  And I heard him testify that these nine

16  milligrams were nothing but magnesium stearate.

17             If you actually look at the composition, the

18  composition which is stated here, the same thing here that I

19  see, it has Aerosil as well, it is three milligrams, and

20  magnesium stearate, six milligrams.  So this amounts to

21  nine, so this is not only magnesium stearate.  That is one

22  difference.

23  Q.      And just can I just stop you there?  Can we go look

24  at those lab notebooks real quick?

25  A.      Okay.

945

Banakar - direct

1    MR. PETERKA:  Can I have DTX-37, please, at

2    54352.  All right.

3    BY MR. PETERKA:

4    Q.    Do you see, Dr. Banakar, this is the lab notebook

5    page with F048 on it.

6    A.    That is the formulation.

7    Q.    Okay?

8    A.    Yes.

9    MR. PETERKA:  Go to the previous page.

10   BY MR. PETERKA:

11   Q.    This is the actual formulation for that batch; is

12   that correct?

13   A.    Yes.

14   Q.    Sorry.

15   THE COURT:  What exhibit number are we looking

16   at?

17   MR. PETERKA:  This is DTX-37.

18   THE COURT:  Thank you.

19   THE WITNESS:  The mesalamine, compacted

20   mesalamine, is from F046, that is correct.

21   Q.    Can we see the formulation for F046?

22   A.    The F046 formulation has three milligrams of

23   colloidal silicon dioxide or Aerosil 200, and magnesium

24   stearate, six milligrams.  That is nine milligrams in total.

25   Q.    Thank you.  And that's at DTX-37 at 54348.  And F048,

Banakar - direct

1   what page was that at?  52?

2              And defendants would move evidence into DTX-37.

3              MR. HAUG:  No objection, Your Honor.

4              THE COURT:  It's admitted.

5   (DTX-37 Exhibit was admitted into evidence.)

6              THE COURT:  I don't have much to do here, but

7   I've got to say my part.

8              MR. PETERKA:  I'm sorry, Your Honor.

9              THE COURT:  It's admitted.

10  MR. PETERKA:  Back to slide DTX-10.41.

11  BY MR. PETERKA:

12  Q.    Now can you continue with your explanation?

13  A.    That, the difference, not only magnesium stearate,

14  also has Aerosil, which we already know is hydrophilic.

15              The second important difference is that sodium

16  carboxy methylcellulose in F044, which is 35 milligrams.

17  It's double to 70 milligrams per tablet.  Now, sodium

18  carboxymethylcellulose we know is the release retardant

19  agent or control release agent.

20              So there is a significant difference here,

21  double difference.  So I would expect that the dissolution

22  of the drug coming out in F044 is going to be faster

23  compared to F048, because it has more of the release

24  controlling agent.  So therefore just the change in

25  dissolution rate, change amount of lubricant is

1   inappropriate.

2   Q.      Thank you, Dr. Banakar.

3           If we could talk now about Dr. Sinko's

4   discussion of a batch F108 and EMM196.

5           MR. PETERKA:  Could I get slide 43, please.  And

6   could you go to -- could you put up DTX-43 at 349763.

7   BY MR. PETERKA:

8   Q.      Now, Dr. Banakar, this is a lab notebook page on

9   which the formulation for batch 1, F108 appears?

10  A.      That is correct.

11  Q.      And what is F108?

12  A.      That is the formulation that we are going to talk

13  about, and it is from the development lab notebook where

14  formulation is still being developed.  And just to give you

15  a little bit more information, this is a very small batch of

16  3,500 tablets.

17          THE COURT:  How many tablets?

18          THE WITNESS:  3,500.

19          THE COURT:  All right.

20  BY MR. PETERKA:

21  Q.      And in comparison --

22          MR. PETERKA:  Could I have DTX-18.  No, that's

23  it.

24  BY MR. PETERKA:

25  Q.      How many tablets of EMM196 in a batch?

948

Banakar - direct

1    A.    EMM196 is a formulation which is an ANDA batch or

2    exhibit batch.  It has 150,000 tablets, so it is over --

3    a lot.  It is 500 versus 150,000, so it is over, what, 50

4    times?  A very large batch size.

5    Q.    So you prepared a very small batch or formulation

6    batch?

7    A.    That is one of the differences.

8              MR. PETERKA:  Can you go back to slide 43

9    please, DTX-43.

10             And defendants would move into evidence DTX-43.

11             MR. HAUG:  No objection, Your Honor.

12             THE COURT:  It's admitted without objection.

13   (DTX-43 Exhibit was admitted into evidence.)

14             THE WITNESS:  The second important difference is

15   F108, the batch which was prepared in compaction.  There is

16   no compaction in this batch when this batch was prepared

17   whereas the exhibit batch had compaction followed by

18   granulation and the rest of steps.

19             That is a significant change which can influence

20   the dissolution rate of these formulations, so I would

21   expect that F108, which has no compaction, which we were

22   using earlier, which would release the drug earlier.

23   Therefore, it would dissolve faster.  It was compacted back

24   to the compacted drug, which is going to take time, and it

25   will release slowly.

Banakar - direct

1           So while, in addition to the differences in

2    small size versus commercial size, or exhibit batch, a

3    difference in this significant -- significant difference

4    in this procedure where one step is completely -- can

5    influence the dissolution, performance of these two lots

6    effectively.  Therefore, once again, comparing dissolution

7    on these two lots based on only changes in amount of

8    magnesium stearate is inappropriate.

9           THE COURT:  I don't understand.  I want to ask

10   you a question.  Let me just ask real quick, Doctor.  What

11   does the batch size have to do with dissolution rates for an

12   individual pill?  Why does that make a difference?

13          THE WITNESS:  When I make a batch size of, let's

14   say every one tablet is ten milligrams, and if I make a

15   batch of 2,000 tablets, then I need only 300 -- 30 grams, so

16   small procedure.  The details of the entire batch, what it

17   will take.

18          THE COURT:  So the mechanics of the machine

19   used?

20          THE WITNESS:  Correct.

21          THE COURT:  I got you.

22          THE WITNESS:  Correct.  And the lab size will

23   have laboratory equipment and affect dissolution and scale

24   up.

25          THE COURT:  Thank you.

Banakar - direct

1        MR. PETERKA:  Could we go to, I think, the next

2    slide.

3    BY MR. PETERKA:

4    Q.    And could you explain to us, you said earlier that

5    roller compaction or the compaction step may impact

6    dissolution?

7    A.    As I said before, that when material which is fluffy

8    or it occupies a large volume is compacted, it becomes

9    compacted.  Therefore, the bulk density becomes harder.

10   Once it becomes harder, the size is large, the total surface

11   area is decreased.  So the granules are prepared of smaller

12   particles of powder, and granules have other important

13   characteristics because if their surface area is less than

14   that of the comparable volume of powder.  So that is a

15   compacted material.  So I have larger size, smaller surface

16   area and compacted.

17         Now had you go to the other consideration, where

18   we look -- looking at dissolution of the drug from the

19   dosage form and what factors affect that rate.  Effective

20   surface area.  The smaller the particle size, the greater

21   the surface area of a given amount of drug, such as one

22   gram.  Therefore, the dissolution rate will increase.

23         So now this one gram is in powder form, it will

24   have small particles, larger surface area, greater

25   dissolution rate.  If the same one gram is compacted, size

Banakar - direct

1    will be large, surface area below.

2    Q.     Thank you, Dr. Banakar.

3          I think you mentioned when you were talking

4    about -- so just for the record, DTX-40, it was the first

5    passage you read from was from DTX-41, which was Ansel's

6    pharmaceutical dosage form.  Is that a reliable source?

7    A.     That is correct, it is.

8    Q.     He read it into the record sufficiently I assume,

9    Your Honor?

10         THE COURT:  Yes.

11   BY MR. PETERKA:

12   Q.     The second reference is "Modern Pharmaceutics," which

13   is DTX-42 at page 129 and 131.  The previous reference was

14   from DTX-41 at 198 to 199.

15         And is "Modern Pharmaceutics" a reliable

16   reference?

17   A.     Yes.

18   Q.     You mentioned when you were talking about the Ansel's

19   reference, you mentioned something about a larger size.  I

20   wanted to make sure.  Did you mean particles that have more

21   weight?

22   A.     That is correct.  Therefore, when they're compacted,

23   they have more weight.

24   Q.     So in your opinion, the difference in dissolution

25   rate between these two batches could be explained by the

Banakar - direct

1   fact that the EMM196 had compaction whereas F108 didn't?

2   A.      That is correct.

3   Q.      Thank you.

4           Can we go on, I want to talk a little bit the

5   doctrine of equivalents.

6           MR. PETERKA:  Can I go to slide -- and just for

7   the record, we were on slide DDX-10.41.  Can I have slide D

8   DX10.46, please.  Actually, slide 10.53.

9   BY MR. PETERKA:

10  Q.      We talked about the doctrine of equivalents a little

11  bit earlier.  Focusing on the yellow highlighting in this

12  slide, what does the '720 patent teach about the inner

13  lipophilic matrix and how it works?

14  A.      The '720 patent talks about two matrices, a

15  lipophilic matrix and then outer hydrophilic matrix.  For

16  our exhibit and understanding, I have used two colors to

17  differentiate how each of the matrices work.  The blue color

18  is for outer hydrophilic matrix, and the yellow is for inner

19  lipophilic matrix.

20          Imagine if you will the inner lipophilic matrix

21  and outer hydrophilic matrix.  When this composition is

22  placed in water or fluid, where it starts to dissolve, the

23  outer swells, and the swelling, outer swells, and the

24  swelling hold the water from accessing the drug.  Therefore,

25  it continues to release.  And at some point, it bursts open.

Banakar - direct

1   It bursts open, and then the lipophilic matrix is exposed

2   from which the drug is going to be released by diffusion

3   mechanism.

4                What diffusion mechanism is is a drug in

5   that lipophilic matrix.  It dissolves, and the dissolved

6   drug comes out of that matrix, because diffusion transfers

7   out in molecules from a matrix or surface or a film.  There

8   are two different mechanisms in mind.  One is through

9   swelling.

10  Q.    Can we go to the next slide, DTX-10.54.

11               How does Zydus' ANDA product control the release

12  lease of mesalamine?

13  A.    10.54 is the composition of the Zydus ANDA product.

14  Their retarding agent, release retarding agent, is sodium

15  carboxymethyl cellulose, sodium CMC it's also referred

16  to it as.  That is a hydrophilic matrix.  That is one

17  that is controlling the release of drug from Zydus'

18  product.

19  Q.    Just for the record this is from DTX-17 at Zydus

20  23436.

21               Going back to slide 46, please.  Now, even

22  assuming that the -- this is purely assuming that the

23  compacted mesalamine blend did somehow slow release of

24  mesalamine from the dosage form, would it do so in the same

25  way as the claimed inner lipophilic matrix?

Banakar - direct

1   A.      No, it will not do that, because even if you assume,

2   first of all, there is no lipophilic matrix of magnesium

3   stearate and the drug is dispersed, has to be dispersed in

4   this matrix, the lipophilic matrix, and now we look at, how

5   does the drug release control.

6           THE COURT:  Well, don't skip over that diagram.

7   I mean, you were in here, I assume, when Dr. Sinko was

8   testifying?

9           THE WITNESS:  Yes.

10          THE COURT:  He spent some time, I was having a

11  conversation with him, that the magnesium stearate forms a

12  matrix.  Right?  I take it you disagree with that.  I want

13  you to explain to me why you disagree with that.

14          THE WITNESS:  First of all, the lipophilic

15  matrix that is defined is a matrix which is uniform

16  throughout its volume, Homogeneous throughout its volume,

17  and it has to have structure.

18          Now, there is no structure that I see, or that I

19  have seen.  There's no evidence to that effect, so there is

20  no matrix that is formed that I believe has been proven.

21          Number two is, if you look at the context of it,

22  the so-called compaction is considered as the so-called

23  inner compact or matrix, then 99 percent, a substantial

24  amount, is drug which is hydrophilic.  Colloidal silicon

25  dioxide is also hydrophilic.  Magnesium stearate is

Banakar - direct

1    dispersed in it.  So I don't see any matrix there.

2              So now if you look at the Zydus product, it has

3    carboxy methylcellulose, which is hydrophilic.  You take it

4    in water, it swells, and then it will -- I will show had you

5    how does the drug --

6              THE COURT:  I understand your point about the

7    outer, that release return.  I was just focused on this

8    matrix, the asserted matrix structure that I'm hearing from

9    the plaintiffs' Zydus and I understand your answer.  Thank

10   you.

11             Go ahead, Mr. Peterka.

12             MR. PETERKA:  Thanks, Your Honor.

13   BY MR. PETERKA:

14   Q.    Now, I would like to move on and cover another bit of

15   the doctrine of equivalents.

16             MR. PETERKA:  Can I go to slide 54.

17   BY MR. PETERKA:

18   Q.    Does a product that utilizes for release, Zydus

19   product that utilizes the release controlling mechanism you

20   just discussed, the sodium CMC, does that function in the

21   same way as a product that uses the claimed inner lipophilic

22   matrix and outer hydrophilic matrix?

23   A.    No, it does not.  The primary reasons, a number of

24   reasons, but the reason that I can show you, the '720 patent

25   requires two matrices.  One is lipophilic and one is

Banakar - direct

1    hydrophilic.  These are like day and night different.

2             One is resistant to water or one has an affinity

3    for water.  So now if I have these two matrices, then I

4    should see that the differences in seeing the dissolution,

5    the dissolution performance of the drug.  You don't see that

6    here.

7             What we see is from a single matrix, which is --

8    I'm going to show you that.  It is a single matrix which is

9    operating where the drug is releasing linearly over a period

10   of time, and that is what we see.

11            MR. PETERKA:  Could I have slide 55, please.

12   Actually, yes.  That's perfect.

13   BY MR. PETERKA:

14   Q.    I think you just referenced the dissolution testing

15   that Vivian Gray and Dr. Little talked about, I think it was

16   Monday.  Is that what you were talking about?

17   A.    Yes.

18   Q.    Okay.  And I think you were talking about Dr. Little

19   expressed an opinion that -- well, I don't need to cover

20   that.

21            MR. PETERKA:  Can I have -- can I have the title

22   of this reference pulled up?  This is DTX-64, by the way, at

23   page 155.

24   BY MR. PETERKA:

25   Q.    This is a journal article.  What is this journal?

Banakar - direct

1    A.    The journal is "Scientia Pharmaceuticals."  The title

2    of the article is "Factors Influencing Drug Dissolution

3    Characteristic From Hydrophilic Polymer Matrix Tablet."

4    Q.    And can you -- and do you consider this to be a

5    reliable reference?

6    A.    Yes, it is.

7    Q.    You would consider it in your work?

8    A.    Yes.

9          MR. PETERKA:  Can I have back the slide DTX --

10   DDX-55.

11   BY MR. PETERKA:

12   Q.    Now, you have a lot of experience with dissolution

13   testing; right?

14   A.    Yes.

15   Q.    What are we seeing here?  And I think we have an

16   illustration, but you can start to explain it.  Maybe we'll

17   pull up the illustration as we go.

18   A.    Forgive me.  I'm going to give a little bit

19   explanation on this.  It will take a couple of minutes.

20   Q.    Sure.

21   A.    Imagine, if you will, if I have a tablet, which has

22   hydrophilic matrix, and in that there is drug dispersing.

23   That tablet is placed in water and you start the dissolution

24   test, you run the dissolution testing.

25          Such a tablet, there are four of these.  Now,

Banakar - direct

1   those are put into a dissolution test, and now what we do

2   is, that tablet has a certain amount of drug that is going

3   to dissolve out of it.  So with time, we take samples, and

4   then we collect the samples, analyze them and determine the

5   amount of drug dissolved over a period of time.

6           We cumulatively add them, and that's how we get

7   this, what's known as a dissolution profile.  If this

8   dissolution profile is linear, then that is what we see

9   with hydrophilic matrices.  They're linear.  Y, it's the

10  linear.

11  Q.    Would you like -- oh.

12  A.    I want to specifically focus on when all of these

13  are hydrophilic matrices, all of these are linear, and I

14  want to specifically focus on this profile, which is the

15  profile generated from a hydrophilic matrix tablet.  You

16  see here hydroxyethyl cellulose.  The hydrophilic matrix

17  tablet.

18          When that is put into water, it will start to

19  release the drug.  There's a finite amount of drug that is

20  released linearly up to a point and then it curves up a

21  little bit.  There's a reason for that.  But what you see

22  is, it is linear.

23          Why does it curve up?  Because we are looking at

24  more than 80 percent of the drug is dissolved, and after

25  that, there is not enough drug maintaining to maintain this

Banakar - direct

1    rate.  That's why we start to see the curve turning, and

2    then if we reach a plateau where there is no more drug

3    coming in, all the drug -- that matrix, the hydrophilic

4    matrix.

5              Why am I going to concentrate on this?  Because

6    you see something like this in Gray's experiment.

7              Next slide, please.

8              MR. PETERKA:  Before we move there, we're going

9    to also offer into evidence Figure 3 of DTX-64, or move into

10   evidence, so it will be DTX-64A.

11             MR. HAUG:  No objection.

12             THE COURT:  Admitted without objection.

13   (Exhibit was admitted into evidence.)

14             THE WITNESS:  When we look at that figure and

15   when you look at this figure, which is the dissolution

16   start, here with the time -- yes.  Put it in side by side.

17   And we see at the time three hours where the dissolution is

18   starting, same as zero times Y.

19                  No drug dissolves in the first three

20   hours, what she called it as pre-treatment where the outer

21   does not dissolve.  That's correct.  So now everything

22   from this point onward is similar to what we see linear.

23   This is a hydrophilic matrix, which is giving a linear

24   profile.  This is also hydrophilic matrix, in my opinion,

25   giving a linear profile.  Why?  Because the sodium carboxy

Banakar - direct

1    methylcellulose is a hydrophilic polymer in which the drug

2    is inside.

3               Now, this also curves off, so that curving off

4    is happening at around 80, 85 percent, so most of the drug

5    is out.  It cannot maintain this rate.  And between this

6    time and maximum, it is 100 percent dissolved.  After that,

7    there's no drug.  There's a little bit slowing down because

8    it cannot maintain this rate, and this is very, very normal

9    for such a hydrophilic matrix.  It's very normal.  It's

10   exactly what she saw.

11              And after that, there is no more drug coming in.

12   This is just where the consequence here, because there is no

13   more drug coming in.  And the whole profile can be explained

14   as a hydrophilic matrix within the drug over a period of

15   time, which is also supported by pictures that she provided

16   to us and those were discussed as well.

17   Q.    Just for the record, you were comparing Part B from

18   the figure, Figure 3 of this reference, which is DTX-64 that

19   we just moved in.  It's the figure to the right, the figure

20   on the right.  And you were looking at the one with the

21   black triangles.  I believe it's under that, in the legend

22   B; is that right?

23   A.    Yes.

24   Q.    And you were comparing that to the dissolution curve

25   from Ms. Gray's testing and Dr. Little, and I believe that's

Banakar - direct

1    PTX-900.1053; is that correct?

2    A.    Yes.

3    Q.    Thank you, Dr. Banakar.

4              What about Dr. Little's opinion that there's

5    visual evidence of a second mechanism of release at work in

6    Ms. Gray's study?

7              MR. PETERKA:  If I could have slide 58, please.

8              THE WITNESS:  What he was reporting was, well,

9    there is release from this point and at 170 minutes, there's

10   a slight change in the so-called profile in terms of how it

11   is moving, and then hit goes to the maximum, and that goes

12   off.

13             So this, he purported that that is an indication

14   of the lipid, also called inner lipophilic matrix without

15   analyzing whether there is magnesium stearate available.

16             Setting that aside, the real reason is not

17   because the lipids are starting to operate.  What he's

18   seeing that it's 85 percent of the drug.  What is left is

19   ten percent over one hour, so it's going to slow down

20   because it cannot maintain this rate.  And the hydrophilic

21   matrix is also disintegrating at the same time.  So I have

22   less drug, less matrix.  It slows down, and that is why this

23   so-called apparent change in the so-called factor moving

24   linear can become a little slightly less.

25             MR. PETERKA:  The next slide, please.  Back up.

1    Sorry.  DTX.  Yes.  And the graph you were just looking at

2    was also PTX-900.1053.  Can I have DDX-10.59, please.

3    BY MR. PETERKA:

4    Q.    And what about the discussion or claim that there was

5    visual evidence of a second release mechanism at work?

6    A.    Right.  So where look at this, he said the starting

7    point, which is correct, three hours.  That's the time when

8    this tablet is now going to start to dissolve, because now

9    you are in the right medium.  It's in the right medium.  The

10   matrix is going to be hydrophilic matrix is going to be

11   exposed.

12              Now 30 minutes en route.  You start to see

13   this has fallen.  It's disintegrating, continuing on, will

14   go for one hour, roughly one-and-a-half hours.  50 percent

15   is gone, it starts loosening up more.  All of the

16   hydrophilic granules that are just disintegrating from the

17   tablet continues on.  It becomes smaller and smaller because

18   it's disintegrating and dissolving.

19              Three hours now going forward.  You see it

20   getting further smaller.  Almost close to four hours.  Now

21   we have very little of the tablet compact remaining,

22   dissolving at the same time.  Disintegrated granules are

23   also disintegrating further and the drug is dissolving at

24   four hours.

25              Very little of this humongous matrix is

Banakar - direct

1    remaining there, and at four hours, close to four hours, all

2    of it is gone.  95 percent.  Very little drug remaining.

3    And the last point, we see -- the next one, please.

4              The last point we see is there is no drug, no

5    matrix.  So composite picture of the entire process.  This

6    is starting 13 minutes into the dissolution run.  If I can

7    imagine, this is zero time.  Thirty minutes, one hour,

8    continuing on almost four hours here.  Ninety-five percent

9    drug gone, five percent remaining.  Now even at end of the

10   dissolution run, so the plateau starts to occur.  There is

11   no drug.  There is no matrix.

12   Q.    Thank you, Dr. Banakar.

13             If I could just flip back to slide 59 so I get

14   on the record the images you're looking at.

15             MR. PETERKA:  Is this the first one?  All right.

16   All right.

17             So DDX-10.59, these are the picture of the

18   tablets before dissolution.  PTX-900.67.  Is that right?

19   And then the picture of the tablet at 12:56 p.m. is at

20   900.108.

21             Can I go to the next slide?  The tablet at

22   1:56 p.m., PTX-900.184.  Next slide, please.  The tablet at

23   256 is 900.244.  Next one.  317 is 900.255.  And 900.269,

24   that's at 3:47 p.m.  And then WE have at 4:06 p.m., 900.281.

25   4:16, 900.282.  And the reference for all of those is

Banakar - direct

1   900.67.  These are all compiled on slide DDX 10.77.  I think

2   I think those are all in evidence.  If they're not, we would

3   move them in.  I think they're in.  Right?

4            Go to slide 67, please.

5   BY MR. PETERKA:

6   Q.   Dr. Banakar, can you explain why there were fragments

7   of the tablet floating throughout the media in the test?

8   A.   I just gave a brief rundown.  If you can please go to

9   the previous slide, 10.65.  10.65, the composite picture.

10  Q.   10.66.

11  A.   Sorry.  10.66.  This process that you are utilizing.

12  One is time.  And the second is how the product is

13  dissolving.  And the third is how much it is dissolving over

14  a period of time.  You put that into perspective, and now go

15  to 10.67, can be seen in this picture, the schematic, the

16  dosage form, such as what we were talking about.  It's

17  disintegrating into granules.  Granules are further

18  disintegrating into fine particles.

19           And all along, all along, the drug is coming

20  out, dissolving, and that is what we see.  And what we are

21  measuring is the amount of drug in this dissolution medium,

22  or in this solution from time zero to infinity.  And then

23  infinity, we find that when all the drug from this tablet is

24  gone and needs to get plateau and that plateau is at four

25  hours.  Roughly four hours.

Banakar - direct

1    Q.    This is on slide DDX-10.67 and the schematic

2    Dr. Banakar was just referencing was out of Ansel's

3    pharmaceutical drug delivery system, DTX-41.  I believe

4    you already said that's a reliable reference; right?

5    A.    Yes.

6              MR. PETERKA:  And Figure 5.11.  And defendants

7    would move Figure 5.11 into evidence as DTX-41A.

8              MR. HAUG:  No objection.

9              THE COURT:  All right.  It's admitted.

10   (Exhibit admitted into evidence.)

11   BY MR. PETERKA:

12   Q.    Doctor Banakar I just want to touch on -- so, well,

13   real quick.  So in your opinion, the test results you've

14   seen from Vivian Gray that we just talked about, those are

15   consistent with, as I understand it correctly, those are

16   consistent with a single hydrophilic matrix?

17   A.    That's exactly what I believe.

18              MR. PETERKA:  If we could go back to slide

19   49, please.  I just want to touch on one last thing here.

20   BY MR. PETERKA:

21   Q.    I wanted to talk about earlier you had on your slide

22   about the requirement that active ingredients dispersed both

23   in the lipophilic matrix and in the hydrophilic matrix.

24              Have you seen any evidence of any fines that are

25   produced by the compaction step in the Zydus ANDA product

Banakar - direct

1    that are pure mesalamine?

2    A.     No.

3    Q.     Have you seen any evidence that there is mesalamine

4    that's -- if Dr. Sinko is correct, if there is somehow a

5    lipophilic matrix, that there is mesalamine that's

6    separately in both an inner lipophilic matrix and an outer

7    hydrophilic matrix in Zydus' ANDA product?

8    A.     No, I don't see it.

9    Q.     Are fines -- what are fines in your opinion?  If you

10   can explain them?

11   A.     Fines are when I have a large composite, I'm slicing

12   it, or if I'm making it smaller, I'm processing it.  The

13   entire composition becomes smaller and smaller, and you get

14   the so-called distribution of area slices.

15          So a fine, I call it as miniature granules.  So

16   it is miniature, what we start off with and what we have.

17   Q.     Would composition be the same?

18   A.     That is what I expect.

19   Q.     All right.  Two quick sum-ups here.

20          So based on everything we've discussed

21   today, what is your opinion as to whether the Zydus ANDA

22   product infringes claim 1 of the '720 patent?

23   A.     What I discussed today and what I have said over the

24   last two hours is, it is my opinion that Zydus' product,

25   Zydus' ANDA product does not infringe claim 1 or claim 3 of

Banakar - cross

1    patent '720 literally or under doctrine of equivalents.

2    Q.      Thank you.

3            MR. PETERKA:  And I don't have any other

4    questions.  Thanks.

5            THE COURT:  Cross-examination, Mr. Haug.

6            MR. GEORGEK:  May we approach the witness, Your

7    Honor?

8            THE COURT:  Yes, you may approach.

9            (Binders passed forward.)

10           THE COURT:  Please proceed.

11           MR. HAUG:  Thank you, Your Honor.

12                        CROSS-EXAMINATION

13   BY MR. HAUG:

14   Q.      Good afternoon, Dr. Banakar.

15   A.      Good afternoon.

16   Q.      I'd like to start by having you look at your slide

17   DDX-10.2.

18   A.      (Witness complies.)

19   Q.      Did you prepare this slide?

20   A.      Yes.

21   Q.      I noticed in the slide, where you say Bachelor's

22   Degree in Pharmaceutical Sciences, you don't have any

23   schools listed where you went to school.

24   A.      Oh.  There was Bombay University in India.  And

25   that's it.

Banakar - cross

1   Q.      That's it?

2   A.      Oh.  You want all of the schools?

3   Q.      Well, I guess my question is why didn't you include

4   your schools there?

5   A.      I didn't think I needed it.

6   Q.      I'd like you to go to DTX-3, please.

7   A.      (Witness complies.)

8   Q.      This is your CV; right?

9   A.      That is correct.

10  Q.      Now you may recall that Mr. Peterka maybe forgot to

11  introduce the exhibit into evidence.

12  A.      Yes.

13  Q.      Is the CV accurate?

14  A.      Yes.

15  Q.      Up at the top, under your name, it says professor.

16  Are you really a professor, a full-time professor?

17  A.      No, I am not a full-time professor.  I am full

18  professor, and professor is an earned degree -- I am

19  sorry -- earned rank, and that stays with you for life.  And

20  I know that very well because my dad was a full professor

21  and he died as a professor as well.

22          But in that, that is a rank earned because of

23  your scholarly activity and all the things you do to earn

24  that rank, and that stays with you.

25          I am at other various academic institutions in

Banakar - cross

1   the world, and I have been recognized as a visiting

2   professor.

3   Q.     You are a visiting professor?

4   A.     Correct, because I am not with them.

5   Q.     Where it says universities listed, the first one

6   listed is Massachusetts Institute of Technology (MIT).  You

7   never attended MIT, did you?

8   A.     I attended MIT.  As I said in my direct, that there

9   was a focus, concentrated focused program in controlled

10  release technology, advancements in control release

11  technology, and that is what.  That is where I earned a

12  certificate.  And that is a teaching thing, so I think that

13  is relative.

14  Q.     You never were awarded a degree of any kind from MIT,

15  were you?

16  A.     No, that was a certificate course.

17  Q.     You attended a course you paid for five days; isn't

18  that right?

19  A.     No, I didn't have to pay for it because it is a

20  course which is not available to everyone, at least in those

21  years, where it was to be not only an indication but it also

22  was recognized on the basis of why, if it would be allowed.

23  So there was some criteria which was used.  And I got a

24  post-grant for advancement in a professional career, so that

25  was the grant that paid for the course.

970

Banakar - cross

1   Q.       Thank you, Dr. Banakar.

2            Now I'd like to ask you what you did to prepare

3   for the opinions that you have given in this case.  Do you

4   recall when you were first retained as an expert in this

5   case?

6   A.       Honestly, no.

7   Q.       Could it have been back in 2012?

8   A.       Yes.  This case has been so long.  Yes, that is

9   correct.  That is possible.

10  Q.       All right.  Do you recall how many expert reports you

11  have filed or served or prepared in this case?

12  A.       I think five or six, but don't take me on that.  It

13  is between five and six, I think.

14  Q.       Did you write all those reports yourself?

15  A.       The way the reports were written were as it is done,

16  there is discussions, there are onsite meetings, there is

17  method meetings.  And then the textual part comes out of it,

18  which is discussed, and I approve it, and it goes through

19  whether it meets the criteria of what I think is the way it

20  is expressed is correct, and then that is how it comes out.

21           So, yes, I wrote it.

22  Q.       Are you saying that the text report is drafted by the

23  attorneys and then you review it and approve it?  Is that

24  what you are saying?

25  A.       It is combination of both.  Because technical matters

Banakar - cross

1    is where my expertise comes in as well as the language also

2    comes in there.

3              The matter and the way it is to be structured,

4    formatted, that all comes through the legalese.  I can't do

5    that.

6    Q.    Thank you.  Now, you have been sitting throughout

7    this entire trial; isn't that correct?

8    A.    Yes.

9    Q.    You were here for the testimony of Mr. Kulkarni on

10   behalf of Zydus; is that right?

11   A.    Yes, I was.

12   Q.    Have you ever met Mr. Kulkarni?

13   A.    No.

14   Q.    Have you ever spoken to him?

15   A.    No.

16   Q.    Have you ever been to Zydus in India where they

17   manufacture this product?

18   A.    No.

19   Q.    So you have never seen the process itself; is that

20   right?

21   A.    I have a very extensive knowledge of all the

22   equipment that is used.  All the process that is being, that

23   they undertake, I can attest to that.

24              So I can say that, yes, I have not physically

25   been there, but I know the machine, compacting machine is

Banakar - cross

1    Cadmach, and the tableting machine is Cadmach.  So I know

2    that very well.  So in that instance, yes, I know that.  But

3    when the product was being manufactured, I was not there.

4    Q.    Did you ever read Mr. Kulkarni's deposition before

5    this trial?

6    A.    Way back, I may have.  I don't know.

7    Q.    Have you ever talked to any other Zydus formulators

8    or scientists about how they manufacture their proposed

9    generic version of this product?

10   A.    No.  And then once I am involved in the case, I can't

11   talk to them anyway.  So either way, I am not.

12   Q.    Once you are involved in the case you can't talk to

13   them?  Why is that?

14   A.    That is my understanding, because I should not talk

15   about it.

16   Q.    Have you done any testing in this case, Dr. Banakar?

17   A.    Can you please define "testing?"

18   Q.    Any kind of testing of the Zydus product in any way?

19   A.    Other than looking at the ANDA, which is, that is a

20   test, but other than that, physically no.

21   Q.    Did you ever ask for any tests to be conducted to

22   investigate any of the products of the Zydus product or process?

23   A.    No, and I was not asked to do that either.

24   Q.    Did you do any literature searching at all in coming

25   to any of the opinions you have given in this case?

Banakar - cross

1    A.    I don't know what you mean by "literature search."

2    But the hydrophilic matrix, I have books and things in my

3    own library which is, where I might have looked at it.  That

4    is the extent of it.  But I am not asked to do this search

5    with these terms, no.

6    Q.    I'd like you to turn to Tab 1 in your book, in your

7    binder.  This is a copy of your deposition.

8    A.    Yes.

9    Q.    Okay.  Your deposition was taken December 7th, 2014.

10   Do you recall that?

11   A.    Yes.

12   Q.    And I'd like you to turn to page 52, please.  Line

13   22.

14   A.    Yes.

15   Q.         "Question:  Did you do any literature searches

16   in coming to your opinions in this case?"

17             Go down to the answer, page 53, line 6.

18             "Answer:  No."

19             Did I read that correctly?

20   A.    Yes, that is exactly what I said.

21   Q.    I'd like to move on to ask you some questions about

22   infringement.  It's a general topic.  Okay?

23   A.    (Nodding head.)

24   Q.    You agree, do you not, that Zydus's ANDA product is a

25   controlled release formulation?

Banakar - cross

1    A.    Yes.

2    Q.    You also agree that Zydus's ANDA product contains

3    5-amino-salycylic acid, also known as mesalamine?

4    A.    That is correct.

5    Q.    And the mesalamine in the proposed Zydus ANDA product

6    is present above 80 percent by weight of the total

7    composition; is that correct?

8    A.    That's correct.

9    Q.    And magnesium stearate is a salt of a hydrogenated

10   fatty acid; isn't that correct?

11   A.    That is correct.

12   Q.    Do you agree that Zydus's ANDA product contains

13   hydrophilic excipients?

14   A.    Yes.

15   Q.    The sodium starch glycolate used in Zydus's product

16   is a starch derivative; isn't that correct?

17   A.    That is correct.

18   Q.    And, therefore, it is a 1(b) excipient as quoted for

19   in the patent; isn't that correct?

20   A.    That is correct.  You are talking about a claim, I

21   believe.

22   Q.    Claim 1.

23   A.    Okay.

24   Q.    Claim 1(b).  I am sorry.

25   A.    That is correct.

Banakar - cross

1    Q.      Thank you for the clarification.  Do you agree that

2    the hypromellose in Zydus's ANDA product is a hydroxyakyl

3    cellulose?

4    A.      That is correct.

5    Q.      That is also a 1(b) excipient, is it not?

6    A.      That is correct.

7    Q.      And do you agree that the carboxymethylcellulose

8    sodium salt in Zydus's ANDA product is as hydroxyakyl

9    cellulose?

10   A.      Sodium salt, that is correct.

11   Q.      And that also a 1(b) element, is it not?

12   A.      That is correct.

13   Q.      And you agree that the hydrophilic materials in

14   Zydus's ANDA product forms a hydrophilic matrix?

15   A.      You will have to tell me what definition I have to

16   use for "matrix."

17   Q.      What is your understanding of what a "matrix" is as

18   required by the '720 patent?

19   A.      The way I understand it is it is asked for the

20   definition, I am sorry, the construction that has come down.

21   It says it has to be "macroscopically homogeneous in all its

22   volume" and that is what I -- and it has to have structure.

23   So that is how I look at a matrix in context of '720.

24   Q.      I think you just said when you look at how it has

25   come down, the claim construction for "matrix" is "a

Banakar - cross

1    macroscopically homogeneous structure in all its volume;" is

2    that correct?

3    A.      That is correct.

4    Q.      That construction didn't come down from anywhere.

5    Isn't that an agreed upon construction by the parties in

6    this case?

7    A.      Yes, that is word play.  This is -- the way I

8    understand anything being ruled is in the way of what has

9    come down from the Court.  So that's in that context.

10           Agreed upon is also correct because that is what

11   it was mentioned in my slide 2 or 3, whichever slide it was.

12   Q.      Within that claim construction of "a macroscopically

13   homogeneous structure in all its volume," what is your

14   understanding of the meaning of the word "structure?"

15   A.      Structure to me is I have to have something that I

16   can see as a structure.  It cannot be something that is

17   hanging in the air or it is just floating around.  That is

18   not a structure.

19           If you look at a good analogy would be if you

20   look at a building where it was being built, you first put

21   in the structure and then they put in all the various parts

22   of the building.  So the structure is there.

23           And I showed you where the structure was in my

24   direct when I talked about "matrix" and where I have the

25   drug dispersed in that structure.  Where the drug goes out,

Banakar - cross

1    I see the structure left behind.  So that tells me that,

2    yes, this is a matrix.

3              Otherwise, I would not have accepted that it is

4    a matrix in the term in the way '720 is defining it, or

5    agreed upon definition.

6    Q.    And I believe you testified that the structure is a

7    monolithic structure; right?

8    A.    Monolithic is one way they said it in that reference.

9    And they have said monolithic equals matrix.

10   Q.    Do you recall giving the opinion in your expert

11   report that structure means monolithic?

12   A.    That is exactly what I said, too.  Monolithic.

13   Q.    You remember giving that opinion, right?, or view?

14   A.    It is possible, but I still believe monolithic is a

15   structure, yes.  You have the structure is as we saw in the

16   slide that I showed you.

17   Q.    Do you recall citing to a dictionary when you gave

18   that definition of structure in your expert report?

19   A.    I need to see it because I don't have it memorized

20   right now.

21   Q.    Can a structure, to your understanding, within the

22   construction that we're talking about in the '720 patent,

23   can that also be an arrangement of particles in a substance

24   or body?

25   A.    Not according to the way of '720 says.  Because they

Banakar - cross

1    are not -- there is no structure.  It is so-called hanging

2    around.

3    Q.     Sorry, Dr. Banakar.  Just give me a moment.

4           All right.  I'd like you to turn to tab 28 in

5    your binder.

6    A.     Yes.

7    Q.     Okay.  Do you recognize tab 28?

8    A.     Sorry?

9    Q.     Do you recognize this?

10   A.     Yes.  Merriam-Webster's Collegiate Dictionary.

11   Q.     Do you remember referring to this dictionary in your

12   expert report?

13   A.     It is possible.

14   Q.     Why don't we go to tab 2, paragraph 78 in your expert

15   report.

16          Let me know when you are with me.

17   A.     Yes, I am there.

18   Q.     All right.  Thank you.  All right.  We have paragraph

19   78.  If we go to the bottom here, do you see, about two

20   lines up -- one more.  If we go to the top line there, it

21   says "monolithic."

22          "Monolithic" means "cast as a single piece,"

23   or "consisting of or constituting a single unit."

24          And then it goes on:  "(See Example S,

25   Merriam-Webster's Collegiate Dictionary, 573 (10th Edition

Banakar - cross

1   1997)."

2                   Did I read that correctly?

3   A.      Yes.

4   Q.      Now, going back to tab 28.  Isn't that

5   Merriam-Webster's Collegiate Dictionary that you were

6   referring to in your expert report?

7   A.      Oh, yes.

8   Q.      And if you go to page 753 of the dictionary?

9   A.      Yes.

10  Q.      Upper right-hand corner, definition of monolithic.

11  That is where you got this; right?  Do you see where it says

12  "2:  Cast as a single piece."

13                  It goes down below.  "c:  Consisting of or

14  constituting a single unit."

15                  That is where you got your definition that you

16  put in your report; correct?

17  A.      That is correct.

18  Q.      All right.  That is your definition for "monolithic"

19  which you say is a structure within the context of this

20  patent.

21                  Why don't we go to page 1167 of the same

22  dictionary.  Next page over.

23                  Let's look up the definition for structure.  I'd

24  like you to go to No. 4:  "a:  The arrangement of particles

25  or parts in a substance or body."

Banakar - cross

1              Did I read that correctly?

2    A.    The structure 4.

3    Q.    I highlighted it on the screen.

4    A.    Oh.

5    Q.    Do you see that?

6    A.    Yes, I see that.

7    Q.    Okay.  A short while ago, you said you didn't agree

8    with that.

9    A.    Correct.  Because I still look at it in the context

10   of '720.  I need to see the structure.  And structure as I

11   look at it is polymer matrix.  I need to see the drug

12   dispersed in it, and that is what structure I need to see

13   left behind.

14          Otherwise, just connecting two words from a

15   dictionary does not constitute a definition of the meaning

16   for the word.

17   Q.    Let's go back to the patent, PTX-1.  You can refer to

18   it if you need to, but let me ask you a few questions.

19          Does the word "structure" appear in than patent

20   claim, claim 1?

21   A.    What is the number?

22   Q.    PTX-1, it's the patent.  Actually --

23   A.    I don't have that.

24   Q.    -- we have it up on the screen.  I am just asking you

25   about claim 1 of the patent.  You are familiar with this

Banakar - cross

1   claim; right?

2   A.      Oh, yeah.  Yes.

3   Q.      You would agree with me, right?, the word "structure"

4   doesn't appear anywhere in that claim; right?

5   A.      The way I understand it is that is the reason why

6   there was a dispute and then it was agreed upon for the

7   definition.  So, yes, there is no word for "structure"

8   explicitly stated there.

9   Q.      Do you agree that the word "monolithic" doesn't

10  appear anywhere in the patent claim?

11  A.      That is correct.

12  Q.      As a matter of fact, the word "monolithic" doesn't

13  appear anywhere in the entire patent; is that right?  Except

14  the part that you may have referred to in the file history.

15  I am only talking about the issued patent in the

16  specification.  Does the word "monolithic" appear anywhere

17  in there?

18  A.      The specification, then prosecution comes into that

19  category, but if you are only talking about claim, no.

20  Specification, prosecution, according to me, at least the

21  way I understand it, is the prosecution information is also

22  considered in the specification, but if you are talking

23  about claim, correct, there is no word "monolithic" there.

24  Q.      Okay.  I was asking you before we got to the

25  dictionary whether you agreed about certain elements of the

Banakar - cross

1    Zydus product.  I'd like to go back to that.

2                    Now, do you agree that the product of the roller

3    compaction step in the Zydus ANDA process is uniformly

4    dispersed in the hydrophilic matrix?

5    A.    You must first tell me where the hydrophilic matrix

6    is, and then I can tell you that, respond to that question.

7    Q.    Do you think there is a -- do you know if there is a

8    hydrophilic matrix coming in the product that comes out of

9    the roller compaction step?

10   A.    I said on a couple of occasions, and I say there,

11   what we have that comes out after powder is compacted is

12   mesalamine which is hydrophilic, colloidal silicon dioxide

13   which is hydrophilic, so that compact is more than

14   99 percent hydrophilic.

15                   Now, if that is put into the final dosage form

16   you asked me, I just said that.  That final dosage form is

17   being like a single hydrophilic matrix.  So there is your

18   answer.

19   Q.    So you are saying you do agree that the product of

20   the roller compaction step in the ANDA process is uniformly

21   dispersed in the hydrophilic matrix?  Yes or no.

22   A.    You must first tell me what "matrix" is.

23   Q.    Why don't we turn to your deposition again.  It's

24   tab 1.  This time, I would like you to go to page 258,

25   line 12.

Banakar - cross

1          Are you with me?

2     A.     Yes.

3     Q.     Okay.  I have it on the screen also.

4          "Question:  All right.  Given that description,

5     would it be fair to say that the downsized compact pieces

6     are dispersed within the hydrophilic materials that form the

7     hydrophilic matrix in the Zydus product; correct?"

8          After an objection.

9          "Answer:  Processing-wise, strictly they will

10    be uniformly dispersed.  But will they kind of connect to

11    each other, no, because just the mass differences is fairly

12    large.  But, yes, it is required for uniform distribution

13    because the content uniformities are stepwise in process

14    quality control check, otherwise, you'd have problem with

15    the product."

16          Did I read that correctly?

17    A.     That is correct.

18    Q.     Do you agree that the products that went into the

19    Zydus roller compaction step, which is mesalamine, colloidal

20    silicon dioxide and magnesium stearate, are all blended to

21    uniformity before compaction?

22    A.     That is the requirement for GMP, good manufacturing

23    practices, and that is what I expect unless I see evidence

24    otherwise.

25    Q.     So you agree that that is what happens in the Zydus

Banakar - cross

1    product as it goes through the compaction step; is that

2    correct?

3    A.    I am giving the same response.  Unless I see

4    information otherwise, then that is expected as per good

5    manufacturing procedures.  Yes, GMP.

6    Q.    I want the record to be clear I am asking a very

7    specific question as to the Zydus product that comes through

8    the compaction step.  My question is whether you agree that

9    the product that went into the Zydus roller compaction step,

10   which is mesalamine, colloidal silicon dioxide, and

11   magnesium stearate, whether you agree they are all blended

12   to uniformity before compaction?  Yes or no.

13   A.    Again, following GMP, it would, it would be.

14   Q.    Could be.

15   A.    Following GMP, yes.  Otherwise, I would have to see

16   evidence it is not.

17   Q.    I'd like you to go back to your deposition, tab 1,

18   this one page 259, line 9.

19          Are you with me?

20   A.    Yes.

21   Q.          "Question:  In forming that compact of

22   mesalamine, colloidal silicon dioxide, and magnesium

23   stearate, is it your understanding that Zydus mixes those

24   three chemicals together before they're put through the

25   roller compactor?

Banakar - cross

1          "Answer:  It is not only my understanding, it

2     is the requirement and plus BMR model you can see will tell

3     you that.  Otherwise, again, we'll have aggregation --

4     segregation and separation.  I don't need that.  I don't

5     need quality control issues later on.  So, yes, it has to

6     be a blend.  And one of the in-process control step has to

7     be to check the blend to make sure that it is uniform and

8     then go through compaction."

9          Did I read that correctly?

10    A.     That is exactly what I said.  That is correct.

11    Q.     Do you also agree that Zydus's product contains

12    lipophilic chemicals?

13    A.     Yes.

14    Q.     And one of those lipophilic chemicals is magnesium

15    stearate, isn't it?

16    A.     Yes.

17    Q.     I'd like to talk a bit about magnesium stearate now,

18    if I may, Dr. Banakar.  You testified that magnesium

19    stearate in the Zydus product is not controlled release.

20    Do I have that right?

21    A.     That is controlled release for the product.  That is

22    correct.

23    Q.     It is your opinion that the magnesium stearate which

24    is in the Zydus product before the compaction step -- in

25    that uniform blend is what I am talking about now; right?

Banakar - cross

1   It is your opinion that that magnesium stearate is not

2   controlling release at all; is that right?

3   A.    Yes.

4   Q.    It is also your opinion that that magnesium stearate

5   at that point in time in the Zydus process and product, it

6   doesn't prevent water from coming into the formulation, does

7   it?

8   A.    Controlled release is, you are talking about the

9   product in the controlled release in context of the '720.

10  That is correct.

11  Q.    That is right.  Now, would you agree that in the

12  pharmaceutical industry, magnesium stearate is known to be

13  hydrophobic, water insoluble, and water repellent?

14  A.    That is correct.

15  Q.    Now, isn't it known that magnesium stearate inhibits

16  drug dissolution, slows it down due to its hydrophobicity?

17  A.    You have to give me context of "slows it down."  But

18  it can have some affect, yes.

19  Q.    Why don't we go to tab 12 in your book.

20  A.    (Witness complies.)

21  Q.    I'm sorry that the volume is so big.

22  A.    Oh, sure.

23  Q.    Tab 12.

24  A.    Yes.

25  Q.    Are you familiar with this?

Banakar - cross

1    A.    Yes.

2    Q.    This is your book; right?

3    A.    Yes.

4    Q.    You are the author here on the bottom, right?  That's

5    you?

6    A.    Yes.

7    Q.    Okay.  Why don't we go to page 8-6.

8    A.    Yes.

9    Q.    And in the second paragraph, third line, starts:  For

10   example, magnesium stearate, a lubricant, commonly used in

11   tablet and capsule formulations, is water-insoluble and

12   water repellent.  Its hydrophobic nature tends to retard

13   drug dissolution by preventing contact between the solid

14   drug and aqueous GI fluids.

15         Did I react that correctly?

16   A.    Yes.

17   Q.    That is what you stated in your book?

18   A.    Yes.

19   Q.    You stand by that statement, don't you?

20   A.    Yes, but it could be taken out of context.  That is

21   what you are doing.  That's fine.  I still stand by this

22   statement.

23   Q.    And would you agree that one way to measure whether

24   magnesium stearate is exerting a hydrophobic effect is

25   through a water penetration test?

Banakar - cross

1    A.    I am not an expert on water penetration test on or

2    any kind of penetration test.  But what I saw is not what

3    I -- it was nonscientific, I think.  And I did not opine on

4    that.

5    Q.    When you will say what I saw, you are referring to

6    the testing by Dr. Hoag; right?

7    A.    Yes.

8    Q.    He did a water penetration test?

9    A.    He called it a drop penetration test.

10   Q.    Why don't we go to tab 11 in your book.

11   A.    (Witness complies.)

12   Q.    Do you have it?

13   A.    Yes.

14   Q.    What is this?

15   A.    My textbook.

16   Q.    This is your textbook.  You wrote this textbook;

17   right?

18   A.    Yes.

19   Q.    Okay.  Why don't we go to page 253, please.  253.

20   A.    We have the whole book?

21   Q.    No, only a portion.  Tab 11, page 253.

22   A.    Yes.

23   Q.    Do you have that?

24   A.    Yes.

25   Q.    So if we go below the line in the middle of the page,

Banakar - cross

1    it says:  It stands to reason that the more hydrophobic the

2    powder is, the slower the wetting and subsequent penetration

3    of the dissolution medium across the solid surface barrier.

4    Figure 7.1 illustrates this phenomenon which can explain the

5    dissolution profile that results from the presence of

6    magnesium stearate in the formulation.

7              Did I read that correctly?

8    A.    Yes.

9    Q.    Okay.  If we go to the next page in your book, there

10   is Figure 7.1; right?

11   A.    Yes.

12   Q.    What is shown in Figure 7.1?

13             Withdrawn.  Let me ask it a little more

14   directly.

15             The curve that I am looking at here which is in

16   Figure 7.1, it is the uppermost curve; right?  Right here

17   (indicating).

18   A.    Yes.

19   Q.    And I think it has Xs.  Do you know what that curve

20   represents?

21   A.    That, as I read it from that, the Y axis is depth of

22   liquid penetration raised to two millimeters square as a

23   function of timing time in seconds.

24   Q.    And this, the formulation that this curve correlates

25   to is one without any magnesium stearate; isn't that right?

Banakar - cross

1    Look right where it says.

2    A.    Yes.

3    Q.    Okay, you agree.  And the curves down below going

4    from top to bottom, top one has 1 percent magnesium

5    stearate, the middle curve 2 percent, and the bottom curve

6    5 percent magnesium stearate; isn't that right?

7    A.    Yes, these are very high amounts.

8    Q.    All right.  So you agree with me that in this test,

9    when you have magnesium stearate as compared to zero

10   magnesium stearate, the Depth of liquid penetration is much

11   less; correct?

12   A.    I don't know what exactly was being measured in terms

13   of what was the basis, whether it goes to compact, whether

14   it was a tablet, whether it was a compressed tablet, whether

15   it was granules.  We don't know that.  But just looking at

16   the pictures, I have two things that come to mind right

17   away, without analyzing it in detail.

18         No. 1 is the concentrations of magnesium

19   stearate are so humongous that we never see those high

20   concentrations in pharmaceutical formulations that we are

21   working with.  And,

22         No. 2 is other factor that are the substrate

23   which is what the measurement of liquid penetration is being

24   done on.  I don't know.

25         So, yes, increasing magnesium stearate amount is

Banakar - cross

1    showing the slope going down, which means that it is getting

2    slanted not as steep, so that is correct.  But those other

3    coordinates I don't have.

4              So just taking that picture out of context and

5    saying that, hey, look at this, the magnesium stearate is

6    the one that is in the driver's seat, and that is the reason

7    for this observation, that is very difficult, as you could

8    imagine.

9    Q.    This is a water penetration test, isn't it?

10   A.    Yes.

11   Q.    So your book is using a water penetration test with

12   respect to magnesium stearate; isn't that correct?  Yes or

13   no, sir.

14   A.    It is reporting a phenomenon which is hydrophobicity

15   and how the hydrophobicity is linking to the solution is one

16   of the parameters, yes.

17              MR. HAUG:  I offer Figure 7.1.

18              THE COURT:  Mr. Peterka.

19              MR. PETERKA:  No objection.

20              THE COURT:  It is admitted without objection.

21              MR. HAUG:  Thank you.

22              (Figured 7.1 admitted in evidence.)

23   BY MR. HAUG:

24   Q.    Dr. Banakar, isn't it known in the scientific and

25   pharmaceutical industry that even lower percentages of

Banakar - cross

1    magnesium stearate can have large effects on hydrophobicity

2    and drug dissolution?  Would you agree with that statement?

3    A.    This is a blanket statement which has to have some

4    kind of a scope here for me to agree with that statement.

5    But in general, you want to say, in general, do I agree.

6    Well, I do agree any hydrophobic substance will do that, but

7    I need a little more context to that.

8    Q.    All right.

9    A.    What is slowed down?  What is significant?  What is

10   not?  What is the hydrophobicity?  What are we looking for?

11   What is the substrate?  What is the compact?  What is the

12   composition?  There are a lot of stuff.

13           Just one statement, I cannot agree or disagree.

14   Q.    I appreciate you didn't do a literature search on

15   this subject; isn't that correct?

16   A.    I know my dissolution test very well.

17   Q.    Why don't we go to tab 15, please.

18           MR. HAUG:  It is also PTX-629, Your Honor.  I

19   think it's tab 15 in your book.

20   BY THE WITNESS:

21   A.    Yes, I am there.

22   Q.    Do you have it?

23   A.    Yes.

24   Q.    Okay.  It's the European Journal of Pharmaceutics and

25   Biopharmaceutics, right?

Banakar - cross

1    A.      European Journal, yes.

2    Q.      Did I misspeak?  I am sorry.  This is a peer-reviewed

3    journal; right?

4    A.      Yes.

5    Q.      Well respected?

6    A.      No.  The reason I said that, there is a European

7    Journal of Pharmaceutics and Biopharmaceutics also.

8            I am just kidding.  I am sorry.

9    Q.      Thank you for the clarification.  And the title is, A

10   Comparative Study of Glycerin Fatty Acid Ester and Magnesium

11   Stearate on the Dissolution of Acetaminophen Tablets Using

12   the Analysis of Available Surface Area.  The first author is

13   Uchimoto.  U-c-h-i-m-o-t-o.

14           Now, I'd like to go to the abstract and about

15   four lines down.  Four lines down.

16   A.      Yes.

17   Q.      It says:  In the dissolution tests, a retarded

18   dissolution of APAP was not observed with TR-FB, whereas

19   magnesium stearate (Mg-St) which is widely used as a

20   lubricant, retarded the dissolution.

21           Did I read that correctly?

22   A.      Yes.

23   Q.      Okay.  You agree with that statement, don't you?

24   A.      The way you read it, yes.  In the context of this

25   article, it may be true.

Banakar - cross

1    Q.     Why don't we go to page 629.3.  It is actually page

2    494 of the article.

3    A.     Yes.

4    Q.     All right.  And you see the curves on the left.  They

5    are Figure 1.

6    A.     Yes.

7    Q.     Okay.  And the curve on the top, that this is

8    dissolution rate versus time; right?

9    A.     A couple of things.

10   Q.     Right now I am just asking you.

11          THE COURT:  You have to wait ask until he asked

12   you a question.

13          THE WITNESS:  No, he asked you that.

14          THE COURT:  No.

15          MR. HAUG:  I am sorry, Your Honor.

16          THE COURT:  Go ahead.

17   BY MR. HAUG:

18   Q.     I am just asking you so we're focused on the top

19   curve.  This curve we're looking at here, Figure 1, this is

20   a plot of dissolution rate versus time for a number of

21   different tablets; is that correct?

22   A.     I don't think I have seen this article right now.  If

23   you want me to, I will go through it.  I can go in detail

24   because this instant when I looked at it, there is an error

25   in that field.  So it will take time to analyze this.  And

Banakar - cross

1    that error is so blatant on the Y axis, it cannot be

2    weight.  It has to be amount.  Otherwise, the profiles are

3    wrong.

4    Q.    Do you recall seeing this article before?

5    A.    Offhand, no.

6    Q.    Down at the bottom, Figure 1, right here, it says, I

7    am reading:  Effect of lubricant concentration on the

8    dissolution rate of APAP (100 milligrams) tablets.  Figures

9    represent (A) magnesium stearate and (B) TR-FB.  Each point

10   represents an average value of three determinations.  And it

11   goes on.

12         So did I read that correctly?

13   A.    Yes, you read it correctly.

14   Q.    And this is plotting what it says.  The effect of

15   lubricant concentration on dissolution rate.  By the way,

16   what is APAP?

17   A.    APAP is acetaminophen.

18   Q.    So that is what it is doing.

19   A.    I know.

20   Q.    This data shows lubricant concentration as a

21   function of, or dissolution rate as a function of lubricant

22   concentration for various different formulations of

23   magnesium stearate in them; right?

24   A.    With all due respect, I will refrain from commenting

25   on this because there are errors, as I said, and I have not

Banakar - cross

1    looked at this.  I need to look at it in more detail.  If

2    you are saying that's the figure title, you read it

3    correctly.  So off-the-cuff, I am not, I don't want to give

4    an opinion unless you force me to.

5    Q.     I am not forcing you to do anything.

6    A.     Okay.

7    Q.     Your counsel can redirect.

8              MR. HAUG:  I offer Figure 7.1.

9              MR. PETERKA:  No objection, Your Honor.

10             THE COURT:  It is admitted without objection.

11             (Figure 7.1 admitted in evidence.)

12   BY MR. HAUG:

13   Q.     Dr. Banakar, isn't it true that Zydus told the FDA

14   that the release retardant and lubricants in its product

15   affect both drug dissolution, both of them?

16             Let me try that again.  It was confusing.

17             Isn't it true that Zydus told the FDA that both

18   the release retardant and lubricants in its product affect

19   drug dissolution?  Do you know that?

20   A.     I don't know that.  You'd have to show me.  The

21   communication between Zydus and FDA, I don't know.  I may

22   have come across it.  I don't recall that.

23   Q.     You have no recollection sitting here now seeing any

24   communications between Zydus and the FDA; is that your

25   testimony?

Banakar - cross

1    A.      I may have seen it in that paper (indicating holding

2    hands apart), NDA -- I am sorry -- the ANDA, so they might

3    be communicating.  It is possible.  If you can show me?

4    Q.      You had your hands about a foot and-a-half or so

5    separated.  That is how much paper you were giving for the

6    ANDA; is that right?

7    A.      That is figurative, but it is a lot of paper.

8    Q.      Did you read through all that paper?  Did you analyze

9    it before you gave your opinions in this case?

10   A.      I read through most of the sections that are

11   important.  Yes, I went through a lot of material.

12   Q.      How would you know what was important in those

13   sections unless you read through the whole thing and found

14   the important sections?

15   A.      One thing for sure is the clinical section is not

16   connected to the patent which is the substantial portion of

17   that ANDA.  So if I discard that, then it becomes this is

18   much smaller.  And then, yes, I went through the entire CMC

19   development report, their in-house reports that were

20   required of the development report.  And then also source

21   stipulated to the product, process, manufacturing controls,

22   API, in-process controls, all of that.

23   Q.      Can we turn to tab 18 in your book?  It's PTX-208.

24   A.      (Witness reviews documents.)

25   Q.      Do you know what this is?

Banakar - cross

1    A.      I need to get to that.

2    Q.      Certainly.

3    A.      Sorry.

4    Q.      Tab 18.

5    A.      Yes, I have it.

6    Q.      Have you seen the quality overall summary before?

7    A.      Yes.

8    Q.      You have reviewed this document, didn't you?

9    A.      Yes.

10   Q.      This is part of the Zydus ANDA; right?

11   A.      Yes.

12   Q.      Okay.  Let's go to page 22, please.

13           MR. PETERKA:  Your Honor, I am going to object

14   to this.  We had a fact witness testimony on this earlier in

15   the case.  He is asking about a document that the fact

16   witness has already testified about before.

17           THE COURT:  Well, I'm not sure I understand your

18   objection, Mr. Peterka.  I haven't even heard the question

19   yet.

20           MR. PETERKA:  All right.

21           THE COURT:  There is a document on the board.

22   No question pending.

23           MR. PETERKA:  I withdraw.

24           THE COURT:  We'll hear what is happening.

25           MR. PETERKA:  Withdraw.

Banakar - cross

1    BY MR. HAUG:

2    Q.      Do you recall seeing this flow chart or depiction on

3    page 22 of Exhibit PTX-208?

4    A.      During the review with my -- I would have looked at

5    it, yes.

6    Q.      Okay.  And do you see here where it says magnesium

7    stearate and AEROSIL-200?  Do you see that?

8    A.      Yes.

9    Q.      And there is an arrow going to lubrication; right?

10   A.      Yes.

11   Q.      And there is two arrows.  One goes to tableting

12   properties and another arrow goes to dissolution.  Do you

13   see that?

14   A.      Yes.

15   Q.      So doesn't this tell you that magnesium stearate as

16   reported by Zydus to the FDA functions both as a lubricant

17   as well as having an impact on dissolution?

18   A.      No, because I think that can be an error, and I think

19   it was covered during the presentation.  This is not what I

20   would expect, so it might be there but agree or disagree is

21   not in my purview because the document was submitted to FDA.

22   Q.      When you say there was an error, are you referring to

23   prior testimony in this trial?

24   A.      Something like that.  I don't know.  I don't recall

25   where exactly, but this had come up somewhere.  I don't

Banakar - cross

1  know.

2  Q.    Okay.  Dr. Banakar, once again, while you didn't do

3  any literature searches regarding magnesium stearate, are

4  you aware of any scientific articles that state that

5  magnesium stearate forms a matrix?

6  A.    I read a lot of stuff.  I continue to read.  Unless

7  you show me something, I don't know.

8  Q.    So sitting here right now, you don't recall seeing

9  any publication of any kind that speaks to whether or not

10 magnesium stearate can form a matrix.  Is that your

11 testimony?

12 A.    If you qualify it in the context of the '720, that is

13 a different meaning.

14 Q.    I'd like you to go to tab 23, please.

15 A.    Yes, I am.

16 Q.    Okay.  Are you familiar with this?  This is Drug

17 Development and Industrial Pharmacy.  Do you see that?

18 A.    Yes.

19 Q.    Is that a respected publication?

20 A.    Yes.

21 Q.    You are familiar with it; right?

22 A.    Yes, I am familiar with that.

23 Q.    Do you use it?

24 A.    It is a source that I go to.

25 Q.    Peer reviewed; right?

Banakar - cross

1   A.      Yes.  Yes.

2   Q.      The title here is Granulation Surface Area As Basis

3   For Magnesium Stearate Concentration in Tablet Formulations,

4   by Joseph F. Bavitz and others.

5           Now I'd like you to turn to page 2482, please,

6   and underneath where it says introduction.  Are you with me?

7   A.      2482.  Yes.

8   Q.      Okay.  It says:  Magnesium stearate is widely used

9   as a lubricant in tablet formulations.  It minimizes

10  inter-particulate friction during compression and the

11  friction between the tablet and metallic surfaces during

12  ejection.  Nevertheless, there have always been concerns

13  with respect to lubricant levels, since excessive quantities

14  or extended mixing times can produce a hydrophobic matrix

15  which retards tablet disintegration and dissolution.  At the

16  other extreme is the recognition that insufficient lubricant

17  results in tableting problems.

18          Did I read that correctly?

19  A.      Yes.

20  Q.      Do you agree with that statement?

21  A.      I have not seen this article until right now.  This

22  is the first time I am seeing it.  I would need time to look

23  at this in context of '720.

24          I have already said that, yes, increasing

25  hydrophobicity or blending excessive amounts, those are the

Banakar - cross

1    ones that are the keywords which tell you that, well, it is

2    becoming, it may show some differences in dissolution.  That

3    does not mean it becomes a rate controlling matrix that is

4    expected of this '720 patent.

5    Q.    Dr. Banakar, a few questions again about the Zydus

6    product and its manufacture.  You agree that during the

7    compaction step, we take the blend, the uniform blend of

8    mesalamine, magnesium stearate, and colloidal silicon

9    dioxide, and that is compacted into a granule; isn't that

10   right?

11   A.    I know what you are saying.  With slight

12   clarification.  It is compacted into sheets, and then the

13   sheets are separated into granules.

14   Q.    Thank you.  Excuse me.  Thank you for that

15   clarification.  That was the picture you put up there that

16   showed the rollers and out comes this ribbon; right?

17   A.    Sheet or ribbon.

18   Q.    It is the same kind of ribbon that Dr. Little

19   testified about; right?

20   A.    Yeah.  I mean this is a very old, age old procedure.

21   Q.    All right.  But that ribbon, it is chopped up into

22   granules, isn't it?

23   A.    That is the function of the oscillating granulator

24   underneath it.

25   Q.    So the Zydus product does make granules; right?

Banakar - cross

1    A.      Under that term, it is a granule, yes.

2    Q.      And those granules contain mesalamine, magnesium

3    stearate, and colloidal silicon dioxide; correct?

4    A.      That is correct.

5    Q.      And they contain a lot of mesalamine, right?,

6    meaning I think you said maybe 99 percent, something like

7    that?

8    A.      Yes, the quantitative assessment showed

9    99.26 percent.

10   Q.      And I think you had a demonstrative where you were

11   looking at the Zydus product and do you recall the one that

12   had all the blue dots and the four little yellow dots or

13   whatever color they were to the right?

14   A.      Yes.

15   Q.      Do you remember that demonstrative?

16           MR. HAUG:  Can we have that demonstrative?  Do

17   you know what I am talking about?

18           Why am I asking them.  Excuse me, Your Honor.

19   BY MR. HAUG:

20   Q.      It was DDX-10.21.  Do you remember this one?

21   A.      Yes.

22   Q.      Okay.  And I think I understood your testimony to

23   be that each of those blue dots represents a milligram of

24   mesalamine; right?

25   A.      That is schematics.

Banakar - cross

1    Q.      Schematic, right.  And the yellow dots over here,

2    you have got four of them, that is magnesium stearate.  And

3    your point is that there is so little magnesium stearate,

4    0.33 percent, that it can not act as a matrix.  Is that

5    basically your view?

6    A.      It will not give me the matrix, unless I am shown

7    evidence that there is a structure that is from there.

8    Q.      And when you used the word "structure" just now, you

9    have in mind this monolith/monolithic structure; is that

10   right?

11   A.      I have in mind a matrix structure.

12   Q.      You do not have in mind an arrangement of particles

13   in a substance or body; is that right?

14   A.      Body of what?

15   Q.      All right.  Now, you calculated 0.33 percent

16   magnesium stearate.  How did you do that calculation?

17   A.      If you add that together, composition of the compact,

18   1,209, it is absolutely wrong.  It is 4 milligrams divided

19   by 1,209 milligrams times 100.

20   Q.      Okay.  So you took the amount of magnesium stearate

21   in milligrams and you divided it by the amount, the total

22   tablet weight, is that right?  Yes, right here (indicating).

23   4 divided by, is that 1,200?  That is what you did, right?

24   A.      Wait a second.  Hold on a second.

25              No.  If you look at third column, if that is

Banakar - cross

1    100 percent, then 3.27 of that compact weight by weight is

2    .23.

3              Or, as a matter of fact, if you look at what

4    they mention there, this is weight by weight of the total

5    composition in terms of this compact is .27.

6    Q.    But isn't it true what you did is you included the

7    total weight of the mesalamine in your calculation; right?

8    A.    That is the way weight by weight works.

9    Q.    All right.  So the .33 percent takes into account

10   that this formulation at this point in time probably has

11   close to whatever, well, 99.26 percent mesalamine; right?

12   A.    Schematic is showing the significance, humongous

13   difference between hydrophilic mesalamine and hydrophobic

14   excipients in that compact.

15   Q.    Isn't it true that the percentage of magnesium

16   stearate of the total excipients in this formulation is

17   44 percent?

18   A.    44.

19   Q.    Well, let's do the arithmetic.  If I take magnesium

20   stearate, it's 4 milligrams.  I have 4 milligrams and I have

21   5 milligrams of colloidal silicon dioxide.  That is a total

22   of 9.  If I divide 4 by 9, I think I get 44 percent.

23   A.    If you divide 4 by 4, you get 100 percent.  That is

24   not the way it is done.

25   Q.    I am asking whether of the total amount of

Banakar - cross

1    excipients, magnesium stearate constitutes approximately 40

2    or more percent of it?

3    A.    Number-wise, yes, but that is misleading information

4    in terms of what I calculate it as total composition as

5    opposed to just the excipients.

6    Q.    Now, when you give your opinion that there isn't

7    enough magnesium stearate there to control release or

8    prevent water penetration, you're basing that solely on

9    the amount of magnesium stearate that is there in the

10   formulation; isn't that right?

11   A.    No, it is not right.

12   Q.    Okay.  But that is one factor, right?

13   A.    Among others.

14   Q.    Okay.  We'll get to the other ones in a second.

15         So how much magnesium stearate would have to

16   be there before you think it would prevent penetration of

17   water?  Do you know?

18   A.    I don't think anybody will know and neither will I

19   because magnesium stearate here is functioning as a

20   lubricant and I cannot add 30 percent, 40 percent of and

21   just make a magnesium stearate compact.  Then it would

22   retard significantly, but that is not the point.

23   Q.    I'd like to ask a different question.  Thank you.  Am

24   I correct that -- withdrawn.

25         Let me ask you this question.  Do you know

Banakar - cross

1   whether the magnesium stearate that finds its way into

2   the granule in the compaction step, do you know if it

3   ever leaves the granules during further processing?

4   A.    No, I don't know.

5   Q.    You don't know.

6   A.    Unless I am analytical.  I do not have analytical

7   model to see that.

8   Q.    Were you here for the testimony of Mr. Kulkarni?

9   A.    Yes, I was.

10  Q.    Did you listen to it?

11  A.    Yes, I did.

12  Q.    I'd like you to go to tab 24 in your book.

13  A.    (Witness complies.)

14  Q.    Specifically, 92.

15  A.    Excuse me?

16  Q.    24.

17  A.    Yes.  Page?

18  Q.    Page 92.  Sorry.  Line 5.

19        Are you with me, Dr. Banakar?

20  A.    Yes.

21  Q.    Okay.  This is from the testimony of Mr. Kulkarni at

22  line 5.  I'll start with the question.

23        "Question:  After milling?

24        "So the colloidal silicon dioxide that was used

25  in that first compaction process doesn't find its way out of

Banakar - cross

1   those granules, to be a glidant again in this later step?

2            "Answer:  No.

3            "Question:  And is that also true of the

4   magnesium stearate that's used in the earlier compaction

5   process?

6            "Answer:  Yes."

7            Did I read that correctly?

8   A.    That is his opinion.

9   Q.    Do you have any reason to doubt the accuracy of that

10  statement by Mr. Kulkarni?

11  A.    I am not analyzing.  This is a statement.  It is a

12  question for him.

13  Q.    Now, am I correct that it is your opinion that

14  magnesium stearate does not form a lipophilic matrix because

15  it functions solely as a lubricant?  Is that your opinion?

16  A.    It functions as a lubricant, yes.

17  Q.    So let's look back at your pharmaceutical book,

18  testing book which is at tab 11.

19            Pharmaceutical Dissolution Testing, Volume 49,

20  Drugs and the Pharmaceutical Sciences.

21  A.    Yes.  Hold on one second.

22  Q.    Sure.

23  A.    Yes.

24  Q.    I'd like you to go to page 149 of your book.

25  A.    (Witness complies.)

Banakar - cross

1    Q.      Do you see the heading down toward the bottom, it

2    says Lubricants?

3    A.      Yes.

4    Q.      Second paragraph.

5    A.      Yes.

6    Q.      The effects of various lubricants on the dissolution

7    rate of salicylic acid tablets were studied by Levy and

8    Gumtow (50).  They concluded that magnesium stearate, a

9    hydrophobic lubricant, tends to retard the dissolution rate

10   of salicylic acid tablets, whereas sodium laurel sulfate

11   enhances the dissolution, due to its hydrophilic character

12   combined with surface activity, which increases the micro

13   environment pH surrounding the weak acid and increases

14   wetting and better solvent penetration into the tablets.

15   Figure 5.11 illustrates the effect of lubricants on the

16   dissolution rate of tablets.

17            Did I read that correctly?

18   A.      You did.

19   Q.      All right.  You agree with that statement; right?

20   A.      Out of context, but statement is, it shows whatever

21   the results that these two authors have reported.  So I need

22   more information to respond to you in the context of '720.

23   Otherwise, this statement is as is.

24   Q.      Let's go to Figure 5.11 on the next page, page 150 of

25   your book.

Banakar - cross

1    A.    Yes.

2    Q.    Up in the right-hand corner.  It says Banakar.

3    That's you, right?

4    A.    Yes.

5    Q.    Okay.  And looking at Figure A first, do you agree

6    with me that this is a plot of amount dissolved in

7    milligrams versus time?

8    A.    Yes.

9    Q.    And what it is comparing is magnesium stearate;

10   right?

11   A.    Yes.

12   Q.    And various different percentages; right?

13   Zero percent; right?

14   A.    Yes.

15   Q.    Versus 0.3 percent; correct?

16   A.    Yes.

17   Q.    And the curve that has got the bigger sharper slope

18   showing larger, faster dissolution, that is the one with the

19   circles here?

20   A.    Um-hmm.

21   Q.    That has zero magnesium stearate in it; right?

22   A.    Yes.

23   Q.    And that is being compared to having 0.3 percent

24   magnesium; right?

25   A.    Yes.

Banakar - cross

1   Q.     So would you agree that the dissolution is much

2   faster when you don't have magnesium stearate in the compact

3   as being one of the acid disks that are being testing here?

4   A.     Let me point out where your highlight is, just behind

5   that is salicylic acid disks.  Salicylic acid is poorly

6   soluble to begin with, and I am increasing the

7   hydrophobicity even more, so that information you take a

8   look at.  And the objective, if I can look at this graph and

9   look at, think about what these two authors are looking for,

10  it is sort, it is a surfactant which is known to increase

11  the dissolution rate.  So they are taking a poorly soluble

12  compound, not a drug, and the hydrophobic compound and a

13  hydrophilic compound, including laurel sulfate, and seeing

14  if I increase or decrease their amount, what effect will it

15  have.

16         It has no connection to '720.  But, yes, it is

17  poorly soluble drug to deliver.  This is not a formulation.

18  So we are looking at an objective to look at what happens

19  when I continue to increase the hydrophobicity of this disk.

20         So there is a lot of disparity in art, that this

21  is telling me it is controlling or not controlling.  And

22  controlling release in context of '720 is the controlled

23  release of the formulation, not just looking at whether just

24  the magnesium stearate here and there without looking into

25  the other context gives me the controlled release or not.

Banakar - cross

1              (Counsel confer.)

2              MR. HAUG:  I offer Figure 5.11.

3              MR. PETERKA:  I am going to -- in general, I

4    don't have an issue offering the image into evidence, but

5    Mr. Haug mischaracterized the portion that is highlighted.

6    And I believe misled the witness.  So I do have an objection

7    to that.

8              THE COURT:  It's not going in with the

9    highlighting, so I hear you saying you don't object.

10             MR. PETERKA:  No, I do.  I object to the way he

11   read the text that is highlighted.

12             THE COURT:  Well, you will have a chance to

13   redirect then; right?

14             MR. PETERKA:  Yes, I guess.

15             THE COURT:  If you wanted to object to the

16   question and answer before, that boat is gone.

17             MR. PETERKA:  Right.

18             THE COURT:  You have a chance to redirect.

19             MR. PETERKA:  All right.  Then no objection.

20             THE COURT:  It is admitted without objection.

21             (Figure 5.11 admitted in evidence.)

22             MR. HAUG:  Thank you.

23             May I have 5, please?

24   BY MR. HAUG:

25   Q.    If you go to Tab 5, Dr. Banakar.

Banakar - cross

1    A.      (Witness complies.)

2    Q.      Do you recognize this document?

3    A.      Let me look at it.   (Witness reviews document.)

4            Yes.

5    Q.      What is it?

6    A.      This is a Journal of Pharmacy Technology.

7    Q.      This is a peer-reviewed publication, is it not?

8    A.      Yes, it is.

9    Q.      All right.  And it has a date of May/June 1990.

10   Right?

11   A.      Yes.

12   Q.      And if we go to the next page of the publication, it

13   says issues in contemporary drug delivery?

14   A.      Yes.

15   Q.      There we are.  And you are the author, are you not?

16   A.      That is correct.

17   Q.      All right.  If we go to page 124.  Table 2.

18   A.      Yes.

19   Q.      Okay.  Table 2 says:  Some primary factors

20   influencing the rate of dissolution of dosage forms.

21           And then under where it says type, it says solid

22   dosage forms (tablets, capsules, suppository).

23           And then in the middle column under factors, if

24   we go down five entries, it says lubricants; right?

25   A.      Yes.

Banakar - cross

1    Q.     All right.  And these are primary factors influencing

2    the rate of dissolution, aren't they?

3    A.     That is what the actuality is there.

4                   MR. HAUG:  I offer Table 2.

5                   MR. PETERKA:  No objection.

6                   THE COURT:  Admitted without objection.

7                   (Table 2 admitted in evidence.)

8    BY MR. HAUG:

9    Q.     Now, Dr. Banakar, I would like to ask you some more

10   questions about claim construction and your opinions of

11   infringement.

12                  Now, the last expert report that you gave in

13   this case was before the Court's claim construction in June

14   or July of 2015.  Isn't that right?

15   A.     Possible.  Exact date, I don't know.  But, yes, you

16   are right.  It is possible.

17   Q.     So you submitted, if I can represent the claim

18   construction I believe was dated July 28th, 2015.  And your

19   report was filed or served at least six months before that;

20   right?  Does that sound about right?

21   A.     If you are representing it, yes.  Because I don't

22   know the dates.

23   Q.     Did you consider that claim construction order from

24   the Court before you gave the opinions you gave today?

25   A.     I don't know.

Banakar - cross

1    Q.      I'd like you to look at PDX-14.20.  This is now in

2    your demonstrative slides.  We have it up on the screen.  Do

3    you see that?

4    A.      Yes.

5    Q.      Now, this is a slide that we prepared; right?

6    A.      Yes.

7    Q.      Okay.  And what we tried to do here is on the left,

8    we have a claim limitation, and these are the various

9    different claim limitations in the '720 patent.  Right?

10   A.      Yes.

11   Q.      Okay.  I'll represent to you that they are hopefully

12   accurately set forth.

13           And then in the middle is the Court's claim

14   construction from the Court's claim construction order back

15   in July of 2015.  Okay?  Are you with me?

16   A.      Excuse me.  I didn't get that.

17   Q.      In the middle column, I set forth the actual claim

18   construction from the Order of the Court in its claim

19   construction ruling.

20   A.      Yes.

21   Q.      Okay.  And then on the right, I have construction

22   applied in 2014 noninfringement report.  That refers to your

23   expert report in 2014.  Okay?

24   A.      Okay.

25   Q.      And what I have highlighted in red is the differences

Banakar - cross

1    between your opinion in your expert report as to what you

2    understood the claim construction to be as compared to the

3    actual claim construction that was later issued by the

4    Court.  That is what this is about.

5    A.    Yes.

6    Q.    Okay.  That is what we did here.  So let's go to

7    inner lipophilic matrix.

8              Now the Court's claim construction is "a matrix

9    that exhibits lipophilic properties and is separate from the

10   outer hydrophilic matrix."

11             In your expert report at paragraph 28, you gave

12   this.  You said this was the claim construction that you

13   understood and that you were giving your opinion on.  And

14   you included what is in red here, you said "a matrix that

15   exhibits lipophilic properties," and what is in red or what

16   you have in your opinion was, "and that cannot have

17   hydrophilic properties."

18             That doesn't appear in the Court's claim

19   construction.  Do you see that?

20   A.    Yes.

21   Q.    If you take my representation that this is accurate;

22   okay?

23   A.    All right.

24   Q.    All right.  And similarly for an "outer hydrophilic

25   matrix," you did the same thing but the other way.  You said

Banakar - cross

1      that in your view, "the outer hydrophilic matrix cannot have

2      lipophilic properties;" right?

3      A.      Yes.

4      Q.      Okay.  Did you ever revisit your opinions from

5      paragraphs 28 and 29 based on that understanding of the

6      claim construction after the Court issued its claim

7      construction in July of 2015?

8      A.      I don't recall.  I may have --

9      Q.      Similarly --

10              MR. PETERKA:  He is still answering.

11     BY MR. HAUG:

12     Q.      Were you finished?

13     A.      No.

14     Q.      Oh, I am sorry.

15     A.      I am sorry.  Maybe my voice was soft and I was going

16     back.  I am sorry.

17              Once -- the way I understand in writing reports

18     is once the construction is ruled on, not comes down but

19     ruled on by the Court, then you are to apply that.  Everything

20     else is set aside.  So that is the construction I worked

21     with afterwards.  Whether I reviewed this, I don't know.  I

22     don't recall.

23     Q.      Dr. Banakar, are you familiar -- withdrawn.

24              Dr. Banakar, are you aware of other litigation

25     us that are ongoing involving the '720 patent?

Banakar - cross

1    A.      Very cursory, yes.

2    Q.      Very cursory?

3    A.      Yes.

4    Q.      Are you aware of a decision from the Federal Circuit

5    Court of Appeals with respect to the '720 patent?

6    A.      When you use the language Federal Court, Circuit

7    Court of Appeals, those are foreign words to me.  I don't

8    know whether a decision is ruled on or not.

9    Q.      Why don't we go to Tab 2 which is your supplemental

10   expert report.  Specifically, paragraph 22.

11          It says, paragraph 22:  It is my understanding

12   that the Federal Circuit in Shire Development, LLC v

13   Watson Pharmaceuticals Inc. reversed the District Court's

14   construction of the term "inner lipophilic matrix" as "a

15   matrix including at least one lipophilic excipient, where

16   the matrix is located within one or more substances" and

17   also reversed the District Court's construction of the term

18   "outer hydrophilic matrix" as "a matrix of at least one

19   hydrophilic excipient, where the matrix is located outside

20   the inner lipophilic matrix."

21          Did I read that correctly?

22   A.      First of all, thank you very much for showing that

23   because as I said, I don't recall.  Now you showed me that,

24   thank you very much and I stand corrected.  Yes, you read it

25   correctly.

Banakar - cross

1   Q.      Okay.  And I am not going through reading all these

2   other paragraphs, but if you look at paragraphs 23, 24, 25,

3   26, 27.

4   A.      Yes.

5   Q.      They all start with -- almost all, 25 doesn't -- "the

6   Federal Circuit."  And then you go on and you make, you give

7   an opinion about what the Federal Circuit said; isn't that

8   right?

9   A.      That is right.

10  Q.      Did you write these paragraphs?

11  A.      I may have.

12  Q.      You may have?

13  A.      Yeah.  But exact wording, I don't know.

14  Q.      Did you read any of the appeal papers that were filed

15  in the Shire v Watson case?

16  A.      I say the same thing.  I don't recall.  If you show

17  me that, yes.

18  Q.      Are you familiar with the recent court decision in

19  the Shire v Watson case concerning the '720 patent?

20  A.      As recent as?

21  Q.      Monday of this week?

22  A.      No.

23  Q.      Did you see it?

24  A.      No, no.  Definitely not.

25  Q.      Definitely not?

Banakar - cross

1    A.      That I am for sure.

2              MR. HAUG:  Now, I'd like, if I could have PTX-1

3    up again, claim 1.

4    BY MR. HAUG:

5    Q.      Now, I believe Dr. Banakar, you have given the

6    opinion that the '720 patent teaches that one must use a

7    sufficient amount of the claimed lipophilic substances to

8    create a matrix structure into which the active ingredient

9    can be dispersed.

10             Do you agree with that statement?

11   A.      I have stated it in my report, then yes.

12   Q.      Does that sound right to you?

13   A.      (Pause.)

14   Q.      Why don't we go to Tab 2, your expert report again.

15   Paragraph 85.

16   A.      (Witness complies.)

17   Q.      Are you with me?

18   A.      Yes.

19   Q.      Okay.  Paragraph 85 in your expert report:  Contrary

20   to Dr. Sinko's opinion, the '720 patent does not teach that

21   the presence of any amount of lipophilic material in a

22   composition created claimed "inner lipophilic matrix."

23   Rather, the '720 patent teaches that one must use a

24   sufficient amount of the claimed lipophilic substance does

25   create a matrix structure into which the active ingredient

Banakar - cross

1   can be dispersed.  Plaintiffs' experts have presented no

2   evidence that magnesium stearate in the compacted mesalamine

3   forms such a structure."

4               Did I read that correctly?

5   A.      That is correct.

6   Q.      Now, I'd like you to go back.  I'd like to get us

7   back to claim 1.  I have it up on the screen now.

8               Now, is there anything in claim 1 that talks

9   about or is directed to what is or isn't a sufficient amount

10  of lipophilic substances?

11  A.      No, nothing specific.  No.  Nothing explicit, no.

12  Q.      Nothing explicit.  Is there something implicit or

13  other than explicit?

14  A.      To me, as a formulator reading this claim, if I

15  wanted to see a structure, it will have certain amount that

16  I can see it.  And if that is not there, then I cannot say

17  that there is a structure and therefore there is no matrix

18  unless somebody shows me that.  So the word "sufficient" is

19  not there for structure.

20  Q.      I understand your position on structure, but there

21  is nothing in this claim about a sufficient amount of

22  lipophilic material or hydrophilic material for that matter;

23  is that correct?

24  A.      That is correct.

25  Q.      Now, you also gave an opinion -- withdrawn.

Banakar - cross

1              Do you recall earlier that you gave the opinion

2      that the '720 patent requires two separate additions of

3      mesalamine?  Is that your view?

4      A.    Yes.

5      Q.    So, in other words, it is your view, your

6      understanding of the patent that you have to have one

7      addition of mesalamine into the inner lipophilic matrix

8      and then another addition of mesalamine into the outer

9      hydrophilic matrix; is that right?

10     A.    If you read claim 1, it says that is the active

11     ingredient is dispersed in both.  So going through the claim

12     and the specifications and reading the patent, for me, the

13     understanding is you cannot have the drug in both unless you

14     add it in both.  You cannot just veer from that.  There has

15     to be some way that it is added in both, provided that both

16     the structures are first added and they are separate as in

17     the claim right now.  And then also that drug is in both

18     matrices.

19     Q.    So am I correct to understand that as a basis for

20     your giving your opinions, you understand there is a

21     requirement to add mesalamine separately into the inner

22     lipophilic matrix and the outer hydrophilic matrix?  Am I

23     correct?

24     A.    That will be a part of the way that I would

25     understand it, unless I am shown that how does the active

Banakar - cross

1    ingredient get into both of the matrices when they are

2    identified as individual lipophilic and hydrophilic matrices.

3    Q.    A few questions about melting point.  You were here

4    for Dr. O'Halloran; right?

5    A.    Yes.

6    Q.    And you actually gave some opinions based on the

7    findings by Dr. O'Halloran; is that correct?

8    A.    Yes.

9    Q.    Now, Zydus' product, which is the subject of this

10   litigation, that is not an -- the magnesium stearate in the

11   Zydus product is not in the anhydrous form.  Would you agree

12   with me?

13   A.    I don't know which form it is and I've not done any

14   analysis of that.

15   Q.    So in coming to your opinion on melting point where

16   you gave the opinion that the Zydus magnesium stearate using

17   its product does not meet the claim limitation of a melting

18   point below 90, you did that without even knowing what it

19   is, whether it's hydrate or anhydrous?  Is that what you are

20   saying?

21   A.    The opinion I give is using a standard control test,

22   such as a USP test.  According to that, the procedures were

23   followed correctly.  I'm not a melting point expert, but I

24   am a regulatory expert in terms of determining what is

25   regularly available, I mean acceptable.  So at this point

Banakar - cross

1    melting point using the -- correct.  It is a standard test

2    and that's what I opine on.  I do not opine on whether

3    it's hydrous, anhydrous, isotropic.  I've heard a lot of

4    that.

5    Q.    I think I just heard you're not a melting point

6    expert; right?

7    A.    That's correct.

8    Q.    But you still felt competent to give an opinion that

9    Zydus does not infringe because from of the melting point

10   limitation; right?

11   A.    Using a standard test such as USP, which is

12   acceptable as well as it is scientifically acceptable, on

13   that basis, looking at what was performed by Dr. O'Halloran,

14   it met that criteria and the melting point numbers were not

15   below 90.  That is the extent of my opinion.

16   Q.    All right.  A few questions about the outer

17   hydrophilic matrix.

18              Now, you've opined in this case, I believe, that

19   Zydus does not have an outer hydrophilic matrix as called

20   for in the '720 patent; is that right?

21   A.    That's correct.

22   Q.    Am I correct that had your only argument, only

23   argument in support of that opinion that Zydus does not have

24   an inner -- an outer hydrophilic matrix is because, in your

25   view, it doesn't have an inner lipophilic matrix?  Isn't

Banakar - cross

1    that the sole basis of that opinion?

2    A.    Along with my experience and the way the part is

3    manufactured, the way it is structured, the way it is put

4    together and the dissolution data, I don't see any matrix,

5    so that's why I don't see an outer hydrophilic.

6    Q.    Can you go to tab 2, your noninfringement report.  I

7    would like you to turn to page 55, please.

8              Next to where it says, Roman VI, are you with

9    me?

10   A.    Yes.

11   Q.    It says, the proposed ANDA product does not contain

12   the claimed, quote, "outer hydrophilic matrix," close quote.

13   149.

14             As explained above, it is my opinion that

15   the proposed ANDA product does not contain the claimed quote

16   "inner lipophilic matrix" close quote.

17             Because there is no inner matrix in the

18   proposed ANDA product, it necessarily follows that there is

19   no quote "outer matrix," close quote and the proposed ANDA

20   product does not infringe the quote outer "hydrophilic

21   matrix" close quote limitation of claim 1 as well.

22             Did I read that correctly?

23   A.    Yes, you did.

24   Q.    All right.  And my question is, isn't it true that

25   this is the only opinion you gave in your expert report

Banakar - cross

1    about why the Zydus product does not have an outer

2    hydrophilic matrix?

3    A.      In the words, it is my opinion.  That opinion

4    includes all the other information that I just told you, so

5    that was not recited as correct, but in your context, yes,

6    there's only one paragraph which talks about it.

7    Q.      I would like to put up -- one second.

8                MR. HAUG:  Do we have a slide?  I'm sorry.

9    PDX-9, which would be the slides for Dr. Sinko.

10               Tab 39.  Let's do it this way.  Tab 39 in your

11   book.  Okay.  Are you with me?

12   A.      No, not yet.

13   Q.      Not yet.  Sorry.

14   A.      Okay.

15               MR. PETERKA:  Is this going into evidence?  I

16   object.

17               MR. HAUG:  I have not moved it into evidence.

18               MR. PETERKA:  All right.

19               MR. GAERTNER:  May I speak, Your Honor?  I don't

20   want to have two lawyers.

21               We had an agreement with counsel at the

22   initial -- from the original part of the case when we first

23   showed up in front of Judge Jordan.

24               MR. HAUG:  It is what it says.

25               THE COURT:  Whoa, whoa, whoa.  Do not talk to

Banakar - cross

1   each other.  You've got to talk to me.

2             MR. GAERTNER:  I apologize.  I apologize.

3             MR. PETERKA:  Your Honor, I misremembered.  I

4   thought he represented to me they are Dr. Sinko's slides.

5   They are not.  We did have an agreement at the claim

6   construction hearing not to be used for any purpose in the

7   case later on, and that's on the record.

8             MR. HAUG:  May I speak --

9             THE COURT:  Sure.

10            MR. HAUG:  -- to that?

11            I don't actually remember the agreement that

12  way, but I will just simply withdraw that question.

13            THE COURT:  That's fine.  And -- good enough.

14            MR. HAUG:  May I have just --

15            THE COURT:  You still have a minute yes.

16            (Pause while counsel conferred.)

17  BY MR. HAUG:

18  Q.    I have a question about, remember that demonstrative

19  you had with all the blue dots, the four yellow dots?

20  A.    Yes.

21  Q.    All right.  And you had -- you were showing what you

22  believed to be the percentage of magnesium stearate compared

23  to mesalamine; right?  Correct?  Do you have it?

24  A.    Can you tell me where it is, please?

25  Q.    Sure.  I think it's DDX-10.21.

Banakar - cross

1    A.    Yes.

2    Q.    Okay.  Now, do you know what the molecular weight of

3    mesalamine is?

4    A.    Not offhand.

5    Q.    Do you know what the molecular weight of magnesium

6    stearate is?

7    A.    No.

8    Q.    Do you know how many carbon atoms there are in

9    magnesium stearate?

10   A.    A lot, because it has the long chain.

11   Q.    A lot more than mesalamine; right?

12   A.    Can you bring up the picture?

13   Q.    Sure.  DDX-10.21.

14   A.    Yes.  So as I referred to it numerous times in the

15   schematic, one unit milligram is one dot.  I never said it

16   was certain molecular weight or number of carbon atoms.  It

17   isn't scaled to the molecular weight.

18   Q.    Magnesium stearate is a much bigger molecule than

19   mesalamine; right?

20   A.    I don't know.

21   Q.    You don't know.  Okay.

22         MR. HAUG:  Could we go to DDX-10.26, please.

23   BY MR. HAUG:

24   Q.    Do you recall this slide?  You were talking about the

25   prosecution history of the '720 patent.

Banakar - cross

1              Do you remember that?

2    A.     Yes.

3    Q.     This slide, DDX-10.26.

4    A.     Yes, I do.

5    Q.     Okay.  And on the left, this is a picture taken from

6    the prosecution history.  And do you see where it says, drug

7    in polymer matrix, and it has got, like an arrow maybe

8    pointing to a dot?

9              Do I have that right?

10   A.     Yes.

11   Q.     So all of those dots are supposed to be drug; is that

12   right?

13   A.     That is correct.

14   Q.     Well, the mesalamine in the Zydus formulation, it

15   would never look like that, would it?

16   A.     That's exactly what I'm expecting if matrix is the

17   way it's defined by the Court.

18   Q.     And then on the right disclosure, where it says

19   disclosure, down below it says, drug in polymer matrix.

20             Are you with me?

21   A.     Yes.

22   Q.     And then underneath it says microparticle, a

23   monolithic system of approximately one to several, 100

24   micrometers in diameter; right?

25   A.     Yes.

Banakar - cross

1   Q.      Approximately one micron is very small, isn't it?

2   A.      Yes.

3   Q.      And how can this be a structure in your expert

4   opinion based on your understanding of a structure as it is

5   required by the patent?

6   A.      Microparticles, that that is a microparticle.  Okay.

7   So now if you can imagine, if I have a polymer and I take

8   the drug, blend it with that polymer, compress it, that drug

9   might be -- I might have a particle size of one micron, a

10  hundred microns, and those are distributed in that polymer

11  matrix.  And then over the next -- next slide, I show that

12  the drug leaves this out and what is left behind, that is

13  the structure.

14  Q.      And the mesalamine which is used in the patent

15  examples --

16  A.      Yes.

17  Q.      -- switching now back to the patent; right?  The '720

18  patent has how many examples?  Do you know?

19  A.      I can look at it.

20  Q.      Do you know how many without looking at it?

21  A.      Five.

22  Q.      Five.  Okay.

23          And do you know if the mesalamine in the patent

24  examples would look anything like either of the pictures

25  that are shown on your slide, DDX-10.26, which on the left

Banakar - cross

1  comes from DTX-2, and on the right from DTX-13?

2  A.     That is the burden that I -- you have to show me,

3  because this is how the patent also said the matrix would be

4  formed.

5  Q.     You say the patent says it has to be this way because

6  these, whatever these references are, they were provided to

7  the Patent Examiner during the prosecution of the patent; is

8  that right?

9  A.     That is my understanding.

10  Q.     So it was your understanding that because literature

11  references or publications were provided to the Patent

12  Office, that that means that it's a limitation, right, on

13  what the patent covers?  Is that what you are saying?

14  A.     I don't know the legal -- meaning of the word

15  "limitation," but what I am expecting is, matrix as also

16  defined by the Court has to have a structure, and that

17  structure is what I'm looking for, which is represented in

18  this, and that's exactly what the patentees did to the

19  Patent Office to get them separated out from the prior art.

20  So forget about that.  But that is exactly what they said,

21  and that is my opinion.

22              I don't know the word, legal word, an

23  understanding of the limitation and how it is to be

24  interpreted, but that's exactly what I'm expecting and I

25  don't see that here in evidence.  If you show me that, then

Banakar - redirect

1    I will take a look at it and evaluate it.

2              MR. HAUG:  Thank you.  No further questions.

3              THE COURT:  All right.  Thank you, Mr. Haug.

4              Mr. Peterka, any redirect?

5              MR. PETERKA:  Yes.  Just one thing.

6              THE COURT:  You are on the clock.

7              MR. PETERKA:  Hello again, Your Honor.

8                     REDIRECT EXAMINATION

9    BY MR. PETERKA:

10   Q.    Dr. Banakar, I just want to walk through a few things

11   that Mr. Haug just covered with you if you don't mind.

12   A.    Yes.

13   Q.    I would like to have you turn to tab 11 in your

14   binder that Mr. Haug gave you.

15             MR. PETERKA:  Does this work?

16             THE COURT:  Yes, the Elmo should work.

17             MR. PETERKA:  You know what, Your Honor.  I have

18   a slight problem.  I wrote on my copy, the part I want to

19   show the witness.  Could I perhaps borrow Dr. Banakar's

20   copies of the exhibit to put on the Elmo?  I would like to

21   show him something.

22             THE COURT:  If you would like to do that, you

23   can freely approach.

24             MR. PETERKA:  Okay.

25   BY MR. PETERKA:

Banakar - redirect

1    Q.     Mr. Haug showed you this article, or this table

2    earlier from, I think it's from your book; right?

3    A.     Yes.

4    Q.     I believe he asked you if -- on Figure 11, plot 11 in

5    the legend there under, after the word salicylic acid disks,

6    open parentheses, (A) close parentheses (E)?

7                Do you see that?

8    A.     Pardon?

9    Q.     All right.  Do you see the (A) after salicylic disk

10   in Figure 511?

11   A.     Yes.

12   Q.     It says (A).  Then there's an open circle, three

13   percent?

14   A.     Yes.

15   Q.     Then there's magnesium stearate and semicolon, closed

16   circle, no magnesium stearate?

17   A.     Yes.

18   Q.     I believe I heard Mr. Haug refer to that 0.3 percent

19   magnesium stearate.  I just want to -- is that how you view

20   that?

21   A.     No.  Both of the legends, that is three percent with

22   this and zero percent.

23   Q.     Okay.  Thank you.

24                And this is --

25                THE COURT:  Figure 5.11?

Banakar - redirect

1        MR. PETERKA:  Yes.

2        THE COURT:  It was admitted as a plaintiffs'

3   exhibit.

4        MR. PETERKA:  I don't know if it was admitted.

5        THE COURT:  Go ahead.

6        MR. PETERKA:  It was tab 11 in Dr. Banakar's

7   binder.  It was admitted as 5.11.

8   BY MR. PETERKA:

9   Q.    If you could turn to tab 23 in your binder that Mr.

10  Haug gave you, and if you could go to page 2485.  I'm sorry.

11  2482.

12  A.    Yes.

13  Q.    And Mr. Haug showed you this, this reference earlier.

14  I just want you to -- you've read in that first paragraph

15  there it starts halfway down, it starts, nevertheless, there

16  have always been?

17  A.    Yes.

18  Q.    Can you read that?

19  A.    Nevertheless, there have been -- there have always

20  been concerns with respect to lubricant level since

21  excessive quantities are standard mixing times, tablet

22  disintegration.

23  Q.    And if you turn to Table 1 in this reference, 2485,

24  do you see there's a formulation there for the mannitol

25  formulation?

Banakar - redirect

1    A.    Yes.

2    Q.    Actually, I withdraw that.

3          Is there any evidence of excessive quantities or

4    extended mixing times for a lubricant in the Zydus ANDA

5    product?

6    A.    No.

7    Q.    Can you turn to tab 15 in your binder.

8    A.    Which one?

9    Q.    The first binder, the one Mr. Haug gave you.

10   A.    Yes.

11   Q.    This is the Uchimoto reference?

12   A.    Yes.

13   Q.    If you turn to page 494, there's a Figure 1 there.

14   A.    Yes.

15   Q.    And what is the amount of, what are the amounts of

16   magnesium stearate that are used in the formulations that

17   are tested in that figure?

18   A.    From .1 to 3 percent.

19   Q.    I see.

20         Now, at .1, for Figure -- in Figure 1 under part

21   A, the top one there.

22   A.    Yes.

23   Q.    Do you see there's a concentration of 0.1 percent?

24   A.    Yes.

25   Q.    And the dissolution rate is almost instantaneous;

Banakar - redirect

1     right?

2     A.     Yes.  You do it rapidly.

3     Q.     Okay.  Now, what about at the .5 percent?  Would you

4     consider that to be immediate release?

5     A.     Yes.

6     Q.     All right.  And there's nothing on this, in this

7     figure showing a magnesium stearate content of less than

8     .5 percent; is that correct?

9     A.     That is correct.

10    Q.     And there's nothing here showing a magnesium content,

11    magnesium stearate concentration of .33 percent; is that

12    correct?

13    A.     That is correct.

14    Q.     Did Mr. Haug show you any reference that studied the

15    effect of magnesium stearate or that showed an effect on

16    dissolution from an amount of magnesium stearate that was

17    less than 0.5 percent?

18    A.     No.  There was three percent and high, pretty high.

19           MR. PETERKA:  Can I have -- I guess we've got to

20    turn this off.

21           Can I have Dr. Banakar's slide?  There was a

22    slide towards the beginning with the claim constructions on

23    it.

24    BY MR. PETERKA:

25    Q.     Just to be clear, this is DDX 10.6, Dr. Banakar.

1    A.     Yes.

2    Q.     In your slide deck.

3           This lists the claim construction from the Court

4    as you're aware; is that correct?

5    A.     Basically.

6    Q.     These are the claim constructions that you applied

7    when forming your opinions that you gave today; is that

8    correct?

9    A.     That is correct.

10          MR. PETERKA:  No further questions.

11          THE COURT:  All right.  You may step down.

12          (Witness excused.)

13          THE COURT:  Do you have any other witnesses?

14          MR. GAERTNER:  No, Your Honor.  The defense

15   rests.

16          THE COURT:  Plaintiff?  Mr. Haug, do you have

17   any witnesses in a rebuttal case?

18          MR. HAUG:  No witnesses.  Plaintiff rests.

19          THE COURT:  All right.  Both sides rest.  Any

20   applications?

21          MR. GAERTNER:  Your Honor, on behalf of the

22   defendants, we renew our motion for judgment under Federal

23   Rule of Civil Procedure 52 for the same reasons we did at

24   the close of plaintiffs' case.  I would be happy to argue

25   those for you again.  It's up to you how you would like to

1    handle it.

2                THE COURT:  No.  I remember what you said.

3                Mr. Haug, your response?

4                MR. HAUG:  I guess I would say the same.  I

5    certainly repeat everything I said, plus we've had

6    additional testimony entered into the record through

7    cross-examination of these witnesses, which I think go to

8    our proofs in the case showing where there's a lipophilic

9    matrix, the function of magnesium stearate is in that inner

10   lipophilic matrix.

11               We have additional evidence about the

12   dissolution.  We have additional evidence about the outer

13   hydrophilic matrix, its separateness.  And, of course, we

14   have a lot of evidence now in the record about melting

15   point.  And it's clearly a question of fact at this point,

16   Your Honor, and I think that to grant any motion at this

17   point would be -- we certainly pro oppose that, because I

18   think there are way too many factual questions in the

19   record.

20               THE COURT:  All right.  Thank you, Mr. Haug.

21               I will give you the last word if you want it,

22   Mr. Gaertner.

23               MR. GAERTNER:  No.  I'm fine, Your Honor.

24               THE COURT:  All right.  Well, again, I will deny

25   your motion without prejudice.  I will look forward to

1    receiving the parties' post-trial submissions.

2              Let's take a moment at this point.  Subject to

3    giving both parties an opportunity to confer with the

4    courtroom deputy to make sure that the exhibits that were

5    tendered, intended to be tendered, in fact, are noted as in

6    the record, we'll consider the record closed at this

7    juncture.

8              Mr. Haug?

9              MR. HAUG:  Yes.  Sorry.  Early on, Mr. Kulkarni,

10   when he testified, there were a couple of lines out of order

11   in the copies we gave the Court and we asked you to correct

12   that, which we did, so I will hand that up.

13             THE COURT:  That's fine.  Why don't you go ahead

14   and give the corrected copies to the deputy afterwards.  All

15   right?

16             MR. HAUG:  Very good.  Thank you.

17             THE COURT:  Well, look.  I want to say a couple

18   things real quickly.

19             First, I appreciate the very thorough,

20   professional job that both sides did here, and I hope

21   representatives from your clients, that the parties are

22   present in the courtroom to hear me compliment, you and

23   compliment both sides highly for the work that was done.

24             Somebody is going to end up unhappy.  That's

25   just the nature of the business we're in.  Right?  But it

1    won't be for lack of trying.  It won't be for lack of

2    significant and highly skilled work on the part of the

3    litigation teams.

4              So I don't say that lightly.  I compliment you

5    both.  I appreciate the professionalism with which you

6    treated the various disputes in that arose, minimized the

7    need for Court involvement, worked problems out where you

8    could, got me involved only when you had to.  You're a

9    credit to your firms and to the clients you serve.

10             And thanks for bringing it in on time so we did

11   not have to have a problem with that.

12             Let's talk logistics for just a moment.  Okay?

13   Since there is no invalidity case at this point, the burden

14   is squarely on the plaintiffs.  I will give the plaintiff an

15   opening and a reply, the defendants an answer in terms of

16   briefing.

17             Both sides can submit -- I hope I don't regret

18   my doing this, in addition to that, the argument, which I

19   expect to see in the briefing, you can cross submit proposed

20   findings of fact and conclusions of law, and cross-submit

21   replies in which you take those on.

22             Do you understand what I'm getting at?  Okay.

23   So I'm talking about two separate sets of submissions, one

24   set being the briefing, the other set being the conclusions

25   of law and proposed findings of fact in which each side has

1    an opportunity to respond to the other side.

2              I would like to have this wrapped up from your

3    end, that is in my lap, within six to seven weeks.  That's

4    given the responsibility I'm going to have to get this done

5    and done by September.  Given the responsibilities I have, I

6    figure it's not untoward for me to ask for three months, so

7    I will give you guys close to two months, because there's

8    one of me -- that's not fair to say.  I've got a great clerk

9    working with me on the case, so he he's worth at least two

10   or three of me, but it's still nothing next to how many

11   folks you've got to work on this.

12             So if that seems like a short time, I'm going to

13   be working on a short fuse, too, and I'm confident your

14   clients would like to have an answer to this an way.

15             So with those time parameters in mind, I will

16   ask the parties to get together.  You've got daily copy, so

17   you are not waiting for the transcripts.  I will ask the

18   parties to get together and discuss a reasonable schedule to

19   get this all submitted so that I can start working on it.

20   Okay?

21             MR. GAERTNER:  Yes.

22             THE COURT:  And when do you think I could expect

23   to hear from you about an agreed upon schedule?

24             MR. HAUG:  We will do it tomorrow.

25             MR. GAERTNER:  Some of us may be in transit

1    tomorrow because we have -- Monday or Tuesday, Your Honor.

2    I think a couple days.

3                THE COURT:  All right.  No later than Tuesday

4    get back to me, because I want to write "So Ordered" on a

5    piece of paper so that we all know what we're talking about.

6    Okay?

7                Yes, Mr. Gaertner?

8                MR. GAERTNER:  Page limits, Your Honor, did you

9    want us to keep in mind?

10               THE COURT:  Local rule page numbers for the

11   briefing.  All right?  And on the findings of fact and

12   conclusions of law, the answer is, no, there are no page

13   limits, but I hope you'll exercise good judgment.  All

14   right?

15               MR. GAERTNER:  Your Honor, can we ask for a few

16   more pages than the local rules?

17               THE COURT:  You would have to make your case to

18   me.  All right?  You are going to have lots of paper with

19   those findings of fact and conclusions of law, but I will

20   listen to you.

21               If you think -- you confer with each other.

22   Here's what I don't want.  I don't want to hear from you

23   that on top of giving you the opportunity to submit all the

24   findings of fact and conclusions of law that you want and a

25   response to each other on that, that you also think you need

1  an enormous amount of briefing to support it, because I

2  think you are going to be okay.  But if you want to push

3  down a little bit, you can talk to the other Zydus and talk

4  to me.  Okay?

5          MR. GAERTNER:  Thank you.

6          THE COURT:  All right.  Great job, you all.

7  Thanks very much.  We stand in recess.

8          MR. GAERTNER:  Thank you.

9          (Bench trial proceedings ended at 4:42 p.m.)

10

11      I hereby certify the foregoing is a true and accurate
   transcript from my stenographic notes in the proceeding.

12

13                          /s/ Brian P. Gaffigan
                         Official Court Reporter
14                        U.S. District Court

15

16

17

18

19

20

21

22

23

24

25